1  Whitney Z. Bernstein, SBN 304917
   wbernstein@bklwlaw.com
2  Sandra C. Lechman, SBN 288660
   slechman@bklwlaw.com
3  **BIENERT KATZMAN**
4  **LITTRELL WILLIAMS LLP**
   903 Calle Amanecer, Suite 350
5  San Clemente, California 92673
   Telephone (949) 369-3700
6  Facsimile  (949) 369-3701

7  *Attorneys for Dr. Karim Arabi*

8

9              **IN THE UNITED STATES DISTRICT COURT**

10         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

11

12 UNITED STATES OF AMERICA,          Case No. 3:22-cr-01152-BAS-1
                                      Honorable Cynthia Bashant
13         Plaintiff,
                                      **MEMORANDUM OF POINTS AND**
14 v.                                 **AUTHORITIES IN SUPPORT OF**
                                      **DR. KARIM ARABI'S MOTION TO**
15                                    **COMPEL DISCOVERY**
16 KARIM ARABI,

17         Defendant.                 Hearing Date:
                                      Hearing Time:
18                                    Department:        Courtroom 4B
19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DR. KARIM ARABI'S
MOTION TO COMPEL DISCOVERY

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND ............................................. 2

    A.    Qualcomm and Hueston Hennigan Made Multiple Attempts to
        Refer This Case to the Government for Prosecution, Using the
        Guise of Good Faith Settlement Discussions to Obtain Evidence to
        Support Prosecution in Violation of a Court-Ordered Protective
        Order and Settlement Agreements. .................................................. 3

    B.    The Government's Flawed Case Against Dr. Arabi is Undermined
        by The Information Sought in This Motion ................................... 12

    C.    Government Produced Discovery to Date Does Not Included the
        Requested Discovery. ..................................................................... 13

    D.    Rule 17 Litigation .......................................................................... 14

III.  THE COURT SHOULD COMPEL THE GOVERNMENT TO
     PRODUCE THE ITEMS OF DISCOVERY REQUESTED IN THIS
     MOTION .................................................................................................. 14

    A.    Materials Pertaining to All Communications Between Qualcomm,
        Hueston Hennigan, and the Government Seeking Prosecution of
        Dr. Arabi, et al. ............................................................................. 14

    B.    Materials Related to Bias and Improper Motivations of
        Complaining Employees, Qualcomm as an Institution, Qualcomm
        Employees at the Time of the Acquisition, and other Key
        Witnesses. ....................................................................................... 15

    C.    Materials Related to Qualcomm's Due Diligence and Internal
        Investigation of the Abreezio Acquisition. .................................... 17

    D.    Materials Related to the Government's Investigation and
        Miscellaneous Requests. ................................................................ 19

IV.   DR. ARABI IS CONSTITUTIONALLY ENTITLED TO THE
     REQUESTED DISOVERY ..................................................................... 21

    A.    The requested discovery is material to preparing Dr. Arabi's
        defense. ........................................................................................... 21

B.    The requested discovery is within the possession, custody, or control of the government because Qualcomm became a state actor during the government's investigation............................................ 23

V.    CONCLUSION.......................................................................... 25

# <u>TABLE OF AUTHORITY</u>

**Page(s)**

<u>Cases</u>

*Brady v. Maryland*,
373 U.S. 83 (1963) ........................................................................................21

*Giglio v. United States*,
405 U.S. 150 (1972) ......................................................................................21

*Hernandez-Meza*,
720 F.3d 760 (9th Cir. 2013) ........................................................................21

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982) ......................................................................................24

*Manhattan Community Access Corporation v. Hallek*,
139 S. Ct. 1921 (2019) ..................................................................................24

*Shelly v. Kraemer*,
334 U.S. 1 (1948) ..........................................................................................24

*United States v. Muniz-Jaquez*,
718 F.3d 1180 (9th Cir. 2013) ......................................................................21

*United States v. Rosenschein*,
2019 WL 2298810 (D.N.M May 30, 2019) ..................................................24

<u>Rules</u>

Fed. R. Crim. P. 16(a)(1)(E)(i) ...........................................................................21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

### I. INTRODUCTION

Dr. Arabi is accused of having an idea for a new technology, allegedly withholding that idea from Qualcomm in violation of certain employment contracts, and purportedly coordinating the development of that technology for sale back to Qualcomm. The filing of this Indictment is the result of repeated attempts by Qualcomm to refer this case to the government for prosecution. During these communications, Qualcomm coordinated with and directed the government's investigation, ensuring that critical evidence was withheld from Dr. Arabi and his co-defendants.

According to the Superseding Indictment ("Indictment"), Dr. Arabi and his co-defendants fraudulently induced Qualcomm to purchase a technology company, Abreezio, LLC ("Abreezio"), by concealing Dr. Arabi's involvement in the patenting and development of one of Abreezio's technologies. *See* Dkt. No. 9 at 4. The Indictment alleges that while Dr. Arabi's sister, Sheida Alan, was listed as the inventor of one of Abreezio's technologies – the design-for-test technology ("DFT") – on a provisional patent, in actuality Dr. Arabi was the primary inventor of the DFT technology. *Id.* at 5. Essentially, the government claims that Dr. Arabi invented valuable intellectual property that belonged to Qualcomm by virtue of his employment there, passed the idea off as Ms. Alan's, orchestrated a company to hide his role, and then helped sell the idea back to Qualcomm, all allegedly to avoid Qualcomm learning of his involvement. *See generally*, Dkt. No. 9.

The requested discovery will reveal crucial facts about who at Qualcomm knew what about the Abreezio acquisition and when, so that the defense can demonstrate that Qualcomm was never misled and the Indictment's allegations are false. Additionally, the requested discovery will demonstrate biases, motivations, and vendettas within Qualcomm that provide necessary context for evaluating the credibility of key government witnesses and presenting Dr. Arabi's defense. Given that the requested evidence is material to the

---

[1] This motion is based on government produced discovery thus far. Dr. Arabi does not waive his ability to take contrary positions in the future as he receives further discovery.

preparation of Dr. Arabi's case and ability to mount a constitutionally effective defense, he requests that the Court grant this motion.

## II.   RELEVANT FACTUAL BACKGROUND

Qualcomm is the complaining witness, the animator of the government's investigation and Indictment, and the primary source of the government's selective evidence in this case.  Five years before the government filed the first indictment in this case and over two years after conducting due diligence prior to the Abreezio acquisition, Qualcomm filed a civil suit (*Qualcomm Technologies, Inc., v. Karim Arabi, et al*., Superior Court of California, County of San Diego Case No. 37-2017-00040719-CU-FR-CTL, the "Civil Suit") against Dr. Arabi, Ms. Alan, and Sanjiv Taneja alleging fraud, unlawful business practices, breach of contract, and breach of duty of loyalty, among other claims. Qualcomm filed the Civil Suit in violation of multiple provisions in the Abreezio Unit Purchase Agreement ("UPA"), including a provision to attempt in good faith to resolve all disputes arising under the UPA informally prior to initiating any action.  Additionally, Qualcomm filed the Civil Suit a mere four days before it was scheduled to release money owed to Ms. Alan, Mr. Taneja, and others pursuant to a holdback provision in the UPA.

Throughout its pursuit of the Civil Suit, Qualcomm and the government communicated in a manner that violated a protective order issued by the civil judge. Qualcomm engaged in civil discovery – receiving documents, admissions, and interrogatory responses from Dr. Arabi and Ms. Alan – under the guise of good faith litigation and settlement discussions, and then turned around and surreptitiously produced that information to the government in violation of the civil protective order.  According to discovery, after representatives and outside counsel for Qualcomm initially met with the government on May 11, 2018, and furnished the government with "Confidential documents," "it was decided to hold off on a criminal investigation an re-evaluate the merits of a criminal prosecution if additional facts came to light during Qualcomm's civil litigation." *See Concurrently Filed Declaration of Whitney Z. Bernstein* ("Bernstein Decl.") at ¶ 25, Ex. N.  Qualcomm engaged in these tactics after the government declined to

prosecute any of the individuals without more information collected from the Civil Suit.

Before filing this motion, Dr. Arabi asked the government to produce the discovery requested herein, by letter, email, and phone conference. *Id.* at ¶¶ 5, 7, 10, Ex. A and D. The government has denied these requests. *Id.* at ¶¶ 6, 8, Ex. B and C.

A. **Qualcomm and Hueston Hennigan Made Multiple Attempts to Refer This Case to the Government for Prosecution, Using the Guise of Good Faith Settlement Discussions to Obtain Evidence to Support Prosecution in Violation of a Court-Ordered Protective Order and Settlement Agreements.**

Prior to the purchase of Abreezio, Qualcomm conducted "months" of due diligence investigation into the company and its technology. *Id.* at ¶ 21, Ex. J at 12. Qualcomm put together a team of qualified scientists to investigate the company and test the various technologies developed and owned by Abreezio. *Id.* at ¶ 21, Ex. J at 10-11. Upon completion of its due diligence, the team recommended that Qualcomm acquire Abreezio. *Id.* at ¶ 21, Ex. J at 12-13.

In acquiring Abreezio, Qualcomm purchased not only the DFT technology that Dr. Arabi is alleged to have invented, but also multiple other patents and technologies. Dr. Arabi is not accused of inventing or otherwise contributing to any of this other technology. . Moreover, the original idea for the DFT technology was not functional before significant time and resources were invested by the engineers at Canadian software development company Invionics to develop the idea from something "notional" to working technology. *Id.* at ¶¶19 & 20, Exs. H-I. The sale price of Abreezio reflected the purchase of all of these technologies and patents, not just the DFT technology, and reflected the value of the time and brainpower investment by Invionics to develop these technologies and patents. *Id.* at ¶¶19 -21.

Sometime in 2016, the exact date is not specified in discovery, a Qualcomm supervisor initiated a post-purchase investigation into the Abreezio acquisition. *Id.* at ¶ 18,

Ex. G at 2.[2]  As a result, Qualcomm conducted an internal investigation into the purchase of Abreezio ("Operation Gopher").

In his statements claiming malfeasance in the Abreezio acquisition, the Qualcomm employee who alleged malfeasance asserted that certain individuals on the due diligence team received bribes and/or kickbacks in exchange for pushing the Abreezio deal through. Bernstein Decl. at ¶ 16, Ex. E at 1.  No such evidence was ever found by Qualcomm, and in fact, despite the government's thorough investigation into the same, no allegations of kickbacks or bribes were charged because no such wrongdoing ever occurred.  On October 26, 2017, after conducting a post-purchase investigation of the Abreezio acquisition, Qualcomm filed the Civil Suit against Dr. Arabi, Ms. Alan, and Mr. Taneja.  *Id.* at ¶ 21, Ex. J.

On January 26, 2018, Mr. Taneja entered into a settlement and cooperation agreement with Qualcomm, which included a provision requiring Mr. Taneja to cooperate with Qualcomm.  *Id.* at ¶ 22, Ex. K.  Under the agreement, Mr. Taneja was required to pay more than $10 million to Qualcomm, provide documents responsive to Qualcomm's discovery demands, and Qualcomm was "entitled to interview Mr. Taneja . . . for a cumulative total of up to fifty (50) hours, exclusive of breaks."  *Id.* at ¶ 22, Ex. K at 5.

On March 7, 2018, Qualcomm, Dr. Arabi, and Ms. Alan entered into a protective order ("Civil Protective Order") requiring that all parties maintain confidentiality of all confidential or highly confidential attorneys' eyes only materials in the Civil Suit.  *Id.* at ¶ 23, Ex. L.  The Civil Protective Order stated that if either party needed to seek relief from the Civil Protective Order, that party must serve "appropriate notice to all other Parties." *Id.* at ¶ 23, Ex. L.  The Civil Protective Order also required that if any party to it received a subpoena or any other process from the government demanding production of such

---

[2] At the time that the supervisor made this report to Qualcomm investigators, he was, himself, being investigated for allegations of sexual misconduct with other employees.  *Id.* at ¶ 18, Ex. G.  In fact, the supervisor first made these allegations while being questioned by a Qualcomm investigator about the sexual misconduct claims against him.  *Id.*

materials, "the recipient of the Subpoena shall promptly give notice of the same by electronic mail transmission, followed by either express mail or overnight delivery to counsel of record for the Designating Party, and shall furnish such counsel with a copy of the Subpoena.  Upon receipt of this notice, the Designating Party may . . . move to quash or limit the Subpoena. . ."  Bernstein Decl. at ¶ 8, Ex. L at 9.  It also required a party who treated its own confidentially designated documents in a non-confidential manner to notify the other parties that the designation no longer applied.  *Id.* at ¶ 23, Ex. L at 10.  Finally, the Protective Order dictated that upon written request made within thirty (30) days after settlement or other termination of the proceeding, the parties would either return all confidential materials and highly confidential attorneys' eyes only materials and agree to appropriate methods and certification of destruction or otherwise dispose of such materials.  *Id.* at ¶ 23, Ex. L at 11.

The next day, on May 1, 2018, Brad Quinton and other parties related to Invionics ("Invionics Group") entered into a cooperation agreement with Qualcomm.  *Id.* at ¶ 24, Ex. M.  The agreement required the Invionics Group to provide requested documents for Qualcomm's prosecution of the Civil Suit against Dr. Arabi and Ms. Alan.  The agreement also entitled Qualcomm to "interview each Witness . . . for a cumulative total of no more than 48 hours, exclusive of breaks."  *Id.* at ¶ 24, Ex. M at 6.  Finally, the agreement released Qualcomm from any and all potential claims related to the sale of Abreezio by the Invionics Group, including any individual or group claim to any amounts owed or outstanding.  *Id.* at ¶ 24, Ex. M at 8-10.

Qualcomm first referred this matter for prosecution to the United States Attorneys' Office for the Southern District of California ("USAO") on May 11, 2018, two months after the Civil Protective Order was issued.  *Id.* at ¶ 25, Ex. N.  Qualcomm representatives met with two Special Agents from the FBI, and Qualcomm's counsel from Hueston Henningan LLP, including Marshall Camp, a former Assistant United States Attorney ("ASUA"), participated via telephone.  *Id.* at ¶ 25, Ex. N.  During the meeting, Qualcomm provided the government with the Civil Complaint detailing allegations for a criminal

referral.  Bernstein Decl. at ¶ 25, Ex. N.  A little over a month later, on June 28, 2018, "[Mr.] Camp furnished **confidential documents** subject to the Civil Protective Order to [SA Cook and AUSA Eric Beste] for review." *Id.* at ¶ 25, Ex. N at 1 (emphasis added). There is no indication in discovery as to which confidential documents were provided.  Dr. Arabi and Ms. Alan were not contemporaneously informed of these communications between Qualcomm and the office of the AUSA as required by the Civil Protective Order.

On July 10, 2018, AUSA Beste "spoke with" Mr. Camp and explained that the government "decided to hold off on a criminal investigation an re-evaluate the merits of a criminal prosecution if additional facts came to light during Qualcomm's civil litigation." *Id.* at ¶ 25, Ex. N at 1.  In its declination report dated July 10, 2018, the government noted that "**[c]onfidential documents received from Camp** were not retained as the matter was declined," and that "[w]riter's notes taken during the aforementioned meeting were submitted in a 1A envelope." *Id.* at ¶ 25, Ex. N at 1 (emphasis added).  None of this has been produced to the defense.  The only documentation of communications and events leading up to, during, and following the May 11, 2018, referral is a July 10 , 2018, FBI report entitled "To document Qualcomm referral and case declination."

On October 31, 2018, Dr. Arabi, Ms. Alan, and Qualcomm entered into a Term Sheet Agreement in which they "agreed to negotiate in good faith toward mutual execution of a longer-form definitive agreement to conclude their dispute and dismiss the Action." *Id.* at ¶ 12, Ex. O at 1.

On December 7, 2018, Qualcomm, Dr. Arabi, and Ms. Alan signed a settlement agreement ("Settlement Agreement"). *Id.* at ¶ 26, Ex. O.  The Settlement Agreement included a schedule of payments to be made by Ms. Alan to Qualcomm reflecting a partial return of her proceeds from the sale. *Id.* at ¶ 26, Ex. O at 2.  It also contained a release of liability section stating that upon receipt of the total payment required from Ms. Alan, Qualcomm would release Ms. Alan and Dr. Arabi from any claims arising out of the same facts as the Civil Suit. *Id.* at ¶ 26, Ex. O at 3-4, 6.  Under the "No Other Claims" provision of the Settlement Agreement, Qualcomm agreed to "never induce, encourage, assist with

and/or abet others to sue or bring a proceeding of any nature against [Dr. Arabi and/or Ms. Alan] concerning any of the claims or causes of action released in this Agreement." Bernstein Decl. at ¶ 26, Ex. O at 6.  While the release of liability section was triggered upon Qualcomm receiving final payment, the No Other Claims provision was in effect from the Effective Date of the Agreement (December 6, 2018).  *Id.* at ¶ 26, Ex. O at 2, 9.

While Dr. Arabi and Ms. Alan engaged in negotiations with Qualcomm, the other parties to the Civil Suit continued their own negotiations.  On January 31, 2020, Behrooz Abdi, Akbar Shokouhi, TechVC represented by Eric Tobias, and Business Strategic Advisors, LLC, non-parties to the Civil Suit, entered into a joint settlement and release of claims agreement with Qualcomm.  *Id.* at ¶ 27, Ex. P.

On February 4, 2020, Ms. Alan and Dr. Arabi signed an addendum to the Settlement Agreement ("Addendum").  *Id.* at ¶ 28, Ex. Q.  The Addendum, inter alia, maintained and incorporated the release of claims and the "No Other Claims" provisions enumerated in the original Settlement Agreement but revised the schedule for payments to be made under the Settlement Agreement.  *Id.* at ¶ 28, Ex. Q.

On April 28, 2020, after Ms. Alan made a further settlement payment of $20.5 million to Qualcomm on February 10, 2020, under the revised payment schedule in the Addendum, Mr. Camp, on behalf of Qualcomm, without notice to Dr. Arabi or Ms. Alan, sent a formal criminal referral letter ("Referral Letter") to the USAO.  *Id.* at ¶ 29, Ex. R.  This Referral Letter included suggestions of criminal statutes that could apply to Dr. Arabi, Ms. Alan, and others, offered analysis as to why venue exists in the Southern District of California, and provided analysis of the applicable statute of limitations periods and how to work around those.  *Id.* at ¶ 29, Ex. R at 3.  In the Referral Letter, Mr. Camp disclosed that there were confidential documents and information that he recommended the government subpoena from Qualcomm.  *Id.* at ¶ 29, Ex. R at 3-4.  Mr. Camp also opined that the earliest expiration of the statutes of limitations would be on October 31, 2020.  *Id.* at ¶ 29, Ex. R at 3.  He never mentioned the recently signed Settlement Agreement or Addendum, the fact that the No Other Claims provision was in effect, or the payments already made to

Qualcomm by Ms. Alan under the Settlement Agreement and Addendum.  Bernstein Decl. at ¶ 29, Ex. R.  Mr. Camp also did not mention that Ms. Alan's final payment to Qualcomm was due by June 30, 2020.  *Id.* at ¶ 29, Ex. R.

Discovery produced thus far does not indicate whether further communications occurred amongst Qualcomm, its counsel, and the government between the government's July 10, 2018, declination and Mr. Camp's April 28, 2020, Referral Letter.

On May 7, 2020, outside counsel for Qualcomm made a 54-page PowerPoint presentation ("PPT") to the government once again requesting prosecution of Dr. Arabi and others allegedly involved with the sale of Abreezio.  *Id.* at ¶ 30, Ex. S.  The PPT presentation included visual copies of portions of documents marked as "Confidential" and protected by the Civil Protective Order.  *Id.*  It also included various responses that Dr. Arabi and Ms. Alan provided to interrogatories in the civil suit, which were also protected by the Civil Protective Order.  Qualcomm did not notify Dr. Arabi or Ms. Alan of its intent to share these materials as required by the Civil Protective Order.  Six days after this PPT presentation, on May 13, 2020, the FBI opened a criminal investigation.  *Id.* at ¶ 31, Ex. T.

The government coordinated with Qualcomm about the wording and substance of its forthcoming grand jury subpoena before issuing it.  The government did not treat Qualcomm like a typical witness, instead catering to Qualcomm's preferences.[3]  For example, rather than request a privilege log and/or institute a filter team, as is standard in cases of this complexity and magnitude, the government simply allowed Qualcomm to make unilateral decisions about what to produce.  First, on May 13, 2020, the night before the government issued a grand jury subpoena to Qualcomm, AUSA Phillip Halpern emailed Mr. Camp confirming the "as discussed" issuance of a grand jury subpoena to allow Qualcomm to circumvent the Civil Protective Order.  *Id.* at ¶ 32, Ex. U at 48.  In that email,

---

[3] This partiality and misplaced sense of loyalty has continued. In a hearing on October 3, 2022, the government referred to Qualcomm as its "clients," saying, "I'll just say from my **client's** perspective, this investigation was managed to be as covert as possible until the arrest warrants were executed." 10-3-2022 Hearing Transcript at 4:12-14 (emphasis added).

the government noted that it would call Mr. Camp on May 14, 2020, in the afternoon, to further discuss the subpoena and "the best method for responding to the subpoena." *Id.*

On May 14, 2020, the government issued Qualcomm a grand jury subpoena. Bernstein Decl. at ¶ 32, Ex. U at 40. Sometime that same day, the government and Mr. Camp had a phone call to discuss the subpoena. *Id.* at ¶ 32, Ex. U at 40. Early in the morning on May 15, 2020, the government sent an email to Qualcomm following up on this phone call. This email referred to a "new subpoena" and reconfirmed promised protections for this "new" subpoena. *Id.* The government has only produced one version of this subpoena in discovery, despite defense requests for all correspondence, subpoenas, and informal requests, thereby preventing Dr. Arabi from knowing whether material and likely exculpatory information has in fact been sought. *Id.*

On May 19, 2020, Qualcomm filed an ex parte application in the Civil Suit seeking relief from the restrictions in the Civil Protective Order and requesting permission to disclose protected materials in order to substantively respond to and comply with the grand jury subpoena. *Id.* at ¶ 32, Ex. U at 3-50. In the filed materials, the court was not told of the extensive coordination, as described above, between Qualcomm, its external counsel, and the AUSA in arranging the subpoena for Qualcomm, instead leaving the impression that it came out of the blue. *Id.* The materials also did not disclose that Qualcomm had already provided the AUSA with confidential documents protected under the Civil Protective Order, prior to seeking any relief from the Civil Protective Order from the court. *Id.* The court granted the ex parte application the next day. *Id.* at ¶ 33, Ex. V. Dr. Arabi and Ms. Alan's counsel, Iian Jablon at Irell & Manella LLP, never received contemporaneous notice of the grand jury subpoena or this ex parte application as required by the Protective Order. *Id* at ¶ 33.

March 31, 2021, Ms. Alan made her final settlement payment to Qualcomm. In total, Ms. Alan paid Qualcomm $47,274,178.19, in complete satisfaction of the terms of the Agreement and Addendum.

Throughout this time period, Qualcomm ensured that Dr. Arabi and Ms. Alan were held to the strict terms of the Settlement Agreement and Addendum, while Qualcomm was secretly urging the government to initiate criminal proceedings regarding the very same subject matter as the Civil Claim, in violation of the Settlement Agreement, and disclosing confidential discovery documents to the USAO in breach of the Civil Protective Order.[4]

On the same day that Ms. Alan made the final payment (March 31, 2021), civil counsel for Dr. Arabi and Ms. Alan contacted Mr. Camp by email to confirm that Qualcomm received the payment and that Qualcomm was "in agreement that all of the settlement payments owed" by Dr. Arabi and Ms. Alan were made. Bernstein Decl. at ¶ 34, Ex. W at 4. Between March 31 and June 4, 2021, civil counsel for Dr. Arabi and Ms. Alan contacted Mr. Camp by email three times to "confirm that Qualcomm agrees that it has been paid the full amount called for the by the settlement agreement and that the matter is now fully resolved, subject to the parties' ongoing obligations under the Protective Order and the settlement agreement." *Id.* at ¶ 34, Ex. W at 3. Mr. Camp finally responded by email on June 15, 2021, confirming that "the payments required by the settlement agreement have been made and that the other terms remain in effect to the extent provided under the agreement." *Id.* at ¶ 34, Ex. W at 2.

The next day, Mr. Jablon responded "[n]ow that the matter is fully resolved [Dr. Arabi and Ms. Alan] request pursuant to Paragraph 22 of the Stipulated Protective Order . . . that Qualcomm and [Hueston Hennigan] return or destroy all Confidential Materials and Highly Confidential Attorney's Eyes Only Materials produced by my clients in connection with the [Civil Suit] within the next 30 days." *Id.* at ¶ 34, Ex. W at 2.

---

[4] Qualcomm and its representatives demonstrated no intention of ever abiding by the orders and agreements in the Civil Suit, but when Dr. Arabi, through counsel, recently contacted Mr. Camp regarding any Directors and Officers Insurance policies or other policies that may cover Dr. Arabi's criminal defense, Mr. Camp leveraged the Settlement Agreement against Dr. Arabi to deny the request. Mr. Camp responded that Dr. Arabi's request for indemnification was "foreclosed by the settlement agreement he entered into with Qualcomm [in which] Dr. Arabi released Qualcomm from "any and all claims, . . . demands, . . . costs, and liabilities of any kind whatsoever, . . . known and unknown, . . . that arise from or relate to the allegations. . . ." *See* Bernstein Decl. at ¶ 39.

Mr. Camp did not respond for three weeks.  When he did respond, on July 7, 2021, Mr. Camp claimed that the request pursuant to Paragraph 22 of the Protective Order was not timely and carefully stated that Qualcomm and Hueston Hennigan were "willing to have our vendor remove documents from our database that were produced by [Dr.] Arabi and Ms. Alan and labeled Confidential or Highly Confidential. . ." and agreed "not to export confidential- designated materials from those archives absent an appropriate court order." *Id.*  In his reply, Mr. Jablon explained why Qualcomm's assertion that the request was untimely was without merit.  Bernstein Decl. at ¶ 34, Ex. W at 1.

It was not until Dr. Arabi was criminally charged and received discovery in the criminal case that Dr. Arabi had any indication that, during the civil proceedings, Qualcomm had been cooperating with the AUSA and encouraging that charges be brought.

On July 24, 2023, Dr. Arabi requested that the government produce all raw returns for all email accounts seized.  *Id.* at ¶ 9.  The government initially responded that it "did not agree that production of the complete raw returns from accounts not associated with [Dr. Arabi] is required or appropriate." *Id.*  On August 1, 2023, Dr. Arabi sent the government a discovery demand letter explaining that the government "maintains that Dr. Arabi was the true owner and user of various accounts. By the government's theory, under the government's position, we request the raw returns of any and all accounts the government contends were used by Dr. Arabi."  *Id.* at ¶ 10, Ex. D at 1.  In a response letter dated August 8, 2023, the government responded that one of its "main concerns is producing potentially privileged materials to non-privilege holders.  Because the accounts allegedly used by Dr. Arabi were not necessary *solely* used by Dr. Arabi, [the government's] concern persists." *Id.* at ¶ 10, Ex. D at 5.  Therefore, the government proposed asking Ms. Alan's counsel to confirm that she has no privilege concerns with respect to any such accounts.  *Id.* at ¶ 10.  On August 24, 2023, the government informed Dr. Arabi that Ms. Alan's counsel could not confirm whether the relevant email accounts contained anything privileged, and so the government would not produce the requested discovery.  *Id.*

On August 10, 2023, Mr. Taneja pled guilty to Count 7 of the Indictment, with an agreement that the government will dismiss all remaining charges against him at sentencing. Dkt. No. 144 at 1-2. The factual basis of the plea agreement includes references to alleged communications between Dr. Arabi and Mr. Taneja. *Id*. at 3-4.

## B.    The Government's Flawed Case Against Dr. Arabi is Undermined by The Information Sought in This Motion

The government's theory of prosecution is flawed on many counts and the requested discovery is necessary and material to highlight and attack these flaws and for Dr. Arabi to present a constitutionally effective defense.

For example, the Indictment assumes that the employment agreements between Dr. Arabi and Qualcomm were enforceable and valid, and also that, assuming all allegations were true, they applied to this alleged circumstance. Without these agreements, Dr. Arabi cannot have committed any fraud against Qualcomm. In this motion, Dr. Arabi requests copies of Qualcomm's current standard employment and inventorship agreements to determine whether Qualcomm amended these agreements after the Abreezio acquisition.

The Indictment also assumes that because one email account was created using a San Diego-based IP address, that email account must have been created by Dr. Arabi for the purpose of impersonating Ms. Alan. The Indictment does not identify the IP address. The specific IP address is requested herein as it is material to Dr. Arabi's defense against any overt acts alleging that he impersonated Ms. Alan by email.

The Indictment assumes that because Ms. Alan may have turned to her big brother for advice, that Dr. Arabi necessarily conceptualized the idea listed in the provisional patent. In the same vein, the Indictment erroneously assumes that because Dr. Arabi allegedly coordinated support and structure for the development of the DFT technology, he must have conceived of the original idea for and created it. The requested discovery is material to Dr. Arabi's defense that he did not invent any of Abreezio's technology, and therefore these assumptions and foundational allegations are completely false.

The Indictment assumes that because Dr. Arabi worked at Qualcomm and because

Qualcomm eventually purchased Abreezio, that Abreezio aimed to sell the technology to Qualcomm specifically, rather than to any number of large technology companies that expressed interest. The requested discovery will show that those marketing Abreezio for sale strategized pitches to multiple technology companies, not just Qualcomm, and therefore that no one, particularly not Dr. Arabi, targeted Qualcomm to purchase Abreezio.

Dr. Arabi needs the requested discovery to competently attack the government's flawed Indictment and theory of prosecution. The government cannot hamstring his defense by filing its Indictment and then coordinating with Qualcomm, the complaining witness and custodian of the majority of the relevant evidence, to limit or otherwise impair the information produced to the defense. The Court should compel the government to produce this material discovery.

### C.   Government Produced Discovery to Date Does Not Included the Requested Discovery.

At the June 12, 2023, status hearing, the government stated that its investigation and discovery production are ongoing. 6-12-2013 Hearing Transcript at 7:22-25. The Court expressed concern that the government may file a new Indictment with new charges and/or new defendants based on its ongoing investigation, which would then severely undermine any preparation done by the defense in the past year and cause indefinite delays in adjudicating the case. *Id*. at 8:15-21. The government explained that timing of this case was uncertain in any event given Ms. Alan's pending extradition, but the Court responded that it would not "wait forever" for that to happen. *Id* . at 8:24-9:6.

In addition to discussing these timing issues, the defense described categories of discovery that were outstanding, including the categories requested here, and the government's reasons for refusing to provide them. *Id.* at 4:12-5:3. The defense explained that without some of the requested discovery, such as the subpoenas underlying Qualcomm's discovery productions and a privilege log showing what Qualcomm refused to produce to the government on the basis of privilege, the defense could not properly assess what documents were missing. *Id.*

So far, the government has produced more than 1.5 million pages and approximately 39 recordings, some of which are multiple hours long.  On August 8, 2023, the government produced an additional 1.37 gigabytes of discovery composed of approximately 3,500 pages as well as a DVD containing the results of the forensic examinations of Dr. Arabi's digital devices, which were seized from his home on August 9, 2022.

### D.    Rule 17 Litigation

As foreshadowed at the June 12, 2023 Status Hearing, Dr. Arabi obtained and served a Rule 17(c) subpoena to Qualcomm.  The subpoena sought much of the same discovery as requested below.  However, rather than produced the subpoenaed documents, on August 22, 2023, Qualcomm moved to quash the subpoena, arguing, inter alia, that it seeks irrelevant and inadmissible materials from Qualcomm as a non-party, is unduly burdensome and oppressive, seeks materials are otherwise procurable, lacks specificity, and that requested materials are protected.  Dr. Arabi's response to this motion is due next Friday.

Dr. Arabi will explain why Qualcomm's arguments fail in his response to its motion to quash.  Litigating Qualcomm's motion to quash will likely take several weeks between pleadings and a hearing.  During these weeks of delay, Dr. Arabi cannot begin any of the investigation, motions practice, or trial preparation that he anticipates conducting on the basis of this discovery.  Dr. Arabi understands the Court's concerns about the parties not delaying discovery disputes, as discussed at the last hearing.  Dr. Arabi is entitled to this critical evidence and must receive it from Qualcomm or the government, and thus brings the instant motion in an effort not to delay this case.

## III.    THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE THE ITEMS OF DISCOVERY REQUESTED IN THIS MOTION

Accordingly, in order to mount constitutionally effective defense, Dr. Arabi requests that this Court order the production of:

### A.    Materials Pertaining to All Communications Between Qualcomm, Hueston Hennigan, and the Government Seeking Prosecution of Dr. Arabi, et al.

1.    All materials, notes, recordings, transcripts, and other documentation of the

May 11, 2018, meeting between the government, Qualcomm, and Hueston Hennigan, outside counsel for Qualcomm, requesting that the government prosecute Dr. Arabi, et. al.

2.      Identification of materials, notes, recordings, transcripts, and other documentation provided to the government by Qualcomm and/or by outside counsel Hueston Hennigan, on or about June 28, 2018.

3.      All materials, notes, recordings, transcripts, and other documentation of the June 28, 2018, government review of confidential documents furnished by Hueston Hennigan, outside counsel for Qualcomm, as part of the request that the government prosecute Dr. Arabi, et. al.

4.      All materials, notes, recordings, transcripts, and other documentation of the July 10, 2018, and May 7, 2020, presentations to the government by Hueston Hennigan, outside counsel for Qualcomm, requesting that the government prosecute Dr. Arabi, et. al.

**B.      Materials Related to Bias and Improper Motivations of Complaining Employees, Qualcomm as an Institution, Qualcomm Employees at the Time of the Acquisition, and other Key Witnesses.**

5.      All materials or information related to any internal incentive program that Qualcomm has to reward internal complaints from Jan. 1, 2013, through Dec. 31, 2020.

6.      All communications from Oct. 30, 2015, through Dec. 31, 2020, between Kevork Kechichian, former Qualcomm Vice President and Senior Vice President, Engineering, and Qualcomm's internal investigation and referral teams.

7.      All communications from Oct. 30, 2015, through Dec. 31, 2020, between James Thompson, Chief Technology Officer, and Qualcomm's internal investigation and referral teams.

8.      All Qualcomm personnel files for all individuals (listed below) who were involved with Qualcomm's due diligence investigation into the Abreezio acquisition, the origination of the Abreezio deal within Qualcomm, and/or who had a relationship with Dr. Arabi while he worked at Qualcomm.  Government produced discovery makes it clear that no witness in this case is without serious bias.  The personnel files of the individuals requested are necessary to root out that bias.  For example, multiple individuals listed below

expressed deep hatred and prejudice against persons of Middle Eastern descent or were the victims of these racist and discriminatory statements and practices. Additionally, many of the individuals who initiated or participated in Qualcomm's internal investigation, and later the government's, were at professional odds with Dr. Arabi, competing for the same promotions and advances at Qualcomm. The personnel files requested include, but are not limited to the personnel files for the following individuals from January 1, 2007, through December 31, 2020:

a.    Behrooz Abdi

b.    Karim Arabi

c.    Mohammad Allam

d.    Abbas Banaiyanmofrad

e.    Bipin Duggal

f.    Saad Elhosni

g.    Joseph Fang

h.    Brian Gilbert

i.    Matt Grob

j.    Andrew Hughes

k.    Marinko Karanovic

l.    Alex Katouzian

m.    Kevork Kechichian

n.    Rakesh Kinger

o.    Michael Lee

p.    Farsheed Mahmoudi

q.    Benny Malik

r.    Ziad Mansour

s.    Trent McClements

t.    Duaine Nelles

u.    Rajesh Pankaj

v.   Srinivas Patil

w.   Brad Quinton

x.   Stewart Roberts

y.   Massood Sammak

z.   Santanu Sarma

aa.   Anthony Schmidt

bb.   Akbar Shokouhi

cc.   Michael Smith

dd.   Hiten Somwal

ee.   Michelle Sterling

ff.   Jim Thompson

gg.   Ensin Terzioglu

hh.   Katie Wilson

ii.   Pranjal Srivastava

9.   All versions and copies of Qualcomm's standard invention and/or intellectual property agreements signed by full time employees, starting from 2010 to the present.

10.   All documents, communications, documents, tips, reports, complaints, or other materials related to Dr. Arabi's relationship with Ms. Alan prior to the acquisition of Abreezio.

**C.   Materials Related to Qualcomm's Due Diligence and Internal Investigation of the Abreezio Acquisition.**

11.   All materials documenting or indicating that any Abreezio technology originated at Qualcomm.

12.   The returns from a forensic imaging of Dr. Arabi's Qualcomm computer, including, but not limited to, any material showing ties or traces to any Abreezio intellectual property.

13.   A list of the 34 people that Qualcomm told the government it interviewed as a part of their investigation.   All materials, notes, recordings, transcripts, and other

17

documentation of those interviews.  *See* Bernstein Decl. at ¶ 30, Ex. S at 36.

14.   All materials, notes, recordings, transcripts, and other documentation of Qualcomm's investigation, often referred to as "Project Gopher."  *See id.* at ¶ 19.

15.   All materials, notes, recordings, transcripts, and other documentation of Qualcomm's interviews with Sanjiv Taneja during its investigation and/or pursuant to the Settlement Agreement entered into between Qualcomm and Mr. Taneja on January 26, 2018, including any documents produced.  *See id.* at ¶ 19.

16.   All materials, notes, recordings, transcripts, and other documentation of Qualcomm's interview with Joseph Fang on May 18, 2017, in particular his denial of Mr. Taneja's statement about Mr. Fang's knowledge that Dr. Arabi and Ms. Alan are siblings.  *See* Bernstein Decl. at ¶ 15.

17.   All materials, notes, recordings, transcripts, and other documentation of Qualcomm's interviews from 2018 to the present with Brad Quinton, Trent McClements, Andrew Hughes, Michael Lee, Scott Chin, Michael Smith, Shawna Quinton, James Derbyshire, Picta Media Inc. or its representatives, Douglas Konkin, and Invionics Inc. or its representatives (together, the "Invionics Group") during Qualcomm's investigation and/or pursuant to the cooperation agreement entered into between Qualcomm and the Invionics Groups on May 1, 2018, including any documents produced.  *See id.* at ¶ 19.

18.   All materials from Jan. 1, 2007, through Dec. 31, 2020, documenting or related to Qualcomm's guidelines, policies, and procedures for conducting due diligence for a potential acquisition.

19.   All materials from Jan. 1, 2015, through Oct. 30, 2015, documenting Qualcomm's communications to Abreezio regarding its guidelines, policies, and procedures for conducting due diligence for a potential startup.

20.   All materials, notes, recordings, transcripts, and other documentation from Oct. 30, 2015, through the present, of any continued investigation by Qualcomm after the Settlement Agreement entered into by Qualcomm, Ms. Alan, and Dr. Arabi, including any notes, communications, and other documentation regarding the motivation of the continued

investigation post-settlement.

21.    All information from Oct. 30, 2015, through Dec. 31, 2018, regarding any tips, reports, or other notifications received by Qualcomm through its tipline(s) and/or hotline(s) relating to Dr. Arabi, Abreezio, the Abreezio acquisition, the Abreezio due diligence, any other defendants, or any other individuals who worked on or had relation to the Abreezio acquisition. According to discovery, "Abreezio was originally reported through Qualcomm's tip-line." *Id.* at ¶ 17, Ex. F at 3.  This request includes all information related to that report – documents, notes, transcripts, and any other materials related to that report. Discovery specifically mentions the Business Conduct Hotline. This request encompasses that hotline as well as any other tip-lines that Qualcomm operates and/or promotes to employees or agents of Qualcomm.

22.    All materials from Jan. 1, 2015, through the present documenting what assets Qualcomm acquired in its purchase of Abreezio, including, but not limited to, all Qualcomm communications with the United States Patent and Trademark Office (USPTO) regarding any Abreezio filings from the initiation of due diligence until the present, a list of all Abreezio intellectual property filings that were not pursued by Qualcomm with USPTO and were abandoned, and a list of Abreezio intellectual property filings that were not integrated in to Qualcomm's products.

**D.    Materials Related to the Government's Investigation and Miscellaneous Requests.**

23.    All grand jury materials, including grand jury subpoenas, returns on grand jury subpoenas, earlier drafts of grand jury subpoenas, and transcripts of testimony.

24.     The name of and information regarding Qualcomm's discovery repository and platform that is shared with the government for use in investigating this case.

25.    All communications from Oct. 30, 2015, through the present between the government and Qualcomm related to this investigation, Qualcomm's internal investigation, and this prosecution.  Because the timing of the government and Qualcomm's communications relative to the civil suit is relevant to Dr. Arabi's defense, this request also

encompasses emails regarding the scheduling of meetings, which the parties previously discussed and the government previously declined to provide as immaterial.

26.    The specific identification of any IP addresses referred to in the Indictment.

27.    All audio and video recordings and FBI 302 reports of all interviews conducted by the government related to this investigation.

28.    All video recordings of Dr. Arabi's arrest and the search and seizure of his home on Aug. 9, 2022.

29.    All information related to Srinivas Patil, the Qualcomm employee who evaluated the Abreezio technology during its due diligence review and assisted with the technology's implementation, including but not limited to his evaluations, any meetings with Qualcomm or government investigators, and all notes, recordings, reports, or other materials from those meetings.  Bernstein Decl.. at ¶ 35, Ex. F at 3.

30.    All information related to Mr. Taneja's negotiated plea deal and cooperation agreement under various authority, including but not limited to Rule 16, *Giglio*, *Roviaro*, and *Brady*.   Dr. Arabi is in receipt of Mr. Taneja's plea agreement and cooperation addendum, but has not yet received discovery related to any other argreements, formal or informal, between the government and Mr. Taneja, or any materials related to any information provided by Mr. Taneja to the government pursuant to these agreements.

31.    All non-privileged information regarding Qualcomm's violations of the anti-bribery, internal controls, and books-and-records provisions of the Securities and Exchange Act of 1934 as found by the SEC Commission in *In the Matter of Qualcomm Incorporated*, Release      No.      77261      (March      1,      2016)      *available      at* https://www.sec.gov/files/litigation/admin/2016/34-77261.pdf.

32.    All non-privileged information regarding Qualcomm's false or misleading statements or filings to any government entity or any other foreign entity, as well as information related to Qualcomm's performance during its Court-ordered FTC monitoring as alleged and found in *Federal Trade Commission v. Qualcomm Incorporated*, 17-CV-00220-LHK (NDCA 2017).

33.    All raw returns for all email accounts that the government alleges or believes were used by Dr. Arabi to facilitate the alleged offenses including, but not limited to, the following email accounts: (1) sheida@abreezio.com; (2) sheida.arabi1@gmail.com; (3) sheida.alan@gmail.com; and (4) sheidaalan@abreezio.com.

## IV.    DR. ARABI IS CONSTITUTIONALLY ENTITLED TO THE REQUESTED DISOVERY

### A.    The requested discovery is material to preparing Dr. Arabi's defense.

Rule 16(a) of the Federal Rules of Criminal Procedure requires the Government to make available, upon a defendant's request, documents and other materials "within the government's possession, custody, or control" that are either "material to preparing the defense," or that the government intends to use in its case-in-chief at trial.  Fed. R. Crim. P. 16(a)(1)(E)(i).

To obtain discovery under Rule 16, all that is required is that the defendant make a threshold showing of materiality.  *Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013). Materiality is a "low threshold" satisfied by a presentation of facts which tends to show that the Government is in possession of information helpful to the defense.  *Id.*; *see also United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013) ("Even inculpatory evidence may be relevant. A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy.")

The government has a duty to disclose exculpatory and impeaching evidence.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); United States Attorneys' Manual ("USAM") § 9-5.001(B) ("Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to a fair trial.").  In *Brady*, the Supreme Court ruled that evidence favorable to the accused must be turned over by the prosecutor, even if it is not subject to discovery under Rule 16(a). *Brady*, 373 U.S. at 87.

The government must produce the requested discovery under Rule 16 and *Brady* because it is both material to the preparation of the defense and is likely to lead to the

discovery of exculpatory information.  The requested discovery is vital to the defense as it will reveal information directly applicable to many of Dr. Arabi's potential defense themes contesting the government's theories about the Abreezio technology, Dr. Arabi's involvement in the marketing and development of Abreezio, the motivation and biases of key government witnesses, and institutional biases and bad behavior by Qualcomm itself.

The government-produced discovery demonstrates that Qualcomm's due diligence and post-purchase investigations uncovered evidence that is material to Dr. Arabi's pre-trial litigation and defense.  But the discovery lacks critical materials including notes, recordings, transcripts, and other documentation related to the thirty-four (34) Qualcomm employee witnesses interviewed as a part of Qualcomm's post-purchase investigation, their personnel files, and dozens of hours of interviews Qualcomm conducted of Dr. Arabi's co-defendants and others pursuant to cooperation agreements negotiated in the Civil Suit.  *See* Bernstein Decl. at ¶ 30, Ex. S at 36.  This is the relevant discovery requested directly of Qualcomm that Qualcomm has opposed.  This is the critical discovery that Dr. Arabi needs to mount a constitutionally effective investigation into witnesses and defenses and present a constitutionally effective defense of the government's indictment.

Many of the individuals who initiated or participated in Qualcomm's internal post-purchase investigation, and later the government's criminal investigation, were at professional odds with Dr. Arabi.  For example, in reviewing the government's discovery, Dr. Arabi learned that the Qualcomm employee who alleged malfeasance was motivated by anger at his own professional setbacks.  *Id.* at ¶ 18, Ex. G; *see also id*. at ¶ ¶ 36-37, Exs. X & Y.  Some of the Abreezio technology acquired by Qualcomm was in direct competition with technology that he was developing within Qualcomm.  *Id*.  Further, he did not like that his project was sidelined in favor of the Abreezio technology.  *Id*.  This information is critical to develop defense themes of bias and lack of credibility, among others.

Further, the discovery related to Qualcomm's due diligence and post-purchase investigation into the Abreezio acquisition is incomplete.  The discovery does not include any materials whatsoever (notes, transcripts, reports, recordings) of many of Qualcomm's

interviews. Where it does include partial materials, it clearly omits other materials that would be helpful to the defense.  On example is the complete absence in the discovery produced so far, of any materials related to any interviews of Pranjal Srivasta, the Qualcomm employee who, prior to the acquisition of Abreezio, conducted projected capabilities for the Abreezio technology versus a similar technology already being developed at Qualcomm under the supervision of the employee who claimed malfeasance in the Abreezio deal.  Bernstein Decl. at ¶ Y.

As another example, the discovery produced so far includes some materials related to Qualcomm's interactions with and interviews of the scientists who developed Abreezio's technology (the "Invionics Group") but does not include materials for most of those communications and interviews.  Specifically, discovery does not include materials resulting from the May 1, 2018, cooperation between Qualcomm and the Invionics Group, including materials resulting from the May 1, 2018, cooperation agreement between Qualcomm and these parties.  *Id.* at ¶ 24, Ex. M.  And while discovery does include the cooperation agreement between Mr. Taneja and Qualcomm, it does not include any of the resulting materials (notes, transcripts, reports, recordings), including any documentation of his required 50 hours of interviews, including what was said, when the interviews occurred, or for how long they occurred. *Id.* at ¶ 22, Ex. K.

Because the requested discovery meets the "low threshold" of materiality, this Court should compel the government to produce it.

**B.    The requested discovery is within the possession, custody, or control of the government because Qualcomm became a state actor during the government's investigation.**

Dr. Arabi anticipates the government claiming that it does not physically possess and thus should not be compelled to produce the requested discovery.  However, discovery is within the possession, custody, or control of the government where it is maintained by a private entity that has become a state actor.  Under Supreme Court precedent, "a private entity can qualify as a state actor in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function. . .; (ii) when

the government compels the private entity to take a particular action, . . .; or (iii) when the government acts jointly with the private entity." *See Manhattan Community Access Corporation v. Hallek*, 139 S. Ct. 1921, 1928 (2019) (internal citations omitted). A private entity can become a state actor when it becomes a part of the "prosecution team." *United States v. Rosenschein*, 2019 WL 2298810 at *1 (D.N.M May 30, 2019). In *Rosenschein* the court held that the private entity was part of the prosecution team for discovery purposes, noting that it "did conduct . . . a limited investigation into the facts of this case. This included an investigation to identify the location of the suspected internet user." *Id.* at *7. Based upon this limited finding, the court granted defendant's motion to compel discovery. *See Id.* at *10.

The Supreme Court has articulated "a number of different factors or tests in different contexts" to deduce whether a private actor has become a state actor. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 393 (1982) (listing, as examples, the public function test, the state compulsion test, the nexus test, and the joint action test). The determination is "necessarily a fact-bound inquiry." *Id.* The Supreme Court noted, in a case involving discriminatory real estate covenants, that private action becomes state action when the government influences or encourages the performance of that act. *See, e.g.*, *Shelly v. Kraemer*, 334 U.S. 1, 19-21 (1948).

Here, Qualcomm functioned as a state actor because it performed a traditional government function, having initiated and conducted the entire investigation of the case, continuing to do so after being told by the government that it would only indict if Qualcomm provided additional evidence from its civil litigation. *See Manhattan*, 139 S. Ct. at 1928. The government coordinated with Qualcomm to covertly use the civil litigation and settlement discussions to investigate Dr. Arabi and collect evidence to prosecute him. The government and Qualcomm jointly shared confidential information, protected by the Civil Protective Order, as if the government were a party to the civil litigation. The government then relied on information unlawfully shared by Qualcomm and Qualcomm's analysis of the statute of limitations to determine when to send out official requests to foreign

governments and to file applications to toll the statute of limitations. Moreover, the government directly relied on statements compelled by Qualcomm in its litigation to claim that the statute of limitations does not begin to run until years after the Abreezio deal.

Because Qualcomm became a state actor, the requested discovery is within the possession, custody, or control of the government, notwithstanding its anticipated response that it does not currently physically possess the requested information, and the Court should compel the government to produce the material and exculpatory discovery to Dr. Arabi.

## V.     CONCLUSION

For the foregoing reasons, Dr. Arabi respectfully requests that the Court grant this motion.

Respectfully submitted,

Dated:  August 25, 2023                   **BIENERT KATZMAN**
                                          **LITTRELL WILLIAMS LLP**

                                          By:  */s/ Whitney Z. Bernsein*
                                                Whitney Z. Bernstein
                                                Sandra C. Lechman
                                                *Attorneys for Dr. Karim Arabi*

MEMORANDUM OF POINTS AND AUTHORITIES

**CERTIFICATE OF SERVICE**

I certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

David K. Willingham
dwillingham@kslaw.com
Blythe Kochsiek
bkochsiek@kslaw.com
Jamie A. Lang
jlang@kslaw.com
KING & SPALDING LLP
*Attorneys for Ali Akbar Shokouhi*

Nicholas W. Pilchak
nicholas.pilchak@usdoj.gov
Eric R. Olah
eric.olah@usdoj.gov
Janaki Chopra
janaki.chopra@usdoj.gov
ASSISTANT UNITED STATES ATTORNEYS

Dated: August 25, 2023                     */s/ Leah Thompson*
                                           Leah Thompson