Whitney Z. Bernstein, SBN 304917
wbernstein@bklwlaw.com
Sandra C. Lechman, SBN 288660
slechman@bklwlaw.com
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701

*Attorneys for Dr. Karim Arabi*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>KARIM ARABI,<br><br>    Defendant. | Case No. 3:22-cr-01152-BAS-1<br>Honorable Cynthia Bashant<br><br>**DECLARATION OF WHITNEY Z. BERNSTEIN IN SUPPORT OF DR. ARABI'S MOTION TO COMPEL DISCOVERY**<br><br>*[Motion to Compel Discovery filed concurrently herewith]* |

## DECLARATION OF WHITNEY Z. BERNSTEIN

I, Whitney Z. Bernstein, declare as follows:

1. I am an attorney licensed to practice law in the United States District Court for the Southern District of California and a partner at Bienert Katzman Littrell Williams LLP, counsel of record for Dr. Karim Arabi in this action. I make this declaration in support of the concurrently filed *Motion to Compel Discovery* (the "Motion"). I make this declaration based on personal knowledge. I am familiar with the pleadings and papers served and filed in this case. If called as a witness, I could and would testify competently to the facts set forth in this declaration under oath.

2. Through the Motion, Dr. Arabi moves the Court to grant an order compelling the government to produce particular discovery enumerated in the Motion.

3. Review of government-produced evidence indicates that there is substantial material evidence that Dr. Arabi has either not been able to secure through Qualcomm and/or that the government refuses to produce.

4. Dr. Arabi requests production of specific discovery pertaining to communications between Qualcomm and the government, motivations and biases of key government witnesses, motivations and biases of Qualcomm as an institution, Qualcomm's due diligence and post-purchase investigation, and the government's investigation. Some of these materials were subpoenaed from Qualcomm pursuant to the Court's granting of Dr. Arabi's Rule 17(c) Application but continue to be withheld from Dr. Arabi due to Qualcomm's decision to move to quash the subpoena rather than respond.

5. Dr. Arabi previously requested many of these materials from the government. On December 4, 2022, defense counsel for all codefendants requested many of these materials by discovery letter. A true and correct copy of this letter is attached to this declaration as **Exhibit A**.

6. On December 16, 2022, the government responded by letter stating that beyond what had already been produced, the government did not have in its possession,

1  custody, or control any additional materials. A true and correct copy of this letter is attached
2  to this declaration as **Exhibit B**.

3      7.    On a January 4, 2023, conference call with the government and counsel for all
4  codefendants, all defendants requested from the government copies of all grand jury
5  subpoenas, administrative subpoenas, and informal discovery requests during the course of
6  the investigation and criminal case, and copies of the full contents of any returns on such
7  subpoenas. The defense explained that, among other things, the defense could not identify
8  missing documents without knowing what was requested, what was returned, and analyzing
9  the gap between the two.

10      8.    On June 9, 2023, the government sent a letter to all defense counsel stating that
11  many of the documents requested in this Motion are not in the government's possession. A
12  true and correct copy of this letter is attached to this declaration as **Exhibit C**.

13      9.    On July 24, 2023, I contacted the government by email to request all raw
14  returns for all email accounts seized by the government. The government responded by
15  email on July 26, 2023, that it did " not agree that production of the complete raw returns
16  from accounts not associated with your client is required or appropriate." The government
17  advised Dr. Arabi to raise the issue with the Court "promptly to avoid undue delay of any
18  motions . . .". In that same email I requested all materials related to Mr. Taneja's
19  cooperation agreement and substantive cooperation with the government.

20      10.    On August 1, 2023, I sent the government a discovery demand letter by email.
21  In that letter, regarding the raw returns of the emails, I noted that I "understand that the
22  government's position is that it is only providing raw returns of email accounts to the
23  account holder. The government also maintains that Dr. Arabi was the true owner and user
24  of various accounts. By the government's theory, under the government's position [Dr.
25  Arabi] request[s] the raw returns of any and all accounts the government contends were
26  used by Dr. Arabi." The letter also requested all discovery related to Mr. Taneja's
27  cooperation with the government including any cooperation agreements, any and all
28  promises made, and all information provided by Mr. Taneja to the government, including

any reports, recordings, transcripts, and other documentation of the same. On August 8, 2023, the government emailed the defense a response letter stating that it could not produce the raw returns for the requested email accounts unless Ms. Alan's "counsel is willing to confirm that she has no privilege concerns with respect to any such accounts," because "the accounts allegedly used by Dr. Arabi were not necessarily *solely* used by Dr. Arabi." (emphasis in original). Regarding cooperation related discovery the government stated in its response letter that it will "produce the appropriate records in a timely matter [sic] ." A true and correct copy of Dr. Arabi's August 1, 2023, discovery demand letter and the government's August 8, 2023, response letter discussing these topics is attached to this declaration as **Exhibit D**.

11. Mr. Taneja pled guilty on August 10, 2023. I emailed the government on August 17, 2023, requesting production of "all cooperation docs (specifically, all materials, notes, recordings, transcripts, and other documentation of any cooperation agreement with Mr. Taneja. This request includes, but is not limited to, any written or other cooperation agreement(s) between Mr. Taneja, including any and all promises made, formal and informal, as well as any and all communications regarding the same. This request also includes all information provided by Mr. Taneja to the government, including any reports, recordings, transcripts, and other documentation of the same.)."

12. In the same August 10, 2023, email I explained to the government that "we cannot competently defend Dr. Arabi from the allegation that he controlled and impersonated Ms. Alan in emails when [it] continue[d] to withhold the email returns."

13. The government produced Mr. Taneja's cooperation addendum by email on August 18, 2023. In that same email, the government indicated that it had reached out to Ms. Alan's counsel regarding any potential privilege in the raw return discovery for the email accounts: (1) sheida@abreezio.com; (2) sheida.arabi1@gmail.com; (3) sheida.alan@gmail.com; and (4) sheidaalan@abreezio.com, and expected a response within three days. The government reiterated that "unless Ms. Alan is willing to either (a) confirm that the accounts contain nothing privileged (i.e., nothing subject to a privilege held

by her that she maintains against your client), or (b) waive any such privilege as to your client, we would not produce the raw returns to you, and would suggest that you file a motion to compel so we can have the benefit of the Court's ruling on the matter."

14. On August 24, 2023, I received an email from the government stating that it "just heard from [Ms. Alan's lawyer who] reports that he is not in a position to confirm whether they contain anything privileged as to Ms. Alan as he does not have access to the accounts."

15. On March 10, 2023, the government emailed defense counsel additional discovery and noted within that email that Mr. Taneja "recalled a meeting at Qualcomm in the April to June 2015 timeframe, in which [Joseph] Fang said that a component of the technology (i.e., Abreezio's technology) must be smart if it came from Karim's sister." The email also stated that Mr. Fang later denied Mr. Taneja's version of their interactions.

16. In July 2016, the Qualcomm employee who alleged malfeasance approached a Qualcomm supervisor and claimed that certain individuals involved in the Abreezio acquisition received payouts or kickbacks. A true and correct copy of Qualcomm's Summary of Allegations and Information Gathered through 2/17/17 is attached to this declaration as **Exhibit E**.

17. Despite the above, a different Qualcomm report claims that "Abreezio was originally reported through Qualcomm's tip-line." A true and correct copy of the FBI Interview of Stewart Roberts is attached to this declaration as **Exhibit F**.

18. On November 2, 2016, a Qualcomm investigator interviewed a Qualcomm supervisor about several allegations of sexual misconduct against the supervisor by other Qualcomm employees. In the middle of this interview about his repeated sexual misconduct, the supervisor interrupted the questioning and changed the subject to an alleged tip that he received about misconduct in the Abreezio acquisition, though he admitted that the allegations "seemed so bogus." The supervisor recounted that the Qualcomm employee who alleged malfeasance, who had "communication issues" with his colleagues, was in a "bad spot" with his boss. When that employee's request for transfer to a new team was

denied, he "wasn't happy" about the denial and started making "accusations against" other Qualcomm employees regarding their work on the Abreezio due diligence. At the end of the interview, the supervisor recounted that his colleague "even told me about this Abreezio thing. 'Watch your back on this deal, the Persian mafia is out to get you.'" A true and correct copy of Mr. Schmidt's Notes of the Supervisor Interview is attached to this declaration as **Exhibit G**.

19. On May 17, 2017, as a part of Qualcomm's post-purchase investigation into the Abreezio acquisition "Project Gopher," Qualcomm investigators Jim Bird and Mr. Schmidt interviewed co-founder of the Canadian software development company Invionics Group, Brad Quinton about the Abreezio acquisition. Mr. Quinton explained that the technology eventually sold to Qualcomm had evolved substantially from Ms. Alan's initial idea. Mr. Quinton emphasized that Invionics "developed this technology. . . this was not Sanjiv [Taneja]'s tech/not Sheida [Alan]'s tech that we are currently using. We developed it." Mr. Quinton also explained that the technology that evolved from Ms. Alan's idea was only one of several technologies that were developed by Invionics and Abreezio. Mr. Quinton estimated that Qualcomm acquired approximately 12 patents in its purchase of Abreezio, though the actual number was greater. Mr. Quinton noted that Abreezio was not developed specifically for Qualcomm, but that, in fact, several other companies expressed interest in the technology. A true and correct copy of Qualcomm Investigator Notes of the May 17, 2017 Quinton Interview is attached to this declaration as **Exhibit H**. Discovery does not contain any visual- or audio-recordings or transcripts of this interview.

20. On May 18, 2017, Mr. Quinton met again with Mr. Schmidt. He again confirmed that Ms. Alan's original idea "was notional" and that Invionics had to add "a bunch of [Invionics'] tech/expertise in order to make it work." He explained that her idea "was a concept," and that what Invionics invented was merely "motivated by that idea." A true and correct copy of Qualcomm Investigator Notes of the May 18, 2017, Quinton Interview is attached to this declaration as **Exhibit I**.

21. On October 26, 2017, Qualcomm filed a civil complaint against Dr. Arabi,

1  Ms. Alan, and Mr. Taneja alleging fraud, unlawful business practices, breach of contract, and breach of duty of loyalty among other claims. In the complaint, Qualcomm alleged that Dr. Arabi, a then-employee of Qualcomm, orchestrated a scheme to defraud Qualcomm in connection with the sale of technology allegedly developed by Dr. Arabi. The complaint admitted that the initial idea for the technology at issue was not complete and that engineers at Canadian software development company Invionics spent months between late-2014 through mid-2015 developing the technology. Qualcomm additionally alleged that Dr. Arabi targeted Qualcomm by providing direction to Mr. Taneja and Invionics "in order to guide development of the technologies to precisely suit Qualcomm's technical needs." Qualcomm alleged that Dr. Arabi, Ms. Alan, and Mr. Taneja misled Qualcomm and hid material information to further the scheme. A true and correct copy of the Civil Complaint is attached to this declaration as **Exhibit J**.

22. On January 26, 2018, Mr. Taneja entered into a settlement agreement with Qualcomm, which included a provision requiring Mr. Taneja to cooperate with Qualcomm. Under the agreement, Mr. Taneja was required to pay more than $10 million to Qualcomm, provide documents responsive to Qualcomm's discovery demands, and Qualcomm was "entitled to interview Mr. Taneja . . . for a cumulative total of up to fifty (50) hours, exclusive of breaks." A true and correct copy of Mr. Taneja's Settlement Agreement is attached to this declaration as **Exhibit K**. The discovery does not include any of the resulting materials (notes, transcripts, reports, recordings), any documentation of what was said, nor any indication of when the interviews occurred or for how long they occurred.

23. On March 7, 2018, a protective order was issued in the civil court limiting access to and disclosure of confidential materials ("Civil Protective Order"). The Civil Protective Order required that if either party needed to seek relief from the order, including if that need arose from the receiving of a government subpoena, must notice the other party. If a party to the Civil Protective Order reviewed a demand for production of any of the confidential materials from the government, that party was required to "promptly give notice" of the request and "furnish such counsel with a copy of the Subpoena." A true and

correct copy of the Civil Protective Order is attached to this declaration as **Exhibit L**.

24. On May 1, 2018, Mr. Quinton and other "Invionics Group" individuals entered into a cooperation agreement with Qualcomm. The agreement required the Invionics individuals to provide requested documents for Qualcomm's prosecution of the civil suit against Dr. Arabi and Ms. Alan. The agreement also entitled Qualcomm to "interview each Witness . . . for a cumulative total of no more than 48 hours, exclusive of breaks." A true and correct copy of the Invionics Group Cooperation Agreement is attached to this declaration as **Exhibit M**.

25. Qualcomm first referred this matter for prosecution to the USAO on May 11, 2018. Qualcomm representatives met with the government via Special Agents of the FBI. Qualcomm's counsel from Hueston Henningan LLP, including Marshall Camp, joined the meeting via telephone. During the meeting, Qualcomm provided the government with the Civil Complaint detailing allegations for a criminal referral. On June 28, 2018, Mr. Camp "furnished confidential documents" to the government, which the government, including a special agent and Assistant United States Attorney Eric Beste, reviewed. After review, the government "decided to hold off on a criminal investigation and re-evaluate the merits of a criminal prosecution if additional facts came to light during Qualcomm's civil litigation." On July 10, 2018, AUSA Beste informed Mr. Camp that the government was declining prosecution of the claims in the Civil Complaint "at this time as there are adequate civil remedies" but agreed to "re-evaluate the matter as warranted." A true and correct copy of the Case Declination Report is attached to this declaration as **Exhibit N**.

26. On December 7, 2018, Dr. Arabi and Ms. Alan entered into a Settlement Agreement and Release of Claims with Qualcomm ("Settlement Agreement"). The Settlement Agreement memorialized the parties' October 31, 2018 term sheet agreement to "negotiate in good faith mutual execution of a longer-form definitive agreement to conclude their dispute and dismiss the Action . . . ." The Settlement Agreement included a schedule of payments, reflecting a partial return of Ms. Alan's proceeds of the sale of Abreezio, to be made by Ms. Alan to Qualcomm. It also contained a release of liability section stating

that upon receipt of the total payment required from Ms. Alan, Qualcomm would release Ms. Alan and Dr. Arabi from any claims arising out of the same facts as the Civil Suit. Finally, in a clause entitled "No Other Claims," the parties agreed to "never induce, encourage, assist, with and/or abet others to sue or bring a proceeding of any nature against the opposing Party or Parties concerning any of the claims or causes of action released" in the Settlement Agreement.  While the release of liability section was triggered upon Qualcomm receiving final payment, the No Other Claims provision was in effect from the effective date of the Settlement Agreement (December 6, 2018). A true and correct copy of the Arabi/Alan Settlement Agreement and Release of Claims is attached to this declaration as **Exhibit O**.

27. On January 31, 2020, Akbar Shokouhi, Behrooz Abdi, Tech VC Investments, Inc., and Business Strategic Advisors, LLC, (the "Abreezio Investors") entered into a settlement agreement and Release of Claims with Qualcomm. The agreement requires the Abreezio Investors to pay to Qualcomm $6 million. A true and correct copy of the Abreezio Investors Settlement Agreement and Release of Claims is attached to this declaration as **Exhibit P**.

28. On February 4, 2020, Dr. Arabi and Ms. Alan entered into an Addendum to the Settlement Agreement. The Addendum incorporated the same Release of Claims and "No Other Claims" clauses enumerated in the original agreement and described in paragraph 26 above. A true and correct copy of the Arabi/Alan Settlement Addendum is attached to this declaration as **Exhibit Q.**

29. On April 28, 2020, Mr. Camp sent a criminal referral letter to the United States Attorney's Office ("USAO") ("Referral Letter"). In the Referral Letter, Mr. Camp represented that in late 2016, Qualcomm "received a tip from a whistleblower that Arabi and another Qualcomm employee had benefited personally from the Abreezio transaction," and that this tip triggered "an extensive internal investigation of these allegations." Mr. Camp suggested applicable offense statutes, offered analysis as to why venue exists in the Southern District of California, and advised that the statute of limitations "would not

expire until October 31, 2020, at the earliest." Mr. Camp acknowledged that Qualcomm settled with Dr. Arabi and Ms. Alan for $45 million, but he made no mention of Ms. Alan's payments to date, nor did he mention the No Other Claims provisions, in effect since December 6, 2018, of Qualcomm's Settlement Agreement. The Referral Letter also did not disclose that the additional Release of Claims provision would be triggered on June 30, 2020, and that Ms. Alan had not yet been given a chance to fulfill her obligations under the agreement. Mr. Camp also stated that Qualcomm had confidential documents and information to share and requested that the government issue a subpoena. A true and correct copy of the Criminal Referral Letter is attached to this declaration as **Exhibit R**.

30. On May 7, 2020, Mr. Camp and other representatives of Qualcomm gave a 54-page PowerPoint presentation to the government again seeking prosecution of Dr. Arabi, Ms. Alan, Mr. Taneja, and others involved with the acquisition of Abreezio. The presentation included portions of documents from the Civil Suit marked as "Confidential" and which were subject to the Civil Protective Order. The presentation stated that Qualcomm conducted an internal investigation into the Abreezio acquisition from November 2016 through May 2017 and interviewed thirty-four (34) employees, collected over 4 million emails, issued twenty-five (25) subpoenas, and obtained more than 21,000 documents "from defendants and 3rd parties" during that investigation. The presentation also noted that Mr. Taneja began actively cooperating with Qualcomm in January 2018. A true and correct copy of the Referral PowerPoint Presentation is attached to this declaration as **Exhibit S**.

31. On May 13, 2020, the FBI opened its investigation. A true and correct copy of the Case Opening Report is attached to this declaration as **Exhibit T**.

32. On May 13, 2020, AUSA Phillip Halpern emailed Mr. Camp confirming the "as discussed" issuance of a grand jury subpoena to Qualcomm. In that email, the government noted that it would call Mr. Camp on May 14, 2020, in the afternoon, to further discuss the subpoena and "the best method for responding to the subpoena." Sometime on May 14, 2020, the government and Mr. Camp had a phone call to discuss the subpoena that

issued that day. Early in the morning on May 15, 2020, the government sent an email to Qualcomm following up on this phone call. This email referred to a "new subpoena" and reconfirmed promised protections for this "new" subpoena. On May 19, 2020, Qualcomm filed an *ex parte* application in state court in the Civil Suit requesting permission to disclose protected materials with the USAO, despite having already shared such information in violation of the Civil Protective Order. In his declaration to the application, Mr. Camp cites to email communications with the government "regarding an initial version of the Grand Jury Subpoena, which was withdrawn and replaced by the Grand Jury Subpoena." The filing did not refer to the extensive communications between the government and Qualcomm starting in dating back to May 11, 2018. The materials did not disclose that during that time Qualcomm had already provided the AUSA with confidential documents protected under the Civil Protective Order, prior to seeking any relief from the Civil Protective Order from the court. A true and correct copy of the application, Mr. Camp's declaration in support of the application, and supporting exhibit containing the email chain regarding the grand jury subpoena is attached to this declaration as **Exhibit U**.

33. On May 20, 2020, the court granted the *ex parte* application. Dr. Arabi and Ms. Alan's counsel, Iian Jablon at Irell & Manella LLP, never received contemporaneous notice from Qualcomm of the grand jury subpoena or this ex parte application as required by the Protective Order. A true and correct copy of the order is attached to this declaration as **Exhibit V**.

34. On June 4, 2021, civil counsel for Dr. Arabi and Ms. Alan, Iian Jablon, emailed Mr. Camp to "confirm that Qualcomm agrees that it has been paid the full amount called for the by the settlement agreement and that the matter is now fully resolved, subject to the parties' ongoing obligations under the Protective Order and the settlement agreement. Mr. Camp responded by email on June 15, 2021, confirming that "the payments required by the settlement agreement have been made and that the other terms remain in effect to the extent provided under the agreement." On June 16, 2021, Mr. Jablon responded "[n]ow that the matter is fully resolved [Dr. Arabi and Ms. Alan] request pursuant to Paragraph 22

of the Stipulated Protective Order . . . that Qualcomm and [Hueston Hennigan] return or destroy all Confidential Materials and Highly Confidential Attorney's Eyes Only Materials produced by my clients in connection with the [Civil Suit] within the next 30 days." Mr. Camp did not respond for three weeks. When he did respond, on July 7, 2021, Mr. Camp claimed that the request pursuant to Paragraph 22 of the Protective Order was not timely, but that "reserving all rights and without waiver" Qualcomm and Hueston Hennigan were "willing to have our vendor remove documents from our database that were produced by [Dr.] Arabi and Ms. Alan and labeled Confidential or Highly Confidential. . ." and agreed "not to export confidential- designated materials from those archives absent an appropriate court order." A true and correct copy of the emails between civil counsel and Mr. Camp regarding the final payment and destruction of documents is attached as **Exhibit W**.

35. On July 12, 2021, Stewart Roberts, Vice President of Global Security at Qualcomm, was interviewed by the government. In the FBI report of the interview, Srinivas Patil, a scientist at Qualcomm, is described as "an expert in the technology that Qualcomm purchased from Abreezio." The report noted that Mr. Patil would be available for an interview with the government. A true and correct copy of the FBI 302 Report of Interview with Stewart Roberts is attached to this declaration as **Exhibit F**.

36. On January 31, 2023, the Qualcomm employee who alleged malfeasance was interviewed by the FBI. During that interview, he stated that he was not included on the Abreezio due diligence team because the Abreezio technology was a "competitive solution to something Allam and his team had already created. . . ." He admitted that others at Qualcomm viewed him as "jealous of the new technology," and, as a result, "excluded him" from Abreezio discussions. He recounted telling a Qualcomm supervisor in late 2016 that he believed someone at Qualcomm got a kickback for the Abreezio deal. A true and correct copy of the FBI Report of this individual's interview is attached to this declaration as **Exhibit X**.

37. On March 2, 2023, Farsheed Mahmoudi was interviewed by the FBI. During

that interview, Mr. Mahmoudi discussed the competition between the Qualcomm employee who claimed malfeasance's "CPR" technology and the Abreezio technology. Qualcomm assigned Pranjal Srivastava to conduct projected capabilities of the CPR technology versus Abreezio's alternative technology. Mr. Srivastava's analysis "showed that Abreezio had value." Mr. Mahmoudi informed the FBI that he was never offered any kickback, incentive, or anything else to help get the Abreezio deal through and that he had not heard of anyone else being offered kickbacks or bribes. A true and correct copy of the FBI Report of the Interview of Mr. Mahmoudi is attached as **Exhibit Y.**

38.  On April 18, 2023, I sent Qualcomm's representatives an email request for copies of potential Director and Officers Insurance policies or other policies that may cover Dr. Arabi's criminal defense. On May 8, 2023, Mr. Camp responded that Dr. Arabi's request for indemnification was "foreclosed by the settlement agreement he entered into with Qualcomm [in which] Dr. Arabi released Qualcomm from "any and all claims, . . . demands, . . . costs, and liabilities of any kind whatsoever, . . . known and unknown, . . . that arise from or relate to the allegations. . . ." **.**

I declare under penalty of perjury the laws of the United States of America that the foregoing is true and correct. Executed this 25th day of August 2023 in Oceanside, California.

/s/ Whitney Z. Bernstein
Whitney Z. Bernstein

# CERTIFICATE OF SERVICE

I certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

David K. Willingham
dwillingham@kslaw.com
Blythe Kochsiek
bkochsiek@kslaw.com
Jamie A. Lang
jlang@kslaw.com
KING & SPALDING LLP
*Attorneys for Ali Akbar Shokouhi*

Nicholas W. Pilchak
nicholas.pilchak@usdoj.gov
Eric R. Olah
eric.olah@usdoj.gov
Janaki Chopra
janaki.chopra@usdoj.gov
ASSISTANT UNITED STATES ATTORNEYS

Dated: August 25, 2023                    */s/ Leah Thompson*
                                          Leah Thompson