TARA K. MCGRATH
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br><br>Defendant. | Case No.:  22-cr-1152-BAS<br><br>Date:  December 4, 2023<br>Time:  2:45 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PRODUCTION OF POTENTIALLY PRIVILEGED MATERIAL (ECF 192)** |

Defendant Karim Arabi seeks an order disregarding the potential privilege of his co-defendant because, he surmises, the potentially privileged items he seeks could somehow aid in his defense. Because this is not a recognized basis to disregard a well-founded privilege claim, is not based on any concrete showing that the material would be helpful, and would seriously undermine his co-defendant's rights, Dr. Arabi's motion should be denied.

## I.

## STATEMENT OF THE CASE

On May 24, 2022, a federal grand jury in the Southern District of California returned an 8-count indictment charging Defendants Karim Arabi, Sheida Alan, aka Sheida Arabi, Sanjiv Taneja, and Ali Akbar Shokouhi with wire fraud conspiracy, various related crimes, and criminal forfeiture.  ECF 1.  The grand jury returned a superseding indictment on July 19, 2022, adding factual allegations to Count 6 and certain allegations pertaining to criminal forfeiture.  ECF 9.

On August 10, 2023, Taneja pled guilty to Count 7 of the superseding indictment. ECF 141.  In his plea agreement, Taneja admitted participating with Dr. Arabi and others "to conceal Karim's role in Abreezio's formation and development" from Qualcomm, to defraud the company in connection with its purchase of Abreezio. ECF 144 at 3–4.  On October 5, 2023, Shokouhi pled guilty to Count 8.  ECF 175. Shokouhi admitted in his plea agreement to participating with Dr. Arabi in a scheme to conceal both Dr. Arabi's and Shokouhi's role in Abreezio from Qualcomm.  ECF 179 at 3–4.

On November 13, 2023, Dr. Arabi filed the instant motion, ECF 190, as part of 280 pages of motions and exhibits overall.  ECF 190–94.  This Response follows.

## II.

## STATEMENT OF FACTS

### A.    Dr. Arabi Impersonates Ms. Alan By Email.

In service of the Abreezio fraud summarized elsewhere in these motion responses and throughout this case, Dr. Arabi used a variety of email accounts to impersonate his sister and make it look like she was taking part in Abreezio's management, when in fact the true mastermind was him.  *E.g.*, ECF 9 at 10.  In fact, Dr. Arabi himself squarely admitted in discovery responses in Qualcomm's civil fraud suit that he drafted and sent one or more emails from the original Sheida Sham Account: sheida.arabi1@gmail.com. Pilchak Decl. ¶ 3.  For her part, Ms. Alan claimed that she could not remember whether

she had drafted several key emails, putatively written by her and sent from sheida.arabi1@gmail.com. *Id.* ¶ 4.

Even beyond Dr. Arabi's admission, it is not hard to reconstruct the paper trail to show that Dr. Arabi used email accounts appearing on their face to belong to his sister. For example, On March 3, 2015, sheida.arabi1@gmail.com (an email address created by Dr. Arabi to impersonate Alan) sent Taneja an email titled "NewSensor" which attached a PDF file entitled "NewSensor" that contained what appears to be a two-page hand-drawn engineering schematic. Approximately 22 minutes later, (1) karim_arabi@gmail.com emailed an attachment, a hand-drawn schematic entitled "OldSensor," with the subject line "OldSensor" to sheida.arabi1@gmail.com, and (2) about a minute after that, sheida.arabi1@gmail.com sent Taneja an email with the identical subject line and attachment.[1]  Dr. Arabi's forwarding the schematic to "Sheida," who then immediately flipped it to Taneja shows that the "Sheida" account was nothing more than a disguise.

Altogether, the allegations of the Superseding Indictment and the evidence produced in discovery tend to show that Dr. Arabi used as many as four email accounts to impersonate Ms. Alan (collectively, the "Impostor Accounts"):

- **sheida.arabi1@gmail.com**, referred to in the superseding indictment as the "First SHEIDA Sham Account,"

- **sheida.alan@gmail.com**, referred to in the superseding indictment as the "Second SHEIDA Sham Account,"

- **sheida@abreezio.com**, and

- **sheida.alan@abreezio.com.**

Notably, Dr. Arabi previously moved to compel "[a]ll raw returns for" these four email accounts, and no others.  ECF 148-1 at 25.  Inexplicably, however, Dr. Arabi now seeks

---

[1]   The United States has moved for handwriting exemplars from Dr. Arabi to determine who wrote the hand-drawn schematics attached to these emails.  ECF 189.

*United States' Response in Opposition to Defendant's Motion for Unfiltered Emails*                    22-CR-1152-BAS

access to <u>seven</u> email accounts—all four of the Impostor Accounts listed above, plus arabisheida@gmail.com, arabisheida@yahoo.com, and s_7295@yahoo.ca.

As far as the United States is aware, there is no evidence or allegation that Dr. Arabi used the three newly-listed email accounts to impersonate his sister. Nevertheless, Dr. Arabi has claimed (inaccurately) in his motion that the United States was ordered to "produce all non-privileged filtered data from [all seven] email accounts to Dr. Arabi," apparently including both the four Impostor Accounts and all three newly-listed accounts. ECF 192-1 at 3. In truth, however, the Court ordered the United States to produce only the post-filtering results from the Impostor Accounts, ECF 182 at 53:23–54:17, and that is all that has been disclosed in discovery. More specifically, as explained at the prior hearing on this issue, the prosecution team believes that no emails were recovered from sheida@abreezio.com or sheida.alan@abreezio.com. *Id*. Consequently, the universe of documents at issue in this motion is properly limited to **sheida.arabi1@gmail.com** and **sheida.alan@gmail.com**.

**B.     Dr. Arabi & Ms. Alan Opt For Joint Representation In the Civil Fraud Suit.**

As outlined elsewhere, Dr. Arabi's victim Qualcomm filed a civil fraud suit against him, Alan, and Taneja (the "Civil Fraud Suit"). To defend themselves during the Civil Fraud Suit, Dr. Arabi and Ms. Alan jointly retained attorneys at Irell & Manella LLP. The United States is aware of no evidence that Dr. Arabi or Ms. Alan retained separate individual counsel in that suit.

**C.     The United States Seeks To Protect Email Users' Attorney-Client Privileges.**

In this investigation, the United States obtained duly-authorized warrants to search over a dozen email accounts. In each case where the prosecution team suspected that the account may contain privileged attorney-client communications, it engaged a filter team in an attempt to safeguard those potential privileges.

Specifically, as noted in Dr. Arabi's motion, the filter team ran a lengthy list of search terms against the data returned pursuant to the warrants to identify potentially privileged items. To clarify, however, the filter personnel did not simply withhold every

record that contained a search term.  Rather, they reviewed the records containing any search terms, and withheld anything that, upon review, appeared potentially privileged.[2] The goal of the entire filter process is to prevent any document determined to be potentially privileged by the filter team from being provided to the prosecution team.

**III.**

**ARGUMENT**

**A.      Dr. Arabi's *Brady* Claim Is Speculative At Best.**

It is unknown to the prosecution team in this case what the potentially privileged files from the Impostor Accounts contain.  What is known is that Dr. Arabi's claims about their contents are based on sheer conjecture—and rather implausible conjecture, at that.

### 1.      *Dr. Arabi's Primary Argument Is Cumulative Conjecture.*

Dr. Arabi's first and best argument is that emails from the Impostor Accounts could tend to show that Alan used the accounts, not him.  This is a good argument for account access generally, and is presumably the primary force behind the Court's October 2, 2023 order to the United States to produce the complete contents of the Impostor Accounts, minus items that were filtered as potentially privileged.  What it does not do is explain Dr. Arabi's need for access to Ms. Alan's *potentially privileged* emails, and not simply the general account contents.  Would it not be enough if Dr. Arabi could show that Ms. Alan used (or, also used) an account to conduct her sensitive personal business?[3]  Must he also violate her attorney-client privilege?

---

[2]      The declaration in support of Dr. Arabi's motion relates counsel's "understanding that, pursuant to the government's review process, any data that triggered one or more of [the search] terms has been segregated and has not been produced to Dr. Arabi." ECF 192-2 at 1.  This is incorrect; as explained above, records containing a search term were only withheld as potentially privileged if, after review by a filter attorney, the filter attorney believed that they were potentially privileged.

[3]      The United States reiterates that the prosecution team has no idea what is in the emails withheld by the filter team.  But as a matter of general experience, an email

*United States' Response in Opposition to*          22-CR-1152-BAS
*Defendant's Motion for Unfiltered Emails*

By now, Dr. Arabi has already received thousands of emails from the Impostor Accounts and is missing only the potentially privileged messages. Either those emails tend to show Dr. Arabi used a particular account, or that Ms. Alan did, or both. Dr. Arabi's motion never explains why only the potentially privileged messages could establish which of those situations is true for each requested account.

This stumbling block is an insurmountable barrier for Dr. Arabi's motion, because he while he frames his claim as a constitutional imperative—i.e., a *Brady* claim—"information . . . has to be more than 'merely cumulative' to be material under *Brady/Giglio*." *United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011) (citation omitted). In this case, not only is the discovery Dr. Arabi seeks based on a speculative justification; it is also almost certainly cumulative with the hundreds or thousands of emails Dr. Arabi has already received from the same source.

The force of Dr. Arabi's argument is reduced still further when considering that Ms. Alan and Dr. Arabi retained joint counsel to defend against the Civil Fraud Suit, which communications are presumably (1) most relevant in substance to the facts of this case, and (2) contemporaneous with some of the allegations in this case, which include (for example) false discovery responses produced during the civil suit. If such joint emails exist, Dr. Arabi could certainly use them to show that Ms. Alan used one or more of the Impostor Accounts to exchange emails with civil defense counsel, copying him. He would have to waive the privilege to do so, of course, but at least he

---

accountholder will often use the account to conduct personal business, and indeed in this case, the United States has seized emails from various of Alan's accounts conducting, for example, investment and financial transactions. For example, in a December 12, 2019 email, Dr. Arabi (karim_arabi@hotmail.com) evidently emailed Ms. Alan (at sheida.alan@gmail.com) a list of real properties, including multiple parcels of real estate that were used to launder the proceeds of the Abreezio fraud. Dr. Arabi can already use emails like this to argue that, at least at some point in time, Ms. Alan used sheida.alan@gmail.com, because she was apparently using that account to coordinate with him concerning the money laundering phase of their criminal scheme.

would seem to have the right and the power to waive his own privilege, and not simply seek the Court's authority to violate the freestanding privilege of his codefendant.

In sum, Dr. Arabi does not argue that the potentially privileged emails contain irreplaceable evidence of Ms. Alan's use of the Impostor Accounts.  To the extent that he does, the claim is sheer conjecture.  This should not override Alan's privilege.

### 2.    Dr. Arabi's Secondary Arguments Are Even Less Plausible.

Dr. Arabi's other arguments are essentially derivative of the first.  He speculates that the Impostor Accounts could contain emails showing (1) Alan consulted with patent counsel for Abreezio's core technology; (2) Alan was involved in Abreezio's formation and had private communications with counsel or other trusted advisors during the process; and/or (3) legal counsel was involved in all stages of the patent and corporate formation process.  Even leaving aside that this is simply guesswork on Dr. Arabi's part, without any articulated support drawn from the 1.5 million pages of (non-privileged) discovery produced to date, once again, Dr. Arabi must argue that it is the *potentially privileged* emails on these subjects that his defense requires to exculpate him.  With the material he already has—the complete, post-filtering results of the Impostor Accounts that, as of this date, even the prosecution team does not have a legal right to access— Dr. Arabi could already show any and all of these things, if they are captured in non-privileged emails.  Could Alan have consulted with a trusted advisor about Abreezio's formation?  Certainly—although the evidence developed to date indicates that her actual participation in the company was effectively nil.

But Dr. Arabi goes further to hypothesize that only *potentially privileged* emails with trusted *legal* advisors will do.  Could Alan have engaged legal counsel to assist with patent filings and not simply allowed her brother Dr. Arabi to direct and execute the process?  Certainly—although again the evidence is to the contrary—and if so, Dr. Arabi has presumably already received all non-privileged emails in which Alan referenced her patent counsel, listed their name on a document, or did any one of a host of non-privileged things revealing the hypothetical counsel's presence and

participation.  From this perspective, it is incredible that Dr. Arabi's motion cites none of the hundreds of thousands of emails he has already received in discovery—including the complete post-filtered returns from the Impostor Accounts—to suggest that such a lawyer might even exist, let alone that Alan may have communicated with them.

Dr. Arabi's bare speculation that such a lawyer exists, that privileged emails with them exist in the Impostor Accounts, and that those emails would exculpate him, do not suffice to justify a clear and present violation of Alan's legal privilege.

**B.     The Requested Relief Is Practically Unprecedented.**

The novelty and boldness of Dr. Arabi's request is underscored by the fact that he can marshal only one cursory, unpublished order from a trial court ruling in favor of what he characterizes as a clear constitutional mandate.  *See* ECF 192-3.  In that case, the parties skirmished on the issue for over a year, and the parties asserting privilege in the material their co-defendants sought were at least present and participating in the litigation to defend their own privileges.  *E.g.*, *United States v. Weaver et al.*, No. 19-cr-527-ODW, ECF 360, 335, 537 (C.D. Cal.).  Here, Dr. Arabi asks the Court to vitiate Ms. Alan's privileges without so much as a word of input from her.

"The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law," *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), and Dr. Arabi's motion plays lip service to the central place of the attorney-client privilege in our legal justice system while seeking to trample it.  ECF 192 at 6.  But no published case resolves the tension that his motion points up—between this venerable and hallowed safeguard to defendants and their need for legal counsel, and the equally valid and fundamental discovery obligation of the government to produce exculpatory information to the defense.  The United States submits that here, in the absence of such authority and coupled with Dr. Arabi's weak showing of the need for potentially privileged information from the Impostor Accounts, Dr. Arabi's motion should be denied.

This is emphatically the correct outcome here because, to restate the obvious, the prosecution team does not have access to the records that Dr. Arabi seeks. As explained at length at the October 2, 2023 hearing, the entire point of the filter team process is to keep the potentially privileged material out of the possession of the prosecution team. Consequently, these facts don't involve the potential unfairness of the typical discovery dispute, where the materials a defendant seeks are unilaterally possessed by the prosecution and not by him. Here, the materials are possessed by no one, apart from the filter team, which is not participating in this prosecution.

The risk of undermining Ms. Alan's potential privilege is not hypothetical. Alan is a defendant in this case and will surely protest if the Court allows her codefendant to eviscerate her legal privileges before she even arrives in these proceedings. These concerns could be very acute. Alan could very well opt to pursue a defense seeking to deflect blame onto Dr. Arabi, and it is possible—although of course unknown to the prosecution team—that potentially privileged items in her email accounts discuss or evaluate such a defense. Producing such records to Dr. Arabi (again, if they exist) could seriously compromise Ms. Alan's defense. The Court must not lightly disregard that concern.

## IV.

## CONCLUSION

Defendant's Motion should be denied.

DATED: November 27, 2023

TARA K. MCGRATH
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys

*United States' Response in Opposition to*
*Defendant's Motion for Unfiltered Emails*

*22-CR-1152-BAS*