TARA K. MCGRATH
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: | 22-cr-1152-BAS |
|---|---|---|
| Plaintiff, | Date: | December 4, 2023 |
| | Time: | 2:45 p.m. |
| v. | Honorable Cynthia Bashant | |
| KARIM ARABI (1), | **THE UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR DECLARATORY RELIEF RE (1) INVENTORSHIP & (2) ENFORCEABILITY OF EMPLOYMENT AGREEMENT (ECF 190)** | |
| Defendant. | | |

Defendant Karim Arabi requests the extraordinary and apparently unprecedented remedy of a pretrial declaratory ruling on two different subjects in this criminal action: the true inventorship of the final patent embodying one of Abreezio's key technologies, and the enforceability of one of his private agreements with his employer and the victim of his fraud. While his motion labors mightily to transplant two highly specialized bodies of civil law into this criminal fraud case, both transplants wither under even mild scrutiny. Dr. Arabi cites no authority applying the sweeping relief he seeks in the

context of a pending criminal case, which confirms that his motion is procedurally unsound. He misapplies the relevant statute, which by its terms only voids the offending provisions of any private agreement and not the contract's entirety. Finally, his request also founders on the facts, because the disputed factual issues Dr. Arabi seeks to side-step with his novel request for declaratory relief are really issues for the jury.

Dr. Arabi's motion should be denied.

## I.

## STATEMENT OF THE CASE

On May 24, 2022, a federal grand jury in the Southern District of California returned an 8-count indictment charging Defendants Karim Arabi, Sheida Alan, aka Sheida Arabi, Sanjiv Taneja, and Ali Akbar Shokouhi with wire fraud conspiracy, various related crimes, and criminal forfeiture. ECF 1. The grand jury returned a superseding indictment on July 19, 2022, adding factual allegations to Count 6 and certain allegations pertaining to criminal forfeiture. ECF 9.

On August 10, 2023, Taneja pled guilty to Count 7 of the superseding indictment. ECF 141. In his plea agreement, Taneja admitted participating with Dr. Arabi and others "to conceal Karim's role in Abreezio's formation and development" from Qualcomm, to defraud the company in connection with its purchase of Abreezio. ECF 144 at 3–4. On October 5, 2023, Shokouhi pled guilty to Count 8. ECF 175. Shokouhi admitted in his plea agreement to participating with Dr. Arabi in a scheme to conceal both Arabi and Shokouhi's role in Abreezio from Qualcomm. ECF 179 at 3–4.

On November 13, 2023, Dr. Arabi filed the instant motion, ECF 190, as part of 280 pages of motions and exhibits overall. ECF 190–94. This Response follows.

# II.
# STATEMENT OF FACTS

## A. Dr. Arabi's Agreements With Qualcomm.

Dr. Arabi was re-hired by Qualcomm as Vice President of Research and Development in 2013.[1] Around that time, he entered several agreements and understandings with the company.

### 1. Dr. Arabi's IP Agreement.

Most relevant, Dr. Arabi entered an Invention Disclosure, Confidentiality and Proprietary Rights Agreement (the "IP Agreement") on or about November 27, 2013. *See* ECF 190 Ex. G. The IP Agreement's primary focus is to provide that, in exchange for his compensation, any inventions created by Dr. Arabi "during [his] period of employment with the Company" were the company's exclusive property, apart from those expressly identified otherwise. *Id*. at § 1.1. Arabi did not identify any excepted inventions. *Id*. at Att. 1. In the IP Agreement, Dr. Arabi assigned all his rights in such inventions to Qualcomm; granted Qualcomm an exclusive, royalty-free license to such inventions if they were not, by law, assignable; and waived his own right to assert an interest in any such inventions, if not assignable or licensable by law. *Id*. at § 1.1.

Dr. Arabi also agreed in the IP Agreement:

- to disclose to Qualcomm all inventions he created during his employment, within 30 days of their creation, *id.* at § 1.3;

- that he owed Qualcomm a duty of loyalty and would not engage in any activity (such as outside business activities) that would create a conflict of interest between him and Qualcomm, *id.* at § 4.1;

- that he specifically understood that it would be a conflict of interest for him to attempt to assign any of his inventions to anyone other than Qualcomm, *id.* at § 4.2; and

---

[1] This is a summary statement of facts for purposes of this Response, and the United States reserves the right to expand and supplement it later as necessary. Facts summarized herein are generally based on allegations in the superseding indictment, *see* ECF 9, except where otherwise indicated.

- that he would not "engage in any activity that is competitive with any activity of Qualcomm," specifically including "forming or making plans to form a business entity that is competitive with any business activity of Qualcomm," *id*. at § 5.1.

Although omitted from his motion, Dr. Arabi's IP Agreement specifically carved out any inventions (1) developed entirely on Arabi's own time; (2) without use of Qualcomm's equipment, supplies, facilities, or trade secrets; (3) not resulting from Arabi's work for Qualcomm; and (4) not relating to Qualcomm's business or research and development. *Id*. at § 1.2(b). The IP Agreement also contains a severability provision, in which Dr. Arabi agreed that if any provision of the agreement were found to be unenforceable or invalid, all remaining provisions would remain in full force and effect. *Id*. at § 6.4.

Further, although similarly unmentioned in Dr. Arabi's motion, his IP Agreement contains an entire section devoted to compliance with California's Labor Code provisions in Sections 2870–72. *Id*. at Att. 2. Specifically, the IP Agreement block-quotes the applicable Labor Code, which provides that the assignment terms cannot, by California law, assign an employee's rights to an invention made on their own time without their employer's supplies, equipment, or trade secrets, unless the invention relates to the employer's business or the employee's work for the employer. *Id*.

The IP Agreement also contains a "Presumption of Ownership" clause, upon which Dr. Arabi's motion fastens relentlessly while still ignoring some key language that vitiates his argument. *See id*. at § 1.5. That clause provides, in part:

> Presumption of Ownership. I agree that any Invention disclosed by me to a third person, or described in a patent application filed by me or on my behalf within one (1) year following the termination of my employment with the Company, shall be presumed to be an Invention Created by me during the term of my employment with the Company and subject to the terms of this Agreement ***unless proven by me to [the] Company's reasonable satisfaction to have been Created by me following the termination of my employment with the Company.***"

*Id*. (emphasis added).  The United States expects to elicit testimony at trial that provisions like Arabi's IP Agreement are exceedingly common in the tech industry.

### 2. Dr. Arabi's Agreement to Qualcomm's Business Code.

In addition to the IP Agreement, Dr. Arabi reviewed and affirmed Qualcomm's business code of conduct ("Code of Conduct").  Pilchak Decl. ¶ 2.  Among other things, the Code of Conduct provides that "Qualcomm owns the rights to anything we develop while employed at Qualcomm to the extent permitted by law . . . .  Subject to local law, this applies no matter where or when we create such intellectual property." *Id*.  That page of the Code also contains an instructive question-and-answer panel that reads:

> Q. I am an engineer and have been working on implementation of a new system protocol.  While working on this project, I got an idea for a new framework that I designed on my own time with my own resources.  Since I developed this framework completely independently of Qualcomm time and assets, does it belong to me or Qualcomm?  A. Because you are a Qualcomm employee and this idea is related to Qualcomm's business or anticipated business, Qualcomm owns the rights to the design, no matter where or when it was created.

*Id*.  Qualcomm's records reflect that Dr. Arabi assented to this code on or about November 18, 2013.  *Id*.

### B.  Abreezio's Fraudulent Formation and Sale to Qualcomm.

Despite the foregoing agreements, in late 2014, Dr. Arabi filed provisional patents for new microchip technology.  Although emails show that Dr. Arabi directed the filing process, the provisional patent paperwork named his sister Sheida Arabi as the technology's sole inventor.  For example, records submitted with one of the provisional patents listed "Sheida Arabi" (Ms. Alan's prior legal name) as its supposed sole inventor and main contact but bore Dr. Arabi's personal email address and telephone number as Alan's contact information.  Likewise, a provisional patent application filed on December 22, 2014 identified Alan as the purported inventor of the

new listed technology, as well as the applicant and filer, but listed as Ms. Alan's contact email address a sham email account that Dr. Arabi had created to impersonate his sister.

At about the same time, Dr. Arabi worked closely with a former coworker to set up a new company to hold the rights to the valuable new technology. Arabi and his former coworker discussed the new company's ownership structure, and how it could survive due diligence when the company was marketed to "QCOM" for tens of millions of dollars. The new company—which later became Abreezio—scrupulously avoided any reference to Dr. Arabi or his role in its creation and development.

Dr. Arabi recruited tech executive and codefendant Sanjiv Taneja to be Abreezio's CEO. Taneja set up new email accounts for Abreezio but wrote to Arabi that Arabi should continue to use his personal email because it would be better for "optics" reasons. As Taneja admitted in his plea agreement, he also communicated with Dr. Arabi using sham email accounts set up to impersonate Ms. Alan. Taneja even solicited sensitive internal information about Qualcomm's existing technologies from Dr. Arabi for use in Abreezio's marketing pitches. After one such pitch, Taneja texted Arabi "Thanks again to your technical prowess 'genius,' creative innovation and guidance, we made [a] great impression [at Qualcomm] yesterday!"[2]

Based on the conspirators' deception in concealing Dr. Arabi's and Shokouhi's role in Abreezio, Qualcomm entered a "Unit Purchase Agreement" ("UPA") agreeing to buy Abreezio for a total of roughly $180 million. *See* ECF 112-1 ¶¶ 2–3. Qualcomm paid $150 million to the co-conspirators and others before discovering the fraud.

---

[2]    Without any particular evidence, Dr. Arabi's motion slanders the prosecution as "grossly sexist" for supposedly assuming that Ms. Alan could not have invented the core technology herself, apparently because she is a woman. ECF 190-1 at 8. But this case is founded upon evidence, not prejudice—such as the above text message, or an email from one of Arabi's unindicted co-conspirators setting up a planning meeting to "go over [Dr. Arabi's] idea/patent application" the same month that Karim filed the provisional patents for Abreezio's technology. Pilchak Decl. ¶¶ 3, 4.

# III.

# ARGUMENT

## A. Inventorship.

### 1. *Dr. Arabi's Motion Is Procedurally Improper.*

Dr. Arabi seeks a pretrial declaration from this Court on some of the central factual allegations in this case, which would otherwise be weighed by the jury. That is, he asks the Court to declare, pretrial, that "Ms. Alan—and not Dr. Arabi—is a true and correct inventor of" one of the key patents. ECF 190-1 at 4. More than that, he demands additional sweeping relief in the form of (1) an order precluding "the government [or] its witnesses from offering any argument or evidence to the jury at trial that Dr. Arabi is an inventor" of one of the key patents "or any other Abreezio patent," or that Ms. Alan is *not* a true inventor of one of the key patents; and (2) an outright instruction to the jury that (i) Ms. Alan is the patent's true inventor; (ii) Dr. Arabi is not; and (iii) "in any event, Dr. Arabi was under no obligation to assign his inventions to Qualcomm." ECF 190-1 at 20.

Dr. Arabi's motion cites precisely zero authority for the proposition that such dramatic relief is *ever* warranted in a criminal case, let alone one like his where the facts are hotly contested. In effect, he seeks partial summary judgment, which is of course a civil remedy and not a criminal one—and even then, is only available when there are no material facts in dispute. *Compare* Fed. R. Civ. P. 56(a) & (g).

In a criminal case, on the other hand, a defendant may raise a defense via pretrial motion only if the merits of the defense can be determined "without a trial of the general issue." Fed. R. Crim. P. 12(b)(2); *see also United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010). "However, if the pretrial motion raises factual questions associated with the validity of the defense, the district court cannot make those determinations" because "[d]oing so would invade the province of the ultimate finder of fact." *Id.*, citing *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). "If the pretrial claim is substantially founded upon and intertwined with evidence

concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *Shortt Acct. Corp.*, 785 F.2d at 1452 (internal citation omitted); *see also Schafer*, 625 F.3d at 636 (concluding the defendant's pretrial motion raised factual disputes that "were intertwined with the 'general issue' to be decided at trial," such that "[t]he district court would have usurped the role of the jury had it conducted an evidentiary hearing and answered these factual questions").

Here, addressing Dr. Arabi's motion on the merits cannot be done without "a trial of the general issue"—or at least, one of the central issues in this case—in contravention of Rule 12 and the proper function of the ultimate fact finder.

### 2. Dr. Arabi's Motion is Factually Unfounded.

Factually, Dr. Arabi asserts that the United States will be unable to muster evidence to meet the unique legal test he has smuggled over from patent infringement law, and therefore argues that a declaratory judgment is necessary. Quite apart from the procedural error he makes in assuming that the government can be forced, pretrial, to muster its trial evidence to get past the quasi-summary judgment gate he seeks to erect, Arabi's factual bases for this request are also suspect.

As just one example, Dr. Arabi's motion contends that the government will have no direct evidence of inventorship at trial to contradict his (and Ms. Alan's) prior "testi[mony] under oath that Ms. Alan, not Dr. Arabi, is an inventor of" one of the key patents. ECF 190-1 at 3. By testimony "under oath," Karim evidently means his (and Sheida's) sworn responses to Requests for Admission in Qualcomm's civil fraud suit, in which they both denied requests to admit that Dr. Arabi was the true inventor of Abreezio's core technology. Pilchak Decl. ¶¶ 6–7. But this puts a great deal of weight on two self-serving claims by indicted defendants, whose evidentiary basis at trial is uncertain—at least unless and until each defendant testifies. More fundamentally, it is rather ironic for Arabi to ground his motion on the supposedly undisputed truth of *these*

discovery responses, when some of his other essential responses in the civil fraud suit were demonstrably false.[3]

### 3. Dr. Arabi's Motion Is Legally Improper.

Dr. Arabi argues that the Court should rule pretrial on these contested factual issues because declaratory judgment is available by statute in the highly specialized domain of private patent infringement law. This argument is creative but unpersuasive.

Dr. Arabi's motion cites fifteen cases in support of his argument for declaratory judgment on inventorship. Eleven of them are patent infringement suits. The others are two suits seeking pre-prosecution judgments declaring new laws unconstitutional,[4] and two seeking purely legal judgments about the scope of federal criminal statutes.[5] But Arabi's motion seeks to do neither of those things. He does not challenge the constitutionality of his charges, which of course he is free to do if he can muster any legitimate grounds. Nor does he argue that his alleged conduct is outside the scope of those statutes. Instead, Dr. Arabi seeks a pre-trial *factual* determination about some of the core conduct at issue in this case.

Rather than cite relevant authority, Dr. Arabi inverts the general logic that a party seeking relief must show that they are entitled to it and boldly argues that he should prevail because no court has *rejected* the applicability of the patent law remedy he seeks.

---

[3]  As pled in the indictment, Dr. Arabi caused service of interrogatory responses falsely denying that he had any role in the "formation, operation [or] sale of Abreezio LLC" besides "introduc[ing] his sister Sheida Alan to his long-time acquaintance Sanjiv Taneja." ECF 9 at 17. When later required to answer the same interrogatory under oath, Arabi conspicuously omitted this language, then acknowledged a whole series of events in which he participated in the company's formation and operations. Pilchak Decl. ¶¶ 9–10.

[4]  *See Steffel v. Thompson*, 415 U.S. 452 (1974); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.C.D.C. 1972).

[5]  *See New Hampshire Hemp Council v. Marshall*, 203 F.3d 1 (1st Cir. 2000); *Monson v. Drug Enforcement Admin.*, 522 F.Supp.2d 1188 (D. N.D. 2007).

*Compare Celotex v. Catrett,* 477 U.S. 317, 323 (1986) (the moving party "always bears the initial responsibility of informing the district court of the basis for its motion"). This, of course, is no support at all.

In the absence of any kind of precedent, Dr. Arabi argues that the Court should accede to his demand because Qualcomm and "the executive branch" have supposedly taken the position that Ms. Alan was the key patent's true inventor. Left unsaid is how exactly Qualcomm's filing of perfunctory certification documents with the patent office—seeking merely to change the name of the holder on Abreezio's patents from Abreezio to Qualcomm after the multi-million dollar acqusition—could somehow collaterally estop the United States from proving in this case that Dr. Arabi was involved in developing Abreezio's technology. ECF 190, Ex. F.[6] Similarly, Arabi never explains how the acceptance of those documents by the U.S. Patent and Trade Office, which was privy to none of the underlying facts of his fraud, could lead to the same result.[7]

In reality, these arguments are all red herrings. The proper arena to decide Dr. Arabi's contentions is not a specialized remedy hauled over from patent infringement law, but the truth-seeking crucible of trial.

---

[6]   Dr. Arabi can certainly cross-examine Qualcomm witnesses on this point at trial for whatever "devastating" effect he believes it will have on the government's case. ECF 190-1 at 11. The witnesses could respond, if appropriate, by explaining what they knew (or didn't know) about Qualcomm's ongoing internal effort in July 2017 to untangle the web of deceit that Arabi and his accomplices had spun to hide his involvement in Abreezio. Then the jury can evaluate those facts for itself, as juries do in criminal cases.

[7]   It would be odd indeed if that were the case. Successfully defrauding the government often causes government agencies to create inaccurate records, induced by the fraud, that reflect a defendant's version of events. If the sheer existence of those records sparked collateral estoppel against the entire executive branch, few cases of fraud on the government could ever be prosecuted.

### B.      Dr. Arabi's Agreement With Qualcomm.

Dr. Arabi also seeks pretrial declaratory relief that one of his key agreements with Qualcomm was invalid. Procedurally, this argument is closer to the mark in that it seems to seek relief on a matter closer to a pure issue of law. Yet even a brief examination of the facts shows that this motion, too, is ill-founded on the evidence. It also misapplies the relevant statute and fails the legal test erected by Karim's own authorities.

#### 1.      Dr. Arabi's Motion Challenges The Wrong Provision.

Dr. Arabi's request for declaratory relief focuses on the supposed invalidity of Section 1.5 of his IP Agreement—the provision that presumptively assigns rights to inventions patented or disclosed by Arabi with a year of his termination. But that provision does not apply to his conduct in this case.

Here, no one alleges that Dr. Arabi patented or disclosed an invention within a year after leaving Qualcomm, requiring the application presumption of which he complains. Instead, Arabi is charged with developing valuable technology *while employed at Qualcomm*, which triggers the most basic provision of the IP Agreement— Section 1.1—a clause that Arabi's motion never challenges.[8] Indeed, in his motion, Dr. Arabi cites no authority finding an employment agreement invalid where the disputed invention was actually created *during* the period of employment.[9]

---

[8]      It is also worth pausing to note that Dr. Arabi never sought a declaration that his employment agreement was invalid when he was planning in 2014 (while on Qualcomm's payroll) how to set up Abreezio to monetize his new technology. Instead, he concocted and executed an elaborate fraud, and only now seeks to escape liability for that fraud through a clever legal argument. Rather predictably, Arabi cites no case in which an employee is alleged to have defrauded his former employer by selling it technology conceived during his employment, but escaped a fraud prosecution by arguing that his employment agreement was technically invalid under state labor law.

[9]      Compare *Whitewater West Indus., Ltd. V. Alleshouse*, 981 F.3d 1045, 1050 (the parties stipulated that "the inventions at issue were not conceived until after [defendant] left his job").

### 2. Dr. Arabi's Motion Misapplies The Relevant Statute.

Even re-interpreting Dr. Arabi's motion as a challenge to the correct provision of the IP Agreement does not save it, however, because his argument is also inconsistent with the plain language of the statute upon which it relies.

California Business and Professions Code Section 16600 provides that "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is **to that extent** void." (Emphasis added.) The bolded language—voiding offending agreements *to the extent that they restrain a lawful profession*—shows that the statute does not void the entirety of Arabi's IP Agreement, even if he were correct that Section 1.5's presumptive restraint on post-employment patent filings violates the statute. Rather, Section 16600 would void the contract *to that extent*—i.e., it would void Section 1.5, and not the entire agreement, which is independently fatal to Arabi's claim.

Limiting the reach of Section 16600 to Section 1.5 (a provision irrelevant to this case) is even more obviously the correct result because the IP Agreement contains an explicit severability clause, providing that even if one provision is found invalid or unenforceable, the rest of the agreement will continue in full force and effect. *See* Ex. G at § 6.4. Indeed, courts have found that a severability clause permits a court to enforce certain provisions of an employment agreement, even after finding other provisions invalid under Section 16600. *See Hendrickson v. Octagon Inc.*, 225 F.Supp.3d 1013, 1030 (N.D. Cal. 2016) (proceeding to "enforce some provisions of the agreements and not others" because "the parties here contracted for this very circumstance").

### 3. Dr. Arabi's Motion Misreads The Caselaw.

Notwithstanding the clear limitations of Section 16600, and the fact that his challenge only undermines an irrelevant provision of the IP Agreement, Dr. Arabi argues that a fatal clause anywhere in an employment agreement automatically invalidates the entire agreement. But the cases do not support this sweeping rule.

The closest Dr. Arabi's motion comes is *Applied Materials, Inc. v. Demaray LLC*, 2021 WL 4222177—an unpublished decision from the Northern District of California whose force actually depends upon a prior published decision: *Applied Materials Inc. v. Advanced Micro-Fab. Equip. (Shanghai) Co.*, 670 F.Supp.2d 1084 (N.D. Cal. 2009). Both the published and the unpublished *Applied Materials* decisions construed clauses presumptively assigning inventions patented or disclosed within one year of termination. But critically, neither clause contained the specific language in Arabi's IP Agreement, allowing the employee to rebut the presumption and show that a particular invention was conceived *after* employment, in which case there would be no assignment. 2021 WL 4222177 at *9; 670 F.Supp.2d at 1088–89.

This omission was dispositive for the precedential published *Applied Materials* court, which refused to read a right to rebut the presumption into the clause because it was not expressly set out therein. *Id.* at 1089. Even if Dr. Arabi were correct that these district court decisions created an ironclad rule that California law prohibits reading a narrowing construction into an employment restriction, no such narrowing construction is necessary here: Arabi's clause contains its own limits, even if they are missing from his motion.[10]

### 4.     Section 1.5 Passes Muster Under CBP Code Section 16600.

Even if this prosecution depended upon Section 1.5, which it does not, the Court could find that section valid and enforceable under existing law. As shown above, Dr. Arabi's IP Agreement with Qualcomm is not truly a post-employment non-competition agreement, in contravention of California law. *Cf. Hendrickson*, 225 F.Supp.3d at 1027 ("Section 16600 does not bar all post-employment obligations; they

---

[10]     Again, the severability clause of Dr. Arabi's IP Agreement further dooms his argument: even if *Applied Materials* required excision of Section 1.5, which is doubtful, the remaining provisions would be valid. The *Hendrickson* court in fact reached precisely this conclusion, explicitly distinguishing *Applied Materials* on that basis. *See* 225 F.Supp.3d at 1030.

must still 'restrain' trade in the first place."). In fact, the IP Agreement does not conclusively bar Arabi from doing *anything* after he leaves the company—even directly competing with Qualcomm in the same field in which he worked for the company, using know-how he developed there.

To be sure, the agreement did create a host of obligations from Dr. Arabi to Qualcomm while he worked at (and was handsomely paid by) the company. Most importantly, he was obliged generally to assign rights to his inventions to the company during employment; to grant the company a royalty-free license to such inventions, if they could not be legally so assigned; and to waive his ability to assert rights in those inventions, if such royalties could not be legally granted.[11]

But even this core obligation had a carve-out in Dr. Arabi's favor: any inventions he developed on his own time and his own dime, which did not relate to Qualcomm's business or research and development, would remain his. He would simply have to disclose their existence to Qualcomm, along with any inventions he made while employed at the company. In fact, Arabi's IP Agreement sought to comply with California's labor laws so scrupulously that it block-quoted the California Labor Code sections barring requirements to assign an employee's private inventions, on their own time and their own dime, as long as they were unrelated to the employer's business.

Nevertheless, Dr. Arabi motion argues relentlessly that the "Presumption of Ownership" provision in Section 1.5 is an unlawful restraint of trade in violation of California law, but this overreads the cases. The crucial error is that Arabi's argument omits key language from the very provision he challenges, which shows that Section 1.5 does not decisively assign rights in inventions created by Dr. Arabi after he left Qualcomm's employ. Instead, it *presumes* that inventions created within a year of his

---

[11] In his IP Agreement, Dr. Arabi also agreed that he would not create conflicts of interest, including through outside business ventures, and that he would not compete with Qualcomm during the course of his employment.

departure were created during his employment—*unless Arabi establishes otherwise*. Dr. Arabi's motion doesn't even mention this exception to the presumption, which his brief seems to assume is a blanket assignment of all property rights in all inventions disclosed by him or described in patent filings within a year of his termination. ECF 190-1 at 17. Even under *Applied Materials*, Arabi's best authority, this explicit opportunity to rebut the presumption would save the clause.

### 5. This Is Not A Breach of Contract Action.

Separately, Dr. Arabi's motion cites various authorities about the impropriety of transmuting a private breach of contract claim into a criminal fraud prosecution. In making this argument, he continues to misunderstand the nature of this case. Arabi could have trampled on his private agreement with Qualcomm in any number of ways short of committing a crime, including by taking technology he invented while at the company and openly selling it to another firm. He could even have breached his duty of loyalty by selling his own technology to Qualcomm *without* engaging in a scheme to deceive the company about the technology's source or development. But scheming to lie about the provenance of a product sold to an unwitting victim for millions of dollars is straightforward fraud, not (or not only) a breach of contract.[12]

While Dr. Arabi dresses this argument up as a fair notice or vagueness concern—arguing that it would be impermissibly vague for him to be prosecuted for violating the obscure (and contested) terms of his employment agreement—those worries are inapplicable here. As Arabi's cases show, a primary point of the vagueness doctrine is

---

[12] Indeed, even if there was a good faith dispute about the applicability of Arabi's employment agreement, which is not conceded, it would not entitle him to defraud the company. His remedy would be to resolve the disagreement about his contract, not embark on the illegal self-help of a freewheeling fraud scheme. *Cf. Dennis v. United States,* 384 U.S. 855, 867 (1966) ("a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional.").

to provide fair notice of criminality to those within a statute's scope, to avoid unfair surprise that conduct is criminal. Here, any concern about fair notice fades away when one considers that Arabi and his co-conspirators engaged in extensive concealment activity to hide their conduct from Qualcomm. Far from confusion about whether their scheme was wrongful, this conduct plainly shows consciousness of guilt.

## IV.
## CONCLUSION

Dr. Arabi's motion should be denied.

DATED: November 27, 2023

TARA K. MCGRATH
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys