TARA K. MCGRATH
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7540
Email: eric.olah@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br><br>Defendant. | Case No.:   22-CR-1152-BAS<br><br>Date:   December 4, 2023<br>Time:   2:45 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' RESPONSE IN OPPOSITION TO DR. ARABI'S MOTION TO SUPPRESS HIS POST-ARREST STATEMENTS (ECF 193)** |

Defendant Karim Arabi received accurate *Miranda* warnings orally and in writing, confirmed he understood his rights, and validly waived them. The only question he had about an attorney was whether the investigators "assign a lawyer"—a question he asked at the end of his nearly 90-minute interview. There is good reason for the Court to disbelieve Dr. Arabi's new, self-serving, and unsupported claim that he unambiguously invoked his right to counsel *before* the video-recorded interview. Moreover, his alleged selective invocations during the interview are neither "unequivocal" or as consequential as he contends, and even a cursory skim of the transcript disproves his claim that his statements were involuntary.

The Court should deny Dr. Arabi's motion to suppress his post-arrest statements.

I.

**RELEVANT FACTS**

**A.    Dr. Arabi Never Invoked his Right to an Attorney.**

In his sworn declaration, Dr. Arabi claims that practically the first thing he was asked, unprompted, by one of the most senior case agents present at his arrest was also the one question most likely to terminate his interview before it began—whether Dr. Arabi wanted to speak with his lawyer.  ECF 193-2 at ¶ 5.  In the attached declaration, Senior Inspector John Shindledecker explains that what he actually asked was whether Dr. Arabi had any phone numbers he wanted to retrieve from his cell phone.  *See* USA Ex. 1 at ¶¶ 5, 6.  In response, Dr. Arabi provided a name, and Inspector Shindledecker searched the contacts section of the cell phone but could not find the individual.  *Id.* at ¶ 7.   When searching the email application on the phone, however, Inspector Shindledecker saw one or more emails that referenced privilege or confidentiality, and scrupulously did not open the identified emails.  *Id.* at ¶ 7.  Nothing about these facts amounts to an unambiguous invocation of the right to counsel.  *Davis v. United States*, 512 U.S. 452, 459 (1994) (invocation must be unambiguous).   Indeed, Inspector Shindledecker's declaration is clear: contrary to Dr. Arabi's self-serving claim, he "did not ask [Dr. Arabi] if he wanted to talk to a lawyer" during the search of the residence.  USA Ex. 1 at ¶ 5.

Inspector Shindledecker's account is also consistent with the contemporaneous written record of the search that Dr. Arabi attaches to his motion.  *See* ECF 193-2.  In the FBI 302 memorializing the search operation, the entry at 6:28 a.m. records that "SI Shindledecker retrieved [Dr. Arabi's cell phone] so ARABI could get telephone numbers from the device. . . . SI Shindledecker brought the [phone] to where ARABI was held for transport."  *Id.*  Despite Dr. Arabi's claim that this entry somehow reinforces his own memory that he was asked whether he wanted to call his lawyer, what it actually shows is precisely what Inspector Shindledecker recalls: an attempt to

get Dr. Arabi to unlock his phone to retrieve any phone numbers he wished to access. *See also* USA Ex. 2 (a separate report noting that at approximately 6:32 "ARABI allowed to access telephone.  ARABI asked SI Shindledecker to provide contact for 'Iian'.").

## B.   Additional Facts Cast Doubt on the Alleged Request for an Attorney.

Inspector Shindledecker's declaration and the contemporaneous written records are not the only reason the Court should question the veracity of Dr. Arabi's alleged invocation.  As a general matter, he is charged with orchestrating a sophisticated, multi-year scheme to defraud in which he and others duped his employer into purchasing technology it legally but unknowingly owed.  ECF 9 at 4.  The recent guilty pleas and sworn admissions of two co-defendants confirm Dr. Arabi's role in the scheme and his prior lies in the course of litigation.

### 1.   The admissions of two co-defendants indicate Dr. Arabi lied in his civil discovery responses, as alleged.

Especially relevant to the Court's credibility determination are the allegations in the Superseding Indictment that Dr. Arabi provided false responses to interrogatories in civil litigation with Qualcomm.  ECF 9 at 16-17.  Specifically, when asked to describe his role in the formation, operation, and sale of Abreezio LLC, Dr. Arabi falsely claimed he "introduced his sister Sheida Alan to his long-time acquaintance Sanjiv Taneja, which introduction ultimately led to the formation of Abreezio, LLC" but otherwise "had no role in the formation, operation or sale of Abreezio, LLC."  *Id.*  In a verified response served months later, Dr. Arabi dropped his claim about having "no role" in Abreezio, but still maintained Abreezio was the result of him introducing Sheida and Taneja.

The problem for Dr. Arabi:  **two** of his co-conspirators have now admitted under penalty of perjury that Dr. Arabi, contrary to his prior discovery response, "was intimately involved in Abreezio's formation, development, and marketing."  ECF 144

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*

at 3, 179 at 3.  And while Dr. Arabi claimed (in a verified response) that he simply played the role of matchmaker between Sheida and Taneja, Taneja has confirmed that claim was a lie because he "never met Sheida."  ECF 144 at 3.  Further contrary to Dr. Arabi's interrogatory response that Abreezio was Sheida's project, Taneja (the CEO of Abreezio) and Shokouhi have admitted that, to their knowledge, "Sheida did not participate in technical or strategic decision-making concerning Abreezio at any time." ECF 144 at 3, 179 at 3.[1]  Finally, Taneja's admission that after Dr. Arabi learned of Qualcomm's investigation, he met with "and directed [Taneja] to delete his emails concerning Abreezio" (ECF 144 at 4), evidences Dr. Arabi's dishonesty and willingness to hide the truth, and provides yet another reason for the Court to question the claims in his declaration.

### 2. Incidental inaccuracies in Dr. Arabi's declarations.

The Court should note two other statements in Dr. Arabi's declaration.  First, Dr. Arabi's declaration claims that his exchange with Inspector Shindledecker outside of his house happened "[a]bout an hour into the search."  ECF 193-2 at 2.  Curiously, his motion slashes that estimate in half and asserts it was "[a]bout a half hour into the search." ECF No. 193-1 at 8.  One explanation for the editorializing: Dr. Arabi's "hour" estimate is inconsistent with the evidence, including the FBI-302 he attaches as Exhibit 2.

Moreover, the United States has produced an audio recording that begins with FBI Special Agent Townsend stating the time is approximately 6:44 a.m. and that he is beginning the transport of Dr. Arabi from his residence to the FBI office.  The recording does not capture any request from Dr. Arabi to speak with a lawyer (or any of the exchange with Inspector Shindledecker about phone numbers).  Approximately 26 minutes into that audio recording (so, approximately 7:10 a.m.), Inspector

---

[1] In his motion, without citing his declaration (or any source at all), Dr. Arabi now claims that Sheida "connected with technical and business professional known to Dr. Arabi" before Qualcomm's acquisition of Abreezio in 2015.  *See* ECF 193-1 at 6.

Shindledecker begins the post-arrest interview transcribed in Exhibit 4 to Dr. Arabi's motion. That is, the audio recording beginning at 6:44 a.m. overlaps with the video-recorded post-arrest interview that began around 7:07 a.m.

Even assuming "the search" of the house started when Dr. Arabi was handcuffed at 6:03 a.m. (*see* Exhibit 2 to the motion, which indicates the initial clearance search of the house was ten minutes after Dr. Arabi's arrest at 6:13 a.m.), Dr. Arabi's alleged request to speak with a lawyer "about an hour" later would take him to roughly 7:03 a.m.—when he was either at the FBI office or being transported there by Special Agent Townsend.

The second suspect claim in Dr. Arabi's declaration: "It did not occur to me, until much later, that the home search was related to the civil dispute with Qualcomm." ECF 193-2 at 2. The motion adds to this assertion, claiming that Dr. Arabi "was very surprised" to learn about the criminal investigation "[o]nly at the end of the interrogation." ECF 193-1 at 18). The implicit claim in Dr. Arabi's motion that he was unaware of the connection between his dispute with Qualcomm and his interview and the agents' search cannot survive even a brief reading of his interview transcript, which mentions the word "Qualcomm" at least 50 times. *See generally* Def. Ex. 2. Indeed, by page 21, after reviewing Dr. Arabi's employment history—and asking follow-up questions about his time and focus at Qualcomm—the agents asked whether Dr. Arabi worked on DFT technology at Qualcomm. Ex. 2 at 21:22. Thereafter, the interview embarked on a series of questions and topics covering numerous topics on the subject that Dr. Arabi's motion suggests was concealed until the end of the interview.

There are additional reasons to question to question Dr. Arabi's purported "surprise." Notably, the search of Dr. Arabi's cell phone revealed emails memorializing questions and answers posted to the website Quora. An email sent from Quora to Dr. Arabi on April 18, 2018, contained the beginning of a question in the subject line: "If someone, on their deathbed, confesses to law enforcement a horrific crime that has . . .

. ."  Another email approximately one month later revealed the question "Which laws do police officers least enjoy enforcing?"  Further, one of Dr. Arabi's main arguments at the outset of the case was that he knew law enforcement was investigating him for at least one year before his arrest.  According to his attorney, that knowledge was based on a filing in the civil suit and, separately, his learning of a subpoena for his and Sheida's emails.  Given such prior queries and representations, the Court should be leery of Dr. Arabi's claim that he did not learn about the criminal investigation until the end of his interview on August 9, 2022.[2]

## C.   Within an Hour of his Alleged Request for a Lawyer, Dr. Arabi Waived His Right to a Lawyer in Writing.

Special Agent Townsend transported Dr. Arabi from his residence to the FBI office.  As discussed in greater detail below, Special Agent Townsend advised Dr. Arabi of his *Miranda* rights during a video-recorded interview at the FBI office.  Exhibit 4 to Dr. Arabi's motion is a document titled "FEDERAL BUREAU OF INVESTIGATION ADVICE OF RIGHTS."  Notably, the document:

- Is dated August 9, 2022, which is the day agents arrested Dr. Arabi at approximately 6:03 a.m.

- Twice indicates the time of the rights advisal and waiver was 7:13 a.m.

/ /

/ /

---

[2] In a footnote, Dr. Arabi questions the "need" for the number of agents executing the search warrant of his residence.  ECF 193-1 at 7, n. 1.  Although this question has no real bearing on his motion, the answer is two-fold:  the home is nearly 4,000 square feet according to Zillow, and agents never know the degree of danger and resistance that awaits inside a house.  *See, e.g.,* National Public Radio, 2 FBI Agents Killed, 3 Others Wounded in Raid in Southern Florida, Feb. 2, 2021, *available at* < https://www.npr.org/2021/02/02/963206415/2-fbi-agents-are-killed-3-others-wounded-in-raid-in-sunrise-fla > (noting the surviving family members of the murdered agents, who were executing a residential search warrant to seize evidence in connection with suspected possession of child pornography).

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*                                    *22-CR-1152-BAS*

- Advises in part "You have the right to talk to a lawyer for advice before we ask you any questions" and "the right to have a lawyer with you during the questioning."

- Further advises "if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."

- Bears Dr. Arabi's signature, under the heading "CONSENT" and the printed statement "I have read this statement of my rights and I understand what my rights are.  At this time, **I am willing to answer questions without a lawyer present**." Def. Ex. 4 (emphasis added).  In between that statement and his signature, Dr. Arabi handwrote "My phone was opened without my consent to find my lawyer number and left opent [sic] with agents.  without my consent."

**D.     Defendant Did Not Request a Lawyer at Any Point During the Roughly 90-Minute Video-Recorded Interview.**

Dr. Arabi's motion includes an 82-page transcription of his post-arrest interview, evidently prepared by the defense, that the United States generally accepts as accurate for purposes of the pending motion only.  Because it does not appear Dr. Arabi submitted the video recording of that interview, the United States will lodge a disk of that recording as Exhibit 3.  Based on the time stamps of the video, the interview started around 7:07 a.m. and concluded around 8:31 a.m.  Notably:

- The interview began with Special Agent Townsend providing Dr. Arabi a granola bar and, four minutes later, a bottle of water. Def. Ex. 2 at 3:4-6; USA Ex. 2 (time stamp 07:11:50-59) (providing water bottle while Dr. Arabi writes on the *Miranda* form).

- Inspector Shindledecker and Special Agent Townsend were dressed in plain clothes, with no visible weapons, and used a friendly, conversational tone throughout the interview.

- Inspector Shindledecker explained at the outset of the interview that "you're under no obligation to talk to us." Def. Ex. 2 at 3:18-19.

- Inspector Shindledecker stated he works for the United States Marshals Service, Special Agent Townsend stated he works for the FBI, and both showed their credentials to Dr. Arabi. *Id.* at 3:23 to 4:3.

- At the outset, Inspector Shindledecker explained "you know more than we do" and that the investigators wanted to hear Dr. Arabi's "side of the story." *Id.* at 3:21-23.

- Special Agent Townsend then added: "I'm sure you have some questions. It's totally fine. You can ask any questions you want." *Id.* at 4:4-5. At no point in the interview did Dr. Arabi ask why he was arrested or why he was at the FBI office.[3] Nor did he ever reiterate his supposed request to speak to a lawyer.

- Special Agent Townsend advised Dr. Arabi of his *Miranda* rights, including "the right to talk to a lawyer for advice before we ask you any questions," "the right to have a lawyer without during questioning," and that a lawyer "will be appointed for you before any question if" Dr. Arabi wished and could not afford a lawyer. *Id.* at 4:18-25.

- Special Agent Townsend further explained: "If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time." *Id.* at 4:25 to 5:3.

/ /

---

[3] But Dr. Arabi did ask questions *after* agents ceased questioning. Dr. Arabi, while leisurely perusing a magazine, broke the silence and spontaneously asked Special Agent Townsend "So why now? Why it took so long?" And When Special Agent Townsend sought clarification of the question, Dr. Arabi stated "this acquisition was a long time ago." Def Ex. 2 at 73:23 to 74:4; USA Ex. 2 (time stamp 08:41:59 to 08:42:18). It was following this exchange (again, after the interview concluded) that Dr. Arabi first referenced a recent "home invasion."

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Special Agent Townsend then asked if Dr. Arabi understood all his rights, and Dr. Arabi answered "Yes." *Id.* at 5:3-4.

- Special Agent Townsend then asked if Dr. Arabi had any questions about any of his rights and whether he wanted them read aloud again.  Dr. Arabi answered "No." *Id.* at 5:5-7.

- Special Agent Townsend then presented a written *Miranda* form for Dr. Arabi to review, and read aloud the statement "I understand what my rights are at this time.  I'm willing to answer questions without a lawyer present."  Special Agent Townsend explained "So if you would like to, you can agree to that." *Id.* at 5:8-13.  Before signing the *Miranda* form, Dr. Arabi answered "Yes.  So the only thing I didn't consent to opening my phone."  *Id.* at 5:14-15.  After he noted that lack of consent on the *Miranda* form, Inspector Shindledecker conscientiously clarified that notwithstanding that note, he still wanted to speak with agents.  Inspector Shindledecker asked if Dr. Arabi's signature meant "you are agreeing that you've read your rights, [and] you are agreeing to talk with us right now and answer some questions?"  "Yes," responded Dr. Arabi unequivocally.  *Id.* at 6:6–14.

- Dr. Arabi did not at this (or any other) time request a lawyer.  Notably, at the end of the interview, he asked a question that confirmed he understood his right to have a lawyer.  *Id.* at 71:1-2 ("And the lawyer will be—you guys assign a lawyer?").

- Following the *Miranda* advisal and waiver, Special Agent Townsend then offered to open the granola bar for Dr. Arabi, who responded he was not hungry.  Agent Townsend asked if Dr. Arabi needed to use the bathroom before the questioning started, and Dr. Arabi answered that he did.  *Id.* at 6:15 to 7:8.  The investigators honored that request, and the video shows Dr. Arabi standing up on his own, walking out of view of the camera, and returning to

the office chair for the interview 3.5 minutes later.  USA Ex. 2 at 07:13:00 to 07:16:32.[4]

At the start of the questioning, Dr. Arabi answered each of Inspector Shindledecker's dozens of questions.  His demeanor was calm, lucid, and responsive. *See generally* USA Ex. 2.  In terms of substance, Dr. Arabi confirmed his phone number and email address.  He stated "Sheida Alan" was his sister in Canada, and that he had another sibling (with last name Arabi) in Norway, a country he's visited.  Dr. Arabi stated he has both a bachelor's degree and a PhD in electrical engineering.  He summarized his employment history and confirmed his familiarity with design for test technology and Abreezio.  *See* Def. Ex. 2 at 7:13 to 23:17.

When Inspector Shindledecker asked "what is Abreezio?" Dr. Arabi responded "I can't . . . I don't want to talk about it."  Def Ex. 2 at 23:18-23.  That was the first of what Dr. Arabi now claims were "unequivocal invocation[s] of *Miranda*" (ECF 193-1 at 11), which he interspersed between providing substantive answers to questions—in each instance, when the questions approached the facts at issue in this case.  A sample of the questions and alleged invocations Dr. Arabi provided in response:

| Question | Dr. Arabi's Response | Citation |
|---|---|---|
| "[W]hat is Abreezio?" | "I can't—" then "I don't want to talk about it." | Def. Ex. 2 at 23:18-23. |
| "[W]ere you involved at all in the makeup of the company that [Sheida] licensed that—she's licensed the technology to do?" | "I'm not comfortable to talk about that." | *Id.* at 33:8-12. |

---

[4] It is of minimal (if any) relevance here, but Dr. Arabi's transcription quotes Special Agent Townsend as offering "if you need to use *the water* or need water or anything like that, just let me know.  Okay?" Def Ex. 2 at 7:6-8 (emphasis added).  The video recording documents that Special Agent Townsend (as Dr. Arabi returned to interview the room from the bathroom break) actually began that offer "if you need to use the *restroom*[.]"  *See* USA Ex. 2 at 07:16:23 to 07:16:30.

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*
10
*22-CR-1152-BAS*

| Question | Dr. Arabi's Response | Citation |
|---|---|---|
| "What about [name] or Tane[j]a, can you—are you comfortable talking about them?" | "Huh-huh." | *Id.* at 33:20-23. |
| "So if you had any inventions while you worked at Qualcomm or you invented any new technology that was related to the work that you did at Qualcomm . . . . [I]s it your understanding that Qualcomm would own that technology?" | "I don't know.  I'd have to go back.  I'm not comfortable to talk about it." | *Id.* at 34:12-23. |
| "Were you aware of anything intentionally hidden from Qualcomm during that [acquisition] process?" | "I can't talk about that.  I mean, I know that it was sold and—but I just don't remember the exact amount." | *Id.* at 39:10-15. |
| If Shokouhi's "company was involved, do you think that would have been sort of a red flag or something like Qualcomm would have wanted to know when they did their due diligence?" | "I can't talk about that.  I don't know what was the relationship.  So even—I—I never worked directly with that company when I was at Qualcomm so I don't know their relationship to assess." | *Id.* at 41:11-18. |
| "Did you ever pose as Sheida and send e-mails using her name?" | "I can't talk about that." | *Id.* at 37:3-5. |

Even though he had been advised (and acknowledged) that he had the right to remain silent, and even "[i]f you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time," Def. Ex. 2 at 4:25 to 5:3, Dr. Arabi never requested that the interview cease or asked to speak with an attorney.

/ /

## II.

## ARGUMENT

### A.  Dr. Arabi Did Not "Unambiguously Request Counsel."

*Miranda* requires the United States to "demonstrate[] the use of procedural safeguards" before using at trial statements "stemming from a custodial interrogation of the defendant." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  *Miranda* identified as a sufficient safeguard an advisal of certain rights prior to questioning and explained "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

The United States agrees that if the exchange with Inspector Shindledecker transpired as Dr. Arabi claims (i.e., he clearly "requested a lawyer," ECF 193-1 at 14), the invocation would be "a significant event" requiring that questioning cease.  *See Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (citing *Miranda*, 384 U.S. at 474).  But there is every reason to doubt Dr. Arabi's self-serving and unsupported claim of such an invocation.

As detailed in Inspector Shindledecker's declaration, he retrieved Dr. Arabi's phone and asked if there were any phone numbers he wanted.  Dr. Arabi provided a bare name which he did not identify as a lawyer, and Inspector Shindledecker, while searching the phone for a phone number associated with the requested name, saw indications that the name might belong to a lawyer.  Thus, the question presented is whether a request for a contact's phone number is a sufficient invocation of *Miranda* rights if the agent later learns the contact is an attorney (either while searching for the requested phone number or when the defendant later identifies it as belonging to an attorney).  While Dr. Arabi has not identified any case directly on point, the Supreme Court and Ninth Circuit have consistently required clear and unambiguous invocations.

In *Davis v. United States*, the Supreme Court explained simply "the suspect must unambiguously request counsel."  512 U.S. 452, 459 (1994) ("if a suspect makes a

reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning"). Dr. Arabi's motion quotes the line in *Davis* that a defendant need not "speak with the discrimination of an Oxford don" (ECF 193-1 at 13), but omits critical language before and after that quote. What the Supreme Court actually wrote was:

> Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* (citation omitted); *see also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights"). As the Supreme Court explained in *Davis*: "when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity[.]'" 512 U.S. at 460 (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)); *see also Davis*, 512 U.S. at 462 ("[W]e are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.").

Case law presents a host of alleged and actual invocations available for comparison. For example, the Supreme Court found in *Davis* that a defendant's statement to agents "Maybe I should talk to a lawyer" was an insufficient request for counsel. 512 U.S. at 462. The Ninth Circuit has adhered to *Davis*. *See, e.g., Michaels*

*v. Davis*, 51 F.4th 904, 923 (9th Cir. 2022), petition for cert. pending, No. 23-5038 (docketed July 5, 2023) (finding "I don't know if I should without an attorney" to be an insufficient invocation); *Petrocelli v. Baker*, 869 F.3d 710, 723 (9th Cir. 2017) (finding insufficient "I'd sort of like to know what my . . . lawyer wants me to do," followed by defendant's confirmation that he understood his rights, and later "I even have a . . . part-time attorney and just to answer questions for me," where the officer restated defendant did not have to answer any questions or make any statements); *Scott v. Hornbeak*, 447 F. App'x 784, 785 (9th Cir. 2011) (unpub.) (affirming reasonableness of determination that defendant's statement to police—"I should talk to an attorney"—"was not an unequivocal request for an attorney").

Of course, the Ninth Circuit has found unambiguous statements sufficient to invoke *Miranda* rights. *See, e.g, Mays v. Clark*, 807 F.3d 968, 971 (9th Cir. 2015) (finding defendant sufficiently invoked when asking "can I call my dad so I can have a lawyer come down," "my step-dad got a lawyer for me," and then "can you call him and have my lawyer come down here?"). In *Sessoms v. Grounds,* 776 F.3d 615, 617-18 (9th Cir. 2015) (en banc)—which Dr. Arabi claims "is on point" (ECF 193-1 at 14)—the defendant sufficiently invoked when he asked detectives "There wouldn't be any possible way that I could have a—a lawyer present while we do this?" and then "Yeah, that's what my dad asked me to ask you guys . . . uh, **give me a lawyer**." (emphasis added). And in *Alvarez v. Gomez*, the defendant asked (1) "Can I get an attorney right now, man?" (2) "You can have attorney right now?" and (3) "Well, like right now you got one?" 185 F.3d 995, 998 (9th Cir. 1999). In finding defendant sufficiently requested an attorney, the Ninth Circuit "considered together" the defendant's three questions. *Id; see also Michaels*, 51 F.4th at 925 ("In light of clear Supreme Court precedent, we have recognized the importance of evaluating a suspect's in-custody statements as a whole.") (quoting *Sessoms*, 776 F.3d at 627).

//

In evaluating the sufficiency of Dr. Arabi's alleged invocation, the Court should "consider together" the request for a phone number and all other documented facts indicating he did not actually seek an attorney. Those other facts include that, less than an hour after Dr. Arabi's request for a number from his phone, Special Agent Townsend orally advised Dr. Arabi of his *Miranda* rights (the accuracy of which Dr. Arabi does not contest in his motion); Special Agent Townsend asked if Dr. Arabi understood all his rights, and Dr. Arabi answered "yes"; Dr. Arabi then signed a *Miranda* waiver form that stated—as Special Agent Townsend read aloud—he understood his rights and was "willing to answer questions without a lawyer present."

Further, the Court should also consider Dr. Arabi's demonstrated comfort in asserting himself at the outset of the interview, as he specifically added to the waiver form his objection to agents opening his phone without his consent "to find my lawyer number." Dr. Arabi argues that his written notation that his "phone was opened without my consent to find my lawyer [sic] number" was a written confirmation of his earlier request to speak with his attorney, ECF 193-1 at 10, but that is not accurate. The notation simply says that Dr. Arabi was trying to find his lawyer's telephone number, which does in fact appear to be his purpose. Tellingly, he did *not* write on the form "I want to speak with my lawyer," "give me a lawyer," or anything approaching an unambiguous request that would have required a cessation of questioning under *Davis.*

Moreover, Inspector Shindledecker immediately clarified with Dr. Arabi that, notwithstanding his markup of the *Miranda* waiver to note his lack of consent to keeping his cell phone unlocked, he *did* consent to speaking with the agents. Dr. Arabi unambiguously said "Yes." Def. Ex. 2 at 6:14. This confirmation strongly cuts against any suggestion that the agents were trying to do an end run around Dr. Arabi's right to counsel, or somehow trick him into waiving it. It also means that, if Dr. Arabi had truly told the agents less than an hour earlier that he wanted to speak with his attorney, he had every opportunity to reiterate that statement—not just when verbally advised of his

right to do so, or advised of that right in writing, but when Inspector Shindledecker triple-checked whether Dr. Arabi was really willing to be interviewed despite his written notation on the form.  It is utterly implausible that, despite each of these invitations to invoke, Dr. Arabi was tricked or lulled into forgetting about his earlier request.

Finally, at no point during the nearly 90-minute interview did Dr. Arabi say anything close to a sufficient request for counsel.  The closest he came to such a request was asking at the end of the interview, "And the lawyer will be—you guys assign a lawyer?"  Def's Ex. 2 at 71:1-2.  In context, this shows that Dr. Arabi was aware of his right to an attorney, but had chosen not to stop questioning to invoke that right before speaking with agents.

Because Dr. Arabi did not make an unambiguous request for an attorney either before or at any time during the interview, the interviewing agents did not have any obligation to cease questioning.  The Court should reject Dr. Arabi's first ground for suppression.

## B.   Dr. Arabi Validly Waived His *Miranda* Rights.

A *Miranda* waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Those standards are met here.

First, there was no intimidation, coercion, or deception.  To the contrary, agents provided Dr. Arabi with food and water, calmly and correctly explained his *Miranda* rights, made clear "you're under no obligation to talk to us," and offered and permitted a bathroom break—all at the outset of the interview.  Def. Ex. 2 at 3:18 to 7:19.  Second, there can be no doubt in this case about Dr. Arabi's "full awareness" of the waiver.  There is no challenge to the accuracy of the rights he was advised of orally and in

writing, and before signing the waiver form he orally confirmed that he understood all his rights.  *Id.* at 4:18 to 5:4.[5]  Thus, Dr. Arabi validly waived his *Miranda* rights.

**C.      Dr. Arabi Did Not "Selectively Invoke" His *Miranda* Rights During The Video-Recorded Interview.**

"That an individual in custody can selectively invoke his *Miranda* rights does not obviate the requirement that a suspect must invoke any *Miranda* right unambiguously and unequivocally to trigger its protection."  *Michaels v. Davis*, 51 F.4th 904, 922 (9th Cir. 2022), petition for cert. pending, No. 23-5038 (docketed July 5, 2023).  Here, the transcript of the interview simply does not support Dr. Arabi's claims that he "unequivocally invoked his *Miranda* right not to answer questions on broad topics[.]" ECF 193-1 at 16.  Indeed, the only unequivocal position that Dr. Arabi took during his interview was that he was willing to speak with agents, notwithstanding his rights.

This case is a far cry from the two Supreme Court opinions cited in *Michaels*. *See Michigan v. Mosley*, 423 U.S. 96, 97 (1975) (affirming admission of defendant's statements implicating him in a homicide after he selectively invoked his right to silence by saying "he did not want to answer any questions about the robberies"); *Connecticut v. Barrett*, 479 U.S. 523, 525 (1987) (finding admission of statements did not violate *Miranda* where defendant said "he was willing to talk about [the incident] verbally but he did not want to put anything in writing until his attorney came").  And in *Michaels*, the Ninth Circuit found a sufficient invocation of the right to silence where the detective reminded the defendant he could "stop at any time" and the defendant responded "Okay, that one." 51 F.4th at 920, 925 ("In context, the phrase 'Okay, that one' is susceptible

---

[5] *Cf. United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011) (finding valid *Miranda* waiver where defendant "was arrested at his home at 6:30 AM by officers with weapons drawn, [] handcuffed for about an hour while agents searched his home, and [] then taken to the police station and forced to listen to audio tapes implicating him in the alleged conspiracy before he received and waived his *Miranda* rights").

to only one reasonable interpretation, as an unambiguous invocation of the right that he was just informed of—to 'stop [talking] at any particular time'").

Conversely, here Dr. Arabi did not set any conditions at the outset of his interview or, as he now claims, "declare[] off limits" any subject matter (ECF 193-1 at 16). Instead, at the outset of the interview he objected only to investigators accessing his phone and refusing to re-lock it; he then stated he understood his rights, waived them, and answered dozens of questions before declining to answer a question.  And while Dr. Arabi now claims he "consistently invoked *Miranda* by simply stating 'I don't want to talk about it'" (ECF 193-1 at 16), he said that line in response to only about three different questions (specifically, (1) what is Abreezio, (2) how did Abreezio acquire its technology, and (3) how Sheida created DFT technology).  Dr. Arabi's declinations were as vague as "I'm not comfortable," and his most repeated line was based on an unidentified restriction—"I *can't* talk about that."  Those assertions are insufficient to invoke the right to silence.  *Cf. Garcia v. Long*, 808 F.3d 771, 773 (9th Cir. 2015) (finding sufficient invocation where officer asked "do you wish to talk to me?" and the defendant answered "no.").

Finally, even if the Court concludes Dr. Arabi sufficiently invoked his right to silence, such a finding does not require suppression of his entire post-arrest statement or the broad swathes he proposes in his motion.  In *Michaels*, the Ninth Circuit explained:

> Admission at trial of the parts of the taped interrogation that did not relate to Michaels's involvement in the murder—his comments about killing others, for example, and the discussion of his relationship with Christina—did not violate *Miranda*, as Michaels did not unambiguously invoke his rights to silence or to counsel with respect to all questioning.

51 F. 4th at 925.  Conversely, admission of his statements regarding his "role in the murder after [his] selective invocation" of the right to silence on that topic did violate *Miranda*.  *Id.*

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*

The United States objects to the overly broad exclusion groups that Dr. Arabi proposes.  For example, Dr. Arabi uses the label "Sheida Alan and DFT technology" to argue that his refusal to initially answer a question—which was about Sheida's *alleged creation of DFT technology*—requires suppression of his subsequent statements that: (1) he communicates with Sheida "mostly" via phone; (2) he visits her a lot and was planning to visit her in Canada on a "work related" trip that week; (3) Sheida loaned him money as a "business to business loan," and that his business had only "partially paid" the loan; (4) that he "personally" had not received money from Sheida  *See* ECF 193-1.  These subsequent statements might be subject to suppression if Dr. Arabi had said he did not want to answer any questions *about Sheida*; but he did not declare the topic of Sheida off limits, and instead said only he could not talk about whether she created DFT technology.[6]

**D.    Dr. Arabi's Post-Arrest Statements Were Voluntary.**

Finally, in obvious tension with his primary argument's focus on his dozens of declinations to answer all of the most relevant questions, Dr. Arabi argues tersely that his statement was involuntary because of "subtle psychological coercion."  ECF 193-1 at 19.  This argument is plainly incorrect, as all of the evidence shows that Dr. Arabi's post-arrest statements were voluntary.  *See, e.g., Lego v. Twomey*, 404 U.S. 477, 489 (1972) (standard is preponderance of the evidence).

"The Constitution demands that confessions be made voluntarily."  *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).  Although compliance with *Miranda* does not "conclusively establish[] the voluntariness of a subsequent confession," cases

---

[6] Another example:  Dr. Arabi claims the Court should suppress his statements about "international funds"—including "I don't remember" when asked if he had ever sent money to other countries—because he previously answered "I can't talk about that" when asked if he was "aware of money being sent back to Iran" or to his brother in Norway.  ECF 193-1 at 12. Simply because he vaguely declined to talk about money being sent to Iran or Norway does not warrant suppression of any statements about "international funds."

in which agents compel an involuntary statement in violation of the Constitution despite adherence to *Miranda* "are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). A statement is unconstitutionally involuntary when a "'defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973)).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary[.]" *Colorado v. Connelly*, 479 U.S. 157 (1986). "A confession accompanied by physical violence is *per se* involuntary, while one accompanied by psychological coercion is not." *Haswood*, 350 F.3d at 1027. Where there is no evidence of physical violence, courts "look to the totality of the circumstances surrounding a confession." *Id.* The United States must show a statement was voluntary by a preponderance of the evidence. *Id.*

The Ninth Circuit has identified the following factors as "relevant" to the inquiry:

> (1) the time between the defendant's arrest and arraignment, (2) whether the defendant knew the nature of the offense with which he was charged at the time of his confession, (3) whether the defendant was aware that he was not required to make any statement, (4) whether the defendant had been advised of his right to counsel, and (5) whether counsel was present at the time of the defendant's confession.

*United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008).

At the threshold, most of the caselaw in this area is concerned with confessions—i.e., substantially inculpatory statements by defendants who admit their involvement in a crime. In this case, Dr. Arabi did no such thing, and it is hard to view his canny, evasive statement as a "confession" in any respect. This, of course, cuts against a finding that his will was overborne and he was somehow coerced into confessing.

Indeed, there is no evidence or even allegation here of "physical violence." Looking to the factors the Ninth Circuit has identified:  Dr. Arabi's arraignment was

the day after his arrest; as explained above, he knew the nature of the offense at the time of the interview; in addition to the oral and written *Miranda* advisal, Agent Shindledecker explained simply at the start of the interview "you're under no obligation to talk to us." Thus, the first four factors all weigh in favor of his statement being voluntary—and the Court should give little to no weight to the fifth factor, as Dr. Arabi expressly waived his right to have counsel present during the interview.[7]

At bottom, Dr. Arabi's complaint seems to be that agents should have (1) shared more information with him about what they were or were not investigating, (2) provided the complete roster of other individuals arrested the same day, and (3) guessed that Dr. Arabi was concerned about a recent (unrelated) home invasion in his neighborhood, and reassured him that their interview about his engineering work at Qualcomm had nothing to do with the armed robbery. As the Court can see, these contentions do not amount to a serious attack on voluntariness and can easily be rejected.

Otherwise, Defendant's claim that his statement was involuntary appears to be based on the circumstances of his arrest, but an arrest is a distinct event from an interview in the voluntariness inquiry. *See United States v. Dominguez-Caicedo*, 40 F.4th 938, 955 (9th Cir. 2022) (affirming finding that defendant's statement was voluntary, noting "the only coercive government misconduct" cited by the defendant was prior to "the time [he] gave his statement" to agents); *United States v. Aviles*, 313 F. App'x 964, 966 (9th Cir. 2009) (unpub.) (finding waiver and statements voluntary—despite defendant arguing that officers arrested him with guns drawn—because there was "no indication that the officers engaged in any coercive behavior following the actual arrest"); *cf. United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011), *supra*.

---

[7] The Court should also note that this is not a case of a defendant having low intelligence. *See, e.g., United States v. Preston*, 751 F.3d 1008, 1016 (en banc) (explaining "low intelligence" is relevant but not dispositive to the voluntariness inquiry). Dr. Arabi is extraordinarily intelligent, and as he stated in his interview, holds a PhD in electrical engineering. If he cannot waive his rights on grounds of mental acuity, then no one can.

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*

And while Dr. Arabi's motion places emphasis on the presence of his family during his arrest, he does not allege that agents made any threats to them.[8]  This case is plainly distinguishable from the *Tingle* case cited in Dr. Arabi's motion, where the interviewing agent "recited [a] virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment" and "expressly stated . . . that Tingle would not see her two-year-old child 'for a while.'"  *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981); *see also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) ("confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'"); *cf. United States v. Bautista*, 362, F.3d 584, 592 (9th Cir. 2004) (affirming finding that statement was voluntary despite defendant claiming he "perceived the agents' comments as threats, and agreed to speak with them only because of his fears for the welfare of his family").  If Dr. Arabi's statement was involuntary simply because his family was present during his earlier arrest by armed agents, then the only defendants who ever could participate in a voluntary interview are those who live alone.

Finally, although not asserted in his declaration, Dr. Arabi claims in his motion that his "will was overborne" during his interview. ECF 139-1 at 18; *compare* USA Ex. 2.  But that self-serving claim is impossible to square with the 82-page transcription of the interview, which shows that Dr. Arabi never admitted to criminal conduct and instead steadily declined to answer any question that would inculpate him.  As the Ninth Circuit has found: a defendant's will cannot be overborne when he "st[ands] his ground"

---

[8] *See United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir. 1998) (affirming finding that statement was voluntary where there was "no evidence of threats regarding Edwards' baby or her brother"); *Lopez v. Janda*, 742 F. App'x 211, 214 (9th Cir. 2018) (unpub.) (finding no coercion because agent "made no threat"); *United States v. Orellana*, 236 F. App'x 281, 282 (9th Cir. 2007) (unpublished) (finding statement voluntary and that there was no coercion, and observing defendant "d[id] not allege that the officers threatened to keep him from seeing his family if he did not cooperate").

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*

and "never 'confesse[s]' in any common sense of the word."  *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *United States v. Perez*, 538 F. App'x 818, 819 (9th Cir. 2013) (unpub.) ("That a suspect remains in control of his responses and consistently denies guilt is compelling evidence that his will was not overborne."); *see also Phillips v. People*, 443 P.3d 1016, 1028 (Colo. 2019) ("Indeed, Phillips did not confess during the police-car interrogation, and so his will was not overborne by the detective's actions."); *State v. Arriaga-Luna*, 311 P.3d 1028, 1034 (Utah 2013) ("Mr. Arriaga-Luna did not confess during this interview, which suggests that the officer's statements did not overcome his free will."). Dr. Arabi's argument is also impossible to reconcile with the recording of his interview, which depicts a calm and courteous interaction.  *See generally* USA Ex. 2.

The Court should find that Dr. Arabi made his post-arrest statements voluntarily.

## II.

## **CONCLUSION**

The Court should find that Dr. Arabi validly waived his *Miranda* rights and answered investigators' questions voluntarily, and should deny his motion to suppress.

DATED: November 27, 2023

TARA K. MCGRATH
 United States Attorney

*/s/ Eric R. Olah*
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys

*United States' Response in Opposition to*
*Dr. Arabi's Motion to Suppress (ECF No. 193)*

*22-CR-1152-BAS*