Whitney Z. Bernstein, SBN 304917
wbernstein@bklwlaw.com
Rebecca S. Roberts, SBN 225757
rroberts@bklwlaw.com
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701

*Attorneys for Dr. Karim Arabi*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>KARIM ARABI,<br><br>        Defendant. | Case No. 3:22-cr-01152-BAS-1<br>Honorable Cynthia Bashant<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DR. ARABI'S MOTION TO COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN QUALCOMM AND THE GOVERNMENT AND FOR ISSUANCE OF A RULE 17 SUBPOENA TO QUALCOMM**<br><br>Hearing Date:    January 4, 2023<br>Hearing Time:   10:00 a.m.<br>Courtroom:       12B |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND ................................................................................... 2

    A.    Discovery requests for written communications between Qualcomm and the government. .................................................... 2

    B.    Government's very sparse production of written communications with Qualcomm. .................................................................... 3

    C.    Recently filed motions and opposition briefs ................................ 4

    D.    Qualcomm interview summaries of Invionics employees post execution of a cooperation agreement ........................................ 6

    E.    Brad Quinton's interview summaries ........................................... 7

    F.    Government's purported independence from Qualcomm. ............... 9

III.   DR. ARABI IS CONSTITUTIONALLY ENTITLED TO THE REQUESTED DISCOVERY ............................................................. 10

    A.    Rule 16 and *Brady* standards. ................................................. 10

    B.    The U.S. DOJ Manual on criminal discovery and case precedent on production of government and third-party communications ........................ 12

    C.    Dr. Arabi has met the threshold materiality requirement ............. 13

IV.   RULE 17 SUBPEONA IS A PROPER VEHICLE OF DR. ARABI TO OBTAIN THE INVIONICS GROUP INTERVIEWS ........................... 15

V.    CONCLUSION .................................................................................. 17

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amado v. Gonzalez*,
   758 F.3d 1119 (9th Cir. 2014) ................................................................ 11, 12

*Bowman Dairy Co. v. United States*,
   341 U.S. 214, 220 (1951) ...................................................................... 15, 16

*Brady v. Maryland*,
   373 U.S. 83, 87 (1963) ............................................................................... 11

*Giglio v. United States*,
   405 U.S. 150, 154 (1972) ........................................................................ 11, 12

*In re Grand Jury Subpoenas 89-3 & 89-4*, *In re Grand Jury Subpoenas 89-3 & 89-4*,
   734 F. Supp. 1207, 1215 (E.D. Va. 1990), *vacated in part on other grounds*, 902 F.2d
   244 (4th Cir. 1990) ................................................................................... 17

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   No. 20-CV-07182-JCS, 2022 WL 93932, at *2 (N.D. Cal. Jan. 10, 2022) ................. 17

*S.E.C. v. Sells*,
   No. 11-CV-04941 CW NC, 2013 WL 450844, at *2 (N.D. Cal. Feb. 4, 2013) .......... 17

*Strickler v. Greene*,
   527 U.S. 263, 280 (1999) ........................................................................ 11, 12

*United States v. Barton*,
   995 F.2d 931, 933–34 (9th Cir.1993) ......................................................... 12

*United States v. Doe*,
   705 F.3d 1134, 1151 (9th Cir. 2013) ......................................................... 10

*United States v. Fort*,
   478 F.3d 1099, 1103 (9th Cir. 2007) ......................................................... 12

*United States v. Fuller*,
   No. 16-CR-867-GPS, 2017 WL 3457166, at *4 (S.D. Cal. Aug. 11, 2017) .......... 14, 15

*United States v. Gamez-Orduno*,
   235 F.3d 453, 461 (9th Cir. 2000) ............................................................. 12

*United States v. Gel Spice Co.*,
   601 F. Supp. 1214, 1224 (E.D.N.Y. 1985) ................................................. 15

*United State. v. Harris*,
   543 F.2d 1247 (9th Cir. 1976) .................................................................. 13

*United States v. Heine*,
   314 F.R.D. 498, 514 (C.D. Cal. 2016)........................................................ 13

*Unites States v. Hernandez-Meza*,
   720 F.3d 760, 768 (9th Cir. 2013) .......................................................... 11

*United States v. Holmes*,
   2019 WL 5722573 (N.D. Cal. 2019) ...................................................... 13

*United States v. Lloyd*,
   992 F.2d 348, 351 (D.C.Cir.1993) ......................................................... 11

*United States v. Lujan*,
   530 F.Supp.2d 1224, 1225 (D. N.M. 2008)............................................ 13

*United States v. Mandel*,
   914 F.2d 1215 (9th Cir. 1990) ............................................................... 11

*United States v. Muniz-Jaquez*,
   718 F.3d 1180, 1183 (9th Cir. 2013) ..................................................... 11

*United States v. Nixon*,
   418 U.S. 683, 699, n.11 (1974).......................................................... 15, 16

*United States v. Stever*,
   603 F.3d 747, 752 (9th Cir. 2010) ......................................................... 10

*United States v. Tomison*,
   969 F. Supp. 587, 593 (E.D. Cal. 1997) ................................................ 15

*United States v. Van Brandy*,
   726 F.2d 548, 552 (9th Cir.1984) .......................................................... 12

**<u>Rules</u>**

Fed. R. Crim. P. 17(c) ...................................................................... 15, 16

**<u>Other</u>**

Robert M. Cary, Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 96
(ABA Criminal Justice Section 2011) .................................................. 10

United States Attorneys' Manual ("USAM") § 9-5.001(B) .................................. 11, 12, 13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

First, this matter, initiated by Qualcomm's criminal referral, has spanned five years. Yet the government has produced only seven written communications between it and Qualcomm Technologies, Inc. ("Qualcomm"), two of which were produced only days ago. The government does not deny that other communications exist but claims they are not "substantive". Instead, the government claims any meaningful communication between the two entities occurs over the phone. (Roberts Decl. ¶ 9.) The government has not produced any notes of these "substantive" phone calls either.

The government's recent oppositions to Dr. Arabi's various motions, scheduled to be heard by the Court on January 4, 2024, demonstrate that the two entities are sharing detailed information and strategy on key issues, a fact confirmed by the government's eleventh-hour production. As courts and the U.S. Attorney's Manual acknowledge, written communications between the government and witnesses and/or victims, and notes reflecting such communications, are routinely produced in criminal discovery. This discovery is material to preparing Dr. Arabi's defense. Accordingly, Dr. Arabi seeks to compel production of all written communications between the government and Qualcomm and its representatives, whether in email, note form, or otherwise, from the initiation of the investigation, approximately May 2018, through present.

Second, new evidence indicates that Invionics employees, who developed the key technology which Qualcomm desired and ultimately purchased, were interviewed by Qualcomm after the execution of a civil cooperation agreement on May 1, 2018. Dr. Arabi suspects and, as a recently produced IRS interview summary confirms, Invionics employee Brad Quinton ("Quinton") provided highly exculpatory testimony that: (1) the two provisional patents at issue were not workable, (2) likely could have been the work product of a graduate student such as Sheida Alan ("Ms. Alan"), (3) at least 99% of core technology that Qualcomm sought out and purchased was the work of Quinton and the Invionics team and was not related to the provisional patents attributable to Ms. Alan, and (4) Dr. Arabi

did not conceal his involvement from anyone at Invionics. Such evidence goes to the very heart of the government's (overly simplistic) theory of the case: that Qualcomm was duped into purchasing what it already owned because Dr. Arabi was its employee.

Evidence suggests that at least Quinton met with Qualcomm extensively after the cooperation agreement was executed and provided this same information, which was never shared with the government, possibly in part because Qualcomm ghost wrote the initial scope of the grand jury subpoena to cut off the time frame prior to the exculpatory interviews. Qualcomm has previously claimed these interview records are privileged but has never produced a privilege log and has inconsistently produced prior interview summaries. Moreover, per the terms of the cooperation agreement, these interviews may have been transcribed or audio recorded. The government claims it does not have these documents. Thus, Dr. Arabi seeks the issuance of a limited Rule 17 subpoena to request these records and Dr. Arabi's personnel file from Qualcomm.

## II.   BACKGROUND

The background for this matter has been laid out in detail in previously filed motions. The facts concerning this discovery dispute are detailed below.

### A.   Discovery requests for written communications between Qualcomm and the government.

On or about December 2, 2022, joint defense counsel submitted a written request for discovery to the government asking for several categories of documents including all communications between it and Qualcomm and/or its representatives related to the civil, the internal investigation, the criminal case, or any allegations contained in the superseding indictment. (Declaration of Rebecca S. Roberts ("Roberts Decl.") ¶ 2.) On December 16, 2022, the government responded stating that certain discoverable responsive material in their possession, custody and control would be produced. (*Id.* ¶ 3.)

On January 4, 2023, the parties had a telephone call to resolve discovery disputes. During this call and as reflected in follow-up correspondence, the government again agreed to produce substantive documents in response to this request. The follow up letter from

joint defense counsel confirmed: "In other words, you [the government] will not produce, for example, calendar invites with no substance—so long as that information is otherwise reflected in other documents (*i.e.*, other documents that reflect the meeting date of the calendar invite.)" (Roberts Decl. ¶ 4.) On June 9, 2023, the government reversed course, stating that it would only "produce substantive, discoverable communications from Qualcomm. The United States respectfully declines to produce sufficient records to identify each and every contact between the government and Qualcomm or its representatives." (*Id* at ¶ 5.)

Dr. Arabi again raised the production of these documents in his motion to compel filed on August 31, 2023. However, this issue was not addressed by the Court at oral argument. Dr. Arabi renewed this request again on November 28, 2023. (*Id* at ¶ 6.)

## B.  Government's very sparse production of written communications with Qualcomm.

Despite producing approximately 1.5 million pages of documents, the government has only produced **seven** written communications between it and Qualcomm, two of which were produced two days ago. The first five include:

- 6/25/18 email from M. Camp to SA Cook referring case for prosecution and attaching an archive of QCABR_00000001-87 (native only, no Bates stamp)

- 6/25/18 email from M. Camp to SA Cook providing password to zip file of archive documents (native only, no Bates stamp)

- 4/28/20 Hueston Hennigan letter to Emily Allen referring the case for prosecution TL-REPORTS-000687

- 5/8/20 M. Camp email to P. Halpern referring the case for prosecution TL-REPORTS-001093

- 5/15/20 email from M. Camp to P. Halpern and M. Heesch regarding the referral TL-REPORTS-001095.[1]

(Roberts Decl. ¶ 7.)

---

[1] Note that this chain refers to a first subpoena issued on May 14. No transmittal email for this initial subpoena—or for the referenced May 14 call—has been produced.

Other correspondence obviously exists as Qualcomm attached two different emails to a court filing. (Roberts Decl. ¶ 8; *see* Ex Parte Application & Supporting Papers filed by Qualcomm Technologies, Inc. on May 19, 2020, Exs. D & E.) The initial limited correspondence produced is only between Qualcomm's counsel and former members of the U.S. Attorney's Office. These are five communications even though this matter has spanned five years.

The government does not deny that additional correspondence exists but rather claims it is only required to produce "substantive" communications. (Roberts Decl. ¶ 9.) The government claims that its practice is to email Qualcomm or its representatives, occasionally attaching documents, to set up times for telephone calls. (*Id.*) It is unclear from the record how often these calls between the government and Qualcomm and its representatives occur. Assuming all substantive discussions between the government and Qualcomm's counsel occur over the phone, it is reasonable to assume that the government or its agents took notes in some form reflecting the content of at least some of these communications. Yet, the government has not produced any notes of these calls either. (*Id.* at ¶ 10.)

### C. Recently filed motions and opposition briefs.

Dr. Arabi has filed several motions to be heard by the Court on January 4, 2023 which raise key issues here such as: (1) Ms. Alan's invention is codified in the provisional patents, (2) Qualcomm's affirmation of Ms. Alan's ownership of the provisional patents, (3) the enforceability of Dr. Arabi's inventorship agreement, (4) whether the provisional patents at issue concerned the technology and products Abreezio ultimately developed with Invionics, (5) what Abreezio products and intellectual property Qualcomm sought to purchase, (6) why Qualcomm purchased Abreezio, (7) how Qualcomm monetized the value of the technology, (8) what cost savings Qualcomm incurred by incorporating the technology.

The government has filed various oppositions to Dr. Arabi's motions which likely include factual and legal argument strategy obtained from Qualcomm and/or its counsel. The two additional emails produced by the government on December 12, 2023, confirm

this.  (Roberts Decl. ¶ 11, Ex. 1.)  The November 21, 2023 email from Qualcomm inhouse counsel indicates it sought input from its outside counsel—Jones Day—as to how to respond to Dr. Arabi's motion for declaratory relief, which challenges the validity of Dr. Arabi's inventorship agreement, upon which the government's case is founded.  In the email, Qualcomm's inhouse counsel wrote:

> Got a response back from Jones Day.  I removed some sections I need to keep privileged, but included their research and analysis of the pertinent issue – whether or not our IDA is enforceable, given the IP at issue was developed while he was employed by Qualcomm.  Essentially, while not conceding the issue over the 1 year post-employment tail on the IDA, we should argue [sic] it's irrelevant, because the IP at issue was developed during employment, so a different section of the IDA applies and any provision that the court takes issue with can be severed from the remainder of the agreement:

In house counsel forwarded the email to AUSA Pilchak.  (*Id.*) The government's response largely tracks Jones Day's outline.  (*See* Dkt. No. 196).

Similarly, the second email produced by the government days ago is a request from Qualcomm's counsel, Hueston Hennigan, requesting that the government claw back some documents Qualcomm produced in the civil litigation years ago and then again in response to the grand jury subpoena.  (Roberts Decl. ¶ 12, Ex. 2.)  The email indicates that Hueston Hennigan and the government had at least two phone calls about the issue over a 10-day period.  Again, the government has not produced any notes reflecting the substance of these calls.

It is unlikely that these seven emails, sent June 2018, between April and May 2020, or between October 2, 2023 and November 13, 2023, represent the entirely of all communications between the government and Qualcomm particularly given the duration of this matter.

### D.   Qualcomm interview summaries of Invionics employees post execution of a cooperation agreement.

In the civil litigation, Qualcomm entered into a cooperation agreement with Invionics, Inc.[2] employees (Brad Quinton, Trent McClements, Andrew Hughes, Michael Scott, Scott Chin, Shawna Quinton, James Derbyshire and Douglas Konkin (collectively the ("Invionics Group")) on May 18, 2018.  (Roberts Decl. ¶ 13, Ex. 3.)  The cooperation agreement contemplates that the individuals, several of whom were Qualcomm employees at the time, would submit to extensive interviews by Qualcomm counsel.  The agreement required the individuals to:

- Provide complete and truthful answers to all questions posed in the interview (*Id.* at p. 4, section 1(b)(i));

- Appear in person or by video conference, as designated by Qualcomm (*Id.* at p. 4, section 1(b)(ii));

- "[N]ot refuse to answer, and Witness Counsel shall not direct the Witness not to answer, any question posed by Qualcomm during the Interview" other than questions that call for privileged information or are not reasonably calculated to lead to the discovery of admissible evidence (*Id.* at p. 5, section 1(b)(viii));

- If witness refuses to answer a question, the government can suspend the interview and seek a court ruling (*Id* .at p. 6, section 1(b)(ix));

- Contemplates that "Qualcomm may record or transcribe each interview, and will provide a copy of such recording or transcription" (*Id.* at p. 6, section 1(b)(x));

---

[2] Invionics is a company started by Brad Quinton in approximately 2020 which specializes in design for test technology ("DFT").  Quinton and his team at Invionics worked with Abreezio to develop IP and build software so that it could be commercialized for industrial players, not just Qualcomm.  Within a few months of collaborating with Abreezio, the Invionics team determined the provisional patents at issue were not workable and separately created the DFTBreez technology, which Qualcomm was mainly interested in and later purchased.  Thereafter, Mr. Quinton and several members of the Invionics team joined Qualcomm and ultimately developed the QBreez product at Qualcomm which has resulted in substantial cost savings to Qualcomm.

- Submit to an interview for a cumulative total of "no more than 48 hours exclusive of breaks" (*Id.* at p. 6, section 1(b)(xii)).

The agreement also reminded the Invionics Group of their obligations as Qualcomm employees:

> Nothwithstanding anything contained herein, nothing in this Agreement is intended to or shall modify the obligations owed by any Qualcomm employee to Qualcomm, including without limitation pursuant to Qualcomm's employment policies and agreements. Each member of the Invionics Group employed by Qualcomm understands and agrees that he or she owes obligations to Qualcomm beyond those set forth in this Agreement, including without limitation to reasonably assist Qualcomm in connection with investigations, judicial actions, and other matters related to his or her employment, and nothing in this Agreement limits or varies those obligations.

(*Id.* at pp. 6-7, section 1(c).)

It is likely that Qualcomm interviewed Invionics Group members after the agreement was executed. There may even be transcripts or audio recordings of these interviews. Yet, no documents related to the interviews have been produced and neither has a privilege log. (Roberts Decl. ¶ 14.) In contrast, Qualcomm freely produced interview summaries of various witnesses to the government which predate the cooperation agreement. (*See*, *e.g.*, Roberts Decl. ¶ 16, Ex. 5.) The government claims it does not have any documents related to the post cooperation interviews. (Roberts Decl. ¶ 14.)

### E. Brad Quinton's interview summaries.

An IRS interview memorandum ("MOI") dated September 14, 2023 and recently produced by the government on November 14, 2023, essentially confirms that Quinton, the head of the Invionics Group which ultimately developed the DFTBreez/QBreez technology for Abreezio, sat for interviews with Qualcomm's counsel after the agreement was executed.

Dr. Arabi believes that, as the MOI suggests, Quinton confirmed that Qualcomm was only interested in one Abreezio technology, "DFTBreez" (later renamed "QBreez" post-

acquisition), which was independently invented by Invionics for Abreezio, and was carefully evaluated by Qualcomm's due diligence team.  Dr. Arabi believes that Quinton also explained that the detailed results of Qualcomm's due diligence evaluations of DFTBreez demonstrated very significant cost savings for Qualcomm and, when this technology was successfully deployed, in fact resulted in hundreds of millions of dollars' worth of savings.  Dr. Arabi also believes Quinton confirmed that Qualcomm only deployed the DFT Breez/QBreez technology, which was based on different technology than Ms. Alan's provisional patents.  As Qualcomm did not suspend or put Quinton or the Invionics team on leave, Dr. Arabi understands that Qualcomm accepted Quinton's representations and cooperation with Qualcomm as truthful.

The MOI, which summarizes an interview with Quinton's attorney, states:

- Quinton and team were retained by Abreezio to assist with the technology, IP and product development;

- When Quinton reviewed the provisional patents filed by Ms. Alan, he quickly determined they were not workable;

- Quinton and Invionics were responsible for 99% of the value increase of the original patents;

- Of the twelve patents filed, Ms. Alan was on two of them and Quinton is on ten of them; the only patents that worked were Quinton's;

- Quinton worked for Qualcomm after the technology was sold while Ms. Alan was never asked to work at Qualcomm, proving Ms. Alan's provisional patents had no value to Qualcomm;

- The provisional patents at issue were not good and could have been the work of a grad student such as Ms. Alan;

- There was no effort to hide Dr. Arabi's involvement from Quinton or anyone from Invionics and the full team knew of his involvement; and

- Quinton fully cooperated with Qualcomm.

(Roberts Decl. ¶ 15, Ex. 4.)

1

2

3

Moreover, Quinton's May 18, 2017 interview summary with Qualcomm's attorneys, which has been produced, indicates that Quinton was willing to assist Qualcomm to sort out who invented what and the inherent value of the technology.

4

5

6

7

8

9

10

11

12

13

14

15

16

The summary reads: "This tech has a very big benefit and you need to know that. . . . I will go through every detail, every patent, every transaction, timeline, if that helps.  If I can feel that Qualcomm is on our side." (*Id.* ¶ 16, Ex. 5.)  Quinton also said: "Flying down to San Diego is possible, phone calls, teleconference, whatever it takes" and "I can get you through all of the technology – what was done here, what was invented, here is what is currently deployed, etc.  I am committed to helping – I can prepare a timeline, develop a framework, if it takes 2 years so be it.  I don't care how long it takes." (*Id.*)  Despite these representations by Quinton, likely to be exculpatory to Dr. Arabi based on the MOI, no further interview summaries have been produced by the government or Qualcomm.  Given the exculpatory nature of this information and the government's *Brady* and ethical obligations, Dr. Arabi assumes the government has followed up.  Yet the government claims it does not have any of them.  No privilege log relating to these documents has been produced.

17

18

The government has identified Quinton as a target.  Thus, he is likely to be unavailable to testify for trial.

19

**F.    Government's purported independence from Qualcomm.**

20

21

At the last court hearing, the government went to great lengths to emphasize its independence from Qualcomm.  (Roberts Decl. ¶ 17, Ex. 6 at 41:4 – 44:5.)[3]

22

23

24

25

26

27

28

---

[3] Examples include:

Mr. Pilchak: I would also like to say on the record that this case is not a conspiracy between the United States and Qualcomm to gin up some charges against Dr. Arabi or anyone else. . .  There was no secret agreement. (*Id.* at 41:7-10; 41:15.)

Mr. Pilchak: There was no wink and a nod.  There was no selective production. (*Id.* at 42:14-15.)

Mr. Pilchak: And we wanted to be as squeaky clean as we could. . .  So again, there's no secret or sinister plot.  It was just an effort to investigate in good faith. (*Id.* at 43:25; 44:4-5.)

Yet, there is evidence that the government is relying on Qualcomm work product. (*See*, *e.g.*, Roberts Decl. ¶ 11, Ex. 1.)    A side-by-side comparison of Qualcomm's "suggestions" of documents the government should request for the grand jury subpoena to Qualcomm shows the government adopted it nearly word for word.  (Roberts Decl. ¶ 18, Ex. 7.)  As the demonstrative exhibit shows, Qualcomm recommended that government only seek production of witness statements made in "relation to the Civil Action or the subject matter of claims assert in the Civil Action."  The government incorporated this request in its grand jury subpoena.  The production of any witness statements made after execution of the cooperation agreement were conveniently omitted from Qualcomm's production to the government.

## III.  DR. ARABI IS CONSTITUTIONALLY ENTITLED TO THE REQUESTED DISCOVERY

### A.  Rule 16 and *Brady* standards.

Rule 16(a) "grants criminal defendants a broad right to discovery."  *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010).  Rule 16(a)(1)(E) provides that a criminal defendant is entitled to discovery of documents and tangible things that are within the government's possession, custody, or control if the requested information is "material to preparing the defense."  Documents and tangible things are in the government's possession, custody, or control if the prosecutor "has knowledge of and access to the documents sought by the defendant."  *Stever*, 603 F.3d at 752.  The requested information need not be admissible to be discoverable.  *See* Robert M. Cary, Craig D. Singer & Simon A. Latcovich, *Federal Criminal Discovery* 96 (ABA Criminal Justice Section 2011).

"Evidence is relevant if it has '*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"  *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013) (reversible error when district court denied tailored discovery requests seeking production of records, reports or calendars which documented dates of any meeting or communications between the defendant and FBI agents).

Rule 16 is broader than *Brady* because "[i]nformation that is not exculpatory or impeaching may still be relevant to developing a possible defense." *United States v. Muniz–Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); United States Attorneys' Manual ("USAM") § 9-5.001(B) ("Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to a fair trial.").

Even inculpatory evidence may be relevant. *Muniz-Jaquez*, 718 F.3d at 1183 ("A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy. Or he can seek a plea agreement instead of going to trial."); *see also Doe,* 705 F.3d at 1151 ("Even if the documents [requested under Rule 16] caused [defendant] to completely abandon [his] entrapment defense and take an entirely different path, the documents would still have been 'material to preparing the defense' under Rule 16(a)(1)(E)(i).").

To obtain Rule 16 discovery, the defendant must make a threshold showing of materiality. *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013). "Materiality is a low threshold." *Id.* at 768. While "[n]either a general description of the information sought nor conclusory allegations of materiality suffice," *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990), "[a] defendant needn't spell out his theory of the case in order to obtain discovery. Nor is the government entitled to know in advance specifically what the defense is going to be." *Hernandez-Meza*, 720 F.3d at 768; *see also Muniz-Jaquez*, 718 F.3d 1183; *United States v. Lloyd*, 992 F.2d 348, 351 (D.C.Cir.1993) (stating that Rule 16's materiality requirement "normally 'is not a heavy burden,' ... rather, evidence is material as long as there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal'").

Pursuant to *Brady* "prosecutors are constitutionally obligated to disclose 'evidence favorable to an accused ... [that] is material either to guilt or to punishment.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1133 (9th Cir. 2014). The Supreme Court instructs that under

*Brady*, "evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see also United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *United States v. Barton*, 995 F.2d 931, 933–34 (9th Cir.1993).

The government has a "broad obligation" to disclose information under *Brady*. *Amado*, 758 F.3d at 1134. "The government, where doubt exists as to the usefulness of evidence, should resolve such doubts in favor of full disclosure ...." *United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir.1984). Additionally, "[t]he prosecutor's duty to disclose information includes a duty to disclose information known to other agents of the government." *United States v. Fort*, 478 F.3d 1099, 1103 (9th Cir. 2007) citing *Giglio v. United States*, 405 U.S. 150, 154 (1972).

### B.   The U.S. DOJ Manual on criminal discovery and case precedent on production of government and third-party communications.

The USAO manual section 9-5.000(5) specifically identifies that discoverable substantive case-related communications are most likely to occur "between prosecutors and/or agents witnesses and/or victims" and that:

> Such communications may be memorialized in emails, memoranda, or notes. "Substantive" communications include factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses/victims, and factual issues relating to credibility. Communications involving case impressions or investigative or prosecutive strategies without more would not ordinarily be considered discoverable, but substantive case-related communications should be reviewed carefully to determine whether all or part of a communication (or the information contained therein) should be disclosed. Prosecutors should also remember that with few exceptions (*see, e.g.,* Fed.R.Crim.P. 16(a)(I)(B)(ii)), the format of the information does not determine whether it is discoverable. For example, material exculpatory information that the prosecutor receives during a conversation with an agent or a witness is no less

1
2

discoverable than if that same information were contained in an
email.

3  United States Attorneys' Manual ("USAM") § 9-5.001[4]

4      Section 9-5.001 provides for broader disclosure than required by *Brady* or *Giglio* and

5  also expressly contemplates retention and production of all communications with witnesses.

6  (*Id.* ("Prosecution team members should preserve for later review and possible disclosure

7  all substantive e-communications created or received by team members during the course

8  of an investigation and prosecution, and <u>all</u> e-communications sent to or received from lay

9  witnesses, regardless of content.")) (emphasis in original.)

10     The government's own manual favors production of the communications sought

11 here.  Moreover, courts routinely order the blanket production of all communications

12 between the government and third-party witnesses/ purported victims.  *See, e.g.*, *United*

13 *States v. Heine*, 314 F.R.D. 498, 514 (C.D. Cal. 2016) (ordering government to "produce

14 any communication from the Bank [the alleged victim] to the government as well as any

15 communication to the Bank from the government that has not already been disclosed in

16 discovery."); *United States v. Holmes*, 2019 WL 5722573 (N.D. Cal. 2019) (ordering

17 production of all communications, including government documents, communications,

18 correspondence, notes or recordings between the government and: (1) news outlets, (2)

19 several clinical laboratories, (3) the FDA, and (4) witnesses); *United State. v. Harris*, 543

20 F.2d 1247 (9th Cir. 1976) (notes taken by FBI agents in interviews with prospective

21 government witnesses or the accused, constitute potentially discovery materials); *United*

22 *States v. Lujan*, 530 F.Supp.2d 1224, 1225 (D. N.M. 2008) (prospective witness statements

23 which are exculpatory are required to be disclosed far enough in advance of trial).

24     **C.    Dr. Arabi has met the threshold materiality requirement.**

25     Communications between the government and Qualcomm and its agents, whether in

26 the form of email or government notes over the course of five years, may shed light on key

27

28
_____
[4] Justice Manual | 9-5.000 - Issues Related To Discovery, Trials, And Other Proceedings |
United States Department of Justice.

issues here such the legality of Dr. Arabi's inventorship agreement with Qualcomm, the ownership of the underlying provisional patents, the specific Abreezio patented technology Qualcomm sought out and why Qualcomm desired to purchase it, how it monetarily valued the technology, what cost savings it incurred by incorporating the technology, etc.  These issues relate to the essential elements of the wire fraud crimes Dr. Arabi is accused of committing: whether he voluntarily devised or participated in a scheme to commit wire fraud, whether he did so with the intent to defraud, or whether the alleged scheme materially impacted Qualcomm's decision to purchase Abreezio, its technology and products, and hire its employees.  These documents may also shed light on whether Qualcomm financially benefited from the technology undermining the argument that it suffered a loss of $150 million.  The degree of Qualcomm's loss or gain is relevant to trial and sentencing.

Moreover, as the emails produced in the eleventh hour indicate, there is evidence of Qualcomm unduly influencing the prosecution, which directly bears on its' bias and credibility as the putative victim.  The government insists that it is operating independently.  Production of all communications and notes would either lend credence to, or undermine, these arguments.  Whether exculpatory or inculpatory, such communications should be produced under Rule 16.  Qualcomm is a third party lay witness/purported victim—it is not a retained expert.  There is no basis to withhold these communications on grounds of attorney-client or work product privilege.

The government may argue, without reference to any controlling case law, that there is no need to produce general emails scheduling calls or calendar invites because these communications are non-substantive.  But calendar invites and emails setting up time for phone calls are exactly the kind of documents which pinpoint when the government and Qualcomm or its representatives may have had substantive telephone calls concerning the case and may have taken notes on various topics or legal theories, which are subject to Rule 16 and *Brady* discovery.  They would also eventually be required to be produced pursuant to the *Jencks Act*, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2; *United States v.*

1    *Fuller*, No. 16-CR-867-GPS, 2017 WL 3457166, at *4 (S.D. Cal. Aug. 11, 2017) (requiring

2    *Jencks* disclosures before trial).

3            This request is also narrowly tailored and not a fishing expedition.  The government

4    can certainly search for and identify all communications with Qualcomm and its

5    representatives over the defined period of time—May 2018 to present, as well as any notes

6    or memoranda it may have made after calls with Qualcomm or its representatives.  Parties

7    request, and produce, these communications all the time in civil litigation.

8    **IV.    RULE 17 SUBPEONA IS A PROPER VEHICLE OF DR. ARABI TO OBTAIN**

9    **THE INVIONICS GROUP INTERVIEWS**

10           As discussed throughout, it is likely that Qualcomm conducted post-cooperation

11   agreement interviews of the Invionics members, some of whom at the time were Qualcomm

12   employees.   Dr. Arabi suspects (and the recently produced MOI confirms) that at a

13   minimum, Quinton gave exculpatory testimony to Qualcomm during these interviews.

14   Apparently, the government has not sought out this information or shared it with Dr. Arabi.

15           Rule 17(c) permits the production of subpoenaed documents prior to trial.  *See* Fed.

16   R. Crim. P. 17(c)(1) ("The court may direct the witness to produce the designated items in

17   court before trial or before they are to be offered in evidence.")   Courts regard the

18   examination of subpoenaed records pretrial as a means to expedite the trial process.  *See,*

19   *e.g., United States v. Gel Spice Co*., 601 F. Supp. 1214, 1224 (E.D.N.Y. 1985); *United*

20   *States v. Tomison*, 969 F. Supp. 587, 593 (E.D. Cal. 1997) (Rule 17(c) meant to supplement

21   6th Amendment and due process rights to "obtain evidence which bears upon the

22   determination of either guilt or punishment.").   Early-return subpoenas are particularly

23   important in a complex case such as this one.  *United States v. Nixon*, 418 U.S. 683, 699,

24   n.11 (1974); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) ("[the]

25   chief innovation [of Rule 17(c)] was to expedite the trial by providing a time and place

26   before trial for the inspection of the subpoenaed materials."); *see also* Dkt. 113 (declaring

27   this case complex).

28

Since it appears the government did not seek out and does not possess this exculpatory information, Dr. Arabi seeks issuance of a Rule 17 subpoena to Qualcomm. Pursuant to Rule of Criminal Procedure 17(c), "a subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Rule 17(c) subpoenas are often a defendant's only path to obtaining necessary evidence to support his defense. As the Supreme Court stated in *Nixon*, 418 U.S. at 709 (1974), "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence."; *see also Bowman Dairy Co.*, 341 U.S. at 221-22.

The documents requested in the subpoena are narrowly tailored, relevant and admissible. The requested subpoena seeks only documents and other recordings of the post-settlement interviews of nine Invionics employees and Dr. Arabi's personnel file. As discussed throughout, the interviews may shed light on the heart of the matter: whether Qualcomm was truly interested in, and purchased, technology that its employee, Dr. Arabi developed. Dr. Arabi's personnel file is relevant to show that he consistently received outstanding evaluations performing the work his job required.[5]

It is also likely that the documents will be admissible pursuant to Fed. R. Evid. 401 & 402 as relevant evidence that does not run afoul of any admissibility exceptions and Fed. R. Evid. 803(6) as Records of a Regularly Conducted Activity. The documents may include transcripts or tape recordings of the interviews as contemplated by the cooperation agreement. Qualcomm previously produced witness interview summaries as part of its

---

[5] The Court previously ordered Qualcomm to produce to the Court for *in camera* review by November 3, 2023 "all materials, notes, recordings, transcripts, and other documentation of Qualcomm's interview(s) with Joseph Fang, Kevork Kechichian, and Saniv Taneja" not previously produced to the government. *See* Dkt. No. 183. Dr. Arabi is unaware whether these documents were produced to the Court.

"Project Gopher" investigation, which are not privileged. Moreover, factual content contained in legal memoranda is often found to be discoverable. *See In re Grand Jury Subpoenas 89-3 & 89-4*, *In re Grand Jury Subpoenas 89-3 & 89-4*, 734 F. Supp. 1207, 1215 (E.D. Va. 1990), *vacated in part on other grounds*, 902 F.2d 244 (4th Cir. 1990) (Finding substantial need for the production of in-house counsel employee interviews (after redactions decided via an in camera inspection) because: (1) the interviews "would surely constitute the most accurate and the principal, if not sole, source of evidence of Movant's state of knowledge"; (2) the time lapse since the interviews would mean that memories have faded; and (3) several "employees are targets of the investigation and . . . they have chosen to invoke the Fifth Amendment right to remain silent."); *S.E.C. v. Sells*, No. 11-CV-04941 CW NC, 2013 WL 450844, at *2 (N.D. Cal. Feb. 4, 2013); *Meta Platforms, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2022 WL 93932, at *2 (N.D. Cal. Jan. 10, 2022) (Allowing discovery of documents underlying a factual investigation overseen by attorneys because the documents "go to the heart of [the seeking party's] defenses and counterclaims.")

## V.   CONCLUSION

For the reasons discussed above, Dr. Arabi respectfully requests that the Court order the government to produce all written communications between it and Qualcomm and its representatives, whether in email, note form, or otherwise, from the initiation of the investigation, approximately May 2018, through present. Dr. Arabi also requests that the Court approve the issuance of the limited attached Rule 17(c) subpoena.

Respectfully submitted,

Dated:  December 14, 2023

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By: */s/ Rebecca S. Roberts*
Whitney Z. Bernstein
Rebecca S. Roberts
*Attorneys for Dr. Karim Arabi*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Nicola T. Hanna
nhanna@gibsondunn.com
Winston Y. Chan
wchan@gibsondunn.com
Katherine H. Sharp
ksharp@gibsondunn.com
James N. Rotstein
jrotstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
*Attorneys for Sanjiv Taneja*

Andrew James Galvin
andrew.galvin@btlaw.com
BARNES & THORNBURG LLP
*Attorneys for Ali Akbar Shokouhi*

David K. Willingham
dwillingham@kslaw.com
Jamie A. Lang
jlang@kslaw.com
Blythe Golay Kochsiek
bkochsiek@kslaw.com
KING & SPALDING LLP
*Attorneys for Ali Akbar Shokouhi*

Nicholas W. Pilchak
nicholas.pilchak@usdoj.gov
Eric R. Olah
eric.olah@usdoj.gov
Janaki Chopra
Janaki.chopra@usdoj.gov
ASSISTANT UNITED STATES ATTORNEYS

Dated: December 14, 2023          /s/ Leah Thompson
                                  Leah Thompson