1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-cr-01152-BAS |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART QUALCOMM'S MOTION TO QUASH** |
| v. | |
| KARIM ARABI, *et al.,* | **(ECF No. 293)** |
| Defendants. | |

20  **I.    BACKGROUND**

21       **A.    The Government's Allegations**

22       According to the Superseding Indictment, Defendant Karim Arabi was

23  employed at Qualcomm from 2007 to 2016.  (Indict. ¶ 1, ECF No. 242.)  As such, he

24  was bound by agreements that any intellectual property he created during his

25  employment belonged to Qualcomm.  (*Id.*)

26       Arabi is an engineer who specialized "in the 'Design for Test' (or 'DFT') field

27  of the microchip sector."  (Indict. ¶ 1.)  The Indictment charges that, while employed

28

at Qualcomm, Arabi helped to found Abreezio, hand-picking codefendant Sanjiv Taneja as CEO and codefendant Bradley Quinton as CTO.  (*Id.* ¶¶ 3, 16.)

"Abreezio was a newly-formed technology start-up company based in Sunnyvale, California." (Indict. ¶ 6.)  Defendants created Abreezio "as a vehicle to commercialize new DFT technology provisionally patented by Arabi." (*Id.*)  Arabi filed "provisional patents for Abreezio's core DFT technology, falsely listing [Defendant] Sheida [his sister] as its true inventor while concealing his own primary role." (*Id.* ¶ 16(a).)  Defendants conducted various schemes to impersonate Sheida and to hide her true identity.  (*Id.* ¶ 16.)

In addition, Arabi provided Defendants Taneja and Quinton with sensitive, internal information about Qualcomm's existing DFT technology and who to contact at Qualcomm to help fine-tune Abreezio's marketing pitch.  (Indict. ¶ 16(l), (m).)

On October 30, 2015, Qualcomm finalized a deal to purchase Abreezio and its DFT technology for over $150 million.  (Indict. ¶ 12.)  During the due diligence for this purchase, Defendants allegedly concealed Defendant Shokouhi's role in Abreezio's formation to avoid scrutiny from Qualcomm's due diligence staff.  (*Id.* ¶ 16(o).)  Additionally, Defendants coordinated responses to questions asked by Qualcomm during the due diligence inquiries to hide the roles of Arabi and Shokouhi in Abreezio's formation.  (*Id.* ¶ 16(s).)  Defendants misrepresented to Qualcomm during the Abreezio purchase that Abreezio was the sole and exclusive owner of the technology and that everyone involved in the creation and development of Abreezio's intellectual property had been truthfully disclosed.  (*Id.* ¶ 16(u).)  Finally, the Government charges that Arabi and his codefendants provided false discovery responses during the civil litigation that ensued to disguise Arabi's role in Abreezio. (*Id.* ¶ 16(v).)

**B.    Procedural History**

In 2023, Arabi issued a sweeping Rule 17(c) subpoena to Qualcomm.  The subpoena requested, for example, the personnel file of any Qualcomm employee who

had any relationship with Arabi while he worked at Qualcomm, all Qualcomm's internal incentive programs to award whistleblowers without any time limitation, and all documents related to the Abreezio purchase even though Arabi had already obtained thousands of these documents in discovery. (ECF No. 133.)

Qualcomm filed a Motion to Quash (ECF No. 150), which was largely granted by the Court (ECF No. 183). Specifically, the Court covered at great length Arabi's requests for interviews conducted by Qualcomm as part of its internal investigation. Ultimately, the Court found: (1) Arabi already appeared to have obtained most of these interviews—or at least summaries of the interviews—in discovery from the Government; (2) there was no requirement that impeachment material be produced pursuant to a Rule 17(c) subpoena; and (3) without specific showings of the necessity of the interviews, the vast majority of the requests were nothing but "a fishing expedition." (*Id.*)

Undaunted, Arabi filed a second request for a Rule 17(c) subpoena, asking for many of the same items requested in the last subpoena, but adding a request for "Abreezio's source code and revision control repository." (Subpoena, ECF No. 264, Ex. 16.) The Court granted in part and denied in part this additional subpoena request, denying the request for internal interviews of all but five employees: Mansour, Nelles, Quinton, Somwal, and Thompson. (ECF No. 265.) In addition, the Court granted Arabi's request for production of (1) "all post-acquisition reviews and reports assessing the fair market value of the IP Qualcomm acquired in the Abreezio acquisition"; (2) a privilege log identifying all documents withheld by Qualcomm in response to the Government's grand jury subpoena and in response to the Court's previously issued Rule 17(c) subpoena; and (3) "all documentation regarding any preservation or legal hold notices issued by Qualcomm with respect to Abreezio." (ECF No. 265 (referencing Subpoena, Requests No. 5, 7–9).) The Court denied all other requests. (*Id.*)

1    Arabi filed a Motion for Reconsideration, focusing solely on the Court's denial
2    of the subpoena with respect to the source code and revision control repository. (ECF
3    No. 280.)  The Court allowed the subpoena to issue.  (ECF No. 290.)  Qualcomm
4    now has filed a Motion to Quash all of the new subpoena requests. (ECF 293.)  Arabi
5    responds (ECF No. 306), Qualcomm replies (ECF No. 304), and Arabi files a
6    Surreply (ECF No. 310).

7    For the reasons stated below, the Court grants in part and denies in part the
8    Motion to Quash.  (ECF No. 293.)

9    **II.    ANALYSIS**

10    The Court adopts the summary of law from its ruling on the previous Motion
11    to Quash.  (ECF No. 183.)  Specifically, the Court notes that a party moving for a
12    subpoena pursuant to Rule 17(c) must show (1) relevancy, (2) admissibility, and
13    (3) specificity.  *United States v. Nixon*, 418 U.S. 683, 700 (1974).  Even if the party
14    issuing the subpoena meets each of these requirements, the court may quash the
15    subpoena "if compliance would be unreasonable or oppressive."  Fed. R. Crim. P.
16    17(c)(2).

17    The Court addresses each of the outstanding subpoena requests below.

18    **A.    Interviews from Internal Investigation**

19    Arabi subpoenas five witness interviews conducted by Qualcomm as part of
20    its internal investigation.  The Court largely disposed of this issue in its ruling on the
21    last Motion to Quash.  (ECF No. 183.)  And, again, the Court adopts the rationale in
22    this prior order.  With respect to the specific witness interviews requested this time
23    by Arabi, the Court finds:  (1) Arabi appears to have already received from the
24    Government much of this material or at least outlines of the interviews, (2) Arabi
25    fails to show what he is allegedly missing and what the missing interviews might
26    provide in the way of admissible or only helpful information, and (3) Arabi glosses
27    over the requirement that the requested material be admissible.

28

22cr1152

1    The interviews are clearly hearsay.  Arabi argues for those witnesses who are
2 unavailable, they are admissible under Federal Rules of Evidence 804(b)(1) and 807.
3 The Court disagrees.  Rule 804(b)(1) applies to former testimony.  There is no
4 suggestion that any of the witnesses testified at a prior trial, hearing, or lawful
5 deposition.  Nor is there any suggestion that the Government, who at the time was
6 not prosecuting Arabi, had any motivation or opportunity to question any of these
7 witnesses.  The prior interviews are also not admissible under the residual exception.
8 There is no proof that these interviews were particularly trustworthy.  In fact, one is
9 offered against an individual who has now been indicted and may have been
10 motivated to cover his own involvement.

11    To the extent Arabi argues the interviews may contain impeachment material,
12 as discussed in the last order, this is insufficient to require production under Rule
13 17(c).  *United States v. Fields*, 663 F.2d 880, 881 (9th Cir. 1981).  However, as the
14 Court did in the last ruling, the Court will order Qualcomm to produce any interviews
15 of potential witnesses Duane Nelles, Hiten Somwal, and Jim Thompson to the Court
16 for *in camera* review.  To the extent Qualcomm claims a privilege applies to any of
17 these interviews, it shall submit a log containing a detailed description of the basis
18 for any privilege.  If any of these witnesses testify at trial, the Court will assess
19 whether the interviews should be produced for impeachment material.

20    Since Defendant Quinton is currently under indictment and in Canada facing
21 extradition proceedings, he is unlikely to be a witness at trial subject to impeachment,
22 so the Court will not require production of his interviews.  And Qualcomm responds
23 that it never interviewed Ziad Mansour, so there are no documents responsive to this
24 request.  Hence, the Court grants in part and denies in part the Motion to Quash the
25 request for witness interviews.

26    **B.    Source Code**

27    Arabi requests Qualcomm produce the source code and revision control
28 repository for the DFT technology that was part of the Abreezio transaction in 2015.

22cr1152

He also provides a defense theory that he claims will be supported by looking at the source code and related metadata from the repository.

Arabi, however, fails to meet the initial hurdle of relevancy. At best, the requested information will show whether the source code that served as the basis for the initial provisional patents was modified and who key-stroked the requests to modify it. However, looking at the commit history or version control for the source code will not negate any of the allegations in the Superseding Indictment, notably:

(1) Defendants Arabi and Shokouhi helped found Abreezio. Arabi hand-picked the CEO and CTO.

(2) Arabi filed provisional patents for Abreezio's core DFT technology, falsely listing Defendant Sheida as its true inventor. Even if this core technology was largely modified, that would not impact the allegation that Arabi falsely listed his sister as the original inventor.

(3) Arabi and his codefendants used various schemes to impersonate Sheida and changed her name on documents to hide her identity.

(4) Arabi provided Taneja and Quinton with sensitive internal information about Qualcomm's existing DFT technology.

(5) Arabi and his codefendants concealed Shokouhi's role in Abreezio's formation to avoid scrutiny from Qualcomm's due diligence staff.

(6) Arabi and his codefendants coordinated responses to questions asked by Qualcomm during the due diligence inquiries to hide the roles of Arabi and Shokouhi in Abreezio's formation.

(7) Defendants misrepresented to Qualcomm during the Abreezio purchase that Abreezio was the sole and exclusive owner of the technology, and everyone involved in the creation and development of Abreezio's intellectual property had been truthfully disclosed.

Hence, even if the Court assumes that the source code repository would show the code was heavily edited by individuals other than Arabi, that will not negate the

22cr1152

1   allegations in the Superseding Indictment.  For instance, changes to the source code

2   do not undermine the allegations that Arabi concealed his involvement from

3   Qualcomm and that Qualcomm would not have completed the purchase had it known

4   about Arabi and Shokouhi's role in Abreezio.  Thus, the Court ultimately finds Arabi

5   does not meet his burden of showing review of the source code repository would be

6   relevant.

7        Furthermore, the Court finds production would be unreasonable and

8   oppressive.  Qualcomm outlines the steps it would take to access the source code

9   repository, which is archived on magnetic tape at an off-site location of its vendor,

10  Iron Mountain.  (Declaration of Byron Yafuso ¶ 8, ECF No. 293-4.)  Qualcomm

11  submits that restoring the magnetic media would be an expensive, time-consuming

12  process.  (*Id.*)  Qualcomm also explains why producing the repository showing

13  changes to the source code "would be more burdensome to Qualcomm than even past

14  cases involving inspection of [other] source code itself."  (*Id.* ¶ 9; *see also* Yafuso

15  Suppl. Decl. ¶¶ 12–15, ECF No. 304-1.)  Although Arabi insists source code

16  management software is readily available to soften Qualcomm's burden, the Court

17  ultimately finds that production would be unreasonable and oppressive, particularly

18  in the light of the fact that the production would produce at best marginally relevant

19  information.

20        Therefore, the Court finds it is appropriate to quash the subpoena with respect

21  to the source code and repository files.

22        **C.    Reviews and Reports Assessing Fair Market Value of IP Post-**

23              **Acquisition**

24        In *United States v. Milheiser*, 98 F.4th 935 (9th Cir. 2024), the Ninth Circuit

25  explained that wire fraud requires a deceptive scheme to deprive the victim of the

26  nature of the bargain, usually price, quality, or other essential aspects.  It is not

27  sufficient that the scheme deprived the victim of intangible interests unconnected to

28  property.  *Id.* at 942.  Depriving a company of accurate information alone is

insufficient for federal wire fraud. *Id.* Loss of a right to make an informed business decision is insufficient for federal wire fraud. *Id.* In other words, if Defendants tricked Qualcomm into entering into a transaction but nonetheless gave Qualcomm exactly what it asked for and charged Qualcomm exactly what it agreed to pay, there is not federal wire fraud. *Id.,* at 944.

Arabi requests "all post-acquisition reviews and reports assessing the fair market value of the IP Qualcomm acquired in the Abreezio acquisition." (Subpoena, Request No. 5.) Arabi argues that the real value to Qualcomm of the Abreezio acquisition was not the patent applications but the DFT Breeze software tools, developed by individuals other than Arabi, along with the key persons from Invionics who joined Qualcomm as part of the Abreezio acquisition.

The Government charges that Qualcomm would not have bought Abreezio because its value came from Arabi's patents. If, however, evidence shows that the true value of Abreezio was not the provisional patents allegedly developed by Arabi, but some other aspect of Abreezio—for example, key personnel Qualcomm could not get otherwise—and if the evidence shows this non-Arabi or provisional patent-related value was worth what Qualcomm paid, then this would provide Arabi with a valid defense under *Milheiser*.

However, what is key is not what the value of Abreezio became post-acquisition. The key is what the value was to Qualcomm at the time it made the acquisition in October 2015: what did Qualcomm think it was bargaining for and what did it actually get? Therefore, to the extent Arabi is requesting reports detailing the value Abreezio obtained after the acquisition, this request is denied as irrelevant. For example, if after the acquisition, Qualcomm found that the Invionics employees added much greater value than anticipated and ultimately this made the acquisition worthwhile, this post-acquisition increase in value is irrelevant. However, to the extent any reports exist that detail the value to Qualcomm of the Abreezio acquisition *at the time of acquisition*, the request is granted.

**D.    Privilege Logs**

The Court previously granted Arabi's request that Qualcomm produce any privilege logs of documents withheld by Qualcomm in response to the earlier Rule 17(c) subpoena.  This order extends to the documents withheld by Qualcomm pursuant to this order as well.

In addition, the Court grants Arabi's request for a privilege log of any documents withheld by Qualcomm in response to the Government's grand jury subpoena.  To the extent this has not already been produced to the Government, Qualcomm is ordered to produce this log to Arabi.

**E.    Legal Holds and Preservation Notices**

Arabi requests all documentation regarding any preservation or legal hold notices issued by Qualcomm with respect to Abreezio.  (Subpoena, Request No. 9.) Arabi fails to show why these notices would be relevant.  Therefore, the Court grants Qualcomm's Motion to Quash with respect to this request.

**III.    CONCLUSION**

In light of the foregoing, the Court **ORDERS** Qualcomm to produce—to the Court *in camera*—all materials, notes, recordings, transcripts, and other documentation of Qualcomm's interviews with Duane Nelles, Hiten Somwal, and Jim Thompson, but only to the extent that these items have not already been produced to the Government.

In addition, the Court orders Qualcomm to produce any reviews and reports assessing the fair market value of the Abreezio IP at the time of acquisition.  To the extent this has not already been produced to the Government, the Court also orders Qualcomm to produce any privilege log identifying all documents withheld by Qualcomm in response to the Government's grand jury subpoena.

If Qualcomm claims a privilege applies to any responsive documents, it shall also submit a log containing a detailed description of the basis for any privilege.

22cr1152

1 Qualcomm shall lodge these items with the Court by delivering them to chambers on

2 electronic media no later than **January 10, 2025**.

3        With respect to all other requested items, the Motion to Quash is granted.

4 Thus, the Motion to Quash (ECF No. 293) is **GRANTED IN PART** and **DENIED**

5 **IN PART**.

6        **IT IS SO ORDERED.**

7

8 **DATED: December 19, 2022**

Hon. Cynthia Bashant
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 10 –

22cr1152