ANDREW R. HADEN
Acting United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.:    22-cr-1152-BAS |
|---|---|
| Plaintiff, | **UNITED STATES' TRIAL MEMORANDUM** |
| v. | |
| KARIM ARABI (1), | Date:    March 10, 2025 |
| | Time:    9:00 a.m. |
| Defendant. | Honorable Cynthia Bashant |

The United States of America, by and through its counsel, Andrew R. Haden, Acting United States Attorney, and Nicholas W. Pilchak, Janaki G. Chopra, and Eric R. Olah, Assistant U.S. Attorneys, hereby files its Trial Memorandum.

## I.    STATEMENT OF THE CASE

### A.    The Charges

The Second Superseding Indictment charges Defendant Karim Arabi with one count of wire fraud conspiracy in violation of 18 U.S.C. § 1349; one count of wire fraud in violation of 18 U.S.C. § 1343; and one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).  ECF 242.

/ /

**B.    Trial Status**

A jury trial is scheduled for March 10, 2025.  The United States estimates its case-in-chief will last approximately four weeks.

**C.    Defense Counsel**

Dr. Arabi is represented by retained counsel Whitney Z. Bernstein, Rebecca S. Roberts, and Ryan Vaughan Fraser.

**D.    Defendant's Custody Status**

Dr. Arabi is on bond.

**E.    Interpreter**

The United States does not anticipate any of its witnesses requiring an interpreter.

**F.    Jury Waiver**

Dr. Arabi has not filed a jury waiver for the liability phase.  The parties have agreed to waive a jury determination of the charged forfeiture issues.

**G.    Pretrial Motions**

**1.    Pretrial Motions**

Dr. Arabi filed a motion to compel discovery, preserve evidence, and for leave to file further motions on August 29, 2022 (ECF 47) and a supplemental motion to compel on November 21, 2022 (ECF 97).  The United States filed responses in opposition to both motions.  *See* ECF 59 and 101.  The Court denied Dr. Arabi's motion at a hearing on January 4, 2024.  ECF 220.

On November 29, 2022, Dr. Arabi joined in co-defendant Sanjiv Taneja's motion to dismiss.  ECF 111.  The United States filed a response in opposition to that motion on November 30, 2022.  ECF 112.  The Court denied the defense motion to dismiss in a written order on December 16, 2022.  ECF 118.

On August 25, 2023, Dr. Arabi filed a motion to compel discovery (ECF 148, 163); and the United States filed a response in opposition on September 18, 2023 (ECF 158).

/ /

On November 13, 2023, Dr. Arabi filed a host of motions, including his motion for declaratory relief regarding inventorship and enforceability of Dr. Arabi's employment agreement (ECF 190); motion for a bill of particulars (ECF 191); motion for full, unfiltered returns for email accounts that Dr. Arabi used (ECF 192); motion to suppress his post-arrest statement (ECF 193); and his motion to dismiss the wire fraud counts (ECF 194). The United States filed responses in oppositions to each of these motions on November 27, 2023. ECF 195-198, 200. The Court denied each of Dr. Arabi's motions, except the motion to suppress, at a hearing on January 4, 2024. ECF 220. The Court denied Dr. Arabi's motion to suppress after hearing testimony and oral argument at a hearing on February 13, 2024. ECF 229.

On December 14, 2023, Dr. Arabi filed a motion to compel communications between Qualcomm and the United States, and for an issuance of a Rule 17 subpoena to Qualcomm. ECF 209. The United States filed a response in opposition on December 28, 2023. ECF 219. The Court granted in part the motion at hearing on January 4, 2024. ECF 220.

On April 19, 2024, Dr. Arabi filed a motion for release of documents produced by Qualcomm to the Court *in camera*. ECF 248. The United States filed a notice of non-opposition the same day. ECF 249. The Court granted the motion on April 22, 2024. ECF 251.

### 2. United States' Motions *in Limine*

On January 21, 2025, the United States filed motions *in limine*. ECF 314. The Court ruled on the motions as follows at a hearing, making clear that all rulings were without prejudice.[1]

The Court granted the United States' motion to admit Dr. Arabi's statements, including his statements to coconspirators and in his post-arrest interview. The Court

---

[1] Unless otherwise noted, the Court ruled on the motions at the hearing on February 3, 2025.

did direct the United States to ensure accurate testimony on Dr. Arabi's statement in his post-arrest interview on the number of people he supervised at Qualcomm.

The Court granted the United States' motion to admit coconspirator statements, and found sufficient evidence that Ziad Mansour, Behrooz Abdi, and Nasser Hendi were each members of a conspiracy at the same time as Dr. Arabi.

The Court granted the United States' motion to admit expert testimony from Professor Dennis Sylvester (at a hearing on February 21, 2025) and. ruled that Senior Inspector Shindledecker could testify as a summary witness.

The Court effectively denied as moot the United States' motion to exclude testimony from Jerry Barth, after defense counsel stated they did not intend to call Mr. Sabarsky as a witness at trial. As to expert testimony from Manoj Sachdev, the Court ruled that he could talk about electrical and computer engineering, whether the provisional patent applications were naïve or novel (without talking about patent law), and whether the United States' expert in electrical engineering could have known more about Abreezio's technology if he had the source code.

The Court granted in part and denied in part the United States' motion to admit evidence as inextricably intertwined or under Rule 404(b). The Court first found that evidence of Dr. Arabi's relationship with Sheida was inextricably intertwined and therefore not subject to Rule 404(b); further, the Court found the proffered evidence was relevant and not prejudicial and declined to exclude it under Rule 403. The Court denied the motion without prejudice with respect to evidence related to Agile, Endura, and Dr. Arabi's control of a Cayman Islands entity, finding such evidence relevant but posing a danger of confusing the jury and therefore excluding it under Rule 403.

The Court denied the United States' motion to admit evidence of Dr. Arabi's settlement of the civil fraud suit under Rule 408(b). But the Court made clear that while the jury will not hear about the nature of the civil fraud suit, the United States can introduce evidence that there was a civil suit, and that it concluded, and that it was

permissible to admit evidence of the timing of payments between Dr. Arabi and Sheida in relation to the commencement and conclusion of the suit.

The Court deferred ruling on the United States' motion to admit business and reliable foreign records at the hearing on February 21, 2025.

The Court granted the United States' motion to exclude irrelevant evidence, making clear the parties could introduce evidence of the value of Abreezio's technology before and on the date of the acquisition, but not any time after the acquisition. Additionally, the Court ruled that while experts could testify that the provisional patents could have been the work of a graduate student with Sheida's background and/or that the idea was not novel, "the details" and "all the rules of patent law" are excluded. Hrg. Tr. Feb. 3, 2025, 55:1-4.

The Court granted United States' motion to exclude unsubstantiated claims involving Special Agent Leah Chambers under Rule 608(b).

The Court granted United States' motion to exclude improper defense argument. Dr. Arabi did not oppose the motion as to the request to prohibit reference to punishment and possible deportation. As to the motion to preclude evidence of Qualcomm's purported violation of the settlement agreement by referring the case for criminal prosecution, the Court rejected Dr. Arabi's claim that such evidence demonstrated witness bias and excluded the evidence under Rule 403.

The Court deferred on the United States' motion to preclude an unnoticed advice of counsel defense, explaining that if Dr. Arabi raises such a defense, he will need to give the United States relevant discovery in an orderly fashion to avoid mid-trial delay.

### 3.    The United States' Supplemental Motions *in Limine*

Based on disclosures from Dr. Arabi after the parties filed their motions *in limine*, the United States filed supplemental motions *in limine* on February 10, 2025. .ECF 335. Specifically, the United States filed motions to exclude double-hearsay proffer testimony from the criminal defense attorneys that co-conspirator Ziad Mansour retained to represent him, and to exclude the hearsay statements of Bozena Kaminska.

*Id.* at 2-8.[2]  Additionally, the United States identified additional facts and argument to authenticate under Rule 901 the purported research notebook that Dr Arabi used to further his fraud.  *Id.* at 8-12.[3]The Court deferred ruling on the supplemental motions *in limine* at a hearing on February 21, 2025.

### 4.    Dr. Arabi's Motions *in Limine*

Dr. Arabi filed his motions *in limine* on January 21, 2025, and the Court ruled on them as follows at a hearing on February 3, 2025.

The Court granted in part and denied in part Dr. Arabi's motion to admit pre- and post-acquisition valuation analyses.  The Court explained the parties can introduce evidence of the value of Abreezio's technology before and on the date of the acquisition, but not any time after the acquisition.

The Court denied Dr. Arabi's motion to preclude argument or evidence regarding unindicted or invalid wire fraud theories.  Notably, the Court rejected Dr. Arabi's attempt to distinguish among the misrepresentations, finding all were part of a conspiracy to conceal Dr. Arabi's creation of Abreezio.

The Court denied Dr. Arabi's motion to exclude unnoticed Rule 404(b) evidence (specifically "testimony alleging that Dr. Arabi stole trade secrets from Qualcomm or engaged in any kickbacks and bribes as detailed, for example, in the grand jury testimony of one government witness").  The Court explained such evidence was not other act evidence under Rule 404(b), but instead inextricably intertwined with the conduct at issue in this case.

The Court granted in part and denied in part Dr. Arabi's motion to exclude "particular improperly authenticated" evidence and evidence that violates the best evidence rule.

---

[2] Mansour, through counsel, subsequently filed a motion to quash a trial subpoena served on one of his attorneys.  ECF 347.

[3] The United States' supplemental motions *in limine* also requested clarification on the admissibility of the civil suit and settlement, a request that is now moot based on the parties reaching a stipulation of facts and agreement on a proposed jury instruction.

The Court denied Dr. Arabi's motion as to his text messages with a co-conspirator who is expected to authenticate the messages during his trial testimony, noting in part that authentication is a low bar.  The Court granted the motions to exclude as to Sheida's purported lab notebook that supposedly documented her independent creation of Abreezio's technology and to exclude Dr. Arabi's unverified civil interrogatory responses, making clear the rulings were without prejudice and that the United Sates could proffer "further evidence of authentication."  Hrg. Tr., Feb. 3, 2025 at 66:8-16; *see also id.* at 68:17-20 ("If you have additional information, you can raise it with me").

At the hearing on February 21, 2025, the Court denied Dr. Arabi's motion to suppress the contents of his cell phone, rejecting Dr. Arabi's claim that he was "coerced" into unlocking his phone after his arrest.

The Court granted Dr. Arabi's motion to exclude the "Quora emails."

The Court granted in part and denied in part Dr. Arabi's motion to preclude cooperating witnesses from opining on materiality or Dr. Arabi's mental state.  The Court made clear that witnesses can testify to their conversations with Dr. Arabi, and the jury can draw conclusions from those conversations.  However, the Court granted the motion as to the request to preclude cooperating witnesses from opining on Dr. Arabi's mental state.

The Court granted in part and denied in part Dr. Arabi's motion to preclude references to Qualcomm as a victim, directing the United States to avoid using the word "victim" in opening statement but allowing its use in closing argument.

The Court deferred on Dr. Arabi's motion to exclude evidence not yet produced in discovery.

The Court granted in part and denied in part Dr. Arabi's motion to admit expert testimony, explaining Mr. Sachdev can discuss electrical and computer engineering and his evaluation of the patents in this case, but finding that he lacks expertise in patent law.  Similarly, the Court stated Mr. Sabarsky can testify to the terms stated in the Unit

Purchase Agreement between Qualcomm and Abreezio, but he cannot opine as to what was material to Qualcomm in the agreement.

The Court deferred ruling on Dr. Arabi's motion to permit defense inquiry into the nature of source code and source code metadata.

The Court denied Dr. Arabi's motion to determine the admissibility of all coconspirator statements prior to the start of trial.

The Court denied Dr. Arabi's motion to suppress and exclude his post-arrest statements, and denied his related motion to preclude "distortion" of his post-arrest statements.

The Court denied Dr. Arabi's motion to preclude reference to him as "inventor" of Abreezio's technology and products. The Court explained that the United States may say in its opening statement that "the evidence will show Dr. Arabi invented Abreezio's technology," and in closing argument argue that he invented it.

### 5. Dr. Arabi's Motion for Judicial Notice

On February 17, 2025, Dr. Arabi filed a motion for judicial notice of statements about patent law and the patent application process based on information on the United States Patent and Trademark Office's website. ECF No. 339. The United States opposes the motion for two principal reasons: Dr. Arabi's proposed statements are modified versions of the information on the USPTO website, and they should be excluded under Rule 403. As the Court explained in limiting the scope of testimony from defense witness Manoj Sachdev: "I don't think you need to put in any patent law. He can talk about, you know, the fact that this particular technology is already in the public domain, is not very technical. So at this point I'm inclined to admit his testimony, but I'm not going to allow any testimony on patent law." Hrg. Tr. Feb. 3, 2025, 78:1-6.

/ /

/ /

/ /

## II.   STATEMENT OF FACTS[4]

While working in Qualcomm's Research and Development department, Dr. Karim Arabi participated in developing valuable microchip technology that was marketed and sold to Qualcomm for $180 million.  Because Dr. Arabi had previously agreed that anything he invented while at Qualcomm would generally belong to Qualcomm, he schemed to hide his involvement in developing and refining the new technology.  He carefully hid his role as the new company's shadow CEO, who did everything from pick its corporate name (Abreezio) to weigh in on its office furniture.  Dr. Arabi even created fake email accounts and sent phony emails to impersonate his sister, Sheida Alan ("Sheida"), the supposed inventor of the new technology.

After the deal closed and Qualcomm paid almost $92 million to Sheida, the campaign of concealment continued: Dr. Arabi invested the money in Canadian and Norwegian real estate while hiding his involvement, funneled funds back to his U.S. companies via intermediary shells, lied repeatedly through Qualcomm's subsequent civil fraud suit, and received steady installments of laundered fraud proceeds until the month before his arrest in this case.

### A.   Dr. Arabi's Agreements With Qualcomm.

Dr. Arabi was re-hired by Qualcomm as Vice President of Research and Development ("R&D") in April 2013, after previously working with the company as a Vice President of Engineering leading R&D in design for test ("DFT") and low power design.  When rehired, Dr. Arabi entered several agreements and understandings.

First, Dr. Arabi agreed that, in exchange for his ample salary, virtually all of his inventions made while employed would belong to Qualcomm.  He also agreed to disclose any such inventions to Qualcomm, not to compete with Qualcomm, and to avoid conflicts of interest, such as attempting to assign his inventions to anyone else.  Second, Dr. Arabi affirmed Qualcomm's code of conduct, which contained a detailed

---

[4]   This Statement of Facts is taken verbatim from the United States' Motions *in Limine* (ECF 314).

section explaining that an engineer's invention belongs to Qualcomm even if developed by an engineer on his own time and with his own resources—so long as the invention related to the company's business and was conceived while employed by the company.

**B.    Agile Semiconductor & Endura Technologies: Dr. Arabi's Dress Rehearsal[5]**

The Abreezio saga was not the only time Dr. Arabi collaborated with company outsiders to try to sell a business to Qualcomm for over $100 million.  On October 24, 2013, Dr. Arabi used KSPA Capital Limited ("KSPA")—a Cayman Islands investment vehicle nominally owned by his wife but, in truth, controlled by Dr. Arabi himself[6]— to invest in Agile Semiconductors Inc. ("Agile").  While employed at Qualcomm, Dr. Arabi communicated extensively with Agile's principals.  He even took a seat on Agile's board.  In early 2014, Agile merged with another company to become part of Endura Technologies LLC ("Endura").  Endura later pitched itself to Qualcomm, offering low-power and testing solutions at an asking price north of $500 million.  Meanwhile, behind the scenes, Dr. Arabi provided Endura's principals with technical feedback on their marketing materials for their pitch to Qualcomm.

On May 30, 2014, Dr. Arabi disclosed to his supervisors via email his *investment* in Endura's predecessor, but never mentioned his prior position on Agile's board, his dozens of emails with Agile and Endura's principals, or his subsequent detailed assistance with their marketing materials.  Regardless, Qualcomm ultimately elected not to purchase Endura.

/ /

---

[5] The United States will comply with the Court's pretrial ruling, made without prejudice, excluding evidence related to Agile Semiconductors Inc., Endura Technologies LLC, or KSPA Capital Limited.

[6] Agents searching Dr. Arabi's residence in August 2022 found a letter from a Cayman Islands bank with filename "Karim Cayman Bank Account," further demonstrating that while KSPA Capital Limited was putatively owned by his wife, Dr. Arabi simply used her as a cutout on the entity and its account.

## C.    Abreezio's Fraudulent Formation and Sale to Qualcomm

Dr. Arabi's plans for a more direct approach to his employer's pocketbook crystallized with Bradley Quinton in late 2014.  By email, Quinton and Dr. Arabi (using his personal email address) formulated the new company's ownership structure as early as October 2014, and schemed how it could survive due diligence when pitched to "QCOM" for tens of millions of dollars.   For example, summarizing their plans, Quinton wrote to Dr. Arabi, describing the most salient features of the company that would become Abreezio:[7]

- "We will adjust the … shareholdings to make you (or your family members) significant shareholder(s) by accepting a nominal investment from you (or your family members)."

- "After making your initial 'investment' and settling the share structure, you will provide technical direction to [the company] in your role as an investor."

- The company will develop and patent technology "to the point where the key value prop can effectively be demonstrated to large semiconductor companies like" Qualcomm.

Exhibit 1.  Quinton emailed his then-colleagues on December 1, 2014, inviting his team to attend a meeting because "Karim will be going over his idea/patent application."

Indeed, in late December 2014, Dr. Arabi filed two provisional patent applications for two different but related ideas in the "design for test" ("DFT") field and low power techniques for microchips.  Abreezio's ultimate technologies, which drew on the concepts in these provisional patent applications, were referred to as TruSens (the sensor technology aiming to achieve power/performance/area ("PPA") savings in microchips) and TruTest (the DFT technology aiming to reduce test time).   Each provisional patent application listed Dr. Arabi's sister, Sheida, as the purported inventor, but the entire filing process was directed by Dr. Arabi and some of the contact

---

[7]    At this point, Dr. Arabi and Quinton were weighing whether to use Quinton's dormant Canadian shell named Trementa to hold the valuable new technology. Together with Taneja, they later formed Abreezio instead.

information on the patent filing paperwork was his. Moreover, both of the provisional patent applications listed as the contact email address for "Sheida" a brand-new email account that Dr. Arabi had just created to impersonate his sister: sheida.arabi1@gmail.com.[8]

Dr. Arabi himself emailed Sheida what is likely the earliest consolidated description of the technology in one of the provisional patents on December 15, 2014—a full week before the filing was actually executed. The email attached a slide presentation with a title matching the title of one of the December 2014 provisional patent applications over the byline "Shadi Arabi."[9] The metadata for the slide deck indicated that it was authored *and* last modified by "Karim Arabi."

In early 2015, Dr. Arabi emailed Quinton, "Let me approach a potential candidate for CEO," and then recruited Sanjiv Taneja to CEO of the nascent company. Dr. Arabi set the terms of Taneja's employment with Abreezio. Despite Dr. Arabi's later claims that he simply played matchmaker between Taneja and Sheida, in truth, Taneja never once met—or even spoke with—Sheida, the company's supposed founder, its 64% majority owner, and the purported creator of its founding intellectual property. Dr. Arabi also set the terms of Quinton's employment as Abreezio's CTO, sending a host of employment agreements to Quinton including a clause under which all of Quinton's inventions while at Abreezio would belong to the company.

On January 23, 2015, Dr. Arabi, Taneja and Akbar Shokouhi met with Qualcomm Senior Vice President of Engineering Ziad Mansour to discuss Abreezio. After that meeting, at Dr. Arabi's instruction, Taneja emailed Mansour's Qualcomm email

---

[8]    Among other things, Dr. Arabi would later admit under oath that he drafted and sent one or more emails from this account. It was also created from the same IP address that filed the provisional patent applications, and that Dr. Arabi used to send over 100 emails from his personal account.

[9]    The United States is unaware of any real person with this name. Dr. Arabi's wife's first name is "Shadi," but she has a different legal last name.

address "to introduce Abreezio, an angel-funded Silicon Valley based Design IP start-up" and to request a meeting to introduce the company's technology.  Taneja's email neither copied Dr. Arabi nor made any mention of their prior in-person meeting; instead, the email appeared on its face to be a cold solicitation for an introduction that had already happened.

A little over an hour after his email, Taneja texted Dr. Arabi requesting sensitive internal information about Qualcomm's existing technologies for use in Abreezio's marketing pitch.[10]  After Abreezio's March 21, 2015 formal pitch to Qualcomm, Taneja texted Arabi "Thanks again to your technical prowess 'genius,' creative innovation and guidance, we made [a] great impression today!"

As part of the fraud, Taneja also created email accounts for Abreezio employees, but wrote to Dr. Arabi that he should continue to use his personal email because it would be better for "optics" reasons.  Nevertheless, Taneja also corresponded with Dr. Arabi as Arabi set up a new account for "Sheida"—which was itself linked to the prior sham account Dr. Arabi had created to impersonate his sister.

Dr. Arabi also rolled up his sleeves and got involved with the design of Abreezio's technology—including in March 2015, months after "Sheida's" supposed filing the initial provisional patent applications in December 2014.  For example, in early March, as Abreezio was working to refine a "new, simplified sensor," Dr. Arabi emailed two handwritten circuit design schematics ("NewSensor" and "OldSensor") to Taneja while impersonating Sheida using the email address he had created.  For one document ("OldSensor"), the email records show Karim forwarding the drawing from his personal email account (karim_arabi@hotmail.com) to the sham Sheida account he

---

[10]    Several months later, an internal diligence reviewer at Qualcomm would ask Mansour whether Abreezio's marketing pitches were "shooting in the dark" or whether Abreezio's "claims of their technology vs. [Qualcomm's technology are] accurate, based on our understanding."  Without mentioning a word about Dr. Arabi, Mansour replied "I am not sure how they know so much about [our existing] technology.  Having said that, their assessment is very close to our assessment. . . . They know their stuff."

had created (sheida.arabi1@gmail.com), followed by the sham Sheida account sending the same document to Taneja *one minute later*.[11]

The playacting continued throughout Abreezio's entire existence, right up until its sale to Qualcomm. Dr. Arabi regularly attended strategy meetings and calls (often in response to invitations sent to "Sheida" at her fake email accounts) and participated in business decisions large and small. Meanwhile, the real Sheida was not a part of any of it. Months later, when Qualcomm representatives asked to speak with Sheida, Taneja would deflect them, insisting that she wished to remain passive. And the emails, text messages, and other hard evidence showed that, while Abreezio itself christened Sheida with the hollow title of "Chief Architect," in truth she was a total nonentity throughout its formation, development, marketing and sale.

But Sheida herself did play a key role in *concealing* from Qualcomm Abreezio's connection to Dr. Arabi. In the summer of 2015, when Abreezio was filing a new round of patent applications, Sheida legally changed her last name from "Arabi" to "Alan," in order to further hide her relationship with Dr. Arabi. In fact, Sheida's name change—which she sought to explain away in Qualcomm's subsequent civil suit as based on her personal desire to avoid misplaced discrimination—occurred just days *after* Abreezio's patent attorney pressed Taneja to clarify Sheida's true legal name, and mere days *before* a new round of patent applications would be filed with listed inventor Sheida Alan, instead of Sheida Arabi.

Following Sheida's legal name change, the documents and records had to be changed too. For example, Dr. Arabi created yet another sham email account to

/ /

/ /

---

[11]    FBI agents searching Dr. Arabi's residence in 2022 would find copies of both drawings on his laptop. The initial sensor diagram ("OldSensor") correlates closely to one of the figures from one of the December 2014 provisional patent applications supposedly conceived of by Sheida. That application, in turn, concerned the same concepts described in the slides Dr. Arabi sent to Sheida over the byline "Shadi Arabi."

impersonate his sister, this time with her new last name: sheida.alan@gmail.com.[12]  The new account even emailed an altered patent assignment document to Taneja, apparently pasting in new information substituting "Sheida Alan" for "Sheida Arabi."

Based on the conspirators' deception in steadily concealing Dr. Arabi's and Shokouhi's role in Abreezio, Qualcomm signed a Unit Purchase Agreement ("UPA") agreeing to buy Abreezio for roughly $180 million.  *See* ECF 112-1 ¶¶ 2–3.  The UPA was riddled with false representations by Abreezio and its principals, including that: (1) Abreezio had not misrepresented anything in any application for its intellectual property; (2) there were no facts that would render their intellectual property invalid or unenforceable; (3) its patents (and patent applications) had been prosecuted in good faith; and (4) Abreezio was the sole and exclusive owner of its intellectual property.

Qualcomm actually paid $150 million to the coconspirators and others before discovering the fraud.  In the months and years after acquiring Abreezio, Qualcomm's engineering staff was able to incorporate its DFT technology into various company products.  Despite years of intensive effort, however, Qualcomm was never able to commercialize TruSens—Abreezio's putatively more valuable sensor technology.

**D.    Dr. Arabi and his Siblings Launder over $91 Million**

In the Abreezio purchase, Qualcomm directly paid Sheida $91.8 million, based on the 64% of the company that she owned in exchange for her supposed IP contributions.  Although nothing was paid directly to Dr. Arabi, Sheida and the web of companies she formed after receiving the fraud proceeds transferred at least $7.6 million to Dr. Arabi and two of his companies between 2016 and 2022.  For example:

- Sheida's brand new company Avante North Ventures, Inc. made a $4 million low-interest "loan" to Dr. Arabi's brand new company, Abacus

---

[12]    This account was also created from the same IP address Dr. Arabi had used to file the provisional patent applications, create the first Sheida sham account (sheida.arabi1@gmail.com), and send over 100 emails from his personal account.

Machines LLC, less than a year after the sale closed, with no loan repayments due for five years;

- Sheida paid off Dr. Arabi's mortgage on the Vancouver condominium he owned (where she was living);[13] and

- Another Sheida company, Teranova North Development Inc., "loaned" *another* $2.9 million to Dr. Arabi's company, Atlazo Inc., in installments continuing until a month before Dr. Arabi's arrest.

Separately, Dr. Arabi coordinated closely with Sheida and her financial advisors as Sheida invested in a portfolio of luxury real estate in British Columbia. Sheida also funneled money to another Arabi sibling in Norway—Mohammed Arabi, aka Mamad Adar—who himself invested millions of dollars more of fraud proceeds in European luxury waterfront property.[14]

By November 2016, some staff at Qualcomm suspected foul play with the Abreezio deal and began an internal investigation. Qualcomm personnel interviewed Dr. Arabi in May 2017; among many other things, he claimed he introduced Sheida to Taneja and then basically stepped aside so Taneja could take over and form Abreezio.[15]

Qualcomm filed a civil fraud suit against Dr. Arabi, Sheida and Taneja in October 2017. Undeterred, Sheida affirmatively counterclaimed, alleging Qualcomm had wrongfully withheld her share of the balance of the $180 million Abreezio purchase price. Dr. Arabi and Sheida's deception continud unabated during the civil litigation. As pled in the indictment, the civil attorneys jointly representing Dr. Arabi and Sjeoda served unverified interrogatory responses falsely denying that Dr. Arabi had any role in

---

[13]    Dr. Arabi later denied under oath that he received any loans from Sheida besides the $4 million Avante loan in his verified civil interrogatory responses in Qualcomm's subsequent civil lawsuit.

[14]    When interviewed by an investigative reporter about his new purchases, Mohammed assured the journalist that none of the money was from his primary occupation as a doctor. Financial tracing confirmed as much.

[15]    Qualcomm staff believed that Mansour tipped Dr. Arabi off about the internal investigation after they interviewed Mansour but before staff approached Dr. Arabi.

the "formation, operation [or] sale of Abreezio LLC" besides "introduc[ing] his sister Sheida Alan to his long-time acquaintance Sanjiv Taneja." When later required to answer the same interrogatory under oath, Dr. Arabi conspicuously omitted this language, then acknowledged a whole series of ways in which he participated in the company's formation and operations, while still never admitting to any role in creating or developing the technology.

Dr. Arabi and Sheida ultimately settled the civil suit with Qualcomm, agreeing jointly and severally to pay Qualcomm $45 million (later increased to over $47 million when they missed an agreed-upon payment). Financial analysis shows that tens of millions of dollars of properties nominally owned by Sheida *and* Mohammed Arabi/Mamad Adar were liquidated to fund the repayment.

## III.    APPLICABLE LAW

### A.    The Elements of Wire Fraud Conspiracy

The conspiracy charged in Count 1 has two elements the United States must prove beyond a reasonable doubt:

1. First, beginning no later than October 2014, and continuing up to at least June 2018, there was an agreement between two or more persons to commit wire fraud; and

2. Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it.

*See* Ninth Circuit Model Crim. Jury Instruction No. 11.1 (Conspiracy), 2022 ed. (last updated Nov. 2024); *see also United States v. Thompson*, 990 F.3d 680, 683–84 (9th Cir. 2021) (holding that an indictment's inclusion of unnecessary allegations of "overt acts" in charging a wire fraud conspiracy offense under 18 U.S.C. § 1349 did not mean that the indictment should be construed as instead relying on the general conspiracy statute, 18 U.S.C. § 371, which (unlike § 1349) requires an overt act).[16]

---

[16] The above parenthetical summary of *Thompson* is taken verbatim from the Ninth Circuit's opinion in *United States v. Ehmer*, 87 F.4th 1073, 1115 (9th Cir. 2023).

## B.    The Elements of Wire Fraud

Wire fraud, charged in Count 2, has four elements the United States must prove beyond a reasonable doubt:

1. First, the defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omitted facts; deceitful statements of half-truths may constitute false or fraudulent representations;

2. Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3. Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

4. Fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

*See* Ninth Circuit Model Crim. Jury Instruction No. 15.35 (Wire Fraud), 2022 ed. (last updated Nov. 2024).

## C.    The Elements of Conspiracy to Launder Monetary Instruments

The money laundering conspiracy charged in Count 6 has three elements the United States must prove beyond a reasonable doubt:

1. First, beginning no later than August 21, 2015, and continuing up to and including at least April 1, 2021, there was an agreement to commit money laundering;

2. Second, the defendant knew the objective of the agreement; and

3. Third, the defendant joined the agreement with the intent to further its unlawful purpose.

*See* Ninth Circuit Model Crim. Jury Instruction No. 18.7A (Money Laundering Conspiracy), 2022 ed. (last updated Nov. 2024).

The SSI charges Dr. Arabi with conspiring with Sheida and others to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.   The crime of concealment money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) has four elements:

1. First, the defendant conducted or intended to conduct a financial transaction involving property that represented the proceeds of wire fraud;

2. Second, the defendant knew that the property represented the proceeds of some form of unlawful activity; and

3. Third, the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds; and

*See* Ninth Circuit Model Crim. Jury Instruction No. 18.4 (Laundering or Attempting to Launder Monetary Instruments (18 U.S.C. § 1956(a)(1)(B)), 2022 ed. (last updated Nov. 2024).

The crime of money laundering in violation of 18 U.S.C. § 1957 has five elements:

1. First, the defendant knowingly engaged or attempted to engage in a monetary transaction;

2. Second, the defendant knew the transaction involved criminally derived property;

3. Third, the property had a value greater than $10,000;

4. Fourth, the property was, in fact, derived from wire fraud; and

5. Fifth, either (a) the transaction occurred in the United States or (b) the transactions occurred outside the United States but the defendant is a United States person (including an alien lawfully admitted for permanent residence in the United States).

*See* Ninth Circuit Model Crim. Jury Instruction No. 18.7 (Money Laundering (18 U.S.C. § 1957)), 2022 ed. (last updated Nov. 2024).

**D.    Victim's Alleged Negligence is not a Defense to Fraud**

At trial, Dr. Arabi may attempt to blame Qualcomm for failing to detect his involvement in Abreezio prior to acquiring it.  The Court should exclude such evidence and consider instructing the jury that "a victim's negligence is not a defense to wire fraud." *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017) (holding "[e]vidence of lender negligence is thus not admissible as a defense to mortgage fraud"); *see also United States v. Kock*, 66 F. 4th 695, 705 (8th Cir. 2023) (citing *Lindsey* with approval and affirming jury instruction "It is not relevant, and not a defense, that the Internal Revenue Service failed to detect the fraudulent nature of the scheme, nor is it relevant that the Internal Revenue Service might have acted with greater diligence.").

**E.    Advice of Counsel**

To qualify for an "advice of counsel" instruction, a defendant must show that he made full disclosure to an attorney of all material facts, and that he relied in good faith on a specific course of conduct recommended by the attorney. *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1987); *see also United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (a defendant seeking an advice of counsel defense or instruction must first present "evidence such that a reasonable juror could find that the defendant honestly and in good faith sought the advice of counsel, fully and honestly laid all the facts before his counsel, and in good faith and honestly followed counsel's advice." (citation omitted)).

As part of the predicate to lodge such a defense, defendants must produce "all documents concerning their intended advice of counsel defense." *United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018). "[E]ven otherwise-privileged communications that defendants do <u>not</u> intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure 'in their entirety.'" *Id.* (citations omitted; emphasis in original); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege

to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."). Such a disclosure order is necessary because of the practical and logistical difficulties that can arise when advice of counsel issues are litigated mid-trial. *Crowder*, 325 F. Supp. 3d at 138 ("Defendants' decision on whether to assert the advice-of-counsel defense may impact the scope of discovery otherwise permitted or ordered, and thus risks unnecessary interruption and delay if asserted at trial. Moreover, because an advice-of-counsel defense is complex it may raise issues requiring additional briefing before trial." (citations and quotations omitted)).

Further complicating and necessitating early resolution, where, as here, the attorney-client privilege is jointly held with others or is likely controlled by a corporation, the Court may need to resolve whether the defendant can rely on evidence that is protected by others' privilege. *See United States v. Milton*, 626 F. Supp. 3d 694, 702-03 (S.D.N.Y. 2022) (denying the defendant's constitutional claim that "privileged communications become discoverable simply because a defendant wishes to use those communications in his defense"); *cf. United States v. W.R. Grace,* 439 F.Supp.2d 1125, 1137-45 (D. Mont. 2006) (holding that a company's attorney-client privilege must "yield where its invocation is incompatible with a criminal defendants' Sixth Amendment right").

In addition, it is important to decipher whether a defendant is truly lodging an advice of counsel defense or is merely relying on the involvement of counsel under the guise of the defense. "[A] defendant is not immunized from criminal prosecution merely because he consulted an attorney in connection with a particular transaction." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006); *see also S.E.C. v. Savoy Industries, Inc.,* 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981) ("Compliance with federal securities laws cannot be avoided simply by retaining outside counsel to prepare required documents."); *Linden v. United States*, 254 F.2d 560, 568 (4th Cir. 1958) ("[L]egal advice does not under all circumstances constitute an impregnable wall of defense . . . . To hold otherwise would be to say that no matter how violative of law a defendant's

conduct may be, and regardless of consciousness of wrongdoing on his part and his adviser's, the advice confers immunity.").

**F.    Hostile Witness or Witness Identified with an Adverse Party**

The United States expects to call witnesses that are friends and associates of Dr. Arabi.  Based on those personal relationships, during the testimony of such witnesses, the United States may request permission to conduct its examination using leading questions, Rule 611(c) of the Federal Rules of Evidence permits.

Rule 611(c) provides that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party; interrogation may be by leading question."   The Rule "vests broad discretion in trial courts." *Miller v. Fairchild Industries*, 885 F.2d 498, 514 (9th Cir. 1989).  Reversal on the basis of an exercise of discretion under the Rule will occur "only if the judge's action amounted to or contributed to the denial of a fair trial."  *Id.*  "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to the opposing party." Glen Weissenberger, *Federal Evidence 1996 Courtroom Manual* 134 (1995).

Before the adoption of Rule 611(c), the use of leading questions on direct examination required either a showing of actual hostility or a determination that the witness being examined was an adverse party, or an officer, director, or managing agent of an adverse party.  *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981).  The drafters of the Rule decided that these limitations presented "an unduly narrow concept of those who may safely be regarded as hostile without further demonstration.  Fed. R. Evid.611(c) Advisory Committee Notes.  The new rule was thus designed to enlarge the categories of witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility."  *Id.*

Rule 611(c) also states: "[O]rdinarily leading questions should be permitted on cross-examination."  But as the Advisory Committee Notes make clear, the "right of a cross-examiner to employ leading questions is not absolute under Rule 611(c)."

*Morvant v. Construction Aggregates Corporation*, 570 F.2d 626, 635, n.12 (6th Cir. 1978). "Generally, when a witness identified with an adverse party is called, the roles of the parties are reversed. Leading questions would be appropriate on direct examination but not on cross examination." *Alpha Display Paging v. Motorola*, 867 F.2d 1168,1171 (8th Cir. 1989). The Advisory Committee Notes to Rule 611(c) state the use of the word "ordinarily" was meant to "furnish a basis for denying the use of leading questions when the cross examination is cross examination in form only and not in fact," giving the example of an insured defendant who proves to be friendly to the plaintiff. In instances where the United States' witnesses are friendlier to the defendants, the United States would request that the Court require the defense to examine these witnesses by means of non-leading questions.

## G.    The Residual Hearsay Exception

Days before the motion *in limine* hearing on February 3, 2025, Dr. Arabi provided notice that he intended to introduce, under Rule 807, clips from Bozena Kaminska's telephonic interview, which occurred and was audio recorded 2.5 years earlier. But "courts use FRE 807 only in exceptional circumstances" not present here, and the Court should exclude Kaminska's interview statements in this case. *United States v. Bonds*, 608 F.3d 495, 501 (9th Cir. 2010).

Rule 807 provides a "residual exception" to the general prohibition on hearsay at trial. Specifically, a statement is not subject to the general prohibition if it (1) "is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and" (2) "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a); *see also Idaho v. Wright*, 497 U.S. 805, 817 (1990) ("The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial.").

In evaluating trustworthiness of a statement, the Ninth Circuit has placed great emphasis on (1) whether the declarant was under oath and subject to perjury, and (2) whether the United States had an adequate opportunity to cross-examine the declarant. For example, in *United States v. Lindsay*, the Ninth Circuit affirmed the district court's refusal to apply the residual exception to videotaped depositions in the Philippines (attended by defense counsel but not the Assistant United States Attorney) because equivalent guarantees of cross-examination were not present." 931 F.3d 852, 866 (9th Cir. 2019); *compare United States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012) (residual exception applied in part because "the interview was taken under oath," the statements were "within her personal knowledge," and the video "show[ed] the demeanor of the witness, allowing a jury to use visual cues to assess credibility"); *United States v. Sanchez-Lima*, 161 F.3d 545, 547-548 (9th Cir. 1998) (videotaped statements of witnesses should have been admitted under the residual exception in part because they "were under oath and subject to the penalty of perjury," and the videotapes "would allow jurors an opportunity to view their demeanor").

Further, Kaminska's untrustworthiness in answering questions cuts sharply against admitting her out-of-court statements. *See Bonds*, 608 F.3d at 502 ("The district court finding properly focused on the record of untrustworthiness of the out of court declarant, Anderson, as required under the rule.").

## IV. WITNESSES AND EXHIBITS

On January 28, 2025, the United States provided to the Court and Dr. Arabi with draft witness and exhibit lists. The United States' revised witness list:

- Mohamed Allam
- FBI DFE Taylor Armstead
- Viraphol Chaiyakul
- FBI SA Leah Chambers
- Saad Elhosni
- Joseph Fang

- Alan Gilchrist
- Daniel Hoggar
- Kevork Kechichian
- Farsheed Mahmoudi
- Charlie Matar
- FBI SA Terrence Mycka
- Duane Nelles
- Paul Norlen
- Rajesh Pankaj
- John Roberts
- SCBPO Enrique Rodriguez
- Amir Salek
- Anthony Schmidt
- USMS SI John Shindledecker
- Akbar Shokouhi
- Hiten Somwal
- Dennis Sylvester
- Sanjiv Taneja
- Esin Terzioglu
- James Thompson
- FBI SA Jaime Vigorito
- Katie Wilson
- Bank of America witness (interstate wire)

The United States will provide updated witness and exhibit lists prior to the start of trial. As a general overview, the United States may seek to admit at trial:

- Dr. Arabi's agreements with Qualcomm.
- Emails and text messages Dr. Arabi sent, from his personal phone number, his personal email address, and sham email addresses he created to pose as

*United States' Trial Memorandum*                                                     *22-CR-1152-BAS*

his sister, to his co-conspirators, and emails and text messages sent by others as relevant to the charged fraud scheme.

- Bank records and summary charts showing Qualcomm paid $91.8 million to Sheida, and the subsequent use of that money, including less than a year later a $4 million low-interest "loan" to Dr. Arabi's new business.

## V.    JURY INSTRUCTIONS

As directed in the Court's amended pretrial order, the United States will submit proposed jury instructions under separate cover forthwith.

## VI.    PROPOSED VOIR DIRE

The United States requests that the following *voir dire* questions be addressed to the jury panel.

1.    The Court will instruct you about the law. Will you follow the law as given by the Court and not be swayed by any feelings you may have about what the law is or should be?

2.    Does anyone have any negative views of law enforcement, the FBI, the IRS, or the United States Marshals Service that would prevent you from being fair and impartial?

3.    Have you had an unpleasant or negative experience with any law enforcement personnel?  Would that experience cause you to be biased against law enforcement?

4.    Have you ever had any disputes with any agency of the United States Government?  If so, please describe.

5.    Have you or any relatives or close friends ever been accused of, or charged with a crime?

6.    Have you had any training in the law? Do you have close family or friends who have been trained in the law? If so, please explain.

7.    Do you have any experience with patents or intellectual property law?

8.    Have you ever started a business?  Have you ever sold a business?

9.   Does anyone work in human resources?

10.   Has anyone ever settled a civil lawsuit?

11.   Do you speak or read Norwegian?

12.   Do you have any moral or religious reservations that might prevent you from standing in judgment of someone else?

13.   Have you or someone you know ever been the victim of fraud?  Would that experience prevent you from being fair and impartial in this case?

14.   The law requires the United States to prove each charge against each defendant beyond a reasonable doubt.  If you are selected, would you want the United States to prove its case by a higher standard of proof, for example beyond any possible doubt?

15.   Do you understand the difference between circumstantial and direct evidence? Do you understand that circumstantial evidence can be used to prove a fact? Will you have trouble giving circumstantial evidence the same weight as direct evidence?

16.   Have you, any relatives, or close friends ever worked at Qualcomm?

17.   Do you, any relatives, or close friends currently hold any Qualcomm stock?

18.   Have you, any relatives, or close friends ever worked at Atlazo, Inc.?

DATED: March 3, 2025

ANDREW R. HADEN
Acting United States Attorney

*/s/ Nicholas W. Pilchak*
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys