Whitney Z. Bernstien, S.B.N. 304917
Rebecca S. Roberts, S.B.N. 225757
Ryan V. Fraser, S.B.N. 272196
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Email:  wbernstein@bklwlaw.com
          rroberts@bklwlaw.com
          rfraser@bklwlaw.com

*Attorneys for Dr. Karim Arabi*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>KARIM ARABI,<br><br>     Defendant. | Case No. 3:22-cr-1152-BAS<br>Honorable Cynthia A. Bashant<br><br><br>**KARIM ARABI'S SUPPLEMENTAL JURY-INSTRUCTION REQUESTS & SUPPORTING MEMORANDUM** |

## I. Introduction

Karim Arabi supplements his prior jury-instruction requests and objections, written and oral, with this memorandum and further requests.

## II. Multiple-Conspiracies Instruction

The jury instruction conference on April 2, 2025, left an open issue with respect to the Court's Instruction No. 20 regarding multiple conspiracies. *See* Trial Transcript ("TT") at 3562–71 ("If I give an instruction, if you plan to argue to the jury that the wrong Indictment has been proven up, then I would give 20 and have the jury -- the Government read the Indictment in its entirety . . . . At this point, I'm tentatively giving 20 unless the Defense says they don't want me to give 20.").

Dr. Arabi understands the Court to intend to have the entire Second Superseding Indictment ("SSI") read to the jury if the Court's proposed multiple-conspiracies instruction (Court's Instruction No. 20 at the April 2, 2025, instruction conference) were to be given. Arabi respectfully maintains that his previously proposed instruction 60, *see* Dkt. 356 at 72 (p. 76 of 80, by the CM/ECF page numbering), should be given without a reading of the SSI, because its summary of the SSI's charges is fair, *see* SSI ¶ 15, and the SSI contains prejudicial surplusage. As between the choices—of (a) the Court giving the Court's proposed multiple-conspiracies instruction (Court's Instruction No. 20 at the April 2, 2025, instruction conference) with a reading of the entire SSI and (b) no multiple-conspiracies instruction being given at all—Dr. Arabi elects to have no multiple-conspiracies instruction given (option (b)).

### III. Defense Instruction Request 63(d) —
### Alternative, Fall-Back Theory of Defense

*Preferred Version*

If you believe that Qualcomm obtained Abreezio's true value from sources other than provisional patent applications or a patent whose underlying idea is alleged to have been conceived in whole or in part by Karim Arabi—for example, if Abreezio's true value came from key personnel Qualcomm could not get otherwise, from technology that it is reasonable to believe that Arabi may not have contributed to, or both—and if you believe that such non-Arabi value was worth what Qualcomm paid, then Arabi is not guilty of wire fraud and wire-fraud conspiracy.

*Second-Choice Fall-Back*

The Government charges that Qualcomm would not have bought Abreezio because its value came from provisional patent applications or a patent the Government ascribes to Karim Arabi. If, however, you find it reasonable to infer that the true value of Abreezio was not a provisional patent application or patent describing an invention by Karim Arabi, but some other aspect of Abreezio—for example, key personnel Qualcomm could not get otherwise—and if you find it reasonable to infer that this non-Arabi value was worth what Qualcomm paid, then Arabi is not guilty of wire fraud and wire-fraud conspiracy.

### **Background & Authority**

"'[A] defendant is entitled to an instruction concerning [his] theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility,' as long as a jury 'could rationally sustain the defense.'" *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1180 (9th Cir. 2024) (second alteration replacing "its" with "his") (quoting *United States v. Kayser*, 488 F.3d 1070, 1076 (9th Cir. 2007) (citations omitted)); *see also United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011) (reversible error to deny a legally accurate theory-of-defense instruction that has any foundation in the evidence).

At the April 2, 2025, jury-instruction conference, the Court declined requests for particular theory-of-defense instructions. Maintaining his prior requests and objections, Arabi submits the above as a fall-back, alternate theory-of-defense instruction based on the Court's December 19, 2024, order, Dkt. 311. In that order, the Court stated:

> The Government charges that Qualcomm would not have bought Abreezio because its value came from Arabi's patents. If, however, evidence shows that the true value of Abreezio was not the provisional patents allegedly developed by Arabi, but some other aspect of Abreezio—for example, key personnel Qualcomm could not get otherwise—and if the evidence shows this non-Arabi or provisional patent-related value was worth what Qualcomm paid, then this would provide Arabi with a valid defense under *Milheiser*.

Dkt. 311 at 8.

(Arabi's second-choice alternative above tracks even more closely the Court's December 19, 2024, order, than the above "preferred version" does.)

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

## IV. Defense Instruction Request 64—
### Conditional Imputation to Qualcomm of Ziad Mansour's Knowledge

For your consideration of whether Qualcomm was deceived with respect to a material fact, I instruct you as follows:

**Part One**

If you have reasonable doubt that Ziad Mansour was acting solely for his own purposes or those of a third party at a given time, then you should consider Mansour's knowledge to have been Qualcomm's knowledge as of that time.

**Part Two**

If Qualcomm knowingly received a benefit from the acts or omissions of Mansour in his work for Qualcomm with respect to the due diligence and ultimate acquisition of Abreezio, then you should consider his knowledge at any given time to have been Qualcomm's knowledge as of that time.

## Authority

Ninth Circuit Manual of Model Civil Jury Instructions, Instructions 4.4, 4.13 (2017 edition, last updated Nov. 2024) (omitting inapplicable text and modified to identify Qualcomm as the principal and Mansour as the agent; adapted to the criminal burden of proof).

"[A] principal is generally charged with notice of facts that an agent knows or has reason to know and that are material to her duties as an agent." *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939–40 (9th Cir. 2017) (citing Restatement (Third) of Agency § 5.03 (2006)); *see also In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) (following Restatement (Third) of Agency §§ 5.03, 5.04); *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 876 (9th Cir. 1989) ("if notification is given to an agent who has, or appears to have authority either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it, then such notice is chargeable to the principal" (internal quotation marks omitted) (citing, among others, Restatement (Second) of Agency § 268, comment c (1968))).

"[N]otice is imputed [to a principal] . . . (b) when the principal has . . . knowingly retained a benefit from the agent's action." Restatement (Third) Of Agency § 5.04 (2006);

*see also* Restatement (Third) of Agency § 5.03 (2006) (imputing an agent's knowledge to the principal).

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

## V. Defense Instruction Request 65—
## Multiple-Role Testimony[1]

**Part One**

You have heard testimony from [John Roberts and John Shindledecker][2], who were law-enforcement officers when they conducted investigation relevant to this case. Each testified to both facts and two types of opinions and the reasons for those opinions. I will describe all three types of testimony. The first is fact testimony. Fact testimony is based on what the witness personally saw, heard, or did. The second is opinion testimony based on the specialized knowledge, skill, experience, training, or education of the witness. The third is what is called "lay opinion testimony."

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

As to the opinion testimony based on the witness's specialized knowledge, skill,

---

[1] Roberts's and Shindledecker's expert opinions should be stricken because, in the instance of Roberts, they were not noticed under Federal Rule of Criminal Procedure 16(a)(1)(G), *see* Trial Tr. 436:22, and, in the instances of both Roberts and Shindledecker, they were not shown to be the product of reliable principles and methods, reliably applied to the facts of the case and helpful to the jury. *See* Fed. R. Evid. 702. If these opinions are not stricken, a multiple-role limiting instruction is required, among other reasons because of the prejudice criminal defendants suffer from dual-role testimony by case agents. *See United States v. Holguin*, 51 F.4th 841, 851 (9th Cir. 2022); *United States v. Torralba-Mendia*, 784 F.3d 652, 658 (9th Cir. 2015). Such prejudice is especially strong here, where Roberts's testimony implied that a "takedown" of the defendant and seizure of his property was validated by the same ostensibly rigorous government investigation the products of which were offered in evidence at trial. *See* Trial Transcript at 562:17–567:5.

[2] Arabi contends the multiple-role testimony instruction should be given as to both John Roberts and John Shindledecker. In the alternative, if the Court disagrees, finding that this instruction applies to only one but not the other, Arabi asks the Court to provide a version of this instruction that would address at least the one witness as to whom the Court finds the instruction *should* apply.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

experience, training, or education, you should judge this testimony like any other testimony. You may accept all of it, part of it, or none of it. You should give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

As to the lay opinion testimony, this testimony is based on inferences drawn from the witness's direct perceptions and must be rationally based on those perceptions and not on speculation or what someone else has said. You should judge this testimony like any other testimony. You may accept all of it, part of it, or none of it. You should give it as much weight as you think it deserves. When considering lay opinion testimony, however, you should not give it any extra credence based on the specialized knowledge, skill, experience, training, or education of this witness.

You also should consider whether the witness testified to personal observations or involvement as a fact witness, testifying about a lay opinion based on the witness's perceptions, or testifying to an opinion based on specialized knowledge, skill, experience, training, or education. When a witness provides opinion testimony based on knowledge, skill, experience, training, or education, that person might rely on facts that are not based on his or her personal observations or involvement, but that opinion cannot serve as proof of the underlying facts.

You should also consider the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

Also, the fact that a witness is allowed to express opinions based on that person's specialized knowledge, skill, experience, training, or education should not cause you to give that witness undue deference for any of aspect of that person's testimony or otherwise influence your assessment of the credibility of that witness.

**Part Two**

A witness's status as a law-enforcement officer or former law-enforcement officer alone is not a basis to defer to him or her. Assess the weight and credibility of testimony by

current or former law-enforcement officers using the same standards and criteria you apply to other witnesses.

**Authority**

### *Legal Authority*

Ninth Circuit Manual of Model Criminal Jury Instruction 3.15, Option 3 (modified to add Part Two, above, to avoid undue deference to law enforcement) (2022 edition, last updated June 2024) (henceforth "2022 Model Instr."). In addition, the Ninth Circuit has—

> cautioned district courts about the dangers of allowing a case agent to offer both expert and lay opinion testimony. An agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay.

*United States v. Torralba-Mendia*, 784 F.3d 652, 658 (9th Cir. 2015) (cleaned up); *see also United States v. Holguin*, 51 F.4th 841, 851 (9th Cir. 2022) (noting the further danger from dual-role testimony of circumventing foundation requiremeents). Moreover, "[g]lossing over" the three-way distinction between fact, lay-opinion testimony, and opinions from specialized knowledge "may lead to the jury applying the instructions that they were given about 'opinion' testimony to lay opinion even though it was intended for expert testimony. In doing so, the jury would consider the witness's experience, training, and specialized knowledge in evaluating lay opinion – exactly the kind of bolstering of lay opinion with expert credentials about which we have warned." *Holguin*, 51 F.4th at 864.

### *John Roberts and John Shindledecker: Examples of Lay Opinions and Testimony from Specialized Knowledge*

<u>Roberts</u>

The government encouraged the jury to consider John Roberts's credentials and specialized experience in support of the credibility of his conclusions or opinions that were

based on specialized knowledge and judgment calls. In particular, Roberts testified that, before joining FINRA, "an independent self-regulatory organization" that "oversee[s] brokerage firms and the registered reps who work for them," Roberts belonged to a "specialized squad" at the FBI. TT 409:25. "Virtually my entire career was spent investigating complex financial crimes, things like investment fraud, Ponzi schemes, securities fraud, various corporate fraud matters." TT 408:1–3. The government noted that he was a certified public accountant for five years before becoming an FBI agent and had a bachelor's degree in accounting and math. TT 408:4–6. Roberts effectively testified as an expert—which is to say, a witness who purports to apply specialized knowledge to the facts of the case, *see* Fed. R. Evid. 702—with regard to an entire three-year span of the "investigation into the Abreezio transaction," TT 408:9–14, over which he was "the lead case agent." TT 408:16.

Among other prejudicial opinions derived from second-hand information and specialized knowledge, rather than direct personal observation—which were improper, *unless* Roberts was testifying as an expert, *see* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert *has been made aware of* or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they *need not be admissible* for the opinion to be admitted." (emphasis added))—Roberts testified that he and his team were "trying to get additional financial records" and "real estate records" from Canada "because some real estate had been purchased with some of the funds *from the purchase of Abreezio*." TT 418:21–23 (emphasis added). Moreover, Roberts testified the government's investigation was conducted as it was "[b]ecause *the money that had been sent to Sheida Alan went to Canada*, and we wanted to be able to trace and track that." TT 419:4–6 (emphasis added). Similarly—

15  *Q.* Why did you try to get records from Norway?

16  **A. As we were tracing the funds, we discovered that money had**

17  **been sent from Canada to Norway and additional real estate had**

18  **been purchased there.**

19  *Q.* So was one of the focuses on your investigation to try to

20  follow the money in this case?

21  **A. Exactly right.**

TT 419. Significantly, Roberts testified about what the appropriate steps are in investigating financial crimes generally—steps that he described his investigation to have taken—to bolster the government's case as a whole. *See* TT 420:5–9.

An inexperienced volunteer at the FBI could not have testified about these matters, even if they had personal knowledge of this investigation from helping with this investigation; Roberts's above testimony inherently draws from specialized knowledge. And Roberts's lengthy specialized experience was offered in support of his conclusions. *See, e.g.*, TT 408:1–16. As presented by Mr. Pilchak, Roberts was testifying from the specialized knowledge he acquired in his 23 years as an FBI agent focused on financial crimes. (This is true regardless of whether, in some instances, Roberts's testimony from specialized knowledge sounded like an opinion, rather than a (non-opinion) factual conclusion, so long as the conclusion was based on specialized knowledge or experience. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion *or otherwise*" (emphasis added) if Rule 702's other enumerated conditions are satisfied).)

The following testimony by Roberts appears to draw upon his specialized knowledge, and so it is testimony to which Federal Rule of Evidence 702 and Federal Rule of Criminal Procedure 16(a)(1)(G) apply:

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

- In May 2018, Roberts's "specialized squad" "didn't really have the capacity to take . . . on" an investigation into the Abreezio acquisition. TT 409:18–410:4. (An inexperienced FBI agent or one with a non-financial specialization would not have been qualified to say this from their own personal observations. *See* Fed. R. Evid. 602, 702, 703.)

- Roberts further testified from his specialized knowledge of the FBI that, when a referral is declined, "[w]hat we'll tell them is that if additional information comes to light, they're always welcome to provide additional information as it comes in." TT 413:3–5. Only an experienced FBI agent has the specialized knowledge to give this testimony. (AUSA Pilchak confirmed that Roberts lacked personal knowledge of the May 2018 meeting that Roberts nevertheless testified about, due to his expertise on the investigation. TT 413:7–10.)

- "A subpoena is like a legal process to compel somebody to provide us records under the grand jury process." TT 416:22–24.

- "There is arrangements with all the different countries to get -- serve legal process over there. We call it an MLAT. And it's our government making a formal request to their government to obtain records. And it's a mutual treaty where they can also use the same process to get records from us that they might need in their investigations." TT 418:12–17.

- "We were trying to get real estate records because some real estate had been purchased with some of the funds from the purchase of Abreezio." TT 418:21–23. "Because the money that had been sent to Sheida Alan went to Canada, and we wanted to be able to trace and track that." TT 419:4–6.

- The investigation also "discovered that money had been sent from Canada to Norway and additional real estate had been purchased there." TT 419:16–18. Therefore, the investigation "focus[ed]" on "follow[ing] the money." TT 419:21.

- "[T]rac[ing] the money . . . is a standard step in any financial crimes case. So the money started here at Qualcomm. When the Abreezio was purchased, the money got sent out. The money to Sheida Alan got sent to Canada. And then we tried to trace it on from there to see where it ultimately landed." TT 420:5–9.

- Testimony about how 18 U.S.C. § 2703 works and was used in this case—

  > There's something called a 2703(d) order that is applied for, and a judge, federal judge, would sign off on it. Once we get that signed off on, then we serve it on these email service providers, and then they provide us with the information that we ask for, which is specifically . . . It's not content so it's what's considered to be header information. The "To," the "From," the date. So that kind of back and forth without actually getting the content of the emails.
  >
  > . . .
  >
  > No, the reason why we got this information through the 2703(d) order is because we ultimately wanted to try to get an email search warrant for these accounts that we identified, so that the information that was initially provided by the email service providers could be incorporated into an affidavit, which would support us seeking a search warrant to get the actual content that was in these email accounts.

  TT 420:22–421:18 (before adding that the investigation then obtained the contents of about 14 email accounts by search warrant).

- TT 422:8–423:6 (the investigation's warrants would reveal whether any emails were missing from the civil discovery).

- The email search warrants "were a corroboration" of what Qualcomm provided. TT 423:12. "So we were able to see that some of the emails that were produced during the civil litigation, we found those in the email accounts that we searched, but then we also found additional information on top of that." TT 423:12–16.

- "[D]uring the warrant search process," the investigation "found new things that hadn't been provided by Qualcomm in the beginning." TT 423:19–22.

- Roberts found correspondence between Arabi and Brad Quinton, and this was "relevant" to the investigation. TT 424:15–20.

- TT 425:17–21 (testifying to "corroborat[ion]" of "the fact that it was Brad Quinton's email").

- "I think I had access to, like, hundreds of thousands of emails that came in through the civil litigation that we received from Qualcomm and then the search warrants that I did." TT 426:20–22.

- TT 427:2 (identifying "the last time" when Dr. Arabi appeared to correspond with Brad Quinton from his work account).

- TT 428:13–15 (identifying "specific items that appear to be related to setting up a corporate structure").

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

- Explicitly referencing Roberts's white-collar experience to bolster his explanations:

  > Q. [Y]ou see the words "cap table" there?
  >
  > A. I do.
  >
  > Q. You were a white-collar agent for a long time what. Is a cap table? [sic]
  >
  > A. I believe it's a capitalization table. It's a table that charts out what [sic] owns what percentage of a company, usually through ownership of shares.

  TT 428:17–23.

- TT 429:1–7 (testifying to "find[ing] some email correspondence spelling out a basic corporate plan that Mr. Quinton reference[d] in [a particular] email").

- "Trementa was a dormant corporate structure . . . . [that] belonged entirely to Mr. Quinton . . . ." TT 432:25–433:6.

- TT 434:1 (identifying a "cap table").

- TT 435:7–9 (testifying that Trementa "evolved into the final named company, which was Abreezio").

- TT 436:11–14 (testifying that during the life span of Abreezio, Arabi never "made any kind of cash or capital investment in Abreezio").

- TT 436:15–17 (testifying that the investigation found "evidence of [Arabi] providing technical direction") (an especially unfairly prejudicial unnoticed expert opinion on an ultimate issue).

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

- TT 438:17–19 (testifying that a strategy was designed to make "Trementa . . . easily acquired. So another company could then purchase Trementa and the intellectual property that the corporate entity contained").

- Drawing upon specialized knowledge of the stock market:

  > Qualcomm is a publicly traded company, and if you're publicly traded, you have a four-letter code typically that identifies the stock for that company on the stock market if you're trying to place trades. And so the ticker symbol that you would be able to purchase shares of Qualcomm for is QCOM. Qualcomm.

  TT 439:6–11; *see also* TT 510:16–18.

- "[A]ll the way back in October of 2014, Mr. Quinton is talking about whatever new company he is going to set up with Dr. Arabi, marketing itself to large semiconductor companies like Qualcomm." TT 439:12–16.

- TT 439–41 (testifying that Roberts observed the execution of the plan described in the emails through the development of Abreezio) (mixed lay and expert opinion).

- Explaining what due diligence is:

  > Due diligence is the work a company would do when they're acquiring another company. So they just -- they would go into the company and review its financials, its technology. They would take steps to try to ensure they understand what it is that they are acquiring in the new company.
  >
  > Q. And based on your investigation and your review of extensive documents, did Qualcomm try to conduct due diligence in the Abreezio transaction?
  >
  > A. They did.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

TT 442:13–21.

- Interpreting the evidence through the lens of Roberts's experience as a white-collar specialist:

> Q. So back to Brad's email here . . . . Mr. Quinton suggests something called an independent investor . . . .
> What do you understand that to mean?
>
> A. . . . . [W]hat that means is having an independent person, somebody from the outside, inject additional capital into the company. So it's an independent investor not somebody directly related with the founders of the company.
>
> Q. And **in your experience investigating white collar crime**, how can that help?
>
> A. It just shows that there's another independent set of eyes on the company and the corporate structure. And so he is pointing out the fact that having another independent investor would make the company appear better during the due diligence process.
>
> Q. Got it.
> Did Abreezio actually add some people like that during its life span?
>
> A. They did.
>
> Q. Was one [of] them Behrooz Abdi?
>
> A. Yes.

TT 443:7–444:2 (emphasis added); *see also* TT 465:24–466:2 (identifying another instance of "the same idea that we saw in some correspondence yesterday, that it would be helpful to have some independent people in the business").

- TT 469:4–10 (no evidence that Abreezio's technical advisory board did anything).

- "I believe Sheida Arabi used" the SheidaArabi@gmail.com email account. TT 475:4; see also TT 476:14

- TT 479:24 (no evidence that Karim Arabi's wife was "involved with voltage scaling technology").

- "[A] terms of service IP" is "the IP address that is linked to the creation of the account. So it traces back who created the account, or at least the computer," and an IP address is "like, a unique identifier for Internet traffic that shows where the information was created . . . sort of like a street address for a house . . . but on electronic communications . . . [s]o, like, a street address in cyberspace . . . for whoever it is that created this email account." TT 497:17–498:9.

- Roberts further opined that Sheida.Arabi1@gmail.com "had been created for the purpose of assisting with the Abreezio transaction," apparently in part because "[o]f the 135 emails that [Roberts] had access to, [he and the government] ended up seizing 129 of those emails as being related to [their] investigation." TT 499:23–500:11.

- TT 503:8–18 (explaining what a request for admission is in civil litigation).

- TT 504:17–507:3 (explaining how Roberts investigated whose IP address had been used to send emails from Sheida.Arabi1@gmail.com).

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

- "[A]t least as of December of 2014, Mr. Quinton and Dr. Arabi were talking about how to get through Qualcomm's due diligence." TT 510:19–22.

- TT 511:24–512:1 (no evidence of Sheida investing cash in Abreezio).

- TT 527:5–14 (opining that "somebody was sitting at a computer with both accounts available to them forwarding the information from one account to the intermediate account, and then on to Sanjiv Taneja").

- Sheida.Alan@gmail.com was created from "the same IP address that was used to create the Sheida.Arabi1@gmail.com, and it was also used to file the provisional patent that we looked at earlier," which shows that "it was an email account that was used by Karim Arabi." TT 539:15–20.

- Abreezio was created as a successor entity to Trementa in February 2015. TT 557:15–21.

- Roberts and his colleagues investigated what happened to the money paid to Sheida from the Abreezio acquisition by searching for emails concerning financial transactions involving Karim and Sheida and relevant real-estate transactions, subpoenaed records, executed email search warrants, interviewed "a number of people," and, based on that specialized investigative work and Roberts's experience, "[a]t the conclusion of [the] investigation, . . . [sought] charges . . . [a]nd . . . conduct[ed] what's sometimes called a takedown," taking into custody Arabi and others, and seizing financial assets. TT 562:17–567:5.

In the following instances, Roberts offered lay opinions:
- Qualcomm "did not disappoint" with its subpoena response early in the investigation. TT 416:18–19.

- Getting financial or real-estate records from Canada "was a hard, slow process." TT 419:9–10.

- TT 427:8–10 (summarizing emails as "dialing in the time and location of" a lunch meeting).

- TT 432:3–21 (testifying that based on executing a search warrant on an email account, a particular email was a continuation of a task list from another email ten days earlier).

- TT 433:12–15, 434:15–21 (summarizing the nature of corporate planning based on review of emails).

- TT 439–41 (testifying that Roberts observed the execution of the plan described in the emails through the development of Abreezio) (mixed lay and expert opinion).

- TT 442:9–10 (opining that Quinton appeared "concerned about the appearance of the company from an investor/acquirer due diligence point of view").

- "Invionics was the company that Brad Quinton worked for and was part owner for up in Canada." TT 462:11–12.

- TT 466:22–467:3 (identifying "Professor Kaminska as a real person who is a real professor at Simon Fraser" University and her relationship to Karim Arabi).

- TT 471:1–21 (opining that Kaminska received funds from the Abreezio acquisition in an approximate amount).

- TT 473:19–23, 476:14–17 (testifying to finding evidence that Arabi was corresponding about provisional patent applications with Sheida around the same time as he was communicating with Quinton).

- TT 477:19–478:11 (PowerPoint slide's title text matched a patent word for word; name on PowerPoint was that of Dr. Arabi's wife).

- TT 486:23–488:15 (lay opinions on content present and absent from Sheida-Karim Arabi emails and Sheida's intent in her emails with Karim Arabi).

- TT 491:22–24 (lay opinion that an email account was "genuinely used by Sheida").

- TT 493:17–494:3 (lay opinions on Karim Arabi email regarding Thoughts to Paper application).

- TT 502:3–21 (summarizing the nature of the antecedent civil litigation and identifying which attorneys represented Sheida and Karim Arabi jointly in that litigation).

- TT 508:22–509:20 (opining that Arabi-Quinton emails regarding corporate-structure strategy continued into early 2015 and summarizing them).

- TT 513:17–514:10 (characterizing email correspondence as Brad Quinton "kind of bow[ing] out of the race for CEO . . . [,] indicat[ing] that he does not have the time to be the CEO of . . . Trementa," and "suggest[ing] a role for himself" as "CTO, which would be the Chief Technical Officer, the VP of Engineering, or an Advisor").

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

- TT 517:13–518:4 (opining based on emails reviewed that Karim Arabi set the terms of Taneja's and Quinton's Abreezio employment and that Sheida did not weigh in).

- TT 524:1–3 (email accounts in Karim Arabi's name "seem[ed] to be used by Dr. Arabi").

- TT 525:4–6 ("it sometimes get[s] a little confusing keeping track of which email account is doing what").

- "[B]oth Sheida Arabi and Karim Arabi used" Sheida.Arabi1@gmail.com; Karim "used it during the time of the – after the account was originally created while certain real estate transactions were going on and this transaction with Abreezio was closing." TT 551:9–16.

Shindledecker

The Court has already found that USMS Inspector John Shindledecker testified to both facts and some expert opinions. *See* TT 3521:7–8 ("I think it's appropriate to consider Shindledecker to have some expert testimony."). Arabi requests the above instruction be given as to Shindledecker, as well, because there were also occasions when Shindledecker testified to lay opinions or mixed lay and expert opinions, such as in the following non-exhaustive examples:

```
3   Q.  What's the significance of that account number?
4   A.  That's the account that received approximately $91.8 million
5   from the acquisition of Abreezio.
```

TT 2729.

```
5   Q.  Sir, what are we looking at in Exhibit 472?
6   A.  These are CIBC wire details reflecting the incoming wire
7   from Qualcomm.
```

TT 2730.

```
19  Q.  Inspector Shindledecker, what happened to the money in the
20  3899 account?
21          MR. FRASER:  Same objections.
22          THE COURT:  Same ruling.
23          THE WITNESS:  Approximately two and a half months
24  later, the account was emptied out, and it was transferred to a
25  different CIBC account controlled by Sheida Alan.
```

TT 2735.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

Can you walk us through what's documented here?

A.   Sure.

It's just a timeline of the CIBC 3899 account of which we already saw all the records for.  It was opened on August 21st, 2015, three days prior to the acquisition by Qualcomm.  Sheida sends the account information to Dr. Arabi.  A few days after that, the wire posts to the account in 91.8 million.  And then around two and a half months later, the account is closed, and the entire balance of the account is transferred to another account controlled by Sheida Alan.

TT 2739.

Sir, what did you document in 489?

A.   I documented just the initial wire from Qualcomm posting in the account and then being transferred two and a half months later to the separate account.  I like to do this -- just I think it's easier than looking through bank records to look at a chart to see where the money went.  So it's just a simple example of that.

Q.   You mentioned simple example.

Will the jury see this in subsequent summary charts that you prepared of the movement of money?

A.   Several.

TT 2739–40.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

6    *Q.*  What are we looking at generally in Exhibit 491, sir?

7    **A.**  **Generally, this is just an overview of the outflows or what**

8    **happened to the money that Qualcomm sent, categories that it was**

9    **sent in.  It's a total of around $86 million.**

10    *Q.*  And outflows refers to what set of accounts?

11    **A.**  **These are the -- it refers to several different accounts.**

12    **It's really just the end destination of funds that got paid.**

13    **They got transferred around to multiple accounts, but these are**

14    **more when it got spent on these category of items.**

TT 2742.

2    *Q.*  If we could now turn to Exhibit 495.

3    Generally, what are we looking at here?

4    **A.**  **Generally, it's a flowchart showing money sent from Sheida**

5    **Alan to Abacus Machines, which is a company owned by Dr. Arabi.**

TT 2744.

5    *Q.*  And without getting too in the weeds here, what are the

6    general terms of this note?

7    **A.**  **General terms is 4 percent interest and no payment is due**

8    **for five years.**

TT 2747.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

12    *Q.*  Aside from the transfers that are specified from the Abacus

13    Machines account in this exhibit, did the Atlazo 6028 have any

14    significant money inflows?

15    *A.*  **It did have some other inflows.  This is the bulk of the**

16    **seed money in 2017 and 2018.  But I think in 2018, it did start**

17    **to get other inflows.**

TT 2753.

\\\

\\\

\\\

\\\

\\\

\\\

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

23   Q.  And having reviewed this email, who do you understand her to

24   be emailing?

25        I'm not asking you to attempt to pronounce that name, but

Page 2755

1    who do you understand this to be sent to?

2    A.  A CIBC banker who was handling Sheida's accounts.

3    Q.  And what does Sheida request in this email that we're

4    looking at?

5    A.  She requests four different things.  First, transferring

6    250,000 Canadian to Nassar Hendi's account, including the

7    account number.  Nassar Hendi is someone who was doing real

8    estate business with Sheida.

9        She also requests to convert 3 million United States dollars

10   to Canadian dollars at a certain rate.

11        And then Item Number 3 was transfer 6 million to my Avante

12   North Ventures business account that she wants to use to invest

13   in private companies.

TT 2754–55.

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

Q. And who's the sender?

A. The S_7295 email address.

Q. And who does -- who is the recipient of the email?

A. Sheida.alan@gmail.com.

Q. Did you -- so this appears to be a Yahoo account forwarding it to a Sheida.Alan Gmail account?

A. Correct.

Q. And generally speaking, what's being forwarded?

A. An investment proposal, bank documents, going over options to invest in.

Q. Did you, in reviewing seized emails, find other instances of this Yahoo account forwarding emails to Sheida.alan@gmail.com?

A. Yes.  There was at least over 30 that I found where it was forwarded directly to the Sheida.alan@gmail.com email address.

Q. And including as of March of 2016?

A. Yes.

TT 2759.

\\\

\\\

\\\

\\\

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

**Q.** Again, without reading the exhibit to the jury, what did Dr. Arabi state about that $4 million loan?

**A.** He gives the terms of the promissory note. Again, 4 percent per year, outstanding balance is due five years from the date that it was signed, and that the purpose of the loan was to facilitate investments by Abacus Machines in other startup companies.

**Q.** And, again, Abacus Machines was the recipient of that loan?

**A.** Correct.

**Q.** And where did the -- what did Abacus Machines do with that money?

**A.** The bulk of the money was transferred to Atlazo.

**Q.** Did you see money being sent to other accounts beyond that one?

**A.** There was money sent to another account that was then later sent to Atlazo. That wasn't reflected on the earlier chart.

**Q.** So Dr. Arabi in these responses is acknowledging that $4 million loan. Is that right?

**A.** Correct.

TT 2763.

\\\

\\\

\\\

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

Q.  The jury is now following along with us.  We're going to skip over that top line because you've already testified to what happened in those first couple of transactions.  Is that right?

A.  That's correct.

Q.  All right.  What happens here (*indicating*)?

A.  So in 2016 there was a series of transfers from the CIBC 3134 account to another account controlled by Sheida Alan ending in 0990, which is a Canadian dollar account.  The total transferred was 31.5 million United States dollars, or around 42.6 million Canadian dollars.

Q.  And does the date range suggest that that was a series of transactions totaling that amount?

A.  Yes.

Q.  As opposed to like a one swoop like we see on the line above; is that right?

A.  Correct.  It was multiple transactions.

TT 2770.

\\\

\\\

\\\

\\\

KARIM ARABI'S SUPPLEMENTAL BRIEF RE JURY INSTRUCTIONS

5    Q.  This purports to be an email from Nassar Hendi to

6    Sheida.alan@gmail.com; correct?

7    A.  Correct.

8    Q.  What's the clause beginning with "But" in Sentence 6.

9    A.  "But I believe as long as her account is strong, it is

10   better we proceed with her name."

11   Q.  Based on this and other statements, does it appear that

12   Nassar and Sheida Alan are referring to Sheida as a separate

13   party here?

14        MR. FRASER:  Renewing the standing objection to this

15   segment of testimony.

16        THE COURT:  Overruled.

17        THE WITNESS:  That's correct.

TT 2776.


     Therefore, the above requested instruction should be given with reference to both Roberts and Shindledecker.


                              Respectfully submitted,

Date:   April 6, 2025        **BIENERT KATZMAN LITTRELL WILLIAMS LLP**


                              By:  _/s/ Ryan V. Fraser_
                                   Whitney Z. Bernstein
                                   Rebecca S. Roberts
                                   Ryan V. Fraser
                                   *Attorneys for Dr. Karim Arabi*