ADAM GORDON
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: | 22-cr-1152-BAS |
|---|---|---|
| Plaintiff, | Date: | October 1, 2025 |
| | Time: | 9:00 a.m. |
| v. | | |
| | Honorable Cynthia Bashant | |
| KARIM ARABI (1), | | |
| Defendant. | **THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FORFEITURE** | |

## I.

## <u>INTRODUCTION</u>

The Court should enter a preliminary forfeiture order requiring Defendant Karim Arabi to disgorge the outstanding proceeds from his $180 million dollar fraud and his interest in the millions of dollars of forfeitable property seized during the investigation, including luxury real estate, deposited bank funds, and the proceeds of stocks, notes and loans based on fraud proceeds. This is the minimum relief required to ensure that Dr. Arabi does not profit from the massive fraud that he engineered.

## II.

## STATEMENT OF THE CASE

On April 8, 2025, the second day of deliberations following a trial lasting over four weeks, a jury convicted Dr. Arabi of wire fraud conspiracy (Count 1), wire fraud (Count 2) and conspiracy to commit money laundering (Count 6).  ECF 367, 414–16. Dr. Arabi waived his right to a jury determination concerning forfeiture, leaving the matter for this Court to resolve.  ECF 331 (Feb. 3, 2025 Tr.) at 92:6–8; *see also* Fed. Crim. P. 32.2(b)(5).

## III.

## LEGAL STANDARD

The purpose of criminal forfeiture is simple—it is "imposed upon conviction to confiscate assets used in or gained from certain serious crimes . . . . Forfeitures help ensure that crime does not pay."  *Kaley v. United States*, 571 U.S. 320, 323 (2014).

The Court has jurisdiction under 18 U.S.C. § 981(a)(1)(C), which provides for forfeiture to the United States of real and personal property that constitutes or is derived from a list of specified offenses, which includes wire fraud.  Upon conviction of a listed offense, forfeiture is mandatory.  *See* 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence"); *United States v. Monsanto*, 491 U.S. 600, 607 (1989); *see also United States v. Omidi*, 125 F.4th 1283, 1287 (9th Cir. 2025) ("When [§ 2461(c) is] applicable, such forfeiture is mandatory").

Rule 32.2 provides the procedure for entering a forfeiture order.  The "determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."  Fed. R. Crim. P. 32.2(b)(1)(B).  Because forfeiture is part of sentencing, the Rules of Evidence do not apply, and the Court may consider (for example) reliable hearsay.  *See* Fed. R. Evid. 1101(d)(3); *see also United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007).

Property is forfeitable if the United States can prove, by a preponderance, the requisite nexus between the property and the offense of conviction. Fed. R. Crim. P. 32.2(b)(1)(A); *see also United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015). The United States need not prove that 100 percent of a defendant's scheme or business was fraudulent to forfeit the entire proceeds of the scheme or business. *Omidi*, 125 F.4th at 1288–89. This is because "Congress's inclusion of the phrase 'directly or indirectly' before 'from' [in the criminal forfeiture statute] indicates that the unambiguous and plain meaning of the statute reaches broadly, extending beyond proceeds that stem directly or immediately from the criminal offense." *United States v. Prasad*, 18 F.4th 313, 325 (9th Cir. 2021) (citations omitted). Indeed, "any money acquired via the fraudulent . . . funnel [is] subject to forfeiture," even if some proceeds were derived from legitimate downstream business activities. *Omidi*, 125 F.4th at 1287–88; *Prasad*, 18 F.4th at 325-26 (explaining criminal forfeiture is "expansive, reaching all proceeds that a defendant obtained as a result of the crime"); *see also United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010).

For a money laundering offense, the standard is even simpler: the court must order forfeiture of property "involved in" any money laundering offense of conviction. *See* 18 U.S.C. § 982(a)(1). This means that, "in a money laundering charge, the commingling of tainted money with clean money taints the entire account." *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009); *see also United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) ("The presence of legitimate funds made the transactions no more lawful because the transactions still *involved* the illegitimate proceeds." (emphasis in original)). Consequently, when money laundering involves dirty money deposited in an account together with clean money, the entire account balance is properly forfeitable, particularly where the purpose of the relevant financial transactions is concealment.

Importantly, forfeiture serves a purpose distinct from restitution, and a defendant is properly ordered to pay both, even though the proceeds he forfeits may be the same

funds payable to the victim as restitution.  *United States v. Newman*, 659 F.3d 1235, 1241 (9th Cir. 2011), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443, 454 (2017) (ordering defendant to "pay both restitution and criminal forfeiture [is] not an impermissible 'double recovery'").  This is because restitution's goal is to make the crime victim whole, while the goal of forfeiture is to force the defendant to disgorge his ill-gotten gains.  *See id*.; *see also Omidi*, 125 F.4th at 1287 ("[f]orfeiture . . . is much broader and serves an entirely different purpose than restitution" (citation omitted)).  At most, a defendant may be required to pay financial penalties constituting double his gross gain, but this would serve the deterrent purposes of the criminal sentencing scheme and is not a legal bar to ordering both forms of penalties.  *United States v. McGinty*, 610 F.3d 1242, 1247–48 (10th Cir. 2010) ("Given the many tangible and intangible costs of criminal activity, [paying restitution plus forfeiture] is in no way disproportionate to the harm inflicted upon government and society by the offense.").

## IV.

## STATEMENT OF FACTS

At trial, the jury heard extensive evidence that Dr. Arabi used his sister, Sheida Alan, as a mask to conceal his own significant role in Abreezio.  Then, when the fraud was largely consummated and Sheida was paid almost $92 million based on Dr. Arabi's work, he continued to use Sheida as the puppet owner of his fraud proceeds, while he continued to pull the strings from behind the scenes.

For her part, Sheida opened a new bank account on the eve of the Abreezio payout.  Specifically, the receiving account was opened August 21, 2015—roughly two months before the Abreezio closing.  Tr. 2729:19–20.[1]  Three days before the Abreezio closing, Sheida emailed Dr. Arabi the account opening paperwork for the receiving

---

[1]    Citations to "Tr." refer to the consolidated trial transcript, while "Tr. Ex." refer to trial exhibits.  Trial exhibits are not attached here but are available upon request. Citations to exhibits to the attached declaration of Senior Inspector John Shindledecker ("Decl.") are denoted "Decl. Ex."

*United States' Motion for a Preliminary*
*Order of Forfeiture*                                                    *22-CR-1152-BAS*

account and photographs of its associated debit card.  Tr. Exs. 274, 278, 280; Tr. 2733:3 *et seq*.  The receiving account was emptied and closed in mid-January 2016, just over two months after it received nearly $92 million from Qualcomm.  Tr. 2729:9–10; 2735:23–25; 2739:3–10.

For his part, after executing the principal phase of his fraud, Dr. Arabi left Qualcomm in approximately July 2016.  Tr. 1885:14; 1929:24.  The very next month, he set about opening bank accounts for shell entities and building a new business empire with the fraud proceeds he had parked with his sister.  In August 2016, he opened three bank accounts for new entities, all bearing names—just like Abreezio—beginning with the letter "A": Abacus, Atlazo, and Avior.  Decl. ¶ 7.[2]  Sheida then wired the first $4 million of fraud proceeds from her new shell entity (Avante) to Dr. Arabi's new shell (Abacus), which Dr. Arabi promptly set about plowing into his new business (Atlazo) as its initial seed money.  Tr. Ex. 496; Tr. 2753:15–17; 2743:5–7.

Former Atlazo CTO Mohamed Allam testified that Dr. Arabi was cagey about the source of Atlazo's funding.  He told Allam "it was an angel fund," and didn't initially mention that it was family money.  Tr. 2666:4–24.  Even when Avior and Atlazo merged and Allam could finally see the name of Atlazo's primary investment company (which Allam didn't recognize), Dr. Arabi said "it was a group of investors that created this company in San Diego to invest in startups."  Tr. 2668:4–6; *see also* Decl. ¶ 13.

During the money laundering, Dr. Arabi was steadily involved in Sheida's dealings with (a) her CIBC bankers; Tr. Ex. 443, Tr. 2757:19–21; (b) her realtors; Tr. 2792:6–8, 20–21; and even (c) Nasser Hendi, who assisted with real estate investments made with the Abreezio fraud proceeds; Tr. Exs. 335, 347, 345, 362.

---

[2]    Atlazo CTO Mohamed Allam told investigators that Dr. Arabi claimed that he'd read that companies with names starting with the letter "A" were acquired faster.  Decl. ¶ 13.

Meanwhile, Dr. Arabi continued to use the second fake Sheida email account that he had created to impersonate his sister during the Abreezio fraud.  Sheida herself forwarded financial documents to that email account many times.  *E.g.*, Tr. Ex. 246 (Sheida forwards an investment proposal to "Sheida" at the fake Sheida email account); Tr. 2759:8–14.  And Hendi obviously corresponded with Dr. Arabi using the fake Sheida account in emails that the Court relied on to find that Hendi was an unindicted coconspirator in the money laundering conspiracy.  Tr. Exs. 335, 347, 345, 362; ECF 331 (Feb. 3, 2025 Tr.) at 23:13–21.

When Dr. Arabi was in danger of default, Sheida used fraud proceeds to pay off the mortgage on Dr. Arabi's Vancouver condominium, where she was then living. Tr. Exs. 298, 299, 295; Decl. ¶ 35.  Almost a year later, Sheida and Dr. Arabi crafted an apparently backdated loan agreement for that cash transfusion.  Decl. ¶ 36.  Once the civil fraud suit was underway, Dr. Arabi paid back the purported "loan" (at about the same time as the apparently backdated loan agreement and its companion lease agreement surfaced) and then falsely denied (under oath) that Sheida had loaned him any money besides the $4 million transfer from Avante—even though he had repaid the supposed loan just months before making his response.  Tr. Exs. 789, 483; Tr. 2830:22–2831:4; 2832:23; Decl. ¶ 37.

A huge share of the Abreezio proceeds flowed into at least six other pieces of Canadian real estate, nominally under the ownership of Sheida or her various partnerships and entities.  *See generally* Tr. Exs. 510–515; Tr. 2797:21 *et seq*.  Not content merely to invest in tens of millions of dollars of real estate just north of the American border, the money laundering scheme also roped in a third Arabi sibling, who resided in Norway: Mohammed Arabi, aka Mamad Adar ("Adar").  Using Abreezio fraud proceeds he received from Sheida, Adar bought at least nine pieces of Norwegian real estate with dirty money, bringing to fifteen the total number of real properties purchased with dirty money.  Tr. Exs. 497–508; Tr. 2804 *et seq*.  The investigation uncovered no evidence of any consideration that Adar provided in exchange for the $12

1     million he received from Sheida to fund virtually every dollar of these purchases. Decl.

2     ¶ 48. Helpfully, Adar told a Norwegian investigative reporter that the real estate

3     purchases had nothing to do with his (presumably legitimate) income from his medical

4     profession. Decl. ¶ 46. Adar even changed his name six times while living in Norway,

5     including most recently after purchasing some of the properties involved in the money

6     laundering scheme. Decl. ¶¶ 42–43 & Decl. Ex. 10.

7        Notably, the portfolio of both Canadian and Norwegian real estate was available

8     to liquidate when needed to satisfy the joint obligation Sheida and Dr. Arabi incurred

9     when they settled the civil fraud lawsuit with Qualcomm in December 2018. *E.g.*,

10     Tr. Ex. 504; Tr. 2813:7 *et seq.*; *see also* Tr. Exs. 520–522, 524, 526, 527.

## V.

## <u>ARGUMENT</u>

13        Because it constitutes proceeds of the offenses of conviction, and property

14     involved in money laundering, the Court must order forfeiture of Dr. Arabi's interest in

15     the following property, each of which is listed in the Second Superseding Indictment

16     and the various bills of particulars:

1. Funds from Bank of America accounts ending in
   a. '6028 (the Atlazo business account) and
   b. '7398 (Dr. Arabi's personal account)
2. Funds from Dr. Arabi's personal San Diego County Credit Union account ending in '1860
3. Proceeds from the sale of Dr. Arabi's Atlazo stock, and received based on his promissory notes with and loan to the company
4. Norwegian real property located at
   a. Mosseveinen 267, 1169 Oslo, Norway (Cadastral number 0301/194/188)

b. Dyna Brygge 5, 0252 Oslo, Norway (Cadastral number 0301/210/58/0/11) including two associated parking spaces (Cadastral number 0301/510/16/0/58 and 0301/510/16/0/59), and

5. Canadian real property located at 1520 Vinson Creek Road, West Vancouver, British Columbia, Canada (008-505-152).

*See* ECF 65, 240, 242.  The Court should also enter a forfeiture money judgment in the amount of $44,580,192.74, which represents the amount Qualcomm paid to Sheida ($91,854,370.93) minus the amount that Dr. Arabi and Sheida previously repaid as part of their civil settlement with Qualcomm ($47,274,178.19).  *See* PSR ¶ 73.[3]

Forfeiture of the Abreezio proceeds is mandatory.  As the Court saw at trial, Abreezio itself was a walking, talking scheme to defraud.  It was conceived from its inception to deceive Qualcomm about the source of its core technology.  To the extent that Abreezio modified Dr. Arabi's original inventions, those modifications were made *in service of* the original scheme to conceal the technology's origins and defraud Qualcomm into buying the entire package.  *See, e.g.*, Tr. Ex. 122 (Quinton emailed Dr. Arabi in October 2024, regarding the plan for "you (or your family members)" in the budding corporation and identifying "large semiconductor companies like QCOM" as the target); Tr. Ex. 682 (Quinton emailed Taneja in May 2015 that the products were "tailored specifically to QCOMs needs" and "We have not done *any* work outside of thinking about QCOM." (emphasis in original)).

---

[3]    Dr. Arabi's forfeiture of proceeds received by Sheida is consistent with the Supreme Court's decision in *Honeycutt*, which acknowledged that a "mastermind" defendant could "obtain" proceeds indirectly by arranging to have them paid to an intermediary.  *See* 581 U.S. at 450 ("For instance, the marijuana mastermind might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately 'obtains' the property—whether 'directly or indirectly.'").

Thus, every dollar Qualcomm paid for Abreezio constitutes direct proceeds of the fraudulent scheme and must be forfeited as such. Even if the entire pool of Abreezio money were not direct proceeds, it is clearly indirect proceeds under *Prasad* and *Omidi*, and forfeitable under those theories as well. Finally, any funds involved in Dr. Arabi's money laundering conspiracy with Sheida—which includes every dollar of the property subject to forfeiture in this motion—are also property "involved in" money laundering, and are separately forfeitable as such without inquiry as to whether they are direct or indirect proceeds of the wire fraud offense. *See* 18 U.S.C. § 982(a)(1) (the court "shall order" forfeiture of property involved in any money laundering offense of conviction). And while the Court has legal authority to seize commingled clean funds as property "involved in" money laundering, it can take comfort here that the United States does not seek to forfeit more than the total amount of dirty money that was added to any particular account or asset as part of Dr. Arabi's money laundering conspiracy.

In addition, the Court should enter a forfeiture money judgment in the amount of $44,580,192.74. The Court's order may reflect that Dr. Arabi will receive credit against the money judgment for the amount of any of the specified seized property that is actually subject to forfeiture.[4]

As to specific property subject to forfeiture, the trial evidence coupled with the accompanying declaration of Senior Inspector Shindledecker and its supporting evidence conclusively show a sufficient nexus between each forfeitable property and the offenses of conviction.

---

[4]    It would be premature to credit Dr. Arabi's forfeiture money judgment with the amount of the seized funds at this point since the forfeiture of those assets is not yet perfected. For example, third parties may make claims to those funds and seek to frustrate all or part of the forfeiture. *See* Fed. R. Crim. P. 32.2(c). Instead, Dr. Arabi should receive credit against the money judgment later, in the amount of the fully and finally forfeited seized assets.

*United States' Motion for a Preliminary*
*Order of Forfeiture*

*22-CR-1152-BAS*

## A.    Bank of America Account x6028.

The Bank of America account ending in 6028 is a business checking account held by Atlazo, Inc.—the company that Dr. Arabi funded with millions of dollars of seed money from the Abreezio fraud.  In fact, just in the month before the government's seizure of $284,805.64, the account received a $450,000.00 infusion from Teranova North Development—one of Sheida's money laundering entities, which was also entirely funded by proceeds of the Abreezio fraud.  Dr. Arabi was the sole signer on this account at the time of the seizure.  In total, the x6028 account received over $6.7 million of fraud proceeds, including almost $2.9 million of fraud proceeds from Teranova in just the eight months leading up to Dr. Arabi's arrest.  The United States executed a seizure warrant on August 9, 2022, for all funds on deposit in this account and recovered $284,805.64, which is all subject to forfeiture.

## B.    Bank of America Account x7398.

The Bank of America account ending in 7398 is Dr. Arabi's personal account.[5] It was held in his name and his wife's name.  At the time leading up to the seizure, it was funded primarily with payroll deposits from Atlazo—the company that Dr. Arabi capitalized with Abreezio fraud proceeds.  More specifically, a very large share of the funds that Atlazo used to pay its operating expenses (including Dr. Arabi's salary) is directly traceable to Abreezio fraud proceeds.  For example, in 2022 alone, Atlazo's bank account received $1,899,980.00 from Teranova, and those funds were utilized to pay Dr. Arabi's salary as Atlazo CEO into this account.  On August 9, 2022, all funds on deposit in the x7398 account were seized, resulting in a total seizure of $18,037.63, which is all subject to forfeiture.

---

[5]    The Second Superseding Indictment contains an apparent typographical error, referring to this account as ending in x7390 instead of x7398.

*United States' Motion for a Preliminary Order of Forfeiture*                    *22-CR-1152-BAS*

## C.    San Diego County Credit Union Account x1860.

The San Diego County Credit Union account ending in 1860 is Dr. Arabi's personal account, held in his name alone.  At the time of its seizure, it contained funds from the sale of Dr. Arabi's Robson Street condominium, whose mortgage Sheida had paid off with Abreezio fraud proceeds.  More specifically, Sheida paid off Dr. Arabi's mortgage balance of $322,212.42 CAD in March 2017.  Decl. ¶ 35.  Dr. Arabi nominally paid back this purported loan to Sheida in February 2018, but the timing of the payment is odd—it happened only *after* Dr. Arabi began answering pointed interrogatories from Qualcomm probing his financial connections to Sheida in the civil fraud suit, and just two days before an apparently confected lease and loan agreement for the condominium.  Decl. ¶¶ 36–37.  Then, in February 2023, Dr. Arabi sold the Robson Street condo for $748,000 CAD.  Decl. ¶ 38.  Apart from a nominal balance beforehand, the proceeds of this sale constituted essentially the entire balance of the account when it was seized.  Decl. ¶¶ 39–40.  The United States effected a seizure warrant on December 13, 20123 for all funds on deposit in the x1860 account, and recovered $118,707.89, which is all subject to forfeiture.

## D.    Atlazo Assets.

The United States seized a variety of funds pertaining to Dr. Arabi's loans and equity in Atlazo, the company he capitalized with fraud proceeds.  These funds were obtained when Atlazo was sold in an arms-length asset purchase deal with an unrelated semiconductor company that paid out a reduced share of Dr. Arabi's obligations as part of the transactions.  Decl. ¶ 11.  Notably, the United States seized only *Dr. Arabi's* interest in Atlazo, and not the entire business or its full equity, even though the company's entire stock and debt issuance was arguably property "involved in" concealment money laundering for purposes of forfeiture.

### 1.    *Abacus Machines LLC.*

Dr. Arabi's shell company, Abacus Machines Limited, funneled $2.7 million of Abreezio proceeds to Atlazo.   Decl. ¶ 15 et seq.  Abacus received those funds from

Sheida's shell company, Avante North Ventures, Inc. Abacus also funneled another $583,239.02 to Atlazo through AviorPower—another company that Dr. Arabi controlled. In exchange Abacus held preferred shares and common stock in Atlazo, as well as a promissory note. Pursuant to a seizure warrant, the United States seized a total of $430,825.16 as proceeds of each of those obligations, as itemized in the attached declaration. Decl. ¶ 22. The proposed order submitted herewith particularizes the forfeiture with respect to each specific asset.

### *2.    Direct Investments.*

Dr. Arabi himself invested over $1.5 million directly in Atlazo, funded by the sale of a different company (Appulse Power Inc.) in which he had invested both Abreezio proceeds and independent money. Decl. ¶ 24 et seq. In exchange, Dr. Arabi was the beneficiary of over $1.5 million of promissory notes; the $154,000 payable to him upon Atlazo's sale based on these notes was seized pursuant to a seizure warrant. Dr. Arabi also separately transferred an additional $510,000 of Abreezio proceeds to Atlazo in 2021. Seizure warrants also resulted in the seizure of $21,386.70 and $31,000 payable to Dr. Arabi upon Atlazo's purchase based on his common stock and his loan to the company. Decl. ¶ 29.

Dr. Arabi may argue against seizure of the Atlazo funds by pointing out that Atlazo did actual business, unconnected to the Abreezio fraud. But this proves little. The trial evidence and Inspector Shindledecker's declaration show that Atlazo would not exist but for the massive infusion of Abreezio proceeds that built it and kept it running, including in the months just before this case was unsealed. Accordingly, the Court should forfeit the funds that Dr. Arabi was entitled to based on his investments in Atlazo—most of which were funded with fraud proceeds.[6]

---

[6] As set out in the attached declaration, Dr. Arabi invested roughly $500,000.00 of apparently clean money in Appulse, whose sale generated funds that he then invested in Atlazo, in exchange for certain promissory notes. Dr. Arabi also invested another $500,000.00 of fraud proceeds in Appulse, however. Decl. ¶¶ 24–27. The government seized $154,000.00 payable to Dr. Arabi based on these promissory notes. While these

**E.    Canadian Real Estate: 1520 Vinson Creek Road.**

As part of the charged money laundering conspiracy with Dr. Arabi, Sheida invested a large part of the Abreezio proceeds in high-end Canadian real estate. As the Court heard at trial, Dr. Arabi was directly involved in this process, too, even continuing to impersonate Sheida from the second fake Sheida email account while corresponding with business associate (and unindicted co-conspirator) Nasser Hendi in Canada. While many of the real properties were sold to repay Qualcomm at the conclusion of the civil fraud suit, one remains subject to forfeiture at this point as both proceeds of fraud and property involved in money laundering. More specifically, Sheida funded the entirety of a $300,000.00 CAD down payment on 1520 Vinson Creek Road using Abreezio proceeds. Decl. ¶ 57 *et seq*. Months later, she paid another $1.9 million CAD of Abreezio proceeds towards the purchase of the property, which was acquired by Teranova—one of her shell companies. Sheida also used a Teranova account funded by fraud proceeds to pay the almost $4 million CAD mortgage on the property. This property has been restrained pending sale and forfeiture disposition. Decl. ¶ 62.

**F.    Norwegian Real Estate.**

Sheida also transferred over $12 million USD to Adar for the purchase of high-end Norwegian real estate as part of the charged money laundering conspiracy with Dr. Arabi. As the Court heard at trial, Dr. Arabi had real estate documents, in Norwegian, for some of the purchases on his laptop that agents seized in August 2022. While many Norwegian properties were liquidated to pay Sheida and Dr. Arabi's joint obligation to Qualcomm as part of their civil settlement, two properties remain subject to forfeiture. Both have been encumbered by Norwegian authorities; the second was voluntarily sold, with the funds placed in escrow with the government of Norway.

---

funds are more attenuated from the Abreezio fraud than other assets discussed in this motion, they are still forfeitable (at a minimum) as indirect proceeds of fraud.

### 1.    *Dyna Brygge 5, 0252.*

Adar purchased this property just days after receiving a massive infusion of fraud proceeds from Sheida.  Decl. ¶¶ 49–51.  The 2016 acceptance letter for this real estate deal was found on Dr. Arabi's computer during its 2022 seizure.[7]

### 2.    *Dyna Mossevein 267, 1169.*

Similarly, Adar purchased this property with proceeds of the Abreezio fraud he received from Sheida, after shuffling them through four different Norwegian bank accounts. Decl. ¶¶ 52–55.  Adar voluntarily sold this property, with the proceeds placed in escrow pending the disposition of legal proceedings.

## G.    Property "Involved in" Concealment Money Laundering.

Beyond whether it is direct or indirect proceeds of fraud, the Court also heard ample evidence at trial to conclude that all of the Abreezio proceeds invested and dispersed through Dr. Arabi's laundering activities with Sheida were "involved in" concealment money laundering.  For example, former Atlazo CTO Mohamed Allam testified that Dr. Arabi told him that Atlazo's funding came from "an angel fund" that invested in the company at its outset, and would not provide details about the funding source.  *E.g.*, Tr. 2666:11–24.  Likewise, Dr. Arabi continued to use the second fake Sheida email account to conduct real estate investment business with unindicted co-conspirator Nasser Hendi, masquerading as his sister.  *E.g.*, Tr. Ex. 335, 347.  Sheida's emails with her bankers also suggest that she elected not to tell them that the "investment" money she was providing to Dr. Arabi  (most of which eventually went to Atlazo) was being sent to her older brother, who was helping her with her financial plans.  *E.g.*, Tr. Ex. 442.  And Adar's multilayered bank transfers for Norwegian real estate purchases, his name changes, his repatriation of the money to pay Sheida and

---

[7]    Although the United States filed a notice of intended voluntary sale of this property, ECF 430, Norwegian authorities have advised that Adar later changed plans and decided not to sell the property after the time of this filing.

Dr. Arabi's debt with Qualcomm, and the presence of Norwegian real estate records on Dr. Arabi's computer, all show that even the Norwegian transfers were part of Dr. Arabi's concealment money laundering conspiracy with Sheida.

More fundamentally, the evidence shows that Sheida was acting as a steward for Dr. Arabi's money as part of the laundering scheme, and not simply spending it on herself. As the jury heard, almost $87 million of the $91.8 million total was invested in real estate as part of the laundering scheme, plowed into Dr. Arabi's businesses, paid to the civil attorneys jointly representing Sheida and Dr. Arabi, or paid to the Canadian government in taxes. Tr. Ex. 491. Sheida's careful stewarding of Dr. Arabi's money—on top of her repeated interface with Dr. Arabi—further demonstrates that the web of financial transactions in Canada (and Norway) constituted a concealment money laundering conspiracy and not simply Sheida's good faith investment of a massive windfall.

## IV.

## CONCLUSION

The Court should order forfeiture as requested herein. The United States will provide a proposed preliminary order of forfeiture separately to chambers.

DATED: September 10, 2025       ADAM GORDON
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys