ADAM GORDON
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 22-cr-1152-BAS |
| Plaintiff, | Date: October 28, 2025 |
| | Time: 1:00 p.m. |
| v. | |
| | Honorable Cynthia Bashant |
| KARIM ARABI (1), | **THE UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS FOR ACQUITTAL & NEW TRIAL (ECF 447)** |
| Defendant. | |

After mounting a vigorous defense focused largely on Abreezio's low-power technology, Defendant Karim Arabi now moves for an acquittal or a new trial, claiming he was "misled" into believing that the trial would be solely about DFT technology. Relying on abrogated authority, he also reheats his previously denied challenge to his fraud convictions. Dr. Arabi similarly attempts to resuscitate his state-law attack on his agreement with Qualcomm, seeks acquittal based on Ziad Mansour's supposedly "ambiguous" status as an unindicted co-conspirator, tries to preserve an objection to his money laundering conviction, and quarrels with the Court's jury instructions.

Dr. Arabi's motions should be denied.

# I.

## STATEMENT OF THE CASE

The Court denied Dr. Arabi's motion to dismiss the indictment based on the supposed invalidity of his invention disclosure and assignment agreement with Qualcomm on January 4, 2024.  ECF 220, 194.  The same day, it also denied his motion to dismiss the wire fraud counts because "the core property interest at issue . . . cannot support a prosecution" under two Ninth Circuit cases, one of which the Supreme Court overruled earlier this year.  *Id.*  The Court denied Dr. Arabi's oral placeholder Rule 29 motions twice during trial.  Trial Transcript (TT) 2863:20–22; 3510:8–11; 3511:7–12. A jury convicted Dr. Arabi of wire fraud conspiracy, wire fraud and conspiracy to commit money laundering in violation of Counts 1, 2 and 6 on April 8, 2025, on the second day of deliberations after a trial lasting over four weeks.  ECF 367, 414–16.

On September 10, 2025, Dr. Arabi filed the instant motions.  ECF 447.  This Response follows.

# II.

## STATEMENT OF FACTS

### A.    Prior to Trial.

#### 1.    *The Court directs Dr. Arabi to focus on all 20 Abreezio patents.*

The very first indictment filed in this case apprised Dr. Arabi that, at a minimum, the two provisional patent applications filed under Sheida's name in December 2014 were at issue in his case.  ECF 1 at 11, ¶¶ 16(g), (h).[1]  Nevertheless, Dr. Arabi moved for a bill of particulars, in part, because he claimed the superseding indictment "fails even to clarify whether the government's theory is limited to [design for test or] DFT technology or whether it also includes other forms of technology."  ECF 191-1 at 5.  His

---

[1]    As expounded in detail at trial, of course, one of the provisional patent applications concerned low-power technology rather than design-for-test (or DFT). *E.g.*, TT 3003:3–11 (Dr. Arabi's expert agrees that one of the provisional patent applications referenced in the indictment is a "low power provisional patent application").

*United States' Response in Opposition to*
*Defendant's Motion for Acquittal or a New Trial*                                    22-CR-1152-BAS

filing demonstrated his awareness that "the Abreezio acquisition involved more than twenty patents or provisional patents." *Id*. The same day, Dr. Arabi filed a highly detailed motion for declaratory judgment in which he referenced the two provisional patent applications. ECF 190-1 at 12 ("the contemporaneous documentary evidence at worst shows that Dr. Arabi helped Ms. Alan file the paperwork for her two provisional patent applications"). He even traced one of the provisionals to an issued patent, which he referenced by patent number, ECF 90 at 1, and which his own expert later described as a low-power patent. *Id*.; TT 3003:3–11.

At the hearing on his motions, Dr. Arabi seemed to understand that the indictment concerned—at a minimum—the two provisional patents[2] from December 2014, i.e., a low-power patent application *and* a DFT patent application. ECF 221 (Jan. 4, 2024 Tr.) at 12:17–19 ("The fact that we know about two patents that are at issue doesn't do us any good if Dr. Arabi could be convicted at trial based on something else."); *see also id*. at 15:12–14. In response, the United States noted that there were 20 patents at issue, identified with specificity in the Abreezio Unit Purchase Agreement. *Id*. at 31:8–17.[3]

In denying his motion, the Court ruled that "[t]he allegations are that the entire Abreezio deal was something that Arabi was involved with." *Id*. at 38:17–18. It added that "the defense at this point has notice of [the] Government's theory that they're relying on all 20 [patents owned by Abreezio]." *Id*. at 38:23–25. Wrapping up, the

---

[2]   This Response, like defense witnesses and defense counsel at trial, sometimes uses "provisional patents" as shorthand for "the technology described in the provisional patent applications," while recognizing that there is technically no such thing as a provisional patent. *E.g.*, TT 1177:4–9; 2978:21–24; ECF 191-1 at 5.

[3]   Because several of Dr. Arabi's post-trial challenges simply reiterate his pretrial attacks on the indictment, the United States also incorporates herein its prior responses. *See* ECF 196, 198, 200, 221.

*United States' Response in Opposition to*
*Defendant's Motion for Acquittal or a New Trial*                                    *22-CR-1152-BAS*

Court reiterated that "Abreezio's core technology, again, is focused on those 20 patents. And at this point, that's what the defense should focus on." *Id*. at 39:16–18.[4]

### 2. The United States makes detailed disclosures on low-power technology.

On November 14, 2024, almost four months before trial, the United States disclosed a 62-paragraph report from its electrical engineering expert, Professor Dennis Sylvester. ECF 292. It contained extensive discussion of low-power technologies, so much so that the rebuttal from Dr. Arabi's own expert (Professor Manoj Sachdev) faulted Sylvester for "focus[ing] almost exclusively on low-power design techniques and [] not analyz[ing] DFT technology in sufficient detail." ECF 316-1 at 79. Dr. Arabi's own disclosures discussed Abreezio's low-power patent portfolio at length.[5]

## B. Trial.

### 1. Abreezio's DFT and low-power technologies are intertwined.

At trial, the evidence showed an interrelationship between Abreezio's DFT and low-power products. In fact, Professor Sachdev himself described the second provisional patent application (the "low power provisional patent application") as "similar to the DFT provisional patent application" in technique. TT 3003:6–11; *see also* TT 3423:24–3424:4 (defense witness Andrew Hughes agrees). Discussing his own background, Professor Sachdev named his first area of expertise as "low power circuits." TT 2972:15–17. Indeed, the defense's own charts showed that they had taken the Court's admonition to heart—preparing for trial on Abreezio's entire patent

---

[4]    The Court did, as a matter of trial efficiency, urge the United States to notify the defense if it determined that it would *not* seek to introduce evidence about any of the 20 patents. *Id.* at 38:25–39:1. Had the prosecution been seeking to mislead the defense, this would have been an opportune moment. Instead, the United States never provided any such notification, because it never made a determination that any of Abreezio's patents was entirely irrelevant to the trial proof.

[5]    *See* ECF 316-1 (Professor Sachdev's initial report, beginning p.4 of 112) at ¶¶ 10, 23–34, 42; ECF 316-1 (Professor Sachdev's rebuttal report beginning p. 79 of 112) at ¶¶ 1, 10–17, 19, 21–30, 32–33, 43–50.

portfolio, and not simply focusing on its DFT technology.  Trial Exhibit (Tr. Ex.) 3016 (defense chart cataloguing Abreezio's entire patent portfolio); TT 3015:2–17 (Sachdev attacks Abreezio's issued low-power patent '672 as prior art on direct exam), TT 3012:17–21 (Sachdev spent fifty hours reviewing the low-power patent portfolio).

### 2.    *Invention assignment agreements are commonplace.*

The trial evidence also showed that engineers are routinely subject to an invention disclosure and assignment agreements—both at Qualcomm and elsewhere.  TT 380:7–9; 402:1; 1551:24–1552:1; 1773:2; 1887:24; 2201:24 (Apple); 2054:11–12 (Bell Labs); 3495:6.  In fact, these agreements are so customary in the industry that Dr. Arabi himself used virtually the same terms to bind the personnel he hired at both Abreezio *and* Atlazo.  TT  1508:13; 147:22; 2355:24; 3197:8–11; *see also* Tr. Ex. 675, 634.

### 3.    *Dr. Arabi's expert agrees that "NewSensor" is the key innovation.*

A central claim of Dr. Arabi's trial defense was that the provisional patent ideas that Abreezio had enthusiastically marketed to Qualcomm were actually worthless, and that the real value in the company lay in wholly unrelated technology developed by Canadian engineers.  *E.g.*, TT 3689:17–3690:7.  As part of this effort, two Invionics engineers—Andrew Hughes and Trent McClements—testified that they immediately discarded all of the ideas in the provisional patent applications, and created new technology from whole cloth after Hughes supposedly experienced an epiphany while out on a run.  *E.g.*, TT 3160:16–23 (McClements calls the AVS provisional patent application "extremely naïve, fundamentally flawed, poorly conceived. Bad."); 3165:2–8 ("we also, frankly, that very same day" came up with a potential solution); 3190:4–5 ("Sheida's sensor was kind of DOA.").

On the other hand, Dr. Arabi's own expert claimed that Abreezio's technology involved a "key innovation" that was not present in the provisional patents. TT 3020:19–3021:9; 3066:23–3067:2.  Although unmentioned in Dr. Arabi's motion for an acquittal, Professor Sachdev admitted on cross-examination that this "key innovation" was actually the same thing depicted in "NewSensor"—a handwritten

electrical engineering schematic first sent by Dr. Arabi from the first fake-Sheida email account. TT 3066:23–3067:7, Tr. Exs. 219, 220. Sachdev also admitted that the fake-Sheida email forwarding "NewSensor" was chronologically the earliest document he had seen containing the key innovation. TT 3070:13–23. Professor Sachdev even admitted that the technique in "NewSensor"—Dr. Arabi's "key innovation"—was depicted in a final, issued patent in Abreezio's portfolio, bought by Qualcomm in the Abreezio deal. TT 3077:5–18; Tr. Exs. 877; 220. Moreover, undisputed trial evidence showed Dr. Arabi participating in lengthy conference calls with Brad Quinton and Sanjiv Taneja focused on fixing the technological difficulties with the provisional patents. *E.g.*, Tr. Exs. 846, 846A (Taneja forwards "critical path sensor analysis" to Dr. Arabi before conference call); TT 1679:20–23; Tr. Ex. 587 (summary chart of conference calls).

### 4.    *Abreezio plagiarizes a "Sheida" patent.*

Abreezio also plagiarized one of the provisional patent applications filed in Sheida's name. Specifically, one of the purportedly pristine Invionics patent applications copied the entire "summary of invention" section of one of the supposedly-worthless "Sheida" provisional patent applications. Tr. Exs. 830, 871. For his part, McClements claimed that this was just sloppy draftsmanship, and entirely insignificant, but the undeniable truth was that the summary of invention was transmogrified into the key figure in one of the issued Abreezio patents. *E.g.*, TT 3321:23–3322:2 (McClements: "it was quick and dirty"); TT 1139:14–21. Put another way, the key figure for one of the issued patents in Abreezio's portfolio, which Qualcomm agreed to buy for $180 million, was a lightly edited version of the "summary of invention" from a provisional patent submitted by Dr. Arabi in his sister's name. Tr. Ex. 1077 (demonstrative only).

At the conclusion of the government's case-in-chief, identifying none of the specific grounds raised in the instant motions, Dr. Arabi made a motion under Rule 29 as to "all elements, all counts." TT 2863:20–21. That motion was denied. TT 2863:22.

### **5.    *The Invionics engineers.***

Dr. Arabi's key witnesses, whose testimony he repeatedly cites, were a pair of Canadian engineers from Invionics who each made $4 million from the Abreezo deal. TT 3373:18–21; 3402:23–3403:3.  One of them had such affection for Brad Quinton that he choked up on the stand when asked about their relationship. TT 3373:6–9.  Both agreed that their own professional reputations were deeply intertwined with Quinton, an indicted co-conspirator in the Abreezio fraud.  *E.g.*, TT 3273:4–22 (McClements agrees that reputational damage to Quinton from indictment extends to startup where they both work).  Nevertheless, neither witness had seen the damning emails in which Quinton and Dr. Arabi mapped out the fraud on Qualcomm over a year before the Abreezio acquisition.  *E.g.*, TT 3434:25–3435:16 (Hughes didn't recall the emails between Arabi and Quinton, and hadn't reviewed them with defense counsel).

Beyond basic bias, their testimony was also incredible in its particulars.  Hughes hedged on whether "QCOM" in one of Quinton's emails really meant "Qualcomm." TT 3475:17–3476:9 ("Who knows for sure? It seems likely, though.").    And McClements testified that Dr. Arabi's "NewSensor" was extraneous to the "real" value in Abreezio's technology—an opinion starkly at odds with the conclusion of Dr. Arabi's own expert witness that it was the "key innovation."  *E.g.*, TT 3211:22–25 (McClements: "I wouldn't do it that way, but you could. So it's, like, yeah."); 3213:10–25 (McClements was "a bit annoyed, to be honest, [to get the "NewSensor" diagram] because it's obviously superfluous," but he added it to the application "because it was faster to do that than to argue it doesn't need to be added").

After the conclusion of the defense case, Dr. Arabi renewed his blanket, unspecified Rule 29 motion, which the Court again denied.  TT 3510:8–11; 3511:7–12.

**III.**

**LEGAL STANDARDS**

## A.      Rule 29

A motion for judgment of acquittal under Rule 29 requires the Court to ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  This is a two-step inquiry.  "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010), citing *Jackson,* 443 U.S. at 319.  This means that the Court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Nevils*, 598 F.3d at 1164, citing *Jackson*, 442 U.S. at 318–319.  Instead, "when 'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Nevils*, 598 F.3d at 1164, quoting *Jackson*, 443 U.S. at 326.

"Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164, quoting *Jackson*, 442 U.S. at 319.  While "more than a mere modicum of evidence is required to support a verdict," the Court "may not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt," but "only whether *any* rational trier of fact" could have done so.  *Nevils*, 598 F.3d at 1164 (quotations omitted).

## B.      Rule 33

A motion for a new trial under Rule 33 may be granted and a new trial ordered "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  "A district court's power

8

to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.,* quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Alston*, 974 F.2d at 1212, quoting *Lincoln,* 630 F.2d at 1319. "The decision is within the sound discretion of the district court." *Alston*, 974 F.2d at 1212 (quotation omitted). On appeal, the Court's decision on a Rule 33 motion is reviewed for "whether the district court 'clear[ly] and manifest[ly]' abused its discretion." *Alston*, 974 F.2d at 1211–12, quoting *Lincoln,* 630 F.2d at 1319.

## IV.

## ARGUMENT

### A.    Dr. Arabi Was Convicted of the Same Fraud Described in His Indictment.

Against all the evidence, and his own unparalleled expertise, Dr. Arabi argues that the prosecutors misled him and his attorneys about the technology at issue in his case. ECF 447 at 1 ("The defense was misled and prejudiced by the government's variance from that indictment"). Specifically, he contends that, although the second superseding indictment (SSI) referenced both the original DFT and low-power provisional patent applications, he was confused about whether Abreezio's low-power technology was at issue because the SSI repeatedly used the term "DFT" as a shorthand.

But Dr. Arabi's argument is belied by both the procedural history and the trial evidence. At the outset, Dr. Arabi was as qualified as anyone in the courtroom to understand Abreezio's technology. Not only is Dr. Arabi an internationally-recognized expert in the relevant fields, but he himself was heavily involved in Abreezio's technical

discussions.  It is farfetched to imagine that the indictment's shorthand could have confused *him* about what Abreezio's products were, or which were at issue at this trial.

Second, the Court explicitly directed the defense team, a year before trial, to focus on Abreezio's entire patent portfolio.  This alone eliminates the claimed prejudice.

Third, Dr. Arabi's defense team obviously took the Court's instruction to heart, because it plainly prepared for a trial on Abreezio's entire technology arsenal, and not simply its DFT products, narrowly understood.  *See, e.g.,* TT 250: 21–23 (defense counsel explaining at the outset of opening statement that "they [Invionics] went on to build and come up with a whole slew of new inventions and ideas" and "built products that had value to Qualcomm").  For example, Dr. Arabi's team retained a low-power expert.  That low-power expert spent dozens of hours preparing analysis on low-power techniques.  The defense even complained about the extent of the *government expert's* low-power analysis and then rebutted that analysis in the detailed, responsive report of their own low-power expert.  They cannot now complain that they were tricked into believing that low-power technology would be irrelevant at trial.

### *1.    No constructive amendment.*

The trial proof did not constructively amend the indictment.  The SSI charged that Dr. Arabi and his accomplices fraudulently induced Qualcomm's purchase of Abreezio and its technology.  That is what was proved at trial.

"An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984), quoting *United States v. Cusmano*, 659 F.2d 714, 718 (6th Cir. 1981) (emphasis in original).  "The line that separates a constructive amendment from a variance is not always easy to define, but . . . a constructive amendment typically mandates reversal, while a variance requires reversal only if it prejudices a defendant's

1    substantial rights." *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (citation
2    and quotation omitted).

3    "There are two types of constructive amendment: first, where 'there is a complex
4    of facts [presented at trial] distinctly different from those set forth in the charging
5    instrument,' and, second, where 'the crime charged [in the indictment] was substantially
6    altered at trial, so that it was impossible to know whether the grand jury would have
7    indicted for the crime actually proved.'" *United States v. Davis*, 854 F.3d 601, 603 (9th
8    Cir. 2017), quoting *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) and
9    *Von Stoll*, 726 F.2d at 586.

10    Here, Dr. Arabi cannot make either showing. The SSI charged a single, cohesive
11    fraud conspiracy to deceive Qualcomm in its purchase of Abreezio. The "complex of
12    facts" charged in the SSI consisted of the October 2015 fraudulently-induced sale of
13    Abreezio to Qualcomm for $180 million, as codified in a single contract: the Unit
14    Purchase Agreement. It included a scheme to conceal Dr. Arabi's involvement in
15    Abreezio and its technology, using fake email accounts and aliases, and also to conceal
16    the involvement of Akbar Shokouhi. The scheme involved Sheida's participation to
17    masquerade as the true inventor, and a series of false statements to inflate her credentials
18    to make that pantomime plausible. All of these facts flawlessly matched the trial proof.

19    True, the SSI made a cursory attempt to describe Abreezio's technology by using
20    the shorthand "DFT." But the SSI did not otherwise reduce or limit the scheme to some
21    of Abreezio's products to the exclusion of others. That would be nonsensical; the SSI
22    described a single, overarching scheme and conspiracy to conceal Dr. Arabi's role in
23    Abreezio as a whole—rather than a scheme affecting some of its products but not others.
24    It would also be inconsistent with the framing of the indictment, which charged the
25    fraudulent inducement of the entire Abreezio purchase, without trying to particularize
26    it to any fraction of the Abreezio tech portfolio. Last, it would clash with the trial
27    evidence, including evidence offered by Dr. Arabi himself, which showed how even
28    Abreezio's DFT technology, narrowly defined, was interrelated with its other products.

Apart from repeatedly hammering the frequency of the term "DFT" in the SSI, Dr. Arabi's motion does not really make a factual argument to the contrary. The trial evidence showed that Abreezio was a single ball of yarn. It may have had more than one potential product, but there is *zero* evidentiary support for disentangling the technologies. Put another way: Dr. Arabi does not argue that the jury might have convicted him of a supposedly distinct low-power fraud, where it would have acquitted him of a fraud based solely on Abreezio's DFT product. That is nonsense. Abreezio was a single package; and the defendants marketed and sold it as such as part of their fraud. There is thus no realistic question "whether the grand jury would have indicted for the crime actually proved.'" *See Davis*, 854 F.3d at 603 (quotations omitted).

Dr. Arabi's cases are not to the contrary. In *Stirone v. United States*, the defendant was charged with engaging in a scheme to interfere with the *prior* interstate shipment of sand going *into* Pennsylvania to a *cement-mixing plant*. 361 U.S. 212, 213 (1960). But the trial jury was instructed that it could also consider whether the scheme interfered with the *future* shipment of steel *out of* Pennsylvania from a *steel mill* that would be constructed with the concrete from the cement plant. *Id*. at 214. The Supreme Court was concerned that the prospective steel shipments might not satisfy the Hobbs Act's jurisdictional requirements, but it avoided that question by finding that the trial court had constructively amended the indictment. *Id*. at 215–217. In short, the potential crime of conviction had been amended from the one charged in the indictment.

In *Ward*, the district court constructively amended the indictment by declining to particularize the jury instructions to the two aggravated identity theft victims listed in the indictment, allowing the jury to potentially convict based on different crimes involving other victims who testified at trial. 747 F.3d at 111–92.

Here, the indictment alleges a single victim—Qualcomm—consistent with the trial evidence. In the SSI more broadly, Dr. Arabi was charged with fraud in the sale of Abreezio, which is the crime of conviction. That is, the indictment plainly charges that Arabi and his accomplices fraudulently induced the sale of Abreezio to Qualcomm.

Other than the use of the acronym "DFT" to describe Abreezio's technology, every other factual parameter in the charging documents is drawn to encompass the entire Abreezio transaction.  Nothing, besides the phrase "DFT" alone, suggests that the charged crime somehow partitioned Abreezio into pieces and indicted only one of them. It did not, and there was accordingly no constructive amendment.

### 2. *No prejudicial variance.*

For all the same reasons, there was also no variance.  But even if there was, Dr. Arabi was not prejudiced, and thus is entitled to no relief.

As mentioned, a variance occurs when "the evidence offered at trial proves facts materially different from those alleged in the indictment." *Von Stoll*, 726 F.2d at 586 (quotations omitted).  But not every variance requires reversal or a new trial; relief is warranted only when a defendant's substantial rights are prejudiced. *Adamson*, 291 F.3d at 615.  Dr. Arabi cannot clear that bar.

First, apart from the SSI's reference to "DFT" as shorthand for Abreezio's technology, Dr. Arabi never explains how the trial proof materially varied from the detailed speaking indictment.  The "DFT" references alone are not a material variance, so much as a labeling issue.  *Von Stoll* is instructive.  If a defendant there could be convicted of defrauding funds from a different *victim* than the one named in the indictment without a fatal variance, 726 F.2d at 587, Dr. Arabi's conviction for fraudulently inducing the Abreezio transaction cannot be a material variance from the SSI, even if the SSI repeatedly used the term "DFT" to describe Abreezio's technology.

Second, the facts of this case are miles away from a prejudice showing.  As discussed above, the Court *explicitly directed* Dr. Arabi to be ready for a trial on Abreezio's entire portfolio.  And he was.  Dr. Arabi now boldly argues that the supposed variance "misled the defense" into overlooking the relevance of Abreezio's low-power technology.  ECF 447 at 10.  But this claim is demonstrably false.  As just one example, the defense expert spent dozens of hours preparing to testify about low-power technology, prepared a detailed report about it, and then testified at length on the subject

at trial.[6]  This was not a prejudicial variance, if it was a variance at all, and it requires no relief post-trial.

## B.    The Prior Ruling on Dr. Arabi's Agreement With Qualcomm Was Correct.

Dr. Arabi asks the Court to revisit its prior ruling on the validity and effect of his invention disclosure and assignment agreement with Qualcomm now that the evidence is in.  In so doing, he regurgitates the arguments from his (denied) pretrial motion on the same subject, and offers no new factual or legal analysis.  *See* ECF 190.

Indeed, in his motion, Dr. Arabi does not point to a single fact adduced during trial that tips the evidence for this argument in his favor.  In fact, the trial proof only further showed that his argument is reductive and misguided, and simply reinforced the correctness of the Court's prior ruling.[7]  For example, despite Dr. Arabi's attempt to diminish the importance of the invention assignment agreement, the trial evidence showed that this type of agreement is a mainstay of technology companies, including Qualcomm, its principal competitors, and even Dr. Arabi's *own* companies—Abreezio and Atlazo. It is not merely an oppressive agreement that only Qualcomm sought to

---

[6]    In truth, of course, Dr. Arabi prepared his trial defense on the correct grounds. Even beyond the detailed indictment and the Court's explicit directions, this was in part because of explicit steps taken by the prosecution.  For example, on February 9, 2024, the prosecution made a lengthy, 71-slide presentation to the defense team (including Dr. Arabi himself) outlining some of the anticipated trial proof as part of a reverse proffer.  The "NewSensor" diagram and associated emails featured prominently in that presentation, providing ample notice to the defense that the trial proof wasn't strictly limited to DFT evidence.  Indeed, in a roomful of non-engineers, Dr. Arabi doubtless understood the significance of the "NewSensor" diagram better than anyone.

[7]    As a reminder, the entire force of Dr. Arabi's challenge to the agreement that he (twice) signed with Qualcomm is directed at its supposedly unlawful "tail," which rebuttably presumes Qualcomm's rights to certain inventions codified within a year of Dr. Arabi's departure.  But the trial evidence only underscored that that tail had *zero* relevance to the facts of this case, where Dr. Arabi secretly conceived and developed Abreezio's technology while still on Qualcomm's payroll.

enforce against its employees, but rather a tried-and-true agreement common among technology companies, in large part to prevent the kind of fraud that occurred here.

After hearing the evidence, the Court should also conclude that this case does not strictly rise or fall on the invention assignment agreement's validity or enforceability. The Court saw for itself that Dr. Arabi's fraud scheme was more than simply an effort to secretly violate his agreement with Qualcomm.   It consisted of multiple misrepresentations and deceptions, all deliberately designed to deprive Qualcomm of any inkling that Dr. Arabi had masterminded Abreezio from its inception.  Each layer of deceit was intended, of course, to mask Dr. Arabi's role in founding Abreezio and developing its technology, and to assure Qualcomm that it was purchasing a pristine outside company with enforceable intellectual property, to induce it to part with its own property ($180 million).  And each misrepresentation was material: it would absolutely have mattered to Qualcomm's decision to write a $180 million check that its own Vice President of Research & Development had launched and shepherded the company being offered as an "angel-funded Silicon Valley" start-up.

Dr. Arabi argues in the alternative that he was entitled to a proposed jury instruction, that would have directed the jury to decide facts as to the validity and enforceability of the invention assignment agreement because it "was effectively an element of wire fraud and wire-fraud conspiracy as those counts were charged in this SSI." ECF 447 at 14; *see* ECF 356 at 67–68.  But what facts were those?  Even now, with months of hindsight, Dr. Arabi provides no facts that he would have wanted the jury to consider in this regard.   The only fact that *could* be relevant to Dr. Arabi's challenge to the agreement is *when* he invented Abreezio's technology, and that fact indisputably cuts against him, since his inventions occurred before he left the company. Nor does Dr. Arabi cite any authority for how or why the agreement's legal validity became an element of the crime that the jury was bound to consider.

The Court should reiterate its prior ruling on Dr. Arabi's invention disclosure and assignment agreement, and should find that—to the extent any of the facts adduced at trial are relevant to the agreement at all—the trial evidence confirmed its correctness.

## C.    The Trial Proved Dr. Arabi Invented and Refined Abreezio's Technology.

After a multi-week trial featuring reams of evidence showing his involvement in almost every aspect of Abreezio, Dr. Arabi gamely argues that "there was insufficient evidence that [he] contributed to developing Abreezio's technology." ECF 447 at 15. His argument would fail under any standard, but it is practically a non-starter under the "any rational trier of fact" standard for a challenge to the sufficiency of the evidence. *See Jackson*, 443 U.S. at 319.

At trial, the jury heard that Dr. Arabi was involved in practically every decision of any consequence at Abreezio. It saw an early email from Quinton describing the technology being pitched to the Invionics team as Dr. Arabi's idea/patent application. Tr. Ex. 120 (Quinton writes to Invionics team "Karim will be going over his idea/patent application"). It saw that Dr. Arabi marked up drafts of provisional patent applications filed by Abreezio after the first two obviously fraudulent applications filed under his sister's name. Tr. Ex. 903A. It heard that Dr. Arabi participated in almost 20 hours of conference calls with Abreezio's principals, including a conference call apparently about the "critical path sensor analysis" that the defense described as the watershed pivot to Abreezio's final technology. TT 2520:14–18. It saw that the only written evidence of Sheida even *studying* the relevant technical concepts was an apparently fabricated "research notebook" upon which Dr. Arabi founded his factual defense in Qualcomm's civil suit. In fact, *Dr. Arabi's own expert* testified that the earliest written instance of (what the expert himself described as) Abreezio's "key innovation" came from a hand-drawn schematic sent by Dr. Arabi while impersonating his sister.[8]

---

[8]    Dr. Arabi tries to dodge this damning evidence by, once again, relying on McClements and Hughes, who he claims "testified credibly that the input ostensibly from Dr. Arabi at most merely echoed what they had previously invented." ECF 447

Nevertheless, Dr. Arabi somehow contends that "there was [] no credible documentary evidence . . . that [he] made a material technical contribution to Abreezio." ECF 447 at 18.  This startling argument apparently rests entirely on the testimony of the two heavily biased Invionics engineers, whose close friend and business partner Brad Quinton stands to be convicted of serious felonies based on their joint work.

The Court need not make credibility findings about the testimonies of Hughes and McClements to resolve Dr. Arabi's Rule 29 motion, because it must draw the inferences in favor of the prosecution.  Thus, it should presume that the jury rejected their version of events, in which they were emphatic that not a shred of the "Sheida" provisional patent technology made it into Abreezio's final products,[9] and that the sole issued Abreezio patent bearing Sheida's name was actually invalid, despite all of Abreezio's assurances to Qualcomm about the patents it was selling.  To the contrary, the Court should presume that the jury accepted Professor Sylvester's analysis, in which

---

at 18.  Leaving aside the sheer, implausible convenience of this supposed testimony— that the biased Invionics witnesses had covertly invented the very thing that Dr. Arabi later reduced to writing and tried to disguise as his sister's, but Dr. Arabi just happened to be the first to write it down—that isn't actually what Trent McClements said.  What McClements testified was that the Invionics team broached the possibility of a replica path solution on February 27th, and that the bottom part of Dr. Arabi's March 3, 2015 "NewSensor" diagram was just "another embodiment of a replica path"—that is, not the replica path that Invionics supposedly discussed on February 27th.  TT 3174:6–15, 3211:22–25.  To underscore the point, McClements added: "I wouldn't do it that way, but you could."  *Id*.  Regardless of whether McClements would "do it that way," *Dr. Arabi's* diagram is the one that went into the "Invionics" provisional patent application and the final issued patent.  TT 3213:10–25, 3077:5–18; Tr. Exs. 877; 220.

9    Dr. Arabi argues that the "prosecutor himself conceded . . . that the provisional patent applications were unworkable."  ECF 447 at 17.  What the United States actually conceded (in the next two sentences of the closing argument) was that the technology in those applications was *problematic* and required refinement—which Dr. Arabi participated in—not that it was *worthless*.  *E.g.*, TT 3662:17–18 ("They needed to be improved and refined and developed. But the Defendant was right there during that process.").

he concluded that Abreezio's TruSens product was largely based on the technology described in one of the two December 2014 provisional patent applications, which was thoroughly tied to Dr. Arabi.  *E.g.*, TT 1108:20.

But on a Rule 33 motion, the Court is entitled, and perhaps even required, to evaluate the evidence for itself.  On that score, the Court should find that the testimony from the Invionics engineers was *not* credible.  In particular, the Court should find that they were biased, both because of their own massive Abreezio paydays, and because of their professional and personal connections to Brad Quinton.  Second, the Court should find that they were not knowledgeable about crucial pillars of the charged fraud conspiracy because (for example) Quinton apparently didn't tell them about his detailed, emailed plans with Dr. Arabi designing the Abreezio fraud before it happened. Third, the Court should find that Hughes and McClements actually *did* slant their testimony in Quinton's favor, and thus to benefit Dr. Arabi.  For example, they refused to draw obvious inferences from the documents that could be damaging, like when Hughes refused to admit that "QCOM" obviously meant "Qualcomm" in one of Quinton's emails.  Similarly, Hughes spontaneously and memorably described Sheida's receipt of $108 million in exchange for her "worthless contributions" to Abreezio as "a stroke of luck."  *E.g.*, TT 3487:2.  In the end, the Court must evaluate Hughes and McClements's convenient claims—that anything at Abreezio worth a dollar was invented by them and their colleagues and had nothing to do with the defendant on trial—in the context of their obvious bias and demonstrated capacity to shade the truth and, of course, against the documentary evidence.

Beyond the facts, though, Dr. Arabi's motion also fails on the law.  Remarkably, his motion reheats the argument from his pretrial motion to dismiss but never once mentions *Kousisis v. United States*, the recent (unanimous) Supreme Court decision that sounded the death knell for his property-theory challenge to the wire fraud counts.  145 S. Ct. 1382 (2025).  In fact, Dr. Arabi's motion explicitly relies upon *United States v. Takhalov*, an Eleventh Circuit decision that *Kousisis* specifically overruled.  ECF 447

at 16, citing 827 F.3d 1307 (11th Cir. 2016); *see Kousisis*, 145 S. Ct. at 1390 (resolving a circuit split against *Takhalov* and four other appellate decisions).

In *Kousisis*, the Supreme Court affirmed "the fraudulent-inducement theory, [in which] a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net* pecuniary loss." 145 S. Ct. at 1388 (emphasis in original). There, Kousisis had falsely claimed that he would use disadvantaged businesses in order to win lucrative federal painting contracts. *Id*. at 1388–89. Much like Dr. Arabi, his defense was that, because the painting was actually accomplished, the victim suffered no net loss, and thus no property interest was injured, and accordingly no traditional fraud had occurred. *Id*. at 1390–91. The Supreme Court rejected that argument—explicitly overturning *Bruchhausen*, a Ninth Circuit case upon which Dr. Arabi relied in his pretrial motions—ruling that "the wire fraud statute is agnostic about economic loss," and a defendant may violate it by "scheming to obtain the victim's money or property, regardless of whether he seeks to leave the victim economically worse off." *Id*. at 1392; *see also id.* at 1391 ("No matter how long we stare at it, the broad, generic language of § 1343 leaves us struggling to see any basis for excluding a fraudulent-inducement scheme."); *Bruchhausen*, 977 F.2d 464, 467–468 (9th Cir. 1992).

Here, Dr. Arabi cannot defeat his fraud convictions by showing that Qualcomm received some kind of value in the Abreezio deal—even if he could plausibly show that that value was worth $180 million, which he cannot. To take one prominent example, Dr. Arabi argues that if the evidence showed that "the true value of Abreezio was . . . for example, key personnel Qualcomm could not get otherwise," then he is not guilty under *United States v. Milheiser*. ECR 447 at 15–16, citing 98 F.4th 935, 945 (9th Cir. 2024). Unless framed as a materiality defense,[10] this position cannot be correct after

---

[10]    A materiality challenge, which Dr. Arabi does not explicitly make in his motions, would also fail. The undisputed testimony was that Qualcomm didn't just care about

*Kousisis*. But even if it were still legally possible, there was zero evidence at trial that Qualcomm thought Quinton and his buddies were worth $180 million. To the contrary, even defense witness (and former Qualcomm attorney) Nicholas Cole testified that Qualcomm "cared about getting enforceable rights to intellectual property that it purchased." TT 2938:13–2939:3; *see also* TT 670:3–5; TT 1775:12–23.[11]

In short, Dr. Arabi's fraud was targeted at property, just like the defendant in *Kousisis*, and he was thus properly convicted of wire fraud and wire fraud conspiracy.

## D.    There Was Nothing "Ambiguous" About Ziad Mansour's Role.

The Court should reject Dr. Arabi's claim that there was insufficient evidence of Ziad Mansour's membership in the conspiracy, and that this warrants any relief.

Before trial, the United States sought admission of Mansour's statements in furtherance of the conspiracy, as non-hearsay under Rule 801(d)(2)(E). The Court granted that motion in limine, explaining that if the United States presented the evidence

---

intellectual property in general; it also specifically designed the unit purchase agreement in this case to ensure that it was getting *enforceable* intellectual property in this particular transaction in exchange for its $180 million. That is, it mattered to Qualcomm whether Abreezio was lying about the source and validity of its technology and its patent applications. The lies were material, they went to the essence of the bargain, and the convictions should stand.

[11]    The full impact of *Kousisis* would wipe out not only Dr. Arabi's pretrial "property fraud" challenge to the indictment but also his main trial defense, which was to argue that he was not guilty because he didn't invent Abreezio's valuable technology and therefore Qualcomm didn't buy something it already owned. *See* TT 3689:17–19 (the defense closing argument begins: "Karim Arabi is not guilty because he did not invent any technology, and Qualcomm did not buy anything that it already owned"). After *Kousisis*, if Dr. Arabi lied to Qualcomm to get its money as part of the Abreezio deal, and those lies were material to Qualcomm's decision to pay (meaning, they went to the nature and essence of the bargain), then he committed wire fraud. Thus, legally speaking, if Dr. Arabi simply lied about his thoroughgoing involvement in Abreezio— a fact almost undisputed at trial, *e.g.*, TT 256:23 to 257:1—and those lies were material, then he is guilty of fraudulent inducement, even if Qualcomm didn't already own Abreezio's valuable intellectual property. Note that this also eviscerates the significance of his challenge to his invention assignment agreement.

20

that it proffered, it would be "an adequate showing that a conspiracy existed, that Mansour was part of that conspiracy, and that his statements trying to hurry the process along and discouraging any additional due diligence would be in furtherance of the conspiracy." ECF 331 (Feb. 3, 2025 Tr.) at 11:13–19, 22:12–21.

The United States amply cleared the preponderance standard at trial, by admitting evidence of Mansour's membership in the conspiracy, like:

- Testimony that Mansour was championing Abreezio's technology within Qualcomm and "the one driving the whole assessment or evaluation." TT 285:11-13; 2706:16–17.

- Testimony that Mansour selected the Qualcomm personnel to review Abreezio's technology (including an engineer whose "area of expertise was completely irrelevant to the technology being evaluated"), froze out one skeptical engineer ("I was trying to show why it's not going to work"), and "overrode" another engineer that challenged Mansour's rosy valuation of the technology. TT 650:23–651:9; 654:12-17; 2630:18–2631:6; 2636:3–16.

- Testimony from Shokouhi that coconspirators used the alias "Mitch" to hide Mansour's involvement, and testimony from Taneja that Mansour used that alias "for the same reason as using the alias 'Sheida' for Dr. Karim Arabi." TT 1022:11–13; 2134:2–6.

- An internal Qualcomm email in which Mansour, months after attending an undisclosed Abreezio lunch meeting with Dr. Arabi, Taneja, and Shokouhi, claimed to Qualcomm staff that "I am not sure how they [Abreezio] know so much about [Qualcomm's] RapidBridge technology." Tr. Ex. 67; TT 2255:14–20; *see also* TT 2258 (Taneja testifying that a month after the lunch meeting, Dr. Arabi told him to send an email to Mansour and "specifically instructed me not to make a reference to the lunch meeting").

- Another email, in response to the invitation of additional engineers to evaluate Abreezio's technology and value, in which Mansour complained "I don't understand why you keep bringing other people in. . . . What is your objective? We are wasting valuable time by spinning and rehashing everything we already did or working on." Tr. Ex. 75.

Thus, there was sufficient evidence of Mansour's membership in the conspiracy, such that the Court properly admitted his statements as non-hearsay under Rule 801(d)(2)(E).

*Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *see also United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993) ("An individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E)").

For his part, Dr. Arabi tersely argues that the jury should have heard the supposed "stipulation" of the United States to Mansour's status as "a mere subject" in a tolling agreement which allegedly "reflects doubt of his guilt."  ECF 447 at 26.  Preliminarily, Dr. Arabi's motion does not identify any authority supporting his argument, and he incorrectly insists that the "subject" label indicates a firm conclusion of innocence. *Cf.* Justice Manual 9-11.151 (explaining a subject is "a person whose conduct is within the scope of the grand jury's investigation").

At trial, the Court correctly excluded this evidence under Rule 403, finding it was not particularly relevant and that it "opens a big can of worms that is very unhelpful to the jury."  TT 3444:1–16; *see also* TT 3444:8–10 (the Court noting that "tolling the statute of limitations suggests that the subject is maybe more than just a subject").  The Court's reasoning and ruling is consistent with the instruction (in multi-defendant trials) that jurors "must give separate consideration to each defendant" and that finding "one of the defendants guilty or not guilty should not control your verdict as to any other defendant[s]."  Ninth Circuit Model Criminal Jury, No. 1.13 – Separate Consideration for Each Defendant.   In other words, a statement in a tolling agreement that Mansour was a subject of the investigation has nothing to do with Dr. Arabi's guilt.[12]

Dr. Arabi's core objection as to Mr. Mansour seems to be that the Court should have given the jury an irrelevant civil jury instruction on imputation of liability from an

---

[12]    To the extent Dr. Arabi now argues it was "fundamentally unfair" to exclude such evidence, the jury heard testimony that Mansour was not charged or arrested, and that investigators did not find evidence of a payment from Dr. Arabi to Mansour.  TT 2549:3-16.  Further, the Court permitted Dr. Arabi to twice note in closing argument that Mansour was "never arrested as part of this case," and that the failure to arrest him "should be reasonable doubt as to whether they [the United States] even really believe that" Mansour was "this inside man."  TT 3691:21–25; and 3707:5–7.

1    agent to a principal, so that he could argue that Mansour was *not* a member of the

2    conspiracy (contrary to the Court's finding) and that Mansour's knowledge of

3    Dr. Arabi's fraud scheme should thus be imputed to the rest of Qualcomm—even as

4    Mansour indisputably worked to advance Abreezio's goals during the diligence and

5    simultaneously to frustrate Qualcomm's attempts to properly evaluate the company.

6    But, as the Court correctly explained, the proposed defense imputation instruction was

7    "misleading, at best" and simply "isn't appropriate in a criminal case." TT 3619:20–

8    23.   Five months after that ruling, Dr. Arabi still has not identified any contrary

9    authority.   It would be bizarre indeed if the requested instruction were an accurate

10   statement of criminal law, since then anyone seeking to defraud an organization could

11   immunize themselves by simply recruiting a single insider to their scheme.

12           Dr. Arabi's arguments regarding Mansour do not warrant acquittal or a new trial.

13   In addressing them the Court should find that the evidence at trial adequately established

14   that Mansour was an unindicted coconspirator, and reiterate its prior (correct) ruling

15   that the civil imputation and agency rules are inapposite to this criminal case.

16   **E.    Dr. Arabi Also Schemed to Launder $91.8 Million.**

17           The Court should reject Dr. Arabi's single-sentence challenge to his conviction

18   for conspiracy to commit money laundering.   As discussed above, Dr. Arabi's

19   challenges to his wire fraud conspiracy and wire fraud charges fail, and there is thus no

20   infirmity that undermines the laundering count of conviction.

21           Second, there was ample evidence of Dr. Arabi's knowledge that the $91.8

22   million Qualcomm wired to Sheida constituted or were derived from the proceeds of a

23   felony offense.   First, there was practically no dispute that Dr. Arabi knew that the

24   enormous windfall Sheida received was the proceeds of the Abreezio deal.   If Dr. Arabi

25   knew that Sheida's money was from the Abreezio transaction that he fraudulently

26   induced, and the transaction that he induced was (as the jury found) the result of wire

27   fraud, then he knew that they money was the proceeds of wire fraud.

28

*United States' Response in Opposition to*
*Defendant's Motion for Acquittal or a New Trial*                    *22-CR-1152-BAS*

If Dr. Arabi seeks to split the hair of this conviction finely enough to argue that he knew the money was from *Abreezio*, and he knew that he committed the charged fraud to *induce* that deal, but he didn't subjectively recognize that his conduct was a *felony*, that argument would still fail. A rational trier of fact could certainly have found such knowledge from the welter of concealment evidence adduced at trial, like Dr. Arabi's repeated impersonation of his sister (including during the laundering phase), the original filing of the provisional patent applications in December 2014, the fine tuning of the responses to Qualcomm's due diligence questions about Abreezio's ownership and origins in October 2015, and the repeated acquisition of foreign real estate through shell companies. In short, it would be impossible for Dr. Arabi to *not* know the $91.8 million wired to Sheida—from which he received a $4 million "loan" through a pair of brand-new shells less than a year later, and another nearly $3 million after resolving the civil suit—was both Abreezio money and the proceeds of a felony.

Finally, the jury was instructed that it could not convict unless it found beyond a reasonable doubt that Dr. Arabi knew that the property involved in the laundering was proceeds of a felony. TT 3635:20–22. Juries are presumed to follow their instructions. *United States v. Ovsepian*, 113 F.4th 1193, 1201 (9th Cir. 2024) (courts "presume that jurors follow the jury instructions they are given and do not indulge theories of liability on which they were not instructed" (quotation omitted)). Thus, the jury here necessarily found that Dr. Arabi knew the money was criminal proceeds. The Court cannot conclude that no rational trier of fact could reach that conclusion.

In rejecting this argument once again, and denying Dr. Arabi's request for a new trial, the Court should specifically find that the evidence proved beyond a reasonable doubt that Dr. Arabi knew that the laundered funds were the proceeds of a felony.

## F.    The Jury Instructions Were Proper.

Finally, Dr. Arabi complains the Court did not give some of his proposed jury instructions—specifically, those stating that in order to find him guilty of wire fraud, the jury needed to find beyond a reasonable doubt that Dr. Arabi personally invented,

*United States' Response in Opposition to Defendant's Motion for Acquittal or a New Trial*

*22-CR-1152-BAS*

created, developed, or provisionally patented Abreezio's technology.  ECF 447 at 29–30.  According to Dr. Arabi, the Court incorrectly found his proposals were already covered by other instructions, as the Court's instructions purportedly left open the possibility of wire fraud convictions without the requisite (1) intent to deprive the victim of a "traditional property interest" and (2) a material statement or omission going "to the essence of the bargain."  *Id. a*t 30.  But Dr. Arabi is wrong on both points.  The Court's instructions accurately stated the well-established requirements of wire fraud.

In instructing the jury, "[t]he trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented."  *United States v. Frega*, 179 F.3d 793, 807 n. 16 (9th Cir. 1999).  Here, the Court specifically instructed that one element the United States needed to prove beyond a reasonable doubt is that Dr. Arabi "acted with the intent to defraud.  That is, the intent to deceive and cheat."  TT 3631:8–9.  The Court explained further:

- "The Government must prove beyond a reasonable doubt that obtaining money or property from Qualcomm was the object of the charged scheme. It is not sufficient if obtaining money or property was merely an incidental by-product."  TT 3632:21–25.

- "The intent must be to obtain money or property from the one who is deceived."  TT 3633:1–6.

Dr. Arabi's motion fails to acknowledge these instructions, which sufficed to ensure the jury would convict only if the fraud was "directed at traditional notions of money and property[.]"  ECF 447 at 30.  *See Kousisis*, 145 S. Ct. at 1391 (affirming conviction for wire fraud where the "goal" of scheme was to obtain "money (tens of millions of dollars)" from the victim through false or fraudulent representations).[13]

---

[13]    Dr. Arabi apparently maintains the position that the jury should have been instructed that it must acquit if it found that the Abreezio deal was a "net profitable or break-even transaction."  ECF 447 at 23.  As explained above, this position is inconsistent with *Kousisis*.  See 145 S. Ct. at 1388.

As to materiality of the misrepresentations and omissions, the Court's instructions were even more thorough in addressing Dr. Arabi's concerns. First, the Court instructed that the United States needed to prove materiality beyond a reasonable doubt, meaning "the statements made as part of the scheme were material. That is, they had a natural tendency to influence or were capable of influencing a person to part with money." TT 3631:5–7. The Court elaborated that:

- "To convict a Defendant of wire fraud, the Government must prove beyond a reasonable doubt that the false or fraudulent pretenses, representations, promises, or omissions directly or indirectly deceived the victim about the nature of the bargain." TT 3632:7–11.

- A representation goes to the nature of the bargain if it "goes to price, or quality, or otherwise to essential aspects of the transaction[.]" TT 3632:12–14.

- "For wire fraud, the Government must prove beyond a reasonable doubt both that there was a victim of a material misrepresentation about the nature of a bargain, and that the victim is the same one Dr. Arabi intended to defraud." TT 3633:1–4.

Contrary to the claims in Dr. Arabi's motion for a new trial, the instructions made clear that the deceit must "go to the essence of the bargain." ECF 447 at 30.

Because Dr. Arabi's proposed instructions were adequately covered by the Court's instructions, the Court should deny his motion for a new trial. *See United States v. Braslau*, 665 F. App'x 573, 575 (9th Cir. 2016) (affirming district court's refusal to give a defense jury instruction because "the instructions given to the jury, as reasonably understood in the context of the whole trial, adequately covered Braslau's theory," and specifically noting "the jury was properly instructed on the elements of the offense and the definition of materiality").

## IV.

## **CONCLUSION**

Dr. Arabi is not entitled to an acquittal or a new trial.  His motions should be denied.

DATED: October 14, 2025                          ADAM GORDON
                                                 United States Attorney

                                                 /s/ Nicholas W. Pilchak
                                                 NICHOLAS W. PILCHAK
                                                 JANAKI G. CHOPRA
                                                 ERIC R. OLAH
                                                 Assistant U.S. Attorneys

*United States' Response in Opposition to*
*Defendant's Motion for Acquittal or a New Trial*                    *22-CR-1152-BAS*