Whitney Z. Bernstein, SBN 304917
wbernstein@bklwlaw.com
Rebecca S. Roberts, SBN 225757
rroberts@bklwlaw.com
Ryan V. Fraser, SBN 272196
rfraser@bklwlaw.com
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile (949) 369-3701

*Attorneys for Dr. Karim Arabi*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>v.<br><br>KARIM ARABI,<br><br>         Defendant. | Case No. 3:22-cr-01152-BAS-1<br>Honorable Cynthia A. Bashant<br><br>**DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FOREFEITURE**<br><br><u>Hearing Information</u><br>Courtroom:  12B<br>Date:        October 28, 2025<br>Time:        1:00 p.m. |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

I.      ARGUMENT ..................................................................................................... 2

    A.      The Government is Not Entitled to a Forfeiture Order of
$44,580,192.74 Because Dr. Arabi Did Not Obtain the Proceeds
from the Sale of Abreezio ....................................................................... 2

    B.      Atlazo Was a Legitimate and Thriving Company ................................. 7

    C.      The Government is Not Entitled to the Funds from Dr. Arabi's
Personal Account at San Diego County Credit Union, which are
Proceeds from the Legitimate Sale of Condo He Owned. ................... 10

II.     CONCLUSION ................................................................................................. 11

TABLE OF CONTENTS AND AUTHORITIES

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Honeycutt v. United States,*
581 U.S. 443 (2017).................................................................................1, 2, 3, 6

*United States v. Certain Real Property Located at 2323 Charms Rd.,*
726 F. Supp. 164 (E.D. Mich. 1989)...................................................................10

*United States v. Christensen,*
828 F.3d 763 (9th Cir. 2016) ...............................................................................7

*United States v. Omidi,*
125 F.4th 1283 (9th Cir. 2025) ....................................................................6, 9, 10

*United States v. One Parcel of Real Prop.,*
921 F.2d 370 (1st Cir. 1990)...............................................................................10

*United States v. Rutgard,*
116 F.3d 1270 (9th Cir.1997) ...............................................................................7

*United States v. Thompson,*
990 F.3d 680 (9th Cir. 2021) ..................................................................1, 3, 4, 6

*United States v. Villegas,*
2024 WL 510310 (9th Cir. 2024) ..............................................................1, 4, 6

*United States v. Warshak,*
631 F.3d 266 (6th Cir. 2010) ..............................................................................10

*United States v. Yagman,*
502 F. Supp. 2d 1084 (C.D. Cal. 2007) ................................................................7

## Rules

Fed. R. Crim. P. 32.2(b)(1)(A)...............................................................................7

# INTRODUCTION

The government argues that it is entitled to a forfeiture order against Dr. Karim Arabi of $44,580,192.74, which is the remaining amount of the proceeds Sheida Alan received from the Abreezio acquisition from Qualcomm since Ms. Alan repaid $47,274,178.19 to Qualcomm pursuant to the civil settlement.

However, under U.S. Supreme Court and Ninth Circuit precedent, forfeiture is limited to property that the defendant himself acquired because of the crime and does not permit forfeiture of property or money which the defendant did not personally obtain. *Honeycutt v. United States*, 581 U.S. 443 (2017); *United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021) (*Honeycutt* applies to wire fraud cases); *United States v. Villegas*, 2024 WL 510310 (9th Cir. 2024). Dr. Arabi did not obtain the proceeds from the sale of the Abreezio transaction, his sister did. The only Abreezio proceeds Dr. Arabi arguably "obtained" were the investments Ms. Alan made as a seed investor into his company Atlazo, which totaled $6,718,119.02, $1.5 million of which Dr. Arabi repaid.

The government is also not entitled to forfeiture of Dr. Arabi's preferred and common stock in Atlazo and repayment of the promissory notes. The undisputed evidence at trial was that Atlazo was a legitimate, thriving company built on the sweat and talent of Dr. Arabi and his employees and did not stem from the Abreezio transaction. And while Ms. Alan did invest in the Atlazo as an angel investor, Dr. Arabi also invested in the company with his personal funds and secured funding from others as well. The government has not met its burden tracing all of the Atlazo proceeds to the ill-gotten gains from the Abreezio acquisition and thus, the forfeiture order as to these assets should be denied.

Dr. Arabi's San Diego County Credit Union account ending in x1860 should also not be subject to forfeiture since it contains proceeds from the sale of a condominium he independently owned in Canada, which is not traceable to the proceeds of the Abreezio sale.

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A
PRELIMINARY ORDER OF FORFEITURE

1

## I.    ARGUMENT

### A.    The Government is Not Entitled to a Forfeiture Order of $44,580,192.74 Because Dr. Arabi Did Not Obtain the Proceeds from the Sale of Abreezio

In the seminal case *United States v. Honeycutt*, the U.S. Supreme Court held forfeiture "is limited to property **the defendant himself actually acquired** as the result of the crime" and "does not permit forfeiture with regard to [a defendant] who had no ownership interest in [proceeds of the fraud] and did not personally benefit from the illegal sales." 581 U.S. at 443 (emphasis added).

*Honeycutt* is directly on point here. Two brothers ran a hardware store and sold massive quantities of iodine to customers who they knew were using the product to make meth. The brother who owned the store and profited from the sales, pled guilty and agreed to forfeit a portion of the store's profits from the sales of the iodine. *Id.* at 446. The other brother, who was the manager of the store, was convicted and the government sought a money judgment for the entire amount of the conspiracy profits, which the District Court declined to enter reasoning that manager brother "had not personally received any profits from the iodine sales." *Id.* at 446. The Sixth Court reversed holding that as co-conspirators, the brothers could be held "jointly and severally liable for any proceeds of the conspiracy." *Id.* at 447.

The U.S. Supreme Court rejected the notion that a defendant may be liable for a forfeiture judgment consisting of property that his co-conspirator obtained but he himself did not. Focusing on the language contained in a different (but similarly worded) forfeiture provision, Section 853(a)(1), the U.S. Supreme Court concluded that forfeiture is limited only to property obtained by the defendant:

> Neither the dictionary definition nor the common usage of the word "obtain" supports the conclusion that an individual "obtains" property that was acquired by someone else. … Section 853(a)(1) further provides that the forfeitable property may be "obtained, directly or indirectly." The adverbs "directly" and "indirectly" modify—but do not erase—the verb "obtain." In other words, these adverbs refer to how a defendant obtains the

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FORFEITURE

> property; they do not negate the requirement that he obtain it at all.
>
> . . .
>
> Congress did not authorize the Government to confiscate substitute property from other defendants or co-conspirators; it authorized the Government to confiscate assets only from the defendant who initially acquired the property and who bears responsibility for its dissipation. Permitting the Government to force other co-conspirators to turn over untainted substitute property would allow the Government to circumvent Congress' carefully constructed statutory scheme, which permits forfeiture of substitute property only when the requirements of §§ 853(p) and (a) are satisfied. There is no basis to read such an end run into the statute.

*Id.* at 450, 452.

In a footnote, the government misleadingly summarizes the U.S. Supreme Court's analogy of a farmer who masterminds a scheme to grow and sell marijuana on a school campus, recruits a student to assist with selling the drug on a campus and pays him $300 each month while the farmer's company profits $3 million. Using this analogy, the U.S. Supreme Court theorized the forfeiture statute was not intended to hold the co-conspirator student, who only made $300 a week, for the entire $3 million in profit. *Id.* at 448. Analyzing the "directly or indirectly" wording of the statute, the U.S. Supreme explained that the farmer could be required to forfeit the profits "he obtained" whether "directly" from drug purchasers, or "indirectly" from the college student who collected the profits for the farmer and then passed them on. *Id.* at 450. Again, the determinative factor is whether the defendant actually obtained the property, not how he obtained it.

In *United States v. Thompson*, 990 F.3d 680, 689 (9th Cir. 2021), the Ninth Circuit held that *Honeycutt* applies to forfeiture under 18 U.S.C. § 981(a)(1)(c), the same statute under which the government seeks to recover here. In *Thompson*, three defendants defrauded investors into providing certain funds up front under the premise that larger loans would be forthcoming, which were not. The defendants divided up the proceeds amongst

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FORFEITURE

themselves. *Id.* at 685. The District Court, while not specifically finding the defendants jointly and severally liable, found each defendant liable for the entire sum. *Id.* Following *Honeycutt¸* the Ninth Circuit reversed:

> Under Section 981, forfeiture cannot extend beyond the tainted property and proceeds traceable to it, such as the pickup truck [defendant 1] bought with the stolen money. Yet the money judgments against [defendant 2] and [defendant 1] were not based on findings of how much of the proceeds came to rest with them, nor has the government shown that it complied with Section 853(p) to obtain substitute property. To forfeit money from [defendant 2], the district court was required by Section 981 to find that the amount forfeited came to rest with him as a result of his crimes. The same goes for [defendant 1]. The district court made no findings establishing how the loot was divided among the conspirators.
>
> . . .
>
> *Honeycutt* does not allow for an interpretation that any conspirator who at some point had physical control is subject to forfeiture of all the proceeds. This case would be different if, say, [defendant 2] and [defendant 1] had a joint bank account, or were married tenants by the entirety in a house they bought with the stolen money. If the money came to rest in a joint account, or property owned jointly or as tenants by the entirety, the swindlers would each have an unfettered right to enjoy the whole [Citation omitted.] But here, the trust accounts and escrows were stops on the way to splitting up the money, not jointly controlled deposits where the money came to rest after the swindlers split it up.

*Id.* at 690, 691. *See also United States v. Villegas*, 2024 WL 510310 (9th Cir. 2024) (reversing forfeiture order requiring main co-conspirator to pay full amount received when "$5,261,218 is neither the amount that "came to rest" with [the defendant] as that phrase was used in *Thompson* (*i.e.*, "the money [that] came to rest after the swindlers split it up") nor the amount that was held in [the defendant's] bank accounts (*i.e.*, the amount consistent with the proxy the Government used for the actual amounts that "came to rest" with [defendant's] co-conspirators). [Defendant's] forfeiture judgment violates *Honeycutt*

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A PRELIMINARY ORDER OF FORFEITURE

because he will be required to satisfy the order from untainted assets if his co-conspirators do not first satisfy their forfeiture judgments.")

The undisputed evidence at trial was that Ms. Alan, not Dr. Arabi, received the proceeds from the sale of Abreezio since she was a founding shareholder of the company. According to expert testimony presented at trial, it is not unusual for a founding shareholder, even one who did not substantially contribute to the technology sold, to receive a windfall. Trial Tr. 3358:24-3359:5 (defense expert witness Martin Sabarasky: "I don't think it's about fairness. Usually, it's about math. If at the time of an acquisition, if I'm the founder, if I own 50 percent of the equity, normally then if company sold for $100 and there's no debt, I would get $50. That's just a function of taking out the amount that's being paid and multiplying by the percentage interest that people have.")

The evidence was also undisputed that the funds were wired to Ms. Alan's account at Canadian Imperial Bank of Commerce ("CIBWC"); Ex. 0864, 471; Tr. 2727:25-2729:5, and that the funds were later to transferred to other accounts at CIBC solely controlled by Ms. Alan. Shindledecker Decl. ¶¶ 57-61. The government did not produce any evidence at trial that Dr. Arabi was a signatory to the any of the Canadian bank accounts, which held the proceeds or had access to the proceeds in these accounts.

The same is true of the Canadian properties. U.S. Marshals Service Senior Inspector John Shindledecker testified at length that the six properties in Canada were all purchased by Ms. Alan or entities that she controlled, such as Teranova North Development, Inc., with funds from accounts controlled by her. Trial Tr. 2797:19-2798:5. The government did not introduce any evidence that Dr. Arabi ever had any ownership in the Canadian properties Ms. Alan purchased or the entities that Ms. Alan formed. And, it was Ms. Alan that sold the Canadian properties to pay for the civil settlement. Trial Tr. 2803:9-16.

This is also true concerning the Norwegian properties. The evidence presented at trial (which the Shindledecker Declaration confirms) was that Ms. Alan, not Dr. Arabi, transferred funds from her Canadian accounts to her other brother in Norway, Dr. Mohammad Adar, who then used the funds to invest in Norwegian real estate.

Shindledecker Decl. ¶¶ 42-45. The government did not present evidence that Dr. Arabi transferred these funds or ever had an ownership in the Norwegian properties.

Notably, the government is currently in litigation with Ms. Alan in Canada as to whether she can be extradited to the United States to face criminal charges here. Thus, her case – and valid defenses – should be allowed to run their proper course. By seeking forfeiture of the properties which Ms. Alan owns through a forfeiture order against Dr. Arabi, the government is attempting to end run due process Ms. Alan is entitled to in Canada and in the United States.

Moreover, since Dr. Arabi never obtained the Abreezio proceeds or had any ownership in the real estate, a forfeiture order against him in a money judgment amount of the value of the properties would require him to satisfy the judgment from untainted assets, which is improper under *Honeycutt* and *Thompson*. *See Honeycutt*, 581 U.S. at 449 ("These provisions, by their terms, limit forfeiture under § 853 to tainted property; that is property flowing from . . . the crime itself. The limitations of § 853(a) thus provide the first clue that the statute does not countenance joint and several liability, which, by its nature, would require forfeiture of untainted property."); *Thompson*, 990 F.3d at 692; ([Defendant's] forfeiture judgment violates *Honeycutt* because he will be required to satisfy the order from untainted assets if his co-conspirators do not first satisfy their forfeiture judgments.") *Villegas*, 2024 WL 510310 at * 2.

While the government relies on *United States v. Omidi*, 125 F.4th 1283 (9th Cir. 2025), *Omidi* does not displace *Honeycutt's* person-specific limitation. Even when all business revenues are deemed "proceeds" of the offense, *Honeycutt* and *Thompson* require that the government establish how much each defendant obtained and came to rest with him, and bars collection from untainted assets without satisfying §853(p). *Omidi* leaves that allocation and collection constraint intact. 125 F.4th at 1287. *Cf. also United States v. Prasad*, 18 F.th 313 (9th Cir. 2021) (affirming forfeiture order of entire amount of $1.1 million defendant obtained from fraudulent visa scheme even though he passed on a vast

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A
PRELIMINARY ORDER OF FORFEITURE

1 majority of the funds received to employees who performed the work and held on to only

2 $238,000 in profit.)

3 ## B. Atlazo Was a Legitimate and Thriving Company

4 The government should not be able to forfeit funds payable based on common and

5 preferred stock and promissory notes owned by Dr. Arabi and his company Abacus

6 Machines from the sale of Atlazo, a separate and legitimate start up Dr. Arabi formed after

7 he left Qualcomm. Shindledecker Decl. ¶ 11. In December 2023, Nordic Semiconductor

8 company acquired Atlazo for a fraction of its value, since the company had been greatly

9 devalued due to the government's indictment of Dr. Arabi, who, prior to being indicted,

10 was the company's CEO. Nordic Semiconductor paid approximately 10% of the face

11 amount of the promissory notes and common and preferred stock. Shindledecker Decl. ¶ 11.

12 When the government seeks forfeiture of specific property, such as the proceeds of

13 the sale of Dr. Arabi's stock in Atlazo, it must establish "the requisite nexus between the

14 property and the offense," Fed. R. Crim. P. 32.2(b)(1)(A), by a preponderance of the

15 evidence. *See United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2016). "Where the

16 transaction involves criminal proceeds that have been commingled with innocent funds, the

17 Ninth Circuit imposes a tracing requirement; the government must trace each of the alleged

18 monetary transactions to criminally-derived proceeds." *United States v. Yagman,* 502 F.

19 Supp. 2d 1084, 1087 (C.D. Cal. 2007) (citing *United States v. Rutgard,* 116 F.3d 1270, 1292

20 (9th Cir.1997)). In *United States v. Rutgard*, the defendant was charged with transferring

21 $7.5 million from his bank account and ordered to forfeit this same amount. The Ninth

22 Circuit reversed finding that the government had not met its burden that the funds

23 transferred and ordered forfeited were proceeds traceable to the offenses of conviction.

24 ("The government's position was that all of [the defendant's] practice was fraud. The

25 government failed to prove this position in terms of the monetary transaction accounts and

26 . . . [thus] failed to prove this proposition to establish that $7.5 million dollar transferred by

27 wire were subject to criminal forfeiture.").

28

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A
PRELIMINARY ORDER OF FORFEITURE

As witnesses testified and the Court itself stated, there was no dispute that Atlazo was a legitimate company specializing in low-power edge AI (artificial intelligence) with a very bright and promising future. Trial Tr. 1497:7-1498:2 (Ms. Bernstein: ". . . Atlazo had a lot of promise." Mr. Mahmoudi: "It did." Ms. Bernstein: "And what was the company going to do?" Mr. Mahmoudi: "Well, it was a platform to enable energy-efficient operation for wearable and portable, very low-power devices." . . . Ms. Bernstein: "And Atlazo was the world leader in targeting the market for small wearable chips with ultra low-power edge AI?" Mr. Mahmoudi: "At the time, it was."); Trial Tr. 1498:3-8 (describing Atlazo's ongoing business relationships with at least major companies including Dexcom, Medtronics, Boston Scientific, Google, Microsoft, Fossil, Cirrus Logic, ADI, and others); Trial Tr. 3506:13-16 (The Court: "Yeah, I don't – I don't really think it's – I mean, there's never been any suggestion that Atlazo wasn't a real company. In fact, all the testimony has been that it was a real company.")

Like many startups, Atlazo was angel funded, meaning that the company raised funds from private investors, one of which was Ms. Alan. Trial Tr. 2702:12-144; Trial Tr. 2666:11-14. Expert testimony at trial confirmed that it is not uncommon for start-ups to receive angel funding from friends and family. Trial Tr. 3356:21-3357:1 (Defense expert witness Mr. Sabarsky: "To the extent that a startup needs to raise money quickly and they're not self-funding through friends and family or their own savings or the like, it's often the case that they'll have to start attracting investors by issuing new shares to them so they can own part of the company.")

Senior Inspector Shindledecker's declaration vaguely alleges that Ms. Alan's CIBC account later "transferred millions of dollars to bank account in the United States controlled by Dr. Arabi." Shindledecker Decl. ¶ 6. But the evidence was that Avante North Ventures, Inc., and Teranova, which were entities formed and controlled by Ms. Alan, invested a total of $6,718,119.02 in Atlazo. Trial Ex. 259 (September 20, 2016 Promissory Note from Abacus Machines LLC to Avante North Ventures, Inc.), Trial Tr. 2824:10-2825:14; Shindledecker Decl. ¶ 12.

1    Moreover, Dr. Arabi invested at least $1,540,000 of his own money in Atlazo, as the
2    government acknowledges. Exhibit A (Atlazo promissory notes issued to Karim Arabi in
3    consideration of loans); Shindledecker Decl. at ¶¶ 25-27. Other entities also invested in
4    Atlazo in exchange for common and preferred shares. Exhibit B (Atlazo cap table). These
5    investments were used for Atlazo's legitimate business expenses, such as funding payroll,
6    purchasing hardware and software, and chip fabrication. Shindledecker Decl. ¶ 21.
7    Dr. Arabi, like other employees, received common stock in Atlazo as compensation for his
8    work for the company.

9    The government's indictment of Dr. Arabi leveled Atlazo, ruined Dr. Arabi's career,
10    and negatively impacted Atlazo's dedicated employees. Trial Tr. 1499:11-1500:17
11    (Ms. Bernstein: "And after . . . the Government's prosecution here, did offers of that
12    magnitude disappear?" . . . .Mr. Mahmoudi: "It did." Ms. Bernstein: "No one wanted to risk
13    Qualcomm sending the Federal Government after them?" Mr. Mahmoudi: "Perhaps that
14    was the reason. But the fact is, it did." Ms. Bernstein: "And you've said that this was one
15    of the very few times in your life that you've cried." Mr. Mahmoudi: "It was."
16    Ms. Bernstein: "And the prosecution here has affected Dr. Arabi, of course; correct?"
17    Mr. Mahmoudi: "Obviously, yeah." . . . Ms. Bernstein: "Did the prosecution's impact on
18    Atlazo negatively affect you?" Mr. Mahmoudi: "It did."  Ms. Bernstein: "And your
19    coworkers?" Mr. Mahmoudi: "I assume so." Ms. Bernstein: ". . . [H]ow many co-workers
20    did you have at the time?" Mr. Mahmoudi: "I think there were 19 full time, 18."
21    Ms. Bernstein: "And you've told the Government all of this?" Mr. Mahmoudi: "**I brought
22    up that it was heartbreaking that when this happened, six years of blood and sweat
23    and hard work went down the drain. Yes, I shared that**.") (emphasis added).

24    The government relies on *Omidi*, 125 F.4th 1283, to argue that all of Dr. Arabi's
25    equity interests in Atlazo are subject to forfeiture since at least some of the company's
26    funding was traceable to Ms. Alan's investments through her companies. In *Omidi*, the
27    Ninth Circuit affirmed forfeiture of all money acquired by a doctor and his business through
28    a health care fraud scheme even though some patients received legitimate treatment because

9                                    3:22-cr-01152-BAS-1

1  the fraud was the nucleus of the business model. 125 F.4th at 1288; *see also United States*
2  *v. Warshak*, 631 F.3d 266 (6th Cir. 2010) (Because "the very nucleus of [the defendants']
3  business model [was] rotten and malignant" "[a]ny money generated through these
4  potentially legitimate sales . . . resulted 'directly or indirectly' from a conspiracy to commit
5  fraud.")

6      In contrast to the company in *Omidi*, Atlazo was a legitimate company, and it did not
7  stem from the Abreezio acquisition. Rather, the government only established that Ms. Alan
8  invested certain funds she received from the Abreezio acquisition into Atlazo, Dr. Arabi's
9  new startup company, as an angel investor. *Cf. United States v. One Parcel of Real Prop.*,
10  921 F.2d 370, 374 (1st Cir. 1990) ("We do not believe . . . that forfeitability spreads like a
11  disease from one infected mortgage payment to the entire interest in the property acquired
12  prior to the payment."); *United States v. Certain Real Property Located at 2323 Charms
13  Rd.*, 726 F. Supp. 164, 169–70 (E.D. Mich. 1989) (disallowing forfeiture of all of claimant's
14  personalty where claimant had a legitimate part-time occupation, and complaint failed to
15  specifically allege how some items of personalty were acquired with drug funds).

16      Since the government has not sufficiently traced all Atlazo's funding to the Abreezio
17  acquisition and the company had legitimate intrinsic value built off the sweat, talent and
18  ingenuity of Dr. Arabi and Atlazo's employees, the government is not entitled to a forfeiture
19  order as to Dr. Arabi's preferred and common stock and promissory notes as to Atlazo.

20  **C.    The Government is Not Entitled to the Funds from Dr. Arabi's Personal
21      Account at San Diego County Credit Union, which are Proceeds from the
        Legitimate Sale of Condo He Owned.**

22      The government is also not entitled to forfeiture of the funds contained in Dr. Arabi's
23  San Diego County Credit Union Account, which are proceeds of the sale of a condominium
24  he owned in Canada. The government seeks these funds on the basis that Ms. Alan covered
25  the mortgage of the condominium for period of time, from approximately March 2017 until
26  February 2018, when Dr. Arabi paid her back the amount owed, $245,000. Shindledecker
27  Decl. ¶ 37. He then sold the property for approximately $748,000 and deposited
28  $502,361.84 into the San Diego Credit Union Account. *Id.* ¶¶ 37-39. Since the initial loan

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A
PRELIMINARY ORDER OF FORFEITURE

was paid back in full and the property, which was Dr. Arabi's own investment, was sold at a profit, the proceeds from the sale of the condominium are untainted funds not subject to forfeiture.

## II.    CONCLUSION

For the reasons discussed above, the defense requests that the Court deny the government's motion for forfeiture.

Respectfully submitted,

Dated:  October 14, 2025

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By:  */s/ Rebecca S. Roberts*
      Whitney Z. Bernstein
      Rebecca S. Roberts
      Ryan V. Fraser
      *Attorneys for Dr. Karim Arabi*

DR. KARIM ARABI'S OPPOSITION TO THE UNITED STATES' MOTION FOR A
PRELIMINARY ORDER OF FORFEITURE