ADAM GORDON
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br><br>Defendant. | Case No.:   22-cr-1152-BAS<br>Date:   October 28, 2025<br>Time:   1:00 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' SENTENCING MEMORANDUM** |

Defendant Karim Arabi masterminded a $180 million fraud and then helped launder the lion's share of the proceeds. He recruited, coordinated and supervised a team of accomplices. He planned and directed the fraud, then continued to lie and try to cover it up through his victim's internal investigation and civil lawsuit. He should be sentenced to 151 months in custody, followed by three years of supervised release.

I.

**STATEMENT OF THE CASE**

A jury convicted Dr. Arabi of wire fraud conspiracy, wire fraud and conspiracy to commit money laundering in violation of Counts 1, 2, and 6 of a superseding

indictment on April 8, 2025, on the second day of deliberations following a trial lasting over four weeks. ECF 367, 414–16.

## II.

## STATEMENT OF FACTS

**A.  The Fraud.**

As the Court heard at trial, when he was re-hired by Qualcomm as Vice President of Research and Development in 2013, Dr. Arabi explicitly agreed to Qualcomm's Invention Disclosure, Confidentiality and Proprietary Rights Agreement—which generally provided that his inventions were the company's property. It also bound him to disclose his inventions to his employer, acknowledged his duty of loyalty to Qualcomm, and forbade him from engaging in outside business that would conflict with Qualcomm's interests or competing with any of the company's business. Tr. Ex. 771. He also agreed to Qualcomm's code of business conduct, which provided that the company owned anything he developed while employed at the company, as allowed by law. Tr. Ex. 85. In exchange for these concessions and his performance of his duties, Qualcomm paid Dr. Arabi about $874,000 in 2015. PSR ¶¶ 68, 145.

The jury saw evidence that Dr. Arabi created the two inventions described in a pair of December 2014 provisional patent applications that he filed bearing the name of his sister, Sheida Arabi. The proof was abundant. Metadata for the applications' descriptions—sent by Dr. Arabi from a fake email address he created to impersonate Sheida—showed he was the author. The first attempt to file was made from Dr. Arabi's IP address. Dr. Arabi sent a slide deck describing one of the inventions to Sheida, bearing metadata showing that Dr. Arabi created it, but listing Dr. Arabi's wife's name as the putative author.[1]

---

[1]   This document was edited the night before Dr. Arabi's meeting with Quinton and the Invionics team concerning "his idea/ patent application." *Compare* Tr. Exs. 5A, 120.

At the same time, Dr. Arabi built a company around his two inventions so they could be plausibly commercialized, and his involvement scrubbed. This scheme began to crystallize as early as October 2014, when he started to map it out with Brad Quinton, whom Dr. Arabi recruited. By February 2015, Dr. Arabi had enlisted his sister, Sheida Arabi, Akbar Shokouhi, and Sanjiv Taneja to carry out the Abreezio fraud. But Dr. Arabi himself stayed closely involved, participating in numerous meetings and strategy calls, writing employment agreements, fine-tuning marketing materials, and weighing in on business decisions large and small. In that respect, Taneja and Shokouhi testified consistently that Dr. Arabi guided practically every decision at Abreezio. Moreover, this testimony was backstopped by numerous emails and text messages in which Dr. Arabi did just that. His involvement was so pervasive that Taneja consulted Dr. Arabi even when deciding what laptops to buy, or which office space to rent. Tr. Exs. 683, 702.

The Abreezio principals also relied on Dr. Arabi's inside man: high-ranking Qualcomm employee (and former Arabi supervisor) Ziad Mansour, who hand-selected the diligence team that reviewed Abreezio, and consistently hurried them along and defeated attempts to prolong or improve the diligence.

### 1. *Dr. Arabi's IP Was In Patent Applications Qualcomm Bought.*

At trial, and now at sentencing, Dr. Arabi repeatedly asserted that the only technology that mattered to Qualcomm in the Abreezio acquisition was a pristine invention (or pair of inventions) from Invionics engineers having nothing to do with the two provisional patent applications from December 2014.[2] But as the Court saw

---

[2] Beyond an unsuccessful legal challenge to Qualcomm's property interest in Abreezio, this theory is much less relevant in weighing Dr. Arabi's culpability at sentencing. If Dr. Arabi *intended* to defraud Qualcomm into buying its own merchandise, but simply happened to fail because his inventions were so problematic that they needed to be replaced by others, his conduct is arguably *more* culpable. Put bluntly, it would mean that Dr. Arabi's original plan, objectively speaking, was to sell Qualcomm the proverbial "bag of rocks" that his lawyers disclaimed at trial. TT 3700:20.

through the trial evidence, the final package of intellectual property Qualcomm agreed to purchase for $180 million was rife with concepts developed by Dr. Arabi, built on his work, or plagiarized from it without attribution. *See* ECF 461 at 5–6.

Even Dr. Arabi's claims to the contrary only aggravate the seriousness of his fraud at sentencing. For example, although Abreezio emphatically represented to Qualcomm that its intellectual property was *not* prior art, at trial, Dr. Arabi strenuously argued at trial that the only issued patent bearing Sheida's name was nothing more than prior art. Even accepting his trial position as true, this arguably exacerbates the fraud, by showing that Abreezio sought to sell Qualcomm indefensible patents using false claims that they were valid.

Regardless, the trial evidence is clear that the Abreezio intellectual property Qualcomm purchased not only traced back to Dr. Arabi's work, but included the "key innovation" that he emailed his accomplices while pretending to be his sister.

### 2. *One of Abreezio's Two Products Essentially Failed.*

After the purchase, Qualcomm invested its own extensive resources to try to commercialize both of Abreezio's products. The DFT product was successfully commercialized, resulting in significant savings to Qualcomm. Trial Transcript (TT) 367:2–13. The sensor product was not. PSR ¶ 17 (with very limited exceptions, "TruSens was never successfully commercialized by Qualcomm, despite years of effort to make it work").

### B. The Money Laundering.

As a result of the fraud, Qualcomm paid over $152 million for Abreezio on October 30, 2015. Qualcomm also agreed to make a pair of holdback payments to several Invionics engineers, including Brad Quinton, and actually made $2 million of those payments before discovering it had been defrauded. Tr. Ex. 864 at 15, 61 *et seq.*,

ECF 462 at 2–3.[3]  As a result, Qualcomm actually paid $154 million in total as part of the Abreezio transaction.  ECF 466 at 1.

Dr. Arabi's deception persisted long past the Abreezio acquisition.  For one thing, he continued to use his (second) fake Sheida email account to impersonate his sister while working with Nasser Hendi to invest tens of millions of dollars of fraud proceeds in Canadian real estate. *E.g.*, Tr. Exs. 335, 347.  Dr. Arabi even called participants in the real estate and financial transactions (such as realtors and bankers) himself. *E.g.*, TT. 2757:19–21 (CIBC banker); 2792:6–8 (realtor).  In this respect, the money laundering phase of the criminal enterprise strongly paralleled the underlying fraud: Dr. Arabi used Sheida as an accomplice while directing the substantive activity himself, through her and also while impersonating her.

But Dr. Arabi's connections to the laundering went further.  He was also involved with millions of dollars of Norwegian property purchases by another Arabi sibling: Mohammed Arabi, aka Mamad Adar.  This was demonstrated not just by the financial tracing, but by the location of Norwegian real estate purchase documents on Dr. Arabi's laptop in 2022.  Moreover, Dr. Arabi himself enjoyed the benefit of tens of millions of dollars parked in Canadian and Norwegian real estate, when those properties were liquidated to pay off his joint and several liability to Qualcomm in the civil suit.

---

[3]  When Qualcomm refused to make the rest of the holdback payments and instead sued Dr. Arabi, Sheida, and Taneja for fraud, Sheida counterclaimed for the rest of her share of the money.  ECF 112-1 ¶ 6.  As late as June 18, 2018, Sheida's amended cross-complaint pleaded that she was "the sole inventor of the founding Abreezio technology." *See* Exhibit A (Sheida's cross-claim).  In seeking to get her final $15 million+, Sheida made no mention of Dr. Arabi's trial defense that the provisional patents' technology she claimed to have invented was a supposedly worthless dead end.  Instead, she pleaded that by acquiring Abreezio, Qualcomm also obtained "several other patent applications and issued patents stemming from [Sheida's claimed] Provisional [patent] Applications." *Id* at 2, ¶ 2.

### C. The Civil Suit.

Dr. Arabi also continued to deceive (or at least attempt to deceive) Qualcomm through its internal investigation and civil suit. For example, when he was interviewed by Qualcomm's internal staff about the Abreezio transaction, Dr. Arabi "was very definitive in saying he did not have any involvement" with Abreezio. TT 1897:8-14; *cf.* PSR ¶ 82 (Dr. Arabi's statement to Probation that "I did not fully and properly disclose the full extent of my involvement with Abreezio to Qualcomm"). He also claimed he had "connected" Taneja and Sheida because of the technologies they were purportedly working on. TT 1898:1–10; *cf.* TT 2128:18–19 (Taneja testified that he never met Sheida). Then, Dr. Arabi contacted Taneja and directed him to delete incriminating evidence while literally standing over his shoulder, to prevent the information from reaching Qualcomm. TT 2134:19 *et seq.*

Even when Qualcomm filed a civil fraud suit against him, his sister, and Taneja, Dr. Arabi didn't come clean. Instead, he doubled down on his fraud and continued the lies, repeating the claim he had made to Katie Wilson in an unverified interrogatory response. He lied about a massive supposed "loan" he received from Sheida. When pressed to identify the support for his claim that his sister had invented the technology in the December 2014 provisional patents, Dr. Arabi relied (in part) on the fraudulent research notebook that was revealed at trial to be a wholesale fabrication.[4] And as noted above, Dr. Arabi's accomplice Sheida actually counterclaimed against Qualcomm,

---

[4] Indeed, Dr. Arabi's creative approach to the truth persisted through his trial. For example, he repeatedly tried to suggest that Sheida's invention of the December 2014 provisional patent technology was plausible because of her relationship with SFU Professor Bozena Kaminska. *E.g.*, TT 2215:14–15; 2224:24–2225:2; 2226:8–12, 18–20; 2340:13–14. Yet, as the jury heard, Sheida hadn't even met Professor Kaminska when she supposedly conceived the technology for one of the inventions, according to the dates in her fraudulent notebook. *E.g.*, TT 2440:15 *et seq.*; Tr. Ex. 895; TT 1165:17–1166:15; *see also* TT 768:6–12; 769:14–15.

suing the victim of his fraud to try to force the disgorgement of millions more dollars that she claimed the company still owed under its agreement to purchase Abreezio.

### III.
### ARGUMENT

**A.   The Advisory Guidelines Calculations.**

The Court should adopt the advisory Guidelines calculation set out in the presentence report, which accurately reflects the facts of this case.

**B.   The Correct Loss Amount Is $180 Million.**

The United States has extensively addressed the correct loss amount in its response to Dr. Arabi's objections to the PSR, filed concurrently herewith. The correct loss amount is the intended loss of $180 million. But, consistent with the trial evidence, the Court should alternatively find that:

(1) the actual loss is $154 million;

(2) if there *was* value in Abreezio that was unconnected to Dr. Arabi's fraud, in the sense that Qualcomm could not stake a claim of ownership to it, he has not met his burden to show what it was;

(3) (a) any such value, if it exists, would not be more than the parties' valuation of Invionics' work for Abreezio, which was at most approximately $280,000; and

(b) any such value, if it exists, cannot otherwise be reasonably estimated, and therefore, the alternative measure of loss in this case should be Dr. Arabi's gain from the fraud scheme, which is $91.8 million.

**C.   Sophisticated Means.**

As he apparently concedes, Dr. Arabi's offense conduct is subject to an enhancement for sophisticated means. ECF 464 at 29. Dr. Arabi used Sheida and Quinton to perpetrate important parts of the fraud from outside of the United States, supporting the application of a sophisticated means enhancement. USSG § 2B1.1(b)(10)(B). This certainly had the effect of making the offense harder to

investigate and prosecute, for example by requiring extremely time-consuming MLAT requests for Canadian evidence. Dr. Arabi also used Sheida and his brother to perpetrate key parts of the money laundering conspiracy from outside of the United States, which had the same effect. Dr. Arabi took steps himself during the fraud that amounted to "especially complex or [] intricate offense conduct." USSG § 2B1.1 cmt. n. 9(B). For example, he created at least two phony email accounts to impersonate Sheida; he created multiple false and fraudulent documents, such as Sheida's fake resume; he made deceptive statements through his law firm in the civil suit; and he likely assisted his sister in the preparation of an 85-page falsified research notebook that was produced in civil litigation. This intricate offense conduct independently supports an enhancement. Consequently, the Court should apply a two-level enhancement for sophisticated means.

### C. Money Laundering.

#### 1. *Violation of Section 1956.*

Because Dr. Arabi was convicted of a money laundering conspiracy in violation of 18 U.S.C. § 1956(h), he is subject to an automatic two-level enhancement. *See* USSG § 2S1.1(b)(2)(B).

#### 2. *Sophisticated Laundering.*

As explained in response to his PSR objections, Dr. Arabi should also receive a two-level enhancement for sophisticated laundering under USSG § 2S1.1(b)(3). By utilizing Sheida to launder the proceeds, Dr. Arabi used multiple "offshore" Canadian accounts. *See* USSG 2S1.1 cmt. n. 5(A). Then, the laundering scheme proceeded to park millions of dollars in Norwegian real estate, roping in a third jurisdiction along with a third Arabi sibling. Moreover, Sheida and Dr. Arabi both created shell companies (such as Avante North Ventures and Abacus Machines LLC)[5] that appeared

---

[5] Allam told agents that Dr. Arabi told him that he always gave his companies a name beginning with "A" because he had read that such companies would fetch higher prices when sold. ECF 446-1 at ¶ 13.

to exist solely for the purpose of moving fraud proceeds from Sheida's control to Dr. Arabi's control for purposes of investing them in Dr. Arabi's company, Atlazo. These also had the effect of layering the transaction, Tr. Ex. 495, which also likely smoothed the path of the international $4 million wire transfer from Sheida's company (Avante) to Karim's company (Abacus), avoiding red flags with bank compliance. Tr. Ex. 442.

### D.  Aggravated Role.

As explained in response to his PSR objections, Dr. Arabi recruited every other criminally culpable member of the Abreezio scheme and the subsequent money laundering conspiracy. At a minimum, this includes Sheida, Taneja, Shokouhi, Quinton, and Mansour. *See* USSG § 3B1.1(a) (offense involved five or more participants).[6] Indeed, Dr. Arabi's participation in the crime checks almost every one of the boxes for a leadership role listed in the commentary. *See id.* n.4. He had decision making authority; the nature of his participation was particularly culpable; he recruited at least five accomplices; he claimed the largest share of the proceeds via his sister, Sheida; he had the deepest degree of participation in the planning, nature and scope of the illegal activity; and as the Court heard again and again at trial, he had a high degree of control over the others.

Independently of the five-participant rule, Dr. Arabi is also susceptible to an aggravated role enhancement because the criminal activity that he led was "otherwise extensive" within the meaning of the Guidelines. *See* USSG § 3B1.1 cmt. n. 3 (in applying this test, the Court should consider "all persons involved during the course of the entire offense"; an example of a qualifying organization is one that "used the unknowing services of many outsiders").

Consequently, Dr. Arabi should be subject to a four-level aggravated role enhancement.

---

[6] The Court could also include Nasser Hendi, vis-à-vis the money laundering conspiracy. *See* ECF 331 23:13–21.

E. **Acceptance of Responsibility.**

Having contested his factual guilt at a month-long trial, and persisting to do so even after trial, Dr. Arabi is not entitled to a reduction for acceptance of responsibility. *See* USSG § 3E1.1 cmt. n. 2. Indeed, in his statement to Probation, Dr. Arabi expressed remorse for his failure to be "transparent," but maintained his denial that he "did not partake in the technical side" of Abreezio—even though he admitted being involved in setting up the company. PSR ¶¶ 82–83. He did not address, for example, his motivation in creating phony email accounts to impersonate his sister, including while helping to launder the $91.8 million that she was paid as part of the scheme, or express any remorse for that conduct. In his forfeiture opposition, Dr. Arabi also seeks to blame the United States for the collateral consequences of his prosecution to his post-Abreezio venture, Atlazo. *See* ECF 465 at 9 ("The government's indictment of Dr. Arabi leveled Atlazo, ruined Dr. Arabi's career, and negatively impacted Atlazo's dedicated employees.").

This is inconsistent with acceptance of responsibility. No reduction is warranted.

F. **Zero-Point Offender.**

Because he is susceptible to an aggravated role enhancement, Dr. Arabi is not eligible for a zero-point offender reduction, despite his lack of criminal history points. *See* USSG § 4C1.1(a)(10).

G. **Final Offense Level.**

These Guidelines calculations yield a final offense level 43, producing an advisory Guidelines range of life in prison. Probation calculates the practical term of this range in months of custody using the consecutive stacked statutory maximums for the three offenses of conviction: twenty years apiece for each of three counts, or sixty years total, equaling 720 months. PSR ¶ 159, citing USSG § 5G1.2(b).

**H.      Section 3553(a) Factors.**

Despite this advisory Guidelines range, which is appropriately serious based on the aggravated nature of this crime, the Court should vary downward to sentence Dr. Arabi to 151 months in custody.

   **1.      *Aggravating Factors.***

Such a sentence would account for the nature and seriousness of the offense—which was an aggravated corporate fraud with many layers of deception, coupled with a dedicated, years-long international money laundering conspiracy. It would also account for Dr. Arabi's lack of remorse, and—to the contrary—his attempts to destroy evidence when he learned that Qualcomm was investigating him. Finally, it would account for the collateral damage wrought by defendant's scheme, including the effect of his crimes on the accomplices he recruited and his own family.

At the outset, the Court should recognize that Dr. Arabi had no need to commit this crime. When the fraud scheme was conceived and executed, he was already being paid the better part of a million dollars a year as a top Qualcomm executive and was in no financial distress. He was at the pinnacle of an immensely successful career, and was widely recognized as an expert in his field, even among other talented engineers. Thus, while many criminal defendants are driven to crime by desperate circumstances, Dr. Arabi was not. He did not discuss his motivation to commit the offenses with Probation, *see* PSR ¶ 80, but presumably it was some combination of hubris and greed.

Moreover, the consequences of the Abreezio fraud swept far more broadly than just the criminal charges in this case. The criminal, reputational, and career consequences for the indicted co-defendants and even the unindicted co-conspirators can, to a certain degree, be laid at Dr. Arabi's door as well. He conceived and engineered the scheme and recruited the others to participate in it. While they made a free choice to knowingly join a fraud, it was at Dr. Arabi's invitation.

This is also true for the actors in Dr. Arabi's orbit who are not themselves criminally culpable, but were merely swept up in the wake of the Abreezio fraud. For

example, in his sentencing papers, Dr. Arabi attempts the difficult straddle of claiming complete remorse—and seeking full credit for acceptance of responsibility—while also faulting the government alone for destroying his company, Atlazo. *Compare* ECF 464 at 27 ("Dr. Arabi fully accepts responsibility for his actions in this case, and has repeatedly stated as much.") *with* ECF 465 at 9 ("The government's indictment of Dr. Arabi leveled Atlazo, ruined Dr. Arabi's career, and negatively impacted Atlazo's dedicated employees."). But of course, the effect of the government's prosecution on Atlazo is entirely downstream of Dr. Arabi's own massive fraud. His company wouldn't have been "leveled" by his own indictment had he not first concocted a $180 million fraud scheme and then capitalized Atlazo with its fraud proceeds. In a very real way, the damage to Atlazo (and the damage to other "legitimate" companies like Shokouhi's businesses) are attributable to Dr. Arabi's own crimes, rather than the government's decision to hold him accountable for them. A substantial sentence would reflect that.

A significant sentence in this case is also necessary to deter other corporate executives who might otherwise be tempted to engage in similar crime. When he committed this fraud, Dr. Arabi received, through Sheida, $91.8 million—or about 1,100 years of the U.S. median annual income. That kind of windfall represents a huge temptation. Yet fraud by corporate insiders is hard to detect, comparatively easy to conceal, difficult to investigate, and costly to prosecute. When such crime *is* discovered and prosecuted, imposing a significant sentence is important so that future potential white-collar criminals will not assume they can escape with the proverbial slap on the wrist. Indeed, in drafting Section 3553, Congress specifically found that deterrence "is particularly important in the area of white collar crime." S. Rep. No. 98-255, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned with the fact that "[m]ajor white collar criminals often are sentenced to ... little or no imprisonment," which the offenders disregard as "a cost of doing business." *Id.* Indeed, the profile of white-collar criminals also demonstrates the increased value of general

deterrence. "Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations omitted). A substantial sentence would serve this statutory goal in this case.

### 2. *Mitigating Factors.*

On the other hand, varying downward from the properly calculated but extremely severe Guidelines range is appropriate for several reasons. It would avoid an unwarranted sentencing disparity with the sentences for Shokouhi and Taneja, who are expected to face far lower sentences as a result of their plea agreements, acceptance of responsibility, and extensive cooperation. More specifically, each cooperator's plea agreement provides for a sentencing range beginning at approximately a low-end 33-month sentence. Each is expected to receive a recommendation for a very significant downward departure under Section 5K1.1. A within-Guidelines sentence in Dr. Arabi's case would be an unwarranted sentencing disparity with his codefendants' anticipated sentences. At the same time, his sentence should rightfully be significantly higher than theirs, since he is by far the most culpable participant in this crime and has never accepted responsibility, let alone cooperated in the investigation and prosecution of this offense.

A downward variance in Dr. Arabi's case would also take account of the fact that, although he continued his deception and sought to further bury the truth about his fraud, Dr. Arabi *did* enter a civil settlement with Qualcomm and agree (with his co-conspirator Sheida) to repay over $47 million of fraud proceeds. And it would reflect, in some measure, the fact that Abreezio's products were not entirely hollow but did afford significant value to Qualcomm—albeit value to which the company itself already had legal rights.

Finally, a downward departure would reflect the difficult situation of Dr. Arabi's family, especially his wife. *See* ECF 464 at 29. At the same time, the United States

recognizes that the collateral harm to Dr. Arabi's wife, like the consequences indirectly suffered by Atlazo, seem to trace back to the foreseeable fallout of the Abreezio fraud itself. *See* TT 2945:16–20 (Dr. Arabi's son attributes his mom's attempted suicide to the civil fraud case); *cf. United States v. Schmuel*, 19-cr-03006-BAS-1, 2022 WL 623914, at *3 (S.D. Cal. Mar. 2, 2022) ("Unfortunately, family members often are the most hurt when a parent or spouse commits a crime.").

In Guidelines terms, a 151-month sentence is still lower than the exposure that Dr. Arabi would face if the loss amount were limited to his personal gain—measured as the $92 million that Sheida received from the Abreezio deal—and shorn of the sophisticated means and sophisticated laundering enhancements:

| | | |
|---|---|---|
| 7 | Base offense level | |
| 24 | Loss > $65 million (estimated at $91.8 million) | |
| 2 | Violation of 1956 | |
| 4 | <u>Aggravated role</u> | |
| 37 | Final offense level—Guidelines range 210 to 262 months | |

The loss figure is roughly the same metric used in Taneja and Shokouhi's plea agreements, where they accepted responsibility for loss amounts pegged to their personal receipts. ECF 144, 179. A sentence of 151 months is also commensurate with the sentences imposed nationally on other fraud defendants with a similar offense level.[7] Finally, a lower sentence would mitigate the harsh impact of a Guidelines sentence on

---

[7] Defendants scoring lower than Dr. Arabi received sentences only slightly below the one recommended here. According to data from the U.S. Sentencing Commission, during the last five fiscal years (FY2020-2024), there were 51 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 34 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 50 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 125 month(s) and the median length of imprisonment imposed was 120 month(s). For all 51 defendants in the cell, the average sentence imposed was 123 month(s) and the median sentence imposed was 120 month(s).

Dr. Arabi, who is 59 years old and would be roughly 78 at the conclusion of even a 240-month sentence.

### I. Supervised Release.

A term of supervised release is appropriate in Dr. Arabi's case to deter him from illegally reentering the country, should he be deported following his conviction. It is extremely likely that Dr. Arabi will be ordered removed, deported, or excluded from the United States based upon his conviction in this case. Although ordinarily inappropriate for such a defendant, supervised release here is justified by the very significant factors that would motivate Dr. Arabi to return without permission.

### J. Financial Penalties.

Restitution is mandatory for this fraud and money laundering offense. 18 U.S.C. § 3663A(a), (c)(1)(A)(ii), (c)(1) (B). The proper amount of restitution is $100,894,711.12, which is calculated as

| | | |
|---|---|---|
| | $154,168,889.31 | amount actually paid by Qualcomm for Abreezio |
| | - $47,274,178.19 | amount repaid by Dr. Arabi and Sheida in civil suit |
| | - $6,000,000.00 | amount repaid by others in civil suit |
| = | $100,894,711.12 | total |

ECF 462 at 3. The United States would have no objection to a provision in Dr. Arabi's restitution order giving him credit for restitution voluntarily paid by his codefendants. The United States will tender a proposed order separately to chambers. Dr. Arabi's argument about a potential credit against restitution is addressed separately in the response to his PSR objections.

The United States has separately moved for a preliminary order of forfeiture against Dr. Arabi, including forfeiture of numerous specific pieces of property. ECF 446. The Court has entered a preliminary order of forfeiture and a first amended POF, ECF 448, 458, which the United States will ask the Court to confirm at Dr. Arabi's sentencing and make part of the judgment in his case.

The United States agrees with Probation that Dr. Arabi has not met his burden to prove he is unable to pay a fine. PSR ¶ 157. However, in light of the massive forfeiture and restitution judgments likely to be imposed against him, the United States does not recommend imposition of a fine. If the Court chooses to impose one, the United States would urge it to consider a nominal fine instead of the amount recommended by Probation.

## IV.
## **CONCLUSION**

Dr. Arabi should be sentenced to 151 months in prison, followed by three years of supervised release. He should also be ordered to pay $100,894,711.12 in restitution to Qualcomm and be subject to the preliminary forfeiture orders requested separately by the United States and previously entered by the Court. *See* ECF 448, 458.

DATED: October 21, 2025

ADAM GORDON
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys