ADAM GORDON
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
JANAKI G. CHOPRA
California Bar No. 272246
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI (1),<br><br>Defendant. | Case No.: 22-cr-1152-BAS<br>Date: October 28, 2025<br>Time: 1:00 p.m.<br><br>Honorable Cynthia Bashant<br><br>**THE UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY ORDER OF FORFEITURE** |

I.

**INTRODUCTION**

While Dr. Arabi opposes several portions of the United States' motion for a preliminary order of forfeiture, he does not appear to contest forfeiture of (1) the contents of the Atlazo Bank of America business account (ending in '6028); (2) the contents of his personal Bank of America account (ending in '7398); or (3) his interest in the noticed Canadian and Norwegian real property.[1]  His objections to the remaining items of forfeiture are addressed below.

---

[1] On October 15, 2025, the United States received an emailed letter from counsel for Mamad Adar concerning the forfeiture of the listed Norwegian real property.  The United States does not believe that the credit sought by Mr. Adar in the letter is relevant

## II.

## *HONEYCUTT*

Dr. Arabi argues that he cannot be ordered to pay a forfeiture money judgment (FMJ) for proceeds of the fraud that he masterminded if those proceeds were paid to a co-conspirator. But Sheida Alan—who received the $91.8 million supporting the FMJ at Dr. Arabi's direction—is not just a co-conspirator. She is Dr. Arabi's proxy. And because she operated as the straw recipient of the funds as part of the fraud that he masterminded, money she received may properly be included in a FMJ entered against him, consistent with *Honeycutt* and *Thompson*.

At the outset, Dr. Arabi does not appear to contest the entry of a FMJ for the Abreezio proceeds received by him personally, by his company Atlazo, or by his shell company, Abacus Machines. That amount is approximately $7,399,980.[2] But Dr. Arabi *does* contest the entry of a FMJ in any amount greater than that, for proceeds that "came to rest" with Sheida as part of his scheme.

In *Honeycutt v. United States*, the Supreme Court reversed an order requiring a defendant to forfeit proceeds that he did not personally receive. 581 U.S. 443 (2017). More specifically, it held that a co-conspirator cannot be required to forfeit property based on principles of joint and several liability among co-conspirators if the defendant never "obtained tainted property as a result of the crime." *Id.* at 454.

---

to the forfeiture of Dr. Arabi's interest in the property, which as noted, appears to be undisputed. The government proposes to address Mr. Adar's letter, if appropriate, during the third-party claims phase of the forfeiture of the Norwegian real property.

[2]   This is calculated as $4,000,000.00 (Avante to Abacus) + $500,000.00 (Sheida to Karim to Atlazo) + $2,899.980.00 (Teranova to Atlazo) = $7,399.980.00 (total Abreezio proceeds received by Dr. Arabi and/or his companies). Note that this is slightly higher than the total amount of Abreezio proceeds paid to Atlazo in ECF 446-1 at ¶ 12, because some of the money paid to Abacus was spent on another of Dr. Arabi's companies: AviorPower.

The Ninth Circuit has subsequently extended that holding to the forfeiture statute at issue here for Dr. Arabi's fraud convictions. *United States v. Thompson*, 990 F.3d 680, 689 (9th Cir. 2021). *Thompson* dealt with co-conspirators who had divided the criminal proceeds from their conspiracy. 990 F.3d at 692. *Thompson* said that *Honeycutt* limited the proper forfeiture to the amount that "came to rest with each [co-conspirator] after the loot was divided." *Id.*

In explaining its rationale, the *Honeycutt* decision used a helpful hypothetical:

> Suppose a farmer masterminds a scheme to grow, harvest, and distribute marijuana on local college campuses. The mastermind recruits a college student to deliver packages and pays the student $300 each month from the distribution proceeds for his services. In one year, the mastermind earns $3 million.

*Honeycutt*, 581 U.S. at 448. Thus, under its decision, the student could only be liable for forfeiture of $3,600 ($300 x 12 months). But the Court went on to explain that the crucial test, in measuring the *mastermind's* forfeiture, is whether he "obtained" the proceeds—which he could do directly or indirectly, under the statute.

> For instance, the marijuana mastermind might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately "obtains" the property—whether "directly or indirectly."

*Id.* at 450. Indeed, Dr. Arabi concedes "the determinative [*Honeycutt*] factor is whether the defendant actually obtained the property, not how he obtained it." ECF 465 at 3.

Here, the difficulty with Dr. Arabi's *Honeycutt* argument is that Sheida is not simply a co-conspirator, but rather the straw recipient for funds payable to Dr. Arabi as part of the scheme that he masterminded. The evidence at trial was that Dr. Arabi created, guided and nurtured Abreezio, while Sheida's contributions were virtually nil. In fact, the crux of Dr. Arabi's own trial defense was to describe the only thing that Sheida supposedly *did* contribute to the company—the two December 2014 provisional patent applications—as entirely worthless. But she was nevertheless paid $91.8 million as part of Dr. Arabi's scheme.

After that huge windfall, Sheida spent virtually none of the money on herself. Instead, she bought real estate through shell companies, in consultation with her brother, who spoke to her realtors and bankers and sometimes impersonated her. And when Dr. Arabi needed money, Sheida provided it. Sheida funded his new venture, Atlazo, with over $6 million, partly through other intermediary shells. Sheida paid off his condominium when it was at risk of foreclosure. Sheida sent over $12 million to another Arabi brother, Mamad Adar, to buy *more* luxury real estate, including in deals whose documents were found on Dr. Arabi's computer. And of course—in consultation with her brother—Sheida liquidated tens of millions of dollars of real estate to pay off her and Dr. Arabi's joint liability to Qualcomm when they settled its civil fraud suit.

In short, Sheida was Dr. Arabi's proxy, not an independent co-conspirator. In truth, Dr. Arabi "obtained" Abreezio proceeds that were paid to Sheida as part of his plan, because she was his straw and they were available to him upon demand, much like a bank deposit. Unlike *Thompson*, Sheida and Dr. Arabi hadn't divided the proceeds between them; Sheida was simply holding proceeds for her brother. Thus, the proceeds that he claims "came to rest" with her were not truly hers. They were his, and the Court should find as much for purposes of imposing a correct FMJ against Dr. Arabi in the amount of $44,580,192.74.[3]

Separately, Dr. Arabi argues in passing that no forfeiture order should enter as against him concerning the properties in Canada or Norway, contending that this is somehow an "end run" the due process to which Sheida and Mamad Adar are entitled. ECF 465 at 6. This is misleading. The United States requests a *preliminary* order of forfeiture as against *Dr. Arabi*. Upon entry and confirmation of that order, following

---

[3]   Dr. Arabi argues that imposing a FMJ against him for funds paid to his sister would amount to joint and several liability. But a true, full, joint-and-several FMJ would also include funds received by Taneja, and Shokouhi, and potentially others. The United States does not request such an order. It merely requests a FMJ for funds paid to Sheida, by Dr. Arabi's design, as his proxy.

Dr. Arabi's sentencing, the United States will notify other potential claimants concerning the properties, including Sheida and Mr. Adar, and they will be free to submit themselves to the Court's jurisdiction and pursue whatever remedies they wish. The entry of a forfeiture order extinguishing Dr. Arabi's possible rights to the properties—which he does not assert in his Response—will not directly affect their interests at all.[4]

### III.
### ATLAZO: DR. ARABI'S COMPANY

Dr. Arabi next argues that because Atlazo was a "legitimate company," he cannot be ordered to forfeit $922,017.50 of fraud proceeds that he laundered through it, which were seized by the government, out of a total of over $6 million of dirty money that passed through the company's coffers. But this is incorrect. The Abreezio proceeds that Dr. Arabi laundered through Atlazo constitute property "involved in" money laundering, and are forfeitable as such. Indeed, Dr. Arabi's admission that the United States has established "that [Arabi's sister] invested certain funds she received from the Abreezio acquisition into Atlazo," is fatal to his claim. ECF 465 at 10.

Dr. Arabi's primary argument is that funds that passed through Atlazo cannot be the direct or indirect proceeds of crime because Atlazo was a real company that did actual business. This is irrelevant as a matter of forfeiture law, particularly where the offense of conviction is concealment money laundering. *See* ECF 416 at 2 (jury's special finding that Dr. Arabi conspired to commit concealment money laundering). In

---

[4] "A defendant may not object to forfeiture on the grounds that the property is owned by someone else." *United States v. Manlapaz*, 825 F. App'x 109, 117 (4th Cir. 2020) (citing Fed. R. Crim. P. 32.2). The Court must enter its preliminary forfeiture order "without regard to any third party's interest in the property." *United States v. 101 Houseco, LLC*, 22 F.4th 843, 847 (9th Cir. 2022) (quoting Fed. R. Crim. P. 32.2(b)(2)(A)). "Determining whether a third party has such an interest must be deferred until any third party files a claim in the ancillary proceeding under Rule 32.2(c)." Fed. R. Crim. P. 32.2(b)(2)(A).

fact, money laundering often (and most effectively) uses legitimate businesses to mask the flow of criminal proceeds, which is why the forfeiture statute for money laundering authorizes forfeiture of property simply "involved in" the offense. *See United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019) ("[T]he money laundering forfeiture statute applies not only to funds that are actually laundered . . . but also to those more broadly 'involved in' money laundering. 18 U.S.C. § 982(a)(1). The statute sweeps broadly because money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme.") (quotation omitted); *see also United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) ("in a money laundering charge, the commingling of tainted money with clean money taints the entire account").

The definition of property "involved in" money laundering includes "any property used to facilitate the laundering offense." *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005). This definition of "involved in," is consistent with its congressional intent: "the term 'property involved' is intended to include the money or other property being laundered (the corpus) . . . and any property used to facilitate the laundering offense." *In re 650 Fifth Ave. and Related Properties*, 777 F.Supp.2d 529, 562 (S.D.N.Y. 2011) (quoting 134 Cong. Record S17365 (daily ed. Nov. 10, 1988)). Here, it is arguable that the property subject to forfeiture is truly "facilitating property" because it is less than the total amount of fraud proceeds that capitalized Atlazo. But even if it were, the government would have authority to seize it as such.[5]

---

[5] "The ability to forfeit a business entity which is used to facilitate the offense of money laundering is well established." *United States v. Swank Corp.*, 797 F. Supp. 497, 502 (E.D. Va. 1992). Facilitation applies to business entities because it allows a defendant the use of a seemingly legitimate business to "clean" criminal proceeds. *See, e.g., United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (forfeiture of store-business account because the defendant used the account to receive illicit deposits, which also disguised the source of tainted funds, and forfeiture of store inventories because the inventory made it easier for the defendant to launder money); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 272–273 (E.D.N.Y. 2005) (factory was forfeitable under § 982(a)(1) not because it facilitated the fraud but because it facilitated the laundering of fraud proceeds through the business's operating accounts; the proceeds

Dr. Arabi's cited case does not avail him. In *United States v. Rutgard*, the defendant operated a thriving medical practice. 116 F.3d 1270, 1276 (9th Cir. 1997). On appeal, the Ninth Circuit found the United States failed to prove that the entire practice was fraudulent, although it did prove that certain procedures were medically unnecessary and therefore constituted insurance fraud. *Id*. at 1288. Among other things, defendant was charged with violating Section 1957, which prohibits engaging in a monetary transaction in property derived from specified unlawful activity (SUA). *Id*. at 1278, 1291. In *Rutgard*, the Ninth Circuit ruled for the first time that such an offense requires "strict tracing"—meaning, the United States must prove beyond a reasonable doubt that the charged transaction involved over $10,000 of criminally derived proceeds. *Id*. at 1292. Because the United States had only proved that the charged transactions involved proceeds from the business, and had failed to prove that the entire business was fraudulent, it therefore failed to prove that the charged transactions involved over $10,000 of SUA proceeds. *Id*.[6] This meant that the government could not show that the wire transfers it sought to forfeit were proceeds of a crime. *Id*. at 1293.

The standard for a case involving concealment money laundering, in violation of Section 1956, is markedly different. For one thing, the statutory language is different. As *Rutgard* recognized, Section 1956 criminalizes a "transaction which in fact involves the proceeds" of an SUA, and which is designed "in whole or in part to conceal or

---

from the sale of the factory property are traceable to that property and are therefore forfeitable).

[6]   Dr. Arabi also cites *United States v. Yagman*, 502 F. Supp. 2d 1084 (C.D. Cal. 2007), which simply concerned the evidence required for substantive 1957 convictions, not forfeiture law. ECF 465 at 7. Thus, the "tracing requirement" that *Yagman* discusses concerns substantive 1957 convictions, and not forfeitures. Importantly, neither *Yagman* nor *Rutgard* concerned a 1956 concealment money laundering case, which does not require strict tracing, but merely the identification of property "involved in" money laundering.

disguise the nature, the location, the source, the ownership, or the control of the proceeds." *Id*. at 1291, citing 18 U.S.C. § 1956.

This matters for forfeiture. It means that Dr. Arabi's transactions in Abreezio proceeds at Atlazo are property "involved in" money laundering, and forfeitable as such—whether or not Atlazo was a legitimate business and some of the funds could be traceable to its "legitimate" business activities. In fact, the money laundering statutes are specifically designed to ensure this outcome, because otherwise launderers could prevail simply by commingling their dirty money with clean funds—the core technique of launderers everywhere. *See United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) ("in a money laundering charge, the commingling of tainted money with clean money taints the entire account"); *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) ("Once proceeds become tainted, they cannot become untainted.").

Here, when Dr. Arabi commingled Abreezio proceeds in Atlazo's accounts, the proceeds from Atlazo—paid as the balance of promissory notes or shares of Dr. Arabi's equity in the company[7]—became property involved in money laundering. And they are forfeitable as such.[8]

---

[7] In his opposition, Dr. Arabi asserts that the shares he received from Atlazo were compensation for his work at the firm, instead of the result of his investments in it. ECF 465 at 9 ("Dr. Arabi, like other employees, received common stock in Atlazo as compensation for his work for the company."). But he cited no evidence. The United States asked defense counsel for any evidence of this contention and has received none as of this filing.

[8] Entirely apart from this justification for forfeiture, Dr. Arabi's Abreezio proceeds that were funneled through Atlazo are forfeitable as indirect proceeds of his wire fraud scheme. *See United States v. Omidi*, 125 F.4th 1283, 1289 (9th Cir. 2025) ("there is no so-called '100% Fraud Rule.'"). And while Omidi's business was fraudulent in its rotten "funnel," thus tainting all of the business's receipts, Dr. Arabi's Atlazo receipts are all tainted by the fact that his fraudulent inputs to the business—its seed money, and his repeated, substantial investments—are all, themselves, fraud proceeds.

Dr. Arabi's forfeiture defense isn't that he didn't capitalize the business with fraud proceeds; he clearly did. He offers only the classic launderer's defense: that commingled with the dirty money is some (unknowable) amount of clean money from his honest labors at Atlazo. But this only leads back to the justification for forfeiture under the laundering statute. Either way, Dr. Arabi's Atlazo receipts—which are only about 12% of the total dirty money he "invested in the company"—must be forfeited.

## IV.

## DR. ARABI'S CONDOMINIUM

Dr. Arabi argues that, even though his sister staved off the foreclosure of his Vancouver condominium with undisputed fraud proceeds, because he later paid her back with clean money, the proceeds from the sale of the condominium cannot be forfeited. But "Once proceeds become tainted, they cannot become untainted." *Ward*, 197 F.3d at 1083.

When Sheida paid Dr. Arabi's mortgage, at his direction, with $245,000 of fraud proceeds, his increased equity in the condominium constituted or was derived from criminal proceeds, according to 18 U.S.C. § 981(a)(1)(C). *See, e.g., United States v. 3814 NW Thurman St.*, 164 F.3d 1191, 1196 (9th Cir. 1999) (increased equity value of real property traceable to tainted funds subject to forfeiture), *amended on other grounds on denial of reh'g* at 172 F.3d 689; *see also United States v. Miller*, 911 F.3d 229, 235 (4th Cir. 2018) ("Payments on the mortgage directly increased [defendant's] equity in the Virginia property whether they went towards interest or principal on the note"). When Dr. Arabi sold the condominium, the equity was liquidated and transferred to his SDCCU account, which the government seized. *See generally* ECF 446-1 at ¶¶ 38–40.

Dr. Arabi argues that his purported repayment to Sheida of her "loan" somehow cleansed the equity in his condo. He cites no legal authority for that claim, which is contrary to forfeiture law. *See, e.g., United States v. Ayala*, No. 3:16-CR-00495-HZ, 2019 WL 2518122, at *9 (D. Or. June 18, 2019) (where the evidence showed that payments made on the property were traceable to criminal proceeds, the revenue from

the sale of the property is derived from criminal proceeds forfeitable under § 981(a)(1)(C)). Moreover, he also ignores that the loan "repayment" was itself arguably concealment conduct, rather than a true repayment, since it was done during the pendency of Qualcomm's civil fraud suit, when both Arabi siblings had to answer intrusive interrogatories about their financial entanglements and Dr. Arabi denied receiving "loans" from Sheida besides the earlier $4 million transfer from Avante. *See* ECF 446 at 6. Either way, at least $245,000 of Dr. Arabi's equity in his condominium was indirect proceeds of the wire fraud, and the $118,707.89 seized from his SDCCU account was derived from his equity. It is forfeitable as such.

## V.

## **CONCLUSION**

The Court should affirm the preliminary orders of forfeiture it entered on September 15, 2025, and October 10, 2025. *See* ECF 448, 458.

DATED: October 21, 2025

ADAM GORDON
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
JANAKI G. CHOPRA
ERIC R. OLAH
Assistant U.S. Attorneys