Whitney Z. Bernstein, SBN 304917
wbernstein@bklwlaw.com
Rebecca S. Roberts, SBN 225757
rroberts@bklwlaw.com
Ryan V. Fraser, SBN 272196
rfraser@bklwlaw.com
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile (949) 369-3701

*Attorneys for Dr. Karim Arabi*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-cr-01152-BAS-1 |
| Plaintiff, | Honorable Cynthia A. Bashant |
| v. | **SENTENCING MEMORANDUM OF KARIM ARABI** |
| KARIM ARABI, | |
| Defendant. | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................... 1

II.   DR. KARIM ARABI .................................................................................. 2

    A.    Karim overcame a poverty-stricken, dangerous childhood to accomplish educational and professional success. .......................... 2

    B.    Timeframe of the offense. ............................................................ 5

    D.    Plans for the future. ...................................................................... 8

III.  THE GUIDELINES SUPPORT A TIME-SERVED (215 DAYS) SENTENCE. ................................................................................................ 9

    A.    There should be no increase under U.S.S.G. § 2B1.1(b)(1)(A). .................... 9

    B.    There should be a four-level departure under § 5H1.6. .............. 10

    C.    The Guidelines requested by government substantially overstate the seriousness of the offense. ...................................................... 10

IV.   THE § 3553(A) FACTORS ALSO SUPPORTS A TIME-SERVED (215 DAYS) SENTENCE. .................................................................... 12

    A.    The nature and circumstances of this 2015 offense and the overwhelmingly positive history and characteristics of Karim support a time-served (215 days) sentence. ................................. 12

    B.    Especially in light of the extreme collateral consequences in this matter, a time-served (215 days) sentence sufficiently reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. ............................................................ 15

    C.    Further incarceration is not needed to protect the public from Dr. Arabi or afford adequate deterrence to criminal conduct. ............ 15

    D.    A time-served (215 days) sentence best provides Dr. Arabi with needed medical care in the most effective manner. ..................... 17

    E.    The need to avoid unwarranted sentence disparities supports a time-served (215 days) sentence. ............................................... 18

    F.    Any need to provide restitution is best achieved with a time-served (215 days) sentence. ...................................................... 20

V.    CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Gall v. United States*,
    552 U.S. 38 (2007) ........................................................................................ 12

*Koon v. United States*,
    518 U.S. 81 (1996) ........................................................................................ 12

*Qualcomm Inc. v. Broadcom Corp.*,
    548 F.3d 1004 (2008) .................................................................................... 13

*United States v. Adelson*,
    441 F.Supp.2d 506 (S.D.N.Y. 2006) ...................................................... 16, 17

*United States v. Edwards*,
    595 F.3d 1004 (9th Cir. 2010) ...................................................................... 17

*United States v. Lee*,
    725 F.3d 1159 (9th Cir. 2013) ...................................................................... 11

## Rules

U.S.S.G. Ch. 1, Pt. A § 4(d) (2024) .................................................................. 16

U.S.S.G. § 2B1.1 .................................................................................................. 9

## Regulations

37 CFR 1.56 ........................................................................................................ 13

37 C.F.R. § 1.56(a) ............................................................................................. 13

## Other Authorities

R. Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67 (2005) ........................ 16

MPEP 2001.04 .................................................................................................... 13

E. Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485 (1998) .............. 16

## I.    INTRODUCTION[1]

Dr. Karim Arabi, a 59-year-old first-time offender and formerly highly successful engineer, is before the Court for sentencing for essentially stealing his own idea and selling it to his employer through a straw man ten years ago. Today, Karim is a shell of his former self; for the past eight years, he and his family have been marred in civil and then criminal litigation over this acquisition, his reputation is ruined, and his incarceration and forthcoming deportation have all but destroyed them. Dozens of people from all walks of life, including the jurors who convicted him, have made heartfelt pleas for leniency.

Much in this case is undeniable. As the evidence presented at trial proved, in 2015, following months of due diligence, Qualcomm acquired Abreezio, its key employees, and its developed software tools, deployed them across Qualcomm's chip line, and continues to use them today, resulting in over $180 million worth of profit and savings for Qualcomm over the past decade. Karim did not personally financially profit from this offense and does not have any proceeds of the acquisition, and there is zero evidence to the contrary.

There is no dispute that Karim's failure to disclose his involvement with Abreezio was completely out of character, something he deeply regrets, and will never be repeated. There is also no dispute that his wife is extremely mentally ill, relies on his decades-long caretaking to survive, and is currently, according to her providers, at "severe risk of suicide" without him. And while Karim takes full responsibility for his actions and recognizes their severity, there is also no dispute that this case, where Qualcomm, a highly sophisticated corporate titan, received over $180 million worth of value from the crime (and over $47 million in a civil settlement) and continues to profit from the Abreezio acquisition today, is unlike other financial crimes where, for example, individuals lose their life savings. In light of these factors, as well as the other § 3553(a) considerations, a sentence of 215 days in custody before being removed and forever barred from the United States is appropriate and sufficient but not greater than necessary.

---

[1] Karim presents this position assuming the Court denies his pending motions at Dkt. 447, and makes the arguments herein without prejudice to those made in those pending motions.

## II.    DR. KARIM ARABI

Karim is a kind, gentle, brilliant man; a loving and supportive husband; a steadfast father; and a hardworking and diligent mentor and entrepreneur.

 

### A.    Karim overcame a poverty-stricken, dangerous childhood to accomplish educational and professional success.

Karim's childhood was marked by persecution and impoverishment.  He grew up in the Kurdish region of Iran as the second oldest of six children.  As a Kurd, in the years leading up to and following the Islamic Revolution, his community was subject to ethnic cleansing, bombings, and harassment where Kurds were arrested for no reason and at times tortured and killed for rejecting the Islamic system.  Though he kept himself busy with school and kept his head down, Karim himself was twice rounded up in mass arrests of Kurds and was fortunate to be released each time.  Most people Karim knows from his hometown lost family members during this police state.  When Karim was a teenager, one of his uncles was killed.  Karim's wife, Shadi, who is also Kurdish and grew up near Karim's town, endured the persecution and murder of two family members as well, trauma that laid the groundwork for her subsequent and ongoing decades-long mental health struggles and severe depression.

The uncertain and terrifying political climate was exacerbated by Karim's family's poverty.  Neither of his parents ever received an education, and they could not read or write, though Karim tried to teach them once he got older.  As a Kurd, Karim's father could not

PUBLICLY FILED SENTENCING MEMORANDUM KARIM ARABI

get a steady or decently paid government job, and Karim's entire family – his parents, his five siblings, and his grandmother – survived on his nominal income from doing odd jobs in a small workshop.  They always rented, never had their own bath or shower, and first had electricity in their home when Karim was a teenager.  While they usually had dinner each evening, they never had meat or quality nutrition, and all went hungry some nights.  His father was strict and disciplined him and his siblings with frequent beatings, though, characteristically stoic, Karim is quick to add that his childhood was not bad or remarkable and that his parents loved him and did the best they could under the circumstances.

The region Karim grew up in was impoverished and saw very little opportunities. Karim never had a role model or a coach or someone to give him direction or advice.  He never knew anyone who had attended university.  But he heard that education was a way to break out of poverty and improve circumstances, and he set a goal to work hard, study hard, and get into college.  Owing to his hard work and truly remarkable and unique aptitude, Karim sat for the national exam and was ranked second in the entire country.  In Iran at that time, individuals were put into paths based on their performance and ranking on the national exam, and those who scored top marks were set for engineering.  After graduating from high school, Karim went off to master engineering.  He devoted himself to learning, studying, reading, gaining as much book and practical knowledge as he could.  After he became a student in Tehran, he returned to the Kurdish region and set up a free three-month-long prep course where he took 50 to 60 students and tutored them on the materials to help prepare them for the national exams.  Many of these students went on to become engineers and doctors, and over 100 of them ended up getting into and attending universities.  Karim did this for the first three summers of his college studies and was unable to do this for a fourth summer because he was required to work as an intern then to complete his engineering degree.  In 1989, Karim, the son of illiterate, penniless, persecuted parents, without any connections, network, or mentors, through sheer grit, long hours, hard work, and an unparalleled resolve to improve his and his family's opportunities, achieved his bachelor's degree in electrical engineering from Tehran Polytechnic.  (He also tutored and

PUBLICLY FILED SENTENCING MEMORANDUM KARIM ARABI

mentored his younger siblings, all of whom, with Karim's support, guidance, and example, attended universities and became doctors, accountants, and professors.)

After graduating from university, the situation in Iran was still dangerous for Kurds, and Karim's professional opportunities were accordingly limited. So, when he was only 26 years old, he moved by himself to Canada to continue his education and set up housing and logistics his wife, Shadi, who joined him months later. In Canada, Karim completed his Master's degree in electrical engineering at Ecole Polytechnic Montreal in 1994. He welcomed his son, Parsa, in 1995, and achieved his PhD in electrical engineering two years later. His thesis,[2] dedicated "to [his] dear parents, to [his] wife, Shadi, to [his] son Parsa," was awarded best thesis that year. His youngest son, Arman, was born the following year.



After graduating, Karim first came to the United States to work for a few years in Oregon and Texas, before he and his family returned to Vancouver to follow Karim's job. In 2007, they moved to San Diego when Karim started working at Qualcomm, and they have been here ever since. Karim's family's entire life has effectively been in San Diego. They moved to Carmel Valley in 2007. Karim's kids completed middle school and graduated from high school here. His family continued to live together in their home in Carmel Valley until 2024 when they could no longer afford their house because of Karim's lost job prospects, reputational ruin, and ongoing legal expenses of litigating against

---

[2] *Available at* https://www.youtube.com/watch?v=waVMOAQ5hLM&pp=0gcJCdgAo7VqN5tD.

Qualcomm and then the government since 2017. Shadi's doctors and treatment team are here. San Diego is home. While his wife and children naturalized and are United States citizens, Karim never did and faces certain loss of his LPR status and removal and exclusion from the United States as a result of this conviction, an overwhelmingly severe consequence compounded by the prospect of more time in prison before he meets that fate.

 

### B.     Timeframe of the offense.

Around 2012, Karim developed panic attacks where he often thought he was having a heart attack. He also began abusing alcohol, and would drink by himself, often with pain medication, five days a week after work. At times, he would be successful in limiting his drinking, but then his stress would spike, and he'd start drinking constantly again, and once he was drinking constantly, it was hard to stop. In 2012, Karim also left Qualcomm to join another company where he headed up the entire engineering department. He was often traveling for work and gone from his family. As explained more fully below, his wife suffers from chronic depression and struggled inordinately with her mental health when Karim was away. Their sons were also young and in school during this time and experiencing behavioral issues. Karim felt he had to be there for his wife and kids, and he accepted a job and a pay cut to return to Qualcomm in the Corporate Research and Development group, where he remained until 2016. During these years, Karim worked extremely long hours and experienced an incredible amount of stress. Qualcomm is a huge

competitive company, and people at Karim's level received high pay and even higher expectations and demands. Karim continued to struggle with panic attacks, anxiety, alcohol and painkiller abuse, and emotional and physical exhaustion. These are by no means excuses for Karim's lack of transparency and fatal failure to disclose his involvement in Abreezio to Qualcomm, but the deep exhaustion, crushing demands at work, caretaking for his ill wife, unabating anxiety, and burnout that Karim struggled with daily are important context for his actions.

Not a single day goes by where Karim doesn't wish he could go back in time and change things. He brought together his baby sister, Sheida, 17 years his junior, Sanjiv Taneja, Akbar Shokouhi, Behrooz Abdi (a former General Manager of the QCT division at Qualcomm), and Dr. Bradley Quinton to create Abreezio. In a matter of months, a team of engineers led by Quinton had moved past the rather rudimentary technological concepts that Karim had originally proposed to Taneja and Quinton, and developed working, valuable, innovative technology that was highly attractive to any large semiconductor company. Karim's involvement didn't span years or even many months – after bringing everyone together, his involvement was limited. He was still incredibly busy working for Qualcomm on matters that were not related to Abreezio, and dealing with his family issues and his own anxiety and alcohol abuse. Karim never directed or encouraged those at Abreezio to pitch to Qualcomm; likewise, he never directed or encouraged anyone at Qualcomm to buy Abreezio, nor offered anyone at Qualcomm input on what price Qualcomm should pay for Abreezio or the value of Abreezio's technology.

It is striking and worth noting that if Karim had simply quit his job at Qualcomm before he helped Sheida file the provisional patent applications that gave her an equity share in Abreezio, everything that happened thereafter would have been completely fine, the past decade of his life would have looked completely differently, and he would not be rotting away in a jail cell unable to support his suffering wife and kids and facing his own professional ruin and removal from the country he and his family have called home for nearly twenty years. Instead, for fewer than six months in 2014 and 2015, Karim kept

working for Qualcomm on projects completely unrelated to Abreezio, while also helping Abreezio in his spare time. Karim had no input in Qualcomm's decision to buy Abreezio and was not using Qualcomm's confidential information to help Abreezio (and not any more than he could have otherwise done if he had already quit his job at Qualcomm). And because of this, because he did not quit his day job, he has spent the last eight years addressing these same claims across various legal forums and is currently facing what the government and Probation Office argue is a Guideline range of life, where they are each advocating for him to spend the next ten years or more in prison. This irony is made crueler by the fact that Karim had and has a compelling argument that the invention assignment provision in his employment agreement that gave rise to Qualcomm's claims is not enforceable under California law in the first place.

In 2017, Qualcomm filed its civil lawsuit against Karim and Sheida with identical allegations as the indictment. As the Court is aware, Qualcomm worked hand in hand with the government while litigating its civil suit, making repeated criminal referrals in blatant violation of the civil settlement agreement and court's protective order. The government initially declined the case and advised Qualcomm and its counsel at Hueston Hennigan that it had adequate remedies at civil law. Trial Ex. 2801; Trial Tr. 594:14-18. So, Qualcomm settled its case with Karim and Sheida for about fifty cents on the dollar, a tacit acknowledgement that no one had the obvious better of the legal arguments, and Karim and Sheida repaid nearly all money Sheida had received after taxes and losses from liquidating investments in a down economy. For his part, Karim settled the lawsuit in December of 2018 because the litigation nearly broke his family and ruined his company – the aggressive no-holds-barred, no-expense-spared litigation from Qualcomm created immense stress and anxiety for the entire family, culminating with Shadi's first suicide attempt in October 2018 during the litigation (Under Seal Exhibit A at 4-5 and 7); Karim found his reputation tarnished and wanted to cabin the negative impact on his promising startup, Atlazo; the legal fees nearly bankrupted his family; and the stress, uncertainty, and anxiety of litigation

became too much.  After receiving over $33.5 million[3] from Karim and Sheida, during Covid, when the case agent testified that the FBI had nothing better to do (Trial Tr. 415:14-20), different AUSAs decided to accept Qualcomm's repeat criminal referral.

  

### D.    Plans for the future.[4]

Being incarcerated and away from his family during their most challenging and excruciating times of need has nearly destroyed Karim.  There was no chance that he would ever reoffend prior to his indictment, and there can be no dispute that he still poses zero risk of recidivism at this point.  Still, Karim is hopeful that he can repair and rebuild with the time he has left.  He wants to dedicate himself to public service, as he believes he has expertise and knowledge to share, derives meaning and self-worth from helping others, and thinks it is his obligation and penance if he is given the opportunity to work again.  Karim never led a flashy life, indulged in luxuries, or was motivated by money.  Even when he was at his highest earning potential, he stayed grounded and humble.  When he thinks about the future, he feels excited about the prospect of using his skillset and intellectual gifts to create opportunities, careers, and jobs for people.  Karim previously founded and directed

---

[3] Karim, Sheida, and Qualcomm entered into an Addendum to Settlement Agreement and Release of Claims on February 4, 2020 that outlined a payment schedule for the Second, Third, Fourth, and Fifth installments of the settlement payment. Trial Ex. 2999. After receiving the Second, Third, and Fourth installments, and before the Fifth installment was due, Qualcomm again made a criminal referral to the government, notably, after agreeing in the Addendum to release claims pending total payment of the settlement amount.

[4] Section II(C) intentionally omitted from the public filing.

a non-profit that worked with underprivileged students to provide workshops, courses, and financial assistance to help them get into college.  *See* PSR ¶ 149.  He feels that devoting his future to working in public service and to repaying any financial orders related to this case will put him at peace and be the appropriate final chapter where he continues to pay the price of his mistakes and helps to repair the image of people who make mistakes.

## III.    THE GUIDELINES SUPPORT A TIME-SERVED (215 DAYS) SENTENCE.

The base offense level is 7 under USSG § 2S1.1(a)(1), utilizing USSG § 2B1.1.  As explained further below and in the PSR objections (Dkt. 464 at § P at 14-28) incorporated herein, there is no increase from the loss table in § 2B1.1(b)(1) because the loss amount to Qualcomm must be reduced by the fair market value of the products and services, and Qualcomm received far greater pecuniary value from 2015 through the present from the Abreezio acquisition than it spent to acquire Abreezio.  Karim does not dispute the application of a two-level "sophisticated means" increase under § 2B1.1(b)(1)10(C) and a two-level increase under § 2S1.1(b)(2)(B) for a violation of § 1956.  As explained in his PSR Objections and incorporated herein, Karim is entitled to a three-level reduction under § 3E1.1 (*see* Dkt. 464 at § S at 33-34) and a two-level reduction under § 4C1.1 (*see* Dkt. 464 at § T at 34).  As explained further below, Karim should also receive a departure under § 5H1.6.  Because Karim has no criminal history, his adjusted offense level is 2, and his advisory Guideline range is 0-6 months of imprisonment.

### A.    There should be no increase under U.S.S.G. § 2B1.1(b)(1)(A).

The loss must be reduced by the fair market value of the property and services that Qualcomm in fact received in the acquisition.  U.S.S.G. § 2B1.1 cmt. n.3(D)(i); (Dkt. 464 at § P at 14-28).  Because there is ample evidence, including Qualcomm's own internal valuations, one-year analysis, and testimony from its CTO and employees that the fair market value of the acquisition exceeds $180 million, there should be no increase under § 2B1.1.  *See, e.g.*, Dkt. 464 at § P at 14-28.

**B.      There should be a four-level departure under § 5H1.6.**

A departure under § 5H1.6 is warranted based on the extreme suffering and risk of death by suicide that Karim's mentally unwell wife faces without him.  Shadi has come undone and is unmoored without Karim and continues to struggle with her mental health including an incident in August 2025.  In light of Shadi's condition detailed above (*see* Section II(C) *supra*) and especially given that even after this Court's sentence, Karim faces further indeterminate time in immigration custody before his deportation, it is beyond dispute that these unique circumstances merit a departure based on the considerations the Court is to consider in § 5H1.6 cmt. n.1(B)(i)-(iii): a sentence of further incarceration will cause a substantial, direct, and specific loss of Karim's essential caretaking of Shadi, that the loss of Karim caretaking substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant, that the loss of Karim's caretaking is one for which no effective remedial or ameliorative programs reasonably are available and that Karim's caretaking of Shadi is irreplaceable to his family.  A time-served sentence would effectively address the loss of Karim's caretaking.  § 5H1.6 cmt. n.1(B)(iv).

 

**C.      The Guidelines requested by government substantially overstate the seriousness of the offense.**

The government has argued for a Guideline range of life, limited by the statutory maximum of 60 years, and requested a sentence of over 12 years.  Karim's case is atypical of traditional fraud cases where victims may lose their life savings and where such a severe

sentence might be warranted.[5]   Here, Qualcomm has profited immensely over the past decade in excess of $180 million from its acquisition of Abreezio.  Qualcomm also received $47 million from Karim and his sister in a civil settlement years ago.    Being convicted of providing a product and services that have been wildly profitable for Qualcomm for over a decade *and are still being enjoyed and profited from today* is deserving of a more lenient sentence than, for example, causing harm or pecuniary loss to individuals, but the government's proposed Guideline range does not make any such distinction.

Critically, because Karim is a non-citizen, he will serve the entire sentence imposed as he is ineligible for any reduction of this Court's sentence under the First Step Act or pursuant to RDAP (which he nonetheless wants to participate in if he remains in custody so he can obtain support to not abuse substances and cope with stress in a healthy way).  For a 59-year-old man who is borderline diabetic, suffers from high cholesterol, and has kidney stones and severe arthritis (PSR ¶¶ 126-128, 131), and whose physical and mental health have dramatically deteriorated over the past nearly seven months of incarceration, a further custodial sentence, especially one of a decade or more, truly risks ending Karim's natural life.[6]  *See United States v. Lee*, 725 F.3d 1159, 1169 (9th Cir. 2013) ("There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court.").  The Guideline range and sentence requested by the government overstates the seriousness of the offense, may result in Karim's death in custody, and is unnecessary to effectuate any of the factors to be considered under § 3553(a) in imposing a sentence.

---

[5] *See, e.g.*, Juror Jeremy A. Hodges Letter to Court ("Financial crimes can carry devastating consequences, particularly when individual investors or vulnerable victims suffer great personal losses—as in the case of Bernie Madoff. However, this situation was materially different. Qualcomm is a vast and well-resourced company, and while the conduct in question involved deception, the company did receive valuable technology. The financial impact, though real, represented a small percentage of Qualcomm's overall business, and no individual victims were harmed in a catastrophic or life-altering way.")

[6] As of 2022, "[f]or males, the average life expectancy is about 70 years." *See* https://my.clevelandclinic.org/health/articles/lifespan (last accessed Oct. 21, 2025).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    THE § 3553(A) FACTORS ALSO SUPPORTS A TIME-SERVED (215 DAYS) SENTENCE.

As this Court knows, it has considerable discretion in choosing an appropriate sentence for Karim. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

### A.    The nature and circumstances of this 2015 offense and the overwhelmingly positive history and characteristics of Karim support a time-served (215 days) sentence.

The nature and circumstances of this offense matter: it occurred over ten years ago, when Karim was experiencing extreme stress and anxiety from work and caretaking obligations and abusing alcohol and pain medication, and he has never engaged in criminal or questionable behavior before or since.  There is no credible concern that Karim will ever reoffend; even the Probation Officer "believes he will never be back before the Court again."  PSR ¶ 185.  Karim was convicted of essentially stealing his own idea and helping others sell it to his employer, who profited immensely over the past decade in excess of $180 million from its acquisition of Abreezio; Qualcomm found out, filed a lawsuit, and after years of litigation and exchanging arguments back and forth about whether Qualcomm had a valid claim, it agreed to settle for (about) half the money back (over $47 million) and a full release of claims and promise to not pursue or encourage others to pursue.  Settlement Agreement and Release of Claims, Trial Ex. 2660 at § 8 ("[E] ach of the Parties agrees to never induce, encourage, assist with and/or abet others to sue or bring a proceeding of any nature against the opposing Party or Parties concerning any of the claims or causes of action released in this Agreement.")  At its core, this offense feels like a civil dispute that was already resolved by the parties.

Additionally, it is worth noting that when Qualcomm acquired Abreezio in October 2015, the USPTO had not acted upon most of Abreezio's patent applications.  Once the

transaction closed, Qualcomm replaced Abreezio as the applicant on those pending applications, and Qualcomm then proceeded to prosecute multiple Abreezio patent applications until they issued as U.S. Patents. Critically, and it remains beyond dispute, in July 2017, Qualcomm filed documents with the USPTO certifying that Sheida – but not Karim – was an inventor of U.S. Patent No. 9,760,672, the only issued patent that derived directly from the provisional patent applications at issue in the indictment. Six weeks later, Qualcomm did a 180 and filed its lawsuit claiming that Karim, not Sheida, was the real inventor of that same IP. It also remains beyond dispute that as the patent applicant, Qualcomm had a clear duty under the law to inform the USPTO that Qualcomm believed that Sheida was not an inventor and that Karim was. *See, e.g.*, 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability."); MPEP 2001.04 ("In addition to prior art such as patents and publications, 37 CFR 1.56 includes, for example, information on . . . derived knowledge, prior invention by another, inventorship conflicts, litigation statements, and the like."). Qualcomm did neither – instead Qualcomm clearly and unequivocally informed the USPTO in its filings that Sheida was an inventor of the IP and that Karim was not. *See, e.g.*, Ex. 874 at 17-24. As a highly sophisticated massive tech titan who regularly deals with the USPTO, Qualcomm knew how to correct inventorship at any time, and chose to never do so.[7] Qualcomm's duplicitous and unlawful behavior, in addition to the extraordinary financial benefits it enjoyed over the past ten years and continues to enjoy today from its acquisition of Abreezio, are also important context that support a time-served (215 days) sentence under § 3553(a).

Further, Karim's history and characteristics are very positive. He is a devoted and

---

[7] In fact, Qualcomm has a track record of engaging in exactly this same type of misconduct in the past. *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004 (2008) ("We affirm the district court's determinations that Qualcomm had a duty to disclose the asserted patents to the JVT, that it breached this duty, and that the JVT misconduct and litigation misconduct were proper bases for the court's exceptional case determination.").

loving 59-year-old husband and father, first-time, non-violent offender who is brilliant and innovative and could contribute in significant and positive ways to society after this. He has never in his entire life served time in custody or been away from his family, and the nearly seven months he has been incarcerated and unable to care for his wife through a serious car accident and a recent psychiatric event have been an incredibly serious punishment. As a non-citizen who has lived here continuously for the past nearly 20 years, being removed and barred from returning is also a very harsh reality.

People who know Karim best consistently praise his mentorship, generosity, wisdom, and intellect. *See* Ex. D; *see also* Dkt. 474 (14 Additional Letters of Support). One of the government's trial witnesses wrote to the Court that he "found [Karim] to be a person of integrity and kindness." Dr. Farsheed Mahmoudi Letter to Court. Another explained that Karim is "someone who has consistently contributed to the well-being of his community and the advancement of science and technology." Kouhyar Tavakolian Letter to Court. Others describe how Karim "stands out as someone who consistently advocates for fairness, decency, and doing what is right" (Ben Zaryouh Letter to Court) and that he is someone who "stepped in during one of the most difficult times of our lives[, n]ot because it was expected, but because that is the kind of person he is[,] a man who quietly takes care of those around him without ever asking for recognition or anything in return" (Sheida S Safari Letter to Court). A former colleague articulated what others conveyed:

> A lengthy prison sentence for Dr. Arabi would not only cause profound hardship for his family, but would also be a significant loss to the professional and academic communities that have benefited from his leadership and insight. He is someone who has guided and mentored many – often without obligation – and whose capacity to contribute meaningfully to others' lives and careers remains strong. Removing him from his family and community through incarceration would be deeply disruptive and, I believe, counterproductive to the values of growth, rehabilitation, and social contribution that our justice system upholds.

Javid Jaffari Letter to Court.

**B.  Especially in light of the extreme collateral consequences in this matter, a time-served (215 days) sentence sufficiently reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.**

The extreme collateral consequences of being unable to care for his mentally unwell wife who relies on Karim's support these past nearly seven months and being deported from the only home he's known for the past nearly two decades more than satisfies these § 3553(a) factors without imposing additional prison time.  Additionally, Karim has lived with and been fighting and facing these allegations for over eight years.  For over eight years, he has lived with the debilitating stress, anxiety, and uncertainty of litigation.  For over eight years, he has been a pariah in his industry, with many unwilling to speak with him for fear of reprisal from or ostracization by Qualcomm.  Karim's income was decimated after Qualcomm filed its lawsuit in 2017, and his extremely promising startup Atlazo was eventually sold at a fire sale for a fraction of its value because of the DOJ case.  These realities and extended punishment exist separately and apart from this Court's sentence.  Further incarceration (from this Court, as Karim faces certain further detention before his forthcoming deportation which cannot be captured by this Court's sentence) is not necessary to reflect the seriousness of the offense, promote respect for the law, or provide just punishment.

**C.  Further incarceration is not needed to protect the public from Dr. Arabi or afford adequate deterrence to criminal conduct.**

Deterrence is of two varieties – specific and general.  There is no credible argument that further incarceration is needed to specifically deter Karim from reoffending or to protect the public from any further crimes of the defendant.  He is a first-time offender who committed this offense ten years ago, had a perfect record for two and half years on supervised released, has suffered immensely since then and especially in the past nearly seven months he has been in custody while his family—his entire world—have fallen apart without him, will be deported and barred from returning to the country after his sentence, and will never be back before this, or any, court again.  *See* PSR ¶ 185.  Karim has owned his mistakes and takes full responsibility for them.  *See, e.g.*, PSR ¶¶ 79-83.  His failure to

be forthright with Qualcomm about his involvement in Abreezio was a one-time aberration that he regrets more than anything. The strongest confirmation that Karim needs no further deterrence is that he has been involved in various companies since 2016 and has always been transparent and conducted himself with full disclosure, honesty, integrity.[8]

General deterrence is also not accomplished by further incarceration where Karim has suffered very public ruin over the past eight years between the very public civil lawsuit, settlement, arrest, trial, conviction, and remand and where he will soon be deported and barred from ever returning to the country for this 2015 offense. In fact, numerous authorities have recognized that there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (citing R. Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005), and E. Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)). And the sentencing commission itself has "concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent" to serious economic crimes. U.S.S.G. Ch. 1, Pt. A § 4(d) (2024). To the extent that general deterrence is ever accomplished in an individual sentence, the deterrence here lies in the over eight years of litigation, investigation, public personal, financial, professional, and reputational ruin. Karim is already a cautionary tale. Many individuals defense counsel spoke with over the past three years privately supported Karim but would not testify on his behalf or write a letter of support to the Court for fear of incurring Qualcomm's powerful ire or retribution and consequently suffering their own professional alienation.

Further prison is thus not necessary – the operative word – to achieve general

---

[8] *See* Firas Mohamed Monade Letter to Court (Karim resigned following his indictment to "avoid any harm to the company" and then from a project working on innovative AI technology "to avoid any negative impact on the project"); Chieh-yu Lin Letter to Court ("When Karim realized that our target markets might potentially overlap, despite the clear technical and product difference between our companies, he voluntarily stepped away from his advisory role.").

deterrence. *See Adelson*, 441 F.Supp.2d at 514-15 ("[T]he Government at no time here presented any evidence or cited to any studies indicating that a sentence of more than three-and-a-half years [against guidelines of life in prison] was necessary to achieve the retributive and general deterrence objectives applicable to a case like this one. And 'necessary' is the operative word, for section 3553(a) expressly dictates that '[t]he court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection' (emphasis supplied)."); *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (explaining that § 3553(a)(2)(B) "does not require the goal of general deterrence be met through a period of incarceration.").

### D. A time-served (215 days) sentence best provides Dr. Arabi with needed medical care in the most effective manner.

The Bureau of Prisons is ill-equipped to provide medical treatment or care for aging individuals.[9] Karim's current health issues (PSR ¶¶ 126-128, 131) are most effectively and economically addressed outside of prison, on his own dime once he is deported from the United States. The degree to which his physical and mental health have deteriorated over the past nearly seven months in custody[10] suggests that his medical needs will continue to be a drain on American taxpayers if he is subject to further incarceration.

---

[9] *See, e.g.*, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (DOJ Office of the Inspector General, 2015) (*available at* https://www.govinfo.gov/app/details/GOVPUB-J37-PURL-gpo133784) (finding that BOP institutions with the highest share of older adults spent five times more per person on medical care and 14 times more per person on medications that those with the lowest shares and concluding that the BOP lacked sufficient staffing, training, and age-appropriate infrastructure to meet geriatric needs); Bureau of Prisons: Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs (Government Accountability Office, 2017) (*available at* https://www.gao.gov/products/gao-17-379) (documenting rising per-capita health care costs and significant data/measurement gaps that hinder BOP's ability to manage utilization and outcomes).

[10] *See also* Parsa Alan Letter to Court ("After the indictment, I watched my father lose a part of himself. . . . Even now, I can feel and hear how idle his mind is in custody, and I am certain is brings quiet suffering every day."

### E. The need to avoid unwarranted sentence disparities supports a time-served (215 days) sentence.

As reported by the United States Sentencing Commission's Interactive Data Analyzer (https://ida.ussc.gov/), in the past ten years, nearly 70% of defendants in Criminal History Category I sentenced for fraud/theft/or embezzlement under § 2B1.1 as their primary guideline received less than two years in custody.[11]



**Distribution of Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024

2 to less than 5 years 22.1%
5 to less than 10 years 6…
10 to less than 15 years …
15 to less than 20 years …
20 to less than 25 years …
25 to less than 30 years …
30 to less than Life 0.0%
Less than 2 years 69.9%

The figure includes the 40,009 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
**FILTER:**
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

Defrauding an elderly person out of $5,000 through an investment scheme, for example, is deserving of a much more severe punishment than causing Qualcomm to acquire highly valuable technology, software, and employees that have earned it more than $180 million over the past decade and is still making money for it today.

Additionally, the Court should consider the anticipated non-custodial sentences that will soon be sought for Taneja and Shokouhi.  Trial Tr. 1045:22-1046:6 (Shokouhi testimony that he is "hoping for a reduction" and has signed an agreement with the

---

[11] Just 6.2% received sentences of five to less than 10 years; 1.2% received sentences of 10 to less than 15 years; 0.3% received sentences of 15 to less than 20 years; 0.1% received sentences of 20 to less than 25 years; and 0% received sentences between 25 years to life

government in hopes of this); *see* also 2157:2-16 (Taneja testimony that he doesn't want to spend years in prison).   Taneja, described as a "snake," (Trial Tr. 1336:9-18) was responsible for nearly all communications and representations that occurred at Abreezio and admitted to lying repeatedly (Trial Tx. 2105:8-16; 2147:7-22[12]).   And in the civil litigation upon which this prosecution was premised, Taneja refused to acknowledge any wrongdoing whatsoever and refused to give back even one penny of the more than $10 million he personally received from the sale of Abreezio.   There is no credible argument that Taneja is less culpable for Qualcomm's acquisition of Abreezio on the basis of undisclosed material information than Karim.   Shokouhi, a former Qualcomm executive who had been fired from Qualcomm for self-dealing, is also not substantially less culpable than Karim.   Nor is Behrooz Abdi (Chairman of the Board of Abreezio and a former General Manager of the QCT division at Qualcomm) or Ziad Mansour (Qualcomm executive), individuals the government declined to prosecute.   The difference between Abdi and Mansour, both of whom the government hold responsible and neither of whom accepted responsibility, and Taneja and Shokouhi, who are at least as responsible if not more so than Karim, and Karim should not be multiple years in prison.   Further, as a non-citizen, Karim does not qualify for the substantial sentence reductions and time credits now available under the First Step Act.   This means that he will serve the actual sentence imposed and that the sentences the Court metes out will already be disparate as citizens Taneja and Shokouhi can avail themselves of time credits that are unavailable to Karim.

Further, there are several things about this case and Karim that alleviate the concern that a time-served (215 days) sentence would create a disparity, including, *inter alia*, that he has suffered publicly and privately from this offense for the past eight years, that the case and his incarceration have had a devastating impact on his mentally unwell wife and professional reputation, and that he will be deported and barred from the country.

---

[12] The Court may recall that after Taneja finished testifying on direct examination, his testimony was paused because the Court provided the parties with his prior, deeply inconsistent statements. Trial Tr. 1737:18–1738:1.

**F.    Any need to provide restitution is best achieved with a time-served (215 days) sentence.**

As argued in the PSR Objections (Dkt. 464 at § N) and incorporated herein, no restitution should be imposed.  If, however, the Court disagrees, it is critical to note that Karim cannot earn money or pay restitution from a prison cell.  Karim was a very senior executive in Qualcomm's research and development department for good reason: he has unique skills and expertise he developed over years of study and work.  His expertise in chip design and communications could help the United States' national security and competitiveness against foreign countries, including Chine, in meaningful ways.  As part of his sentence, he is willing and prepared to work for the government in any capacity in which he could be useful, which could include aiding defense projects to benefit national security and competitiveness, helping realize the full potential of the recent CHIPS and Science Act, and/or obtaining critical information and developing counter strategies related to science and technical activities overseas to minimize threats to national security.[13]  This sentencing consideration also counsels in favor of a time-served sentence so Karim can either work directly for the government or simply rejoin the workforce where his earning potential could be high.  Though his reputation has been ruined by this case, once it is over and the threat of further litigation and unknown outcomes are no longer hanging over his head, Karim is hopeful that he can obtain gainful, successful employment, and he is fully committed to using his employment income to pay for any restitution imposed.  *See also* Monade Letter to Court (Karim is someone he "would be willing to employ, collaborate with, or partner with in the future if the opportunity arises").

## V.    CONCLUSION

Three of the jurors who convicted Karim urge this Court to show leniency, noting: "I believe there's been sufficient punishment for the involvement [Karim] had in this case, on top of his time already in a prison cell. One thing the majority of us jurors agreed on is that

---

[13] *See*, *e.g.*, *United States v. Naughton*, 99-CR-00992-ER (C.D. Cal.) (J. Naughton, who had been arrested and tried for 18 USC §§ 2422, 2423, 2252, ultimately agreed to work for the government and entered a post-trial plea to probation with that condition).

[Karim] does not belong in prison." (Juror Vanessa Macias Letter to Court); "I believe that the crimes that Dr. Arabi was convicted of already carry with them a negative effect on the rest of his life and career." (Juror John M. Bugera Letter to Court); "In this case, I believe alternatives to lengthy incarceration should be seriously considered. . . . In my view, a sentence that includes restitution and supervised release—rather than a long period of incarceration—would still hold him accountable while allowing for a more constructive path forward." (Juror Hodges Letter to Court).  While jurors are of course to have no role in determining a defendant's sentence, the fact of support and request for leniency from individuals who witnessed the most damning evidence putting Karim in the worst light imaginable[14] is noteworthy and underscores what is echoed by others who know Karim better: that this offense is an aberration, that he has suffered and continues to suffer for his actions, that he will never reoffend, and that further incarceration needlessly harms him, his innocent family, and society who could otherwise benefit from his innovation, service, and support.  For all the foregoing reasons, a sentence of time-served (215 days) is appropriate and sufficient but not greater than necessary.

 

---

[14]  As Karim's oldest son explained, "[w]atching how my father has been portrayed throughout these proceedings has been painful.  The version of him presented in court is completely unrecognizable to me.  He's the most hardworking, kind, and selfless person I know.  He's my hero."  Parsa Alan Letter to Court.

PUBLICLY FILED SENTENCING MEMORANDUM KARIM ARABI

1

2   Dated:  October 21, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**

By:  */s/ Whitney Z. Bernstien*
        Whitney Z. Bernstein
        Rebecca S. Roberts
        Ryan V. Fraser
        *Attorneys for Dr. Karim Arabi*

PUBLICLY FILED SENTENCING MEMORANDUM KARIM ARABI